GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

EDMUND K. SAFFERY      5860-0
   esaffery@goodsill.com
FOREST B. JENKINS      9761-0
   fjenkins@goodsill.com
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

CLEMENT & MURPHY, PLLC

PAUL D. CLEMENT (*pro hac vice pending*)
ERIN E. MURPHY (*pro hac vice pending*)
MATTHEW D. ROWEN (*pro hac vice pending*)
MARIEL BROOKINS (*pro hac vice pending*)
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900

Attorneys for Plaintiff
NATIONAL SHOOTING SPORTS
FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | CIVIL NO. |
| PLAINTIFF, | COMPLAINT |
| vs. | |

ANNE E. LOPEZ, ATTORNEY
GENERAL OF THE STATE OF
HAWAII,

              DEFENDANT.

## **COMPLAINT**

Plaintiff National Shooting Sports Foundation ("NSSF") brings this complaint against Anne E. Lopez, Attorney General for the State of Hawaii. NSSF brings this complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## **PRELIMINARY STATEMENT**

1. This lawsuit challenges the constitutionality of a new Hawaii statute that is designed to evade the judgment of the Supreme Court and laws enacted by Congress.

2. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court made clear beyond cavil that "the Second Amendment protects the possession and use of weapons that are 'in common use,'" and that the only arms a state may ban consistent with "historical tradition" are those that are not "in common use today," but rather are "highly unusual in society at large." *Id.* at 2128, 2143 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). In other words, states may not ban arms just because it deems them too "dangerous"; states may ban only those arms that are both "dangerous and *unusual*"

2

in modern America.  *Id.* (emphasis added).

3.      Rather than heed this clear instruction from the Supreme Court, the Hawaii State Legislature chose instead to pass a statute that is blatantly inconsistent with *Bruen*.

4.      On April 26, 2023, Governor Josh Green signed into law House Bill 426 ("HB 426").  HB 426 does exactly the opposite of what *Bruen* requires.  The statute restricts the sale and distribution of firearms that the state deems "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State," HB 426 §134-B(b)(2), regardless of how common they are.  By banning firearms based on a test far different from—and far less protective than—the one laid out in *Bruen*, HB 426 violates the Second Amendment.

5.      Defying *Bruen* is not HB 426's only problem.  The statute is also squarely preempted by federal law.  In the late 1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on federally licensed manufacturers and sellers of firearms when third parties criminally and unlawfully misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful (and constitutionally protected) activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005 by wide margins on a substantially bipartisan basis.  The PLCAA expressly

prohibits and preempts state-law civil actions "brought by any person" (including government officials) "against a manufacturer or seller of [firearms or related products] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  15 U.S.C. §7903(5)(A).

6.     Hawaii is now trying to resurrect the very kinds of lawsuits that Congress enacted the PLCAA to eliminate.  Under HB 426, state officials and private parties may bring a "civil action" against "firearm industry member[s]" for damages and other relief resulting from the "criminal use of a firearm[ or] related product" by a third party.  HB 426 §134-C(a)-(d), (g).  HB 426 therefore falls squarely within the express-preemption provision of the PLCAA.

7.     Defying the Supreme Court and Congress in one statute is no mean feat. But HB 426 goes even further, violating long-settled constitutional law even outside Article VI and the Second Amendment.

8.     Although criminal misuse of firearms is ostensibly the state's concern, HB 426 does not regulate the use of firearms.  Nor does it impose liability on individuals who criminally or unlawfully use firearms to the detriment of themselves or others.  Instead, HB 426 regulates selling, distributing, and advertising lawful (and constitutionally protected) firearms and related products.  In other words, it

regulates commerce in and speech relating to arms—even when that commerce and speech takes place entirely outside of Hawaii.

9.     None of that is consistent with the Constitution.  The Constitution prohibits states from regulating commerce that takes place beyond their borders, even when it has effects within the state.  The First Amendment prohibits states from punishing wide swaths of truthful speech about lawful products.  And the Due Process Clause prohibits states from punishing one private party for the conduct of another.

10.    For these reasons and those set forth below, NSSF seeks a declaration that HB 426 is preempted and unconstitutional, an injunction preventing Hawaii from enforcing it against NSSF or its members, nominal damages, and any other relief this Court deems proper.

## THE PARTIES

11.    NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 10,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.  NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges,

advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage. NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under HB 426 not only to members, but to their employees and agents as well. Indeed, NSSF members in the past have been the targets of exactly the kinds of suits HB 426 authorizes and recently have been sued under other similar state statutes enacted in the past few years. NSSF is authorized to bring this action on their behalf.

12.    Defendant Anne E. Lopez is the Attorney General of Hawaii. She is Hawaii's chief legal officer and chief law enforcement officer and, in that capacity, has a duty to "represent the State in all civil actions in which the State is a party" and to "prosecute cases involving violations of state laws and cases involving agreements, uniform laws, or other matters which are enforceable in the courts of the State." Haw. Rev. Stat. §26-7. Attorney General Lopez is a resident of Hawaii, and her principal place of business is 425 Queen Street, Honolulu, Hawaii 96813. At all relevant times, Attorney General Lopez, as well as those subject to her supervision, direction, or control, are and will be acting under color of state law.

## BACKGROUND

**Congress Enacted the PLCAA to Prevent State-Law Civil Actions that Unduly Burden the National Firearm Industry and Infringe Constitutional Rights.**

13.     The Constitution "confer[s] an individual right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127 (quoting *Heller*, 554 U.S. at 595); *see* U.S. Const. amend. II. And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

14.     Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including: strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta U.S.A. Corp.*, 847 A.2d 1127, 1131 (D.C. Ct. App. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 367 F.3d 1252, 1252-53 (11th Cir. 2004); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000), among others.

15.     Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members operating elsewhere.  *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003). Others were unsuccessful.  *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

16.     But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry."  Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS. That, indeed, was in large part the point: "[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry."  Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

17.     It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearms industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation

in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state.  15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended."  *Id.* §7901(a)(5).

18.    Congress enacted the PLCAA to put an end to such state-law actions. Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties.  *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

19.    The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court."  *Id.* §7902(a).  The PLCAA preempts

9

"civil action[s] … brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

20.    Only six enumerated types of claims are not so prohibited. *See id.* §7903(5)(A).   These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, fraudulent transfer, negligent entrustment, and breach of contract or warranty.

21.    None of the enumerated exceptions extends to state laws that impose liability against manufacturers and sellers of firearms and ammunition for harm more directly caused by the unlawful or criminal conduct of third parties.  In fact, such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—and does—stamp out.   *See id.* §7901(a)(7).

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

22.    After Congress passed the PLCAA, federal and state courts routinely

rejected efforts to evade the law's protections for the firearms industry.

23.     Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' Commerce power, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); that the PLCAA is consistent with the Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta*, 940 A.2d 163, 172-73 (D.C. Ct. App. 2008); *City of N.Y.*, 524 F.3d at 395-96; that the PLCAA comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of N.Y.*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 765; and that the PLCAA does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *City of N.Y.*, 524 F.3d at 397-98.

24.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions.  Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions.  For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from criminal misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury.  *Delana*, 486

11

S.W.3d at 321. The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action. *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021). And the Ninth and Second Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii). *City of N.Y.*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1137-38.

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

25. Last June, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, which confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside of the home. 142 S.Ct. at 2134-35. That guarantee, moreover, is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it. *Id.* at 2156. Accordingly, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct means-end balancing. *Id.* at 2125-34. Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show a special need to carry a firearm outside the home. *Id.* at 2134-56.

26. In the course of doing so, *Bruen* also made clear how courts should

analyze the constitutionality of laws that single out particular types of arms for special restrictions. The Court explained that our nation's historical tradition is to protect arms that are "in common use today." *Id.* at 2134. Accordingly, historical tradition permits the prohibition of only those arms that are *both* dangerous *and* unusual—indeed, "highly unusual in society at large." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627); *see also id.* at 2128 (explaining that, in *Heller*, the Court relied on "the historical tradition of prohibiting the carrying of dangerous *and unusual* weapons" in concluding that "the Second Amendment protects the possession and use of weapons that are in common use at the time" (quotation marks omitted, emphasis added)).

27.     *Bruen* should have prompted states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental. Unfortunately, it has prompted the opposite reaction in states that have traditionally been the least protective of Second Amendment rights. Almost immediately, some of the same very few states that had endeavored to keep their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision." Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0. Some of those efforts were re-runs. In particular, a few states (following the lead of New York, the state whose restrictive carry regime was invalidated in *Bruen*) passed legislation purporting to

authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the very same types of lawsuits that prompted Congress to pass the PLCAA almost 20 years ago. *See, e.g.*, N.J. Stat. Ann. §§2C:58-35 (July 5, 2022); 10 Del. Code Ann. §3930 (June 30, 2022); *cf.* N.Y. Gen. Bus. Law §§898-a – 898-e (July 9, 2021). Other post-*Bruen* state laws were more novel—but no less deficient.

**Hawaii's Recently Enacted House Bill 426 Authorizes Sweeping Liability on Firearm Industry Members, in Direct Contravention of the Constitution and Federal Law.**

28.     On April 26, 2023, Governor Josh Green signed into law HB 426, which tracks in large part these recent efforts to circumvent the PLCAA, and in several respects goes even further.

29.     HB 426 applies only to "firearm industry member[s]." That term is defined broadly to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products." HB 426 §134-A; *see also id.* (defining "Firearm-related product" to mean "a firearm, ammunition, a firearm precursor part, a firearm component, or a firearm accessory that … is sold, made, or distributed in the State," "is intended to be sold or distributed in the State," or "is or was possessed in the State [if] it was reasonably foreseeable that the item would be possessed in the State"); *id.* (defining "Firearm

precursor part" as "any forging, casting, printing, extrusion, machined body, or similar article … where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm"); *id.* (defining "Firearm accessory" to mean "an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold and use a firearm").

30.    HB 426's operative section creates three sweeping "standards of conduct" for "firearm industry member[s]." *Id.* §134-B(a).

31.    <u>First</u>, firearms industry members "shall … [e]stablish, implement, and enforce reasonable controls." *Id.* §134-B(b)(1).

32.    The statute does not identify what "controls" are (or are not) "reasonable." It instead supplies a recursive gloss, defining the term "reasonable controls" as "reasonable procedures, acts, or practices." *Id.* §134-A. Then, in a gloss upon this gloss, it points to what these "controls" are supposed to accomplish:

> (1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully;

> (2) Prevent the loss or theft of a firearm-related product from the firearm industry member; and

(3) Ensure that the firearm industry member complies with all provisions of federal or state law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

*Id.*

33.    Hawaii thus requires industry members to have in place certain unnamed and indeterminable procedures that, among other things, are designed to screen for customers who appear "at substantial risk of using a firearm-related product to harm … another," *id.*, which describes most individuals with a heightened need to lawfully possess and lawfully carry a lawful firearm for self-defense.  After all, using a firearm-related product for self-defense may entail harm to another— namely, against an assaultive person.  Yet nothing in HB 426 limits its reach to only unlawful harm of others.

34.    To make matters worse, a firearm industry member must employ all of these unidentified "reasonable controls," even if it manufactures all of its products outside of Hawaii, even if it completes all of its sales outside of Hawaii (i.e., it has no Hawaii stores), and even if all of its product distributions take place entirely outside of Hawaii.

35.    The statute creates "a rebuttable presumption that [a] firearm industry member failed to implement reasonable controls," *id.* §134-C(e), and thus violated §134-B(b)(1), if "(1) [t]he firearm industry member's action or failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur,"

16

and "(2) [t]he firearm industry member could have established, implemented, and enforced reasonable controls to prevent or substantially mitigate the risk that the harm would occur." *Id.* §134-C(e). "If a rebuttable presumption is established … the firearm industry member [has] the burden of showing through a preponderance of the evidence that [it] established, implemented, and enforced reasonable controls." *Id.* §134-C(f).

36.   <u>Second</u>, firearm industry members must "[t]ake reasonable precautions to ensure that [it] does not sell, distribute, or provide to a downstream distributor a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." *Id.* §134-B(b)(2).

37.   This provision effectively bans entirely an unknown and unknowable set of firearms that notably, does not track the test the Supreme Court has articulated for determining which arms may be banned consistent with the Second Amendment— i.e., whether arms are "in common use today." *Bruen*, 142 S.Ct. at 2143. Section 134-B(b)(2) instead appears to borrow from strict liability principles for "abnormally dangerous" products to create Hawaii's own, substantially less protective test for determining what arms people are entitled to keep and bear.

38.   On top of that, the statute departs substantially even from ordinary principles of strict liability.

39.   Under Hawaii common law, to determine whether a product or activity

is "abnormally dangerous," "the following factors are to be considered … (1) existence of a high degree of risk of some harm …; (2) likelihood that the harm that results from it will be great; (3) inability to eliminate the risk by the exercise of reasonable care; (4) extent to which the activity is not a matter of common usage; (5) inappropriateness of the activity to the place where it is carried on; and (6) extent to which its value to the community is outweighed by its dangerous attributes." *Rapoza v. Willocks Const. Corp.,* 103 Haw. 399, at *14 (2004), *opinion clarified*, 2004 WL 225082 (Haw. Jan. 29, 2004).

40.   But that is not how things work under HB 426.  Rather, under HB 426, "[t]here shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if any of the following is true:

> (1) The firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities;
>
> (2) The firearm-related product is designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products; or
>
> (3) The firearm-related product is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms.

HB 426 §134-B(d).

41.   Unlike other presumptions in the law, the statute's "abnormally

dangerous" presumption does not appear to be rebuttable.  *Compare id*. §134-B(d) (nowhere using "rebuttable" or explaining how the abnormally dangerousness presumption could be rebutted), *with id*. §134-C(e) (describing as "rebuttable" the separate "presumption that [a] firearm industry member failed to implement reasonable controls" under specific circumstances).

42.     Section 134-B(d) also suffers from a lack of definitions.  The provision does not define the term "assaultive purposes," *see id*. §134-B(d)(1), which finds no purchase in the Supreme Court's decisions articulating what takes a firearm outside the scope of the Second Amendment's protections.  And unlike with "reasonable controls," there is *no* definition—not even a gloss—for what constitutes "reasonable precautions" under §134-B(d).

43.     Nor does §134-B(d) explain why "minors" are treated the same way as "individuals who are legally prohibited from accessing firearms"—or how designing, selling, or marketing firearms that are safer for minors to use could be unlawful—when minors are permitted to access and use firearms under Hawaii law.  *See*, *e.g.*, Haw. Rev. Stat. §134-5(a) (minors above the age of 16, or minors below the age of 16 in the accompaniment of an adult, "may carry and use any lawfully acquired rifle or shotgun and suitable ammunition" for hunting or target shooting).

44.     Moreover, §134-B(d) oddly appears to ban the sale of certain firearms based on how they are marketed, rather than simply banning certain marketing

19

practices.   To state what should be obvious, there is no Second Amendment exception allowing states to ban firearms that are designed to be easier and safer for minors to use.

45.   Third, a firearm industry member may not "engage in any conduct related to the sale or marketing of firearm-related products that is in violation of this chapter." §134-B(b)(3).

46.   For all of these "standards of conduct," HB 426 greatly expands the scope of traditional liability by radically relaxing "proximate cause" to mean something far different than traditional proximate cause.   Under HB 426, "(a)n intervening act by a third party, *including, but not limited to criminal use of a firearm-related product*, shall not preclude a firearm industry member from liability under [HB 426]." *Id*. §134-C(g) (emphasis added).

47.   Any "act or omission by a firearm industry member" that violates these standards of conduct "shall constitute an actionable cause of action."  §134-C(a).

48.   HB 426 provides that any "person who has suffered harm in the State because of a firearm industry member's violation of [HB 426] may bring an action in a court of competent jurisdiction." *Id*. §134-C(b).

49.   In addition, "the Attorney General, or any county attorney or public prosecutor may bring a civil action in a court of competent jurisdiction in the name of the people of the State to enforce [HB 426] and remedy harm caused by a violation

of [HB 426].  *Id.* §134-C(c).

50.    If a court finds that a firearm industry member violated the statute, HB 426 authorizes the court to award "any or all of the following: (1) Injunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law; (2) Damages; (3) Attorney's fees and costs; and (4) Any other appropriate relief necessary to enforce [HB 426] and remedy the harm cause by the conduct."  *Id.* §134-C(d).  These remedies are not exclusive.  *See id.* §134-D(a).

51.    HB 426 takes effect on July 1, 2023.  *Id.* §5.

## JURISDICTION AND VENUE

52.    Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

53.    This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

54.    Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs her official duties in the District of Hawaii and

is therefore considered to reside within this district as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Second Amendment)

55.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

56.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125; *see also* 15 U.S.C. §7901(a)(1)-(2).  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677.  Commerce in arms is thus constitutionally protected. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

57.     HB 426 infringes this basic Second Amendment right, as well as the even-more-fundamental core component of keeping and bearing arms.

58.     Under *Bruen*, a law that restricts activity protected by the Second Amendment is unconstitutional unless it "is consistent with this Nation's historical tradition." 142 S.Ct. at 2126.  HB 426 is not remotely consistent with that decision or this nation's historical tradition.

59.     First, by its terms, HB 426 operates as a de facto ban on firearms

protected by the Second Amendment.  *Bruen* made clear beyond all doubt that the Second Amendment fully protects arms that are "in common use today."  *Id*. at 2134. The proper inquiry to determine whether an arm is protected thus focuses on whether it is "in common use" or is instead "highly unusual in society at large."  *Id*. at 2143 (quoting *Heller*, 554 U.S. at 629).  If a firearm is in common use, then any effort to ban it is invalid, as a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

60.    HB 426 disregards that framework.   Indeed, it effectively tries to displace it.  Rather than track the test the Supreme Court has articulated, HB 426 makes up its own test, requiring firearm industry members to take reasonable precautions to avoid selling, distributing, or providing to downstream distributors any "firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State."  HB 426 §134-B (b)(2).

61.    HB 426 does not define what features purportedly make a firearm "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety."  Instead, it creates an apparently non-rebuttable presumption that a firearm is "abnormally dangerous" if it is "most suitable for assaultive purposes" or "designed, sold, or marketed in a manner that foreseeably promotes conversion

of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms." *Id*. §134-B(d).

62.    Those categories vividly illustrate the end-run around the Second Amendment that Hawaii's new law affects.  While the Supreme Court has now thrice held that a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," *Heller*, 554 U.S. at 628, HB 426 turns a blind eye to the common-use inquiry and just makes up a new set of standards out of whole cloth.

63.    Making matters worse, HB 426 provides no concrete guidance as to what suffices to make a firearm "most suitable for assaultive purposes," or what constitutes designing, selling, or marketing a firearm "in a manner that promotes conversion of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms."  That is no trivial oversight.  Because of the nature of firearms and self-defense, characteristics that might make a weapon "most suitable for assaultive purposes" are quite likely the exact characteristics many citizens will prioritize in selecting a firearm for self-defense. *See Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023) (pointing out that features like "[a] pistol grip," "[t]humbhole stocks," and "flash suppressors" all help enhance one's ability to fire

"accura[tely]" while "decreas[ing] the risk of … firing stray shots").

64.     Nor is there some free-floating Second Amendment exception for firearms "designed, sold, or marketed in a manner that is targeted at minors." HB 426 §134-B(d)(3).  Again, the key question under *Bruen* is whether a firearm is in common use for lawful purposes today.  And unlike, say, tobacco or alcohol, there are conditions under which minors may lawfully use a firearm in Hawaii.  *See*, *e.g.*, Haw. Rev. Stat. §134-5(a) (allowing minors to carry and use lawfully acquired rifles or shotguns for hunting or target shooting).

65.     Here again, then, asking the wrong question will lead to the wrong answers.  Many parents may wish to introduce their children to hunting or shooting sports and would value a firearm designed for minors precisely because it would be safer and easier for a minor to use.  For instance, a father looking to take his minor child bird hunting might select a lighter shotgun with a shorter or adjustable stock, as basic biomechanics mean that such a firearm will be easier for a minor to handle safely and fire accurately.  But regardless of how commonly used such a firearm might be, and irrespective of the plainly lawful purpose of bird hunting, the father would be out-of-luck because Hawaii has created an apparently irrebuttable presumption that any firearm "designed … in a manner that is targeted at minors" is abnormally dangerous and thus unlawful.  This cannot be reconciled with the Second Amendment or common sense.  *See Heller*, 553 U.S. at 624-25 (the Second

25

Amendment protects firearms "typically possessed by law-abiding citizens for *lawful purposes*" (emphasis added)).

66.   Of course, while §134-B(d) creates an irrebuttable presumption for what constitutes an "abnormally dangerous" firearm-related product, nothing in HB 426 limits the scope of "abnormally dangerous" to those categories.   This is problematic because the very nature of the Second Amendment right is such that danger alone simply cannot be dispositive.  *Cf. Heller*, 554 U.S. at 627 (noting "the historical tradition of prohibiting the carrying of 'dangerous and *unusual* weapons'" (emphasis added)).  That is why the common-use inquiry is critical—the protections of the Second Amendment are the flip side of the historical tradition of prohibiting only those weapons that are *both* dangerous and *unusual*.  Casting all that aside and asking only whether a weapon is "abnormally dangerous" thus defies both the Supreme Court's teachings and the realities of self-defense.   A firearm's dangerousness—i.e., its lethality—is what provides its utility as a tool for self-defense or other lawful uses, like hunting.  That is precisely why it has been a clear teaching since *Heller* itself that "firearms cannot be categorically prohibited just because they are dangerous."  *Caetano v. Massachusetts*, 577 U.S. 411, 418 (Alito, J., concurring in the judgment).

67.   To be sure, HB 426 includes a feint-hearted limit on the scope of "abnormally dangerous," providing that firearms cannot be deemed to satisfy that

standard based solely on their "*inherent capacity* to cause injury or lethal harm." HB 426 §134-B(c). But without any explanation of what makes an instrument designed to inflict lethal injury "abnormally dangerous," HB 426 §134-B(c) will undoubtedly end up covering many firearms that are in common use today, thus effectively banning the sale of firearms that the Supreme Court has taught that the Second Amendment protects.

68.     HB 426's efforts to saddle firearm industry members with the costs of harms created by those who criminally misuse firearms are equally inconsistent with the nation's historical tradition. The Third Circuit explained as recently as 2001 that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented." *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same); *cf. Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009) (interpreting PLCAA in light of Congress' finding that such "liability actions ... are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States" (quoting 15 U.S.C. §7901(a)(7)). Hawaii thus cannot justify its novel liability regime "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

69.     As a result, HB 426 violates the Second Amendment.

## COUNT TWO
### (Preemption)

70.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

71.     The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).  When a federal law "imposes restrictions" and a state law "confers rights … that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020); *cf. Nat'l Pork Producers Council v. Ross*, 142 S.Ct. 1142, 1165 (2023) ("the Framers equipped Congress with considerable power to regulate interstate commerce and preempt contrary state laws").

72.     That is exactly the situation here.  The PLCAA imposes clear restrictions:  States may neither authorize nor bring any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by … a third party." 15 U.S.C. §7903(5)(A).  HB 426 in turn confers rights that conflict with the PLCAA:  Under Hawaii's new statute, state officials and private parties may bring a "civil action" against "firearm industry member[s]" for damages and other relief resulting from the "criminal use" of a firearm or related product.  HB 426 §134-

28

C(b)-(c), (g).   HB 426 therefore falls squarely within the express-preemption provision of the PLCAA.

73.   Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court."  15 U.S.C. §7902(a).  The suits that HB 426 authorizes are plainly "qualified civil liability actions" within the meaning of the PLCAA.

74.   The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or seller of a qualified product, or a trade association [4] for damages … or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by … a third party."  *Id.* §7903(5)(A).

75.   HB 426 satisfies each element.

76.   A suit under HB 426 is plainly [1] a "civil action" that [2] can be brought by individuals and state officials alike.  *See* HB 426 §134-C(b) ("A person who has suffered harm in the State because of a firearm industry member's violation of this part may bring an action in a court of competent jurisdiction."); *id.* §134-C(c) ("[T]he attorney general or any county attorney or public prosecutor may bring a civil action in a court of competent jurisdiction in the name of the people of the State to enforce this part and remedy harm caused by a violation of this part.").

77.   A suit under HB 426 plainly [3] can be brought "against a manufacturer or seller of a qualified product, or trade association."  15 U.S.C. §7903(5)(A).  In

fact, a suit under HB 426 can be brought *only* against such a party; the statute applies to "firearm industry member[s]" and them alone.  HB 426 §134-B(a); *see id.* 134-A (defining ""Firearm industry  member" to mean "a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products").

78.    Finally, HB 426 plainly [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products.  *See* HB 426 §134-C(g).  Indeed, this is a core feature of the statute.   HB 426 subjects a firearm industry member to liability for "[a]n intervening act by a third party, including but not limited to criminal use of a firearm-related product," *id.* §134-C(g), "if the industry member fails to, inter alia, "establish, implement, and enforce" "reasonable procedures, acts, or practices that are designed, implemented, and enforced" to keep guns out of the hands of third parties who misuse them, *id*. §134-C(e), §134-A.   HB 246 suits are therefore "qualified civil liability actions" under the PLCAA.

79.    The kind of liability HB 426 seeks to impose does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).  HB 426 does not authorize suits by the U.S. Attorney General to enforce any federal laws (§7903(5)(A)(vi)); and it does not confine liability to

instances in which a manufacturer or seller knowingly transferred a firearm to a prohibited person (§7903(5)(A)(i)), negligently entrusted a firearm (§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

80.    Nor does HB 426 fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

81.    As the Ninth Circuit has explained, the phrase "statute applicable to the sale or marketing of the product" in §7903(5)(A)(iii) must be read in light of both "the specific context in which [it] is used" and "the broader context of the statute as a whole." *Ileto*, 565 F.3d at 1134 (quoting *Robinson v. Shell Oil Co*, 519 U.S. 337, 341 (1997)); *accord City of N.Y.*, 524 F.3d at 400.  And after examining both the text and that context, the Ninth Circuit concluded that the predicate exception does not cover statutes that merely codify the same novel tort-law theories that the PLCAA was enacted to stamp out.  *Ileto*, 565 F.3d at 1137-38.  As the court explained, lawsuits seeking to deploy the kind of "judicial evolution" that amorphous "novel nuisance suits" entail to hold the industry liability for the independent acts of third parties were "precisely the target of the PLCAA." *Id.* at 1136.  To read the predicate

exception as authorizing such suits just because those theories have been codified into state statutes would "allow the predicate exception to swallow the statute." *City of N.Y.*, 524 F.3d at 403.

82.   At a minimum, HB 426 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

83.   The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*." 15 U.S.C. §7903(5)(A)(iii) (emphases added).

84.   By its terms, however, HB 426 does not require a "knowing[]" violation.  Neither the provision requiring a "firearm industry member" to "enforce reasonable controls" nor the provision to "[t]ake reasonable precautions … not [to] sell, distribute, or provide to a downstream distributor a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety," contain any mens rea element; both set up a strict liability offense based on any failure to "enforce reasonable controls" or "take reasonable precautions."  HB 426 §134-B(b)(1)-(2).  Industry members thus can face liability for each and every failure to abide by these amorphous commands.  With regard to

"reasonable controls," this means that industry members may be liable even if they do not know that their "procedures, acts, or practices" are "unreasonable" means of "prevent[ing]" or "ensur[ing]" HB 426's abstract goals.  *See id.* §134-A.  And with regard to "reasonable precautions," this means that industry members can be held liable for their transactions with downstream distributors regardless of whether they had any idea that the precautions they took would later be deemed "unreasonable" by a Hawaii judge or jury.  *See id.* §134-B(b)(2).

85.    Making matters worse, HB 426 does not require "proximate causation" in the traditional sense.

86.    Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019), and "proximate cause" is a familiar common-law term. "The term 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

87.     HB 426 explicitly discards any such inquiry.   Under HB 426, "[a]n intervening act by a third party, including, but not limited to, criminal use of a firearm-related product, shall not preclude a firearm industry member from liability under this part."   HB 426 §134-C(g).   That, of course, is consistent with HB 426's aim of imposing liability on members of the firearm industry for harms caused by third parties.   But it is fundamentally inconsistent with what the PLCAA demands. For that reason, too, HB 426 is preempted.

## COUNT THREE
### (Unconstitutional Extraterritorial Regulation)

88.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

89.     The Constitution restricts the power of states to directly regulate conduct that takes place entirely in another state.   That bedrock principle of equal sovereignty among the states is inherent in the plan of the Convention, apparent in several of the Constitution's structural protections, and deeply rooted in our nation's historical tradition.   *See Ross*, 143 S.Ct. at 1156-57 & n.1; *id.* at 1172 (Kavanaugh, J., concurring in part and dissenting in part).

90.     To be sure, the Supreme Court recently clarified that this principle does not erect a per se bar against laws that regulate conduct *within* one state in ways that have an "extraterritorial *effect*" in others.   *Id*. at 1155 (majority op.) (emphasis added).   But in doing so, the Court went out of its way to emphasize that it was not

34

dealing with a law that "*directly* regulated out-of-state transactions." *Id.* at 1157 n.1. And it emphasized the importance of looking to "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces" when it comes to cases "testing the territorial limits of state authority under the Constitution's horizontal separation of powers" in that manner. *Id.* at 1156, 1157 n.1. Looking to those principles, it is plain that a state may not directly regulate conduct that neither occurs nor is directed within its borders.

91.    At the outset, it is axiomatic that "all States enjoy equal sovereignty." *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013); *see also PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012) ("the States in the Union are coequal sovereigns under the Constitution"). Indeed, "the constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 580 (1911). When a state reaches beyond its own borders to "directly regulate[] out-of-state transactions by those with no connection to the State," *Ross*, 143 S.Ct. at 1157 n.1 (emphasis omitted), it invades the sovereignty and impinges on the equality of other states. Accordingly, the plan of the Convention necessarily restricts one state from directly regulating conduct that neither occurs nor is directed within its borders, as a union of several *equal* states subject to the overarching regulation only of one federal sovereign could not succeed if each state could trump the others' sovereign powers whenever and however it saw

35

fit. *Cf. PennEast Pipeline Co. v. New Jersey,* 141 S.Ct. 2244, 2259 (2021) ("The plan of the Convention reflects the 'fundamental postulates implicit in the constitutional design.'" (quoting *Alden v. Maine*, 527 U.S. 706, 729 (1999))); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."). Consistent with that understanding, several provisions of the Constitution impose and/or presuppose limits on the ability of one state to override the regulatory powers of another.

92.     For instance, Article I, section 10, of the Constitution deprives states of several powers that one sovereign might ordinarily exercise against another, including the right to "lay any Imposts or Duties on Imports or Exports," and to "lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement or Compact with another State." U.S. Const. art. I, §10.

93.     Conversely, Article IV of the Constitution is devoted entirely to preserving the rights of each state vis-à-vis the others, requiring (among other things) that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State," *id.*, art. IV, §1, that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several

States," *id.*, art. IV, §2, cl. 1, that "no new State shall be formed or erected within the Jurisdiction of any other State," *id.*, art. IV, §3, cl. 1, and that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government," *id.*, art. IV, §4.

94.     The Court has also long interpreted the Due Process Clause to impose restrictions on a state's ability to regulate conduct occurring wholly outside its borders. *See, e.g.*, *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (recognizing and applying the same principle).

95.     And, of course, the Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States *respectively*, or to the people," U.S. Const. amend. X (emphasis added), making clear that each state retains its *own* "integrity, dignity, and residual sovereignty," *Bond v. United States*, 564 U.S. 211, 221 (2011).  It is little surprise, then, that the Supreme Court just reiterated that "the territorial limits of state authority under the Constitution's horizontal separation of powers" are grounded not just in any one provision, but in the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and

comity' it embraces." *Ross*, 143 S.Ct. at 1156 & n.1; *see also, e.g.*, *id.* at 1175-76 (Kavanaugh, J., concurring in part and dissenting in part); *South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2100-01 (2018) (Gorsuch, J., concurring).   And those understandings distill into the basic principle that a state cannot directly regulate conduct that neither occurs nor is directed within its borders.

96.   That principle has long been most finely expressed under the rubric of the Commerce Clause, U.S. Const. art. I, §8, cl.3.  Consistent with the Framers' "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," the Supreme Court has held that the negative or dormant aspect of the Commerce Clause prohibits any one state from directly "control[ling] commerce occurring wholly outside [its] boundaries." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) (footnote omitted); *see also, e.g.*, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.).

97.   To be sure, the Supreme Court recently "refined [its] Commerce Clause framework." *Mallory v. Norfolk S. Ry. Co.*, No. 21-1168, slip op. 11 (U.S. June 27, 2023) (Alito, J., concurring in part and concurring in the judgment).  *See generally Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142 (2023).  But the bedrock principle prohibiting state laws that *directly* regulate out-of-state conduct remains

alive and well.  Indeed, *Ross* went out of its way to confirm the vitality of the holdings of *Healy* and its forebears that state laws are unconstitutional if they "*directly* regulate[] out-of-state transactions by those with *no* connection to the State" and thereby "'deprive[] businesses and consumers in other States of whatever competitive advantages they may possess.'"  *Ross*, 143 S.Ct. at 1155, 1157 n.1 (second alteration in original) (quoting *Healy*, 491 U.S. at 338-39).

98.    HB 426 violates this bedrock constitutional constraint in multiple respects.

99.    First, it requires firearm industry members to "[e]stablish, implement, and enforce" "reasonable procedures, acts, or practices that are designed, implemented, and enforced to … [p]revent the loss or theft of a firearm-related product from the firearm industry member."  HB 426 §§134-A, 134-B(b)(1).  Most firearm industry members, however, do not have any physical presence in Hawaii, which means that most of the conduct this provision regulates will take place entirely outside of Hawaii.  For instance, if a Hawaii judge or jury decides that an Ohio-based manufacturer used too lax of security measures at its Ohio manufacturing plants, and a firearm produced there was later criminally used in Hawaii, then that out-of-state entity could face Hawaii-law liability based solely on its out-of-state conduct—even if it employed every security measure that Ohio or Congress saw fit to impose.

100.   Second, HB 426 requires firearm industry members to "[e]stablish,

implement, and enforce" "reasonable procedures, acts, or practices that are designed, implemented, and enforced to … [p]revent the sale or distribution of a firearm-related product to … a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully." *Id.* This provision is even more problematic. Again, most firearm industry members do not have a physical presence in Hawaii, which means that most of the conduct this provision regulates will take place entirely outside it. For instance, imagine that a retailer in St. Louis, Missouri, is about to sell a firearm that is fully lawful in Missouri to a customer who is permitted to own the firearm under Missouri law and under federal law. If that same firearm is *not* lawful in Hawaii, then the retailer could face liability for selling it to the customer if, say, a sales clerk overhears the customer talking about a new job opportunity in Hawaii and the customer ends up moving, with the new firearm in tow, for the new position.

101.   And that is not even the worst part. This provision imposes a duty on firearm industry members not to sell lawful firearms to any individual if they reasonably believe that the individual "is at substantial risk of using a firearm-related product to harm … another." *Id.* §134-A. While such a duty might make sense if the provision applied only where a firearm industry member has cause to believe

40

that a customer is likely to *unlawfully* use a firearm to harm another, it is not so limited. That is a problem, because the very core of the Second Amendment right to keep and bear arms is the right to have and use firearms for lawful self-defense, and using a firearm in lawful self-defense may cause harm to another. Thus, as a result of this provision, if a licensed retailer has reason to believe that a lawful customer faces an increased risk of needing to use a firearm in self-defense—because he is a Brinks truck driver, or because she has a restraining order against a stalker, or because he lives in a high-crime neighborhood, etc.—that retailer could face liability for selling the firearm to the customer, *even if that retailer is thousands of miles away from Hawaii*.

102.   Third, HB 426 requires firearm industry members to "[t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide to a downstream distributor a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." *Id.* §134-B(b)(2). And it creates a presumption that a product "designed, sold, or marketed in a manner that is targeted at minors" is "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." *Id.* §134-B(d)(3). This means that a firearms manufacturer with no connection to Hawaii could be found liable for lawfully manufacturing firearms that are lawful in its home state if one of those firearms later makes its way into Hawaii and a court

determines that it is "abnormally dangerous."

103.   For example, among NSSF's members is a licensed, Delaware-based firearms manufacturer with manufacturing facilities in New Hampshire, Arizona, and North Carolina.  This company does not sell firearms directly to civilians; it sells its products only to licensed distributors, only a very small handful of which re-sell into Hawaii.  This NSSF member, then, is an out-of-state company that does not do any business in Hawaii, period.  Nevertheless, it can be held liable if a Hawaii judge or jury later determines that a product it sold that found its way into Hawaii was designed in a manner that is targeted at minors.  Liability would attach even if the product was perfectly legal in the state where it was designed and manufactured, and even if the distributor to whom the NSSF member sold the product was also outside of Hawaii.

104.   None of that is remotely consistent with the Constitution.  Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

105.   HB 426 is no less unconstitutional vis-à-vis the out-of-state conduct of firearm industry members that *do* business in Hawaii.  What matters under the extraterritoriality doctrine is where the regulated conduct takes place:  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the

regulation is unconstitutional," even if the actor resides in, is incorporated in, or does some other business in the regulating state. *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) (citation omitted); *see, e.g.*, *Sam Francis Found. v. Christie's, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (en banc) (invalidating California statute that regulated out-of-state art sales, even though the statute only applied to transactions involving California residents); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018). After all the state must have some connection to the regulated *activity*, not just to the regulated *entity*. Otherwise, a state could forever claim extraterritorial regulatory power over anyone who has ever visited, vitiating the power of other states to regulate within their own borders.

106.   By directly regulating commerce that takes place entirely in other states, HB 426 plainly violates the constitutional prohibition on extraterritorial state regulation.

107.   HB 426 remedial provisions make matters worse. HB 426 authorizes private persons, county attorneys, public prosecutors, and the Attorney General to obtain, among other things, "[i]njunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law." HB 426 §134-C(a)-(b). If, as will almost always be the case, some or all of that otherwise-lawful conduct—distributing, marketing, selling, etc.—takes place in other states, then the injunctive relief the statute authorizes will necessarily end up regulating

conduct occurring wholly outside Hawaii's borders.  Indeed, for some manufacturers or national distributors, that will allow for de facto nationwide injunctions regulating conduct far beyond—and entirely outside—Hawaii's borders.   That sort of nationwide sweep is a telling sign of unlawful extraterritorial legislation. *See Edgar*, 457 U.S. at 643 (noting the "most obvious burden … impose[d] on interstate commerce arises from the statute's previously described nationwide reach"); *cf. Ross*, 143 S.Ct. at 1171 (Roberts, C.J., concurring in part and dissenting in part) (noting that "by effectively requiring compliance by farmers who do not even wish to ship their product into California," a statute might have "a 'nationwide reach' similar to the regulation at issue in *Edgar*").

108.   HB 426 violates the extraterritoriality doctrine in yet another way.  In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" within their borders. *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 373 n.18 (1994) (describing "a violation of the dormant Commerce Clause" as "discrimination against interstate commerce").  HB 426 does that too.  Because it imposes liability for commercial transactions occurring in other states by inviting civil actions in Hawaii, HB 426 unlawfully discriminates against

44

and burdens out-of-state commercial interests within the state.

109.   It also negates the legitimate regulatory regimes governing the sale, marketing, and manufacture of firearms and related products in other states and under federal law by rendering conduct that is lawful where it occurs unlawful in Hawaii.  As discussed, that invades the sovereignty of other, co-equal states.

110.   Particularly given that it restricts conduct protected by the Second Amendment, the extreme burdens HB 426 imposes on interstate commerce outweigh any benefits, and the local interest in reducing crime within Hawaii could be achieved by other restrictions that have a lesser impact on interstate commerce.  If other states were to enact similar laws, the PLCAA would be nullified (and the Second Amendment would be little better off).  And firearm industry members would have little choice but to attempt to comply with the strictest state restrictions (assuming compliance is even possible), regardless of federal law or the law of the individual state of operation.  HB 426 therefore unduly burdens interstate commerce.  What is more, because HB 426 creates liability based on the behavior of third parties who are outside their control, firearm industry members can do very little to even attempt to lessen their potential liability; the only way to truly eliminate all risk of liability under HB 426 would be to cease operations altogether, even if those operations are lawful elsewhere.   That is the definition of unconstitutional discrimination against, and an unconstitutional undue burden upon, interstate

commerce.  *Cf. Edgar*, 457 U.S. at 643 (even non-discriminatory law is invalid where "the burden imposed on that commerce [is] excessive in relation to the local interests served by the statute").

111.   Hawaii's overreach into other states is all the more flagrant given the constitutional protections accorded Second Amendment activity and that this is decidedly not an area where the state law has been adopted "against the backdrop of congressional silence."  *Ross*, 143 S.Ct. at 1165.

112.   To the contrary, Congress anticipated exactly this sort of problem in the PLCAA, which explicitly found that allowing civil actions like the ones HB 426 authorizes would usher in "unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6).  Consistent with Congress's judgment, HB 426 violates the constitutional prohibition on extraterritorial regulation that unlawfully burdens interstate commerce.

## COUNT FOUR
### (First Amendment)

113.   Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

114.   In addition to regulating commerce (i.e., the sale and distribution of firearm-related products), HB 426 also regulates speech.  In fact, the statute singles out speech on the basis of its content or viewpoint.  Under HB 426, a firearm industry member is liable for selling, distributing, or providing to a downstream distributor a

46

firearm-related product that is "abnormally dangerous," and a firearm-related product is considered "abnormally dangerous" if it is, inter alia, "marketed in a manner that is targeted at minors." HB 426 §134-B(b)(2), (d)(3). In other words, if a firearm industry member markets a firearm-related product in a manner targeted at minors, the industry member may not distribute that product to downstream distributors. As a practical matter, that means that industry members cannot engage in any marketing that might deemed "targeted at minors."

115. HB 426 thus on its face regulates speech based on its content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022). After all, the statute does not apply to *all* marketing; it applies only to "market[ing]" of "a firearm-related product" that is "targeted at minors." HB 426 §134-B(d)(3). Indeed, it does not even apply to all such speech by all speakers—only the speech of "firearm industry member[s]," i.e., those "engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products." *Id.* §134-(A). And that speaker-based discrimination is no accident. HB 426 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a point of view that Hawaii apparently disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

116. Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive. *Brown v. Entm't*

*Merchants Ass'n*, 564 U.S. 786, 790-91, 799 (2011); *see also Sorrell*, 564 U.S. at 555-56 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.' … Commercial speech is no exception." (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))).

117.   The topics and views that Hawaii has singled out in HB 426 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. at 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But HB 426 does not even purport to target only speech that is false or misleading.  It authorizes the imposition of liability for speech about a product—a product expressly protected by the Constitution, no less— even when that speech is truthful and not misleading.   Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that places online advertisements containing entirely accurate specifications of its products and subsequently sells that product to a distributor, could be liable under HB 426, even if that product is fully lawful in every state in which it is sold, if a Hawaii court later deems the product to have been "marketed in a manner that is targeted at minors."  HB 426 §134-B(b)(2), (d)(3).

118.   The state apparently thinks that laws restricting speech about firearms are subject to more relaxed scrutiny, perhaps because firearms are dangerous.  But the Supreme Court has made clear that truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion).  Simply put, the mere fact that a product is dangerous does not transform promotion of that product (i.e., speech) into a tort for which liability may be imposed.  And that is of course true *a fortiori* when it comes to promotion of products that not only are legal, but protected by the Second Amendment.

119.   The only way Hawaii could justify HB 426's speech restrictions, then, would be to affirmatively prove that those restrictions are sufficiently tailored to achieve a sufficiently important state interest.  *See Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2384 (2021).  That, it cannot do, as HB 426 is both "seriously underinclusive" and "seriously overinclusive" in relating to any public safety interests the state may assert.  *Brown*, 564 U.S. at 805.

120.   HB 426's most obvious defect—and one of the reasons it runs headfirst into the PLCAA—is its underinclusiveness.  Clearly, HB 426 is aimed at deterring

and punishing those who cause "an unreasonable risk of harm to public health and safety in the State." HB 426 §134-B(b)(2). But HB 426 does nothing to police the conduct of third parties who misuse firearms. Nor does it regulate, e.g., direct incitements to violence or countless other forms of speech that may actually encourage criminal gun violence. Likewise, while HB 426 restricts firearms-products marketing "targeted at minors," it does not address "indistinguishable … effects produced by other media," such as movies and videogames that promote the use of firearms by minors. *Brown*, 564 U.S. at 800-01. That, in First Amendment terms, is "wildly underinclusive." *Id.* at 801-02.

121.   Conversely, by imposing sweeping liability for firearms marketing, HB 426 is also "vastly overinclusive," *id.* at 804, as Hawaii has impermissibly swept large amounts of protected speech "within the broad reach of" the statute, *United States v. Stevens*, 559 U.S. 460, 480 (2010).

122.   HB 426 restricts the marketing of firearms in a manner "targeted at minors." But it is not always illegal for minors to handle or use firearms in Hawaii. And nothing about HB 426 changes that dynamic; the statute restricts only the provision of information that may encourage minors to use firearms even in lawful ways.

123.   Remarkably, the Supreme Court seems to have foreseen a law like this in *Brown*, writing that "California ha[d] (wisely) declined to restrict … the

distribution of pictures of guns." *Id*. at 801-02. While Hawaii decided not to abide

by that wisdom, the First Amendment has not changed.

124.   In short, HB 426 "prohibit[s] or chill[s]" vast swaths of fully protected

expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying

the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*,

413 U.S. 601, 610 (1973).

125.   HB 426 also suffers from fatal vagueness problems.

126.   Vagueness "raises special First Amendment concerns because of its

obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

After all, vague laws risk chilling would-be speakers by forcing them "to steer far

wider of the unlawful zone" than they otherwise would "if the boundaries of the

forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

For that reason, laws touching on speech must themselves speak "only with narrow

specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

127.   HB 426 does the opposite. The statute makes it virtually impossible for

regulated parties to tell what speech is and is not permitted, leaving them with no

realistic choice but to err on the side of refraining from exercising their First

Amendment rights.   By its terms, HB 426 restricts industry members from

distributing firearm-related products that have been marked in a manner that a court

deems to be "targeted at minors." HB 426 §134-B(d)(3). And it is no defense to

liability that the product was lawful when made and marketed even under Hawaii law.

128.   There is no shortage of problems with this provision, which restricts a sporting goods store or firearms manufacturer from pointing out which firearms it sells are safest for minors.  As a result of this provision, a perfectly lawful product becomes impermissible to distribute under Hawaii law if it is marketed in a way deemed to be "targeted at minors"—even though, as explained, it is not illegal for minors to handle or use firearms in Hawaii.

129.   HB 426 thus necessarily "will provoke uncertainty among speakers" as to how they can promote any of their lawful (and constitutionally protected) products without incurring Hawaii's wrath.  *Reno v. ACLU*, 521 U.S. 844, 871 (1997).

130.   That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute.  *Id.* After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  And that threat is even more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech

or of the press." *Id.* HB 426 therefore violates the First Amendment because it is unconstitutionally vague.

131. There is another problem here too. Even when speech about a product is actually proven to be false or misleading—which, again, is not required under HB 426—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought. *See*, *e.g.*, *Restatement (Second) of Torts* §525 (1977); Dee Pridgen & Richard M. Alderman, *Consumer Protection and the Law* §2.26, at 2-64 (2002); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet HB 426 does not require proof of reliance.

132. Nor does it require a plaintiff to trace alleged injuries directly to the speech in question. Under HB 426, a firearm industry member may be held accountable even for the actions of an "intervening … third-party" (including one

who is breaking the law) so long as the industry member is deemed to have distributed the "abnormally dangerous" product, i.e., a product marketed in a way that is targeted at minors. For example, if an industry member markets a firearm-related product and then sells that product to a downstream distributor, if that product is then purchased by a third party who uses it to commit a crime, the industry member can be held liable if it is later determined that he marketed it in a way that was targeted at minors. This is true regardless of whether the third party was a minor or relied on the marketing of the industry member in any way.

133. Furthermore, given that speech can now be broadcast across the world (including into Hawaii) nearly instantaneously, allowing liability based on speech without that core causation requirement could expose defendants to nearly limitless liability. A causation-free regime may well lead individuals to confine themselves to "statements which 'steer far wider of the unlawful zone,'" thereby "dampen[ing] the vigor and limit[ing] the variety of public debate." *Sullivan*, 376 U.S. at 279.

134. The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections. That is true even of torts that pre-date the Republic and the First Amendment. And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree. By removing the traditional, constitutionally grounded safeguards for all speech-based torts, HB 426 flunks First Amendment 101 at every turn.

54

## COUNT FIVE
### (Due Process)

135.  Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

136.  For many of the same reasons that HB 426 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices.  The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §1.  A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law."  *Connally v. Gen. Constr. Co*., 269 U.S. 385, 390 (1926).  So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

137.  Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," moreover, this anti-vagueness guarantee applies to both criminal and civil laws.  *See id*. at 108-09 (collecting cases); *see also Sessions v. Dimaya*, 138 S.Ct. 1204, 1224-26 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

138.  For all the reasons already discussed, "[t]he vice of unconstitutional

vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961). A more "stringent" vagueness test applies, moreover, for statutes that "threaten to inhibit the exercise of constitutionally protected rights"—including not just the First Amendment, but also the Second Amendment—or that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

139. The most protective vagueness standard known to our law thus applies here several times over, as HB 426 not only restricts speech, *see supra* ¶¶113-34, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment. And the liability it threatens is no small matter: "Injunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law," "[d]amages," "[a]ttorney's fees and costs," and "[a]ny other appropriate relief necessary to enforce this part and remedy the harm caused by the conduct." HB 426 §134-C(d). HB 426 thus brings with it the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms. 15 U.S.C. §7901(a)(6). As a result, it is subject to a "stringent" vagueness test even as to the non-speech conduct that it regulates.

140. HB 426 flunks that test, as the prohibitions it imposes are hopelessly

vague.

141.   Under HB 426, not only is there "a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if" it is "marketed in a manner that is targeted at minors"; that same presumption exists if "[t]he firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities."  HB 426 §134-B(d)(1).  Both of those provisions are unconstitutionally vague, as they give no guidance as to what is and is not prohibited.  *See supra* ¶¶125-30.

142.   HB 426 also requires firearm industry members to "[e]stablish, implement, and enforce reasonable controls."  HB 426 §134-B(b)(1).  But it remains a mystery what "reasonable controls" means.  The statute's modest effort to supply a definition only makes matters worse.  Rather than identify a firearm industry member's concrete obligations with specificity, HB 426 issues a sweeping command that industry members adopt any and all "procedures, acts, or practices that are designed, implemented and enforced" to "prevent" or "ensure" a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on.  *Id.* §134-A.

143.   Moreover, when it comes to taking "reasonable precautions" in ensuring that "abnormally dangerous" firearm-related products are not sold,

distributed, or provided to downstream distributors, the statute provides absolutely no guidance on what constitutes a "reasonable precaution," leaving industry members with no way to know whether their precautionary steps will subsequently be deemed sufficiently "reasonable." *Id.* §134-B(b)(2).

144.   To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).  The problem with HB 426 is not mere imprecision at the margins, but the failure to articulate any standard whatsoever.  Determining, for example, what makes a firearm most suitable for assaultive purposes invites "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.*

145.  Indeed, HB 426 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the common law, HB 426 "impermissibly delegates basic policy matters to policemen, judges[,] and juries for resolution on an ad hoc and subjective basis," with the attendant dangers of arbitrary and discriminatory application. *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999).  The Due Process Clause demands far more.

146.   And that is not the only due process problem with HB 426.  Proof that

the defendant caused the plaintiff's injury is and always has been a core element of tort law. *See, e.g.*, *Restatement (Second) of Torts* §430 (1965); *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014). Indeed, even strict-liability torts require proof of causation. *See, e.g.*, *Restatement (Second) of Torts* §§504-05, 507, 509, 519 (1977). That is not just tradition; it is constitutionally mandated: Denying a defendant a meaningful opportunity to demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property. Yet HB 426 does just that by allowing liability for harms supposedly caused by conduct not just far out of state and back in time, but through the criminal acts of third parties. *See* HB 426 §134-C(g).

147.   Finally, the statute's non-rebuttable presumption under §134-B(d), *see supra* ¶¶40-41, is inconsistent with basic notions of due process. It has long been established that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause." *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929). HB 426 flouts that settled law.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief from the Court:

1.   a declaration, pursuant to 28 U.S.C. §2202, that HB 426 on its face violates the United States Constitution and is therefore void and unenforceable, or,

in the alternative, that HB 426 is unconstitutional as applied to NSSF and its members;

2.      a preliminary injunction enjoining Attorney General Lopez, as well as all officers, agents, and employees subject to her supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under HB 426;

3.      a permanent injunction enjoining Attorney General Lopez, as well as all officers, agents, and employees subject to her supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under HB 426;

4.      such costs and reasonable attorneys' fees to which Plaintiff may be entitled by law;

5.      nominal damages; and

6.      any further relief the Court deems just and proper.

DATED:  Honolulu, Hawaii, July 12, 2023.

/s/ *Edmund K. Saffery*
_____
EDMUND K. SAFFERY
FOREST B. JENKINS

PAUL D. CLEMENT (*pro hac vice pending*)
ERIN E. MURPHY (*pro hac vice pending*)
MATTHEW D. ROWEN (*pro hac vice pending*)
MARIEL BROOKINS (*pro hac vice pending*)

Attorneys for Plaintiff
NATIONAL SHOOTING SPORTS
FOUNDATION