IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | CIVIL NO. 1:23-CV-00287 DKW-RT |
| PLAINTIFF, | MEMORANDUM IN SUPPORT OF MOTION |
| vs. | |
| ANNE E. LOPEZ, ATTORNEY GENERAL OF THE STATE OF HAWAII, | |
| DEFENDANT. | |

**<u>MEMORANDUM IN SUPPORT OF MOTION</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION .................................................................................. 1

BACKGROUND .................................................................................... 3

ARGUMENT ......................................................................................... 9

    I.    NSSF Is Likely To Succeed On The Merits Of Its Claims. ................ 9

        A.    HB 426 Violates the Second Amendment. ............................... 9

        B.    HB 426 Is Preempted. ............................................................ 12

        C.    HB 426 Exceeds the Constitution's Limits on Extraterritorial State Regulation. ........................................... 17

        D.    HB 426 Violates the First Amendment ................................... 21

        E.    HB 426 Is Void for Vagueness. .............................................. 24

    II.    The Remaining Factors All Favor Injunctive Relief. ........................ 25

CONCLUSION .................................................................................... 27

CERTIFICATE OF WORD COUNT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

15 U.S.C. §7901(a)(4) ........................................................15

15 U.S.C. §7901(a)(5) ........................................................15

15 U.S.C. §7903(5)(A) ............................................5, 13, 14, 16

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996) ..........................................................22

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.,*
163 F.3d 780 (3d Cir. 1999) ..............................................19

*AK Futures LLC v. Boyd St. Distro, LLC,*
35 F.4th 682 (9th Cir. 2022) ................................................9

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002) ..........................................................24

*Baldwin v. G.A.F. Seelig, Inc.,*
294 U.S. 511 (1935) ..........................................................18

*Bank of Am. Corp. v. City of Miami,*
581 U.S. 189 (2017) ..........................................................16

*Barnett v. Raoul,*
2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ......................11

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ..........................................................24

*Brown v. Entm't Merchants Ass'n,*
564 U.S. 786 (2011) ....................................................21, 23

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ..........................................................11

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
563 F.3d 847 (9th Cir. 2009) ............................................26

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta,*
273 F.3d 536 (3d Cir. 2001) ........................................................12, 14, 15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) .................................................................................22

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
142 S.Ct. 1464 (2022) .............................................................................21

*City of N.Y. v. Beretta,*
524 F.3d 384 (2d. Cir. 2008) ...................................................................13

*Comptroller of Treasury of Md. v. Wynne,*
575 U.S. 542 (2015) .................................................................................20

*Connally v. Gen. Constr. Co.,*
269 U.S. 385 (1926) .................................................................................24

*Craig v. Boren,*
429 U.S. 190 (1976) .................................................................................26

*Daniels Sharpsmart, Inc. v. Smith,*
889 F.3d 608 (9th Cir. 2018) ...................................................................19

*District of Columbia v. Beretta U.S.A. Corp.,*
940 A.2d 163 (D.C. 2008) .........................................................................5

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .............................................................................5, 11

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.,*
565 U.S. 606 (2012) .................................................................................26

*Edgar v. MITE Corp.,*
457 U.S. 624 (1982) .............................................................................19, 20

*Elrod v. Burns,*
427 U.S. 347 (1976) .................................................................................25

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) .................................................................................24

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ...................................................................9

*Holmes v. Secs. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ...............................................................................16

*Ileto v. Glock, Inc.*,
565 F.3d 1126 (9th Cir. 2009) ...................................................... passim

*In re Acad., Ltd.*,
625 S.W.3d 19 (Tex. 2021) ......................................................................4

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001).................................................................................22

*Mitchell v. Forsyth*,
472 U.S. 511 (1985)..................................................................................25

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S.Ct. 2111 (2022) .................................................................. passim

*NAACP v. Button*,
371 U.S. 415 (1963)..................................................................................23

*Nat'l Pork Producers Council v. Ross*,
143 S.Ct. 1142 (2023) ...................................................................17, 18, 20

*Nat'l Shooting Sports Found. v. Platkin*,
2023 WL 1380388 (D.N.J. Jan. 31, 2023)...........................14, 15, 16, 17

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................26

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)..................................................................................20

*Reno v. ACLU*,
521 U.S. 844 (1997)..................................................................................23

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022).....................................................................26

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ..............................................................26

*Sam Francis Found. v. Christies, Inc.*,
784 F.3d 1320 (9th Cir. 2015) ..............................................................18

*Shelby Cnty. v. Holder*,
570 U.S. 529 (2013)................................................................................17

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)................................................................................21

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ..................................................................9

*Twitter, Inc. v. Taamneh*,
143 S.Ct. 1206 (2023) ............................................................................16

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001)................................................................................26

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)................................................................................24

*Watson v. Emps. Liab. Assurance Corp.*,
348 U.S. 66 (1954)..................................................................................19

**Statutes**

15 U.S.C. §7901(a)(6)....................................................................17, 20, 25

15 U.S.C. §7901(a)(7)............................................................................12, 17

15 U.S.C. §7901(b)(1)..................................................................................4

15 U.S.C. §7902(a) ..................................................................................4, 13

15 U.S.C. §7903(2)-(6)................................................................................4

Haw. Rev. Stat. §134-5(a) ....................................................................11, 23

Pub. L. No. 109-92, 119 Stat. 2095 (2005)................................................4

**Other Authorities**

Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939 (2006)..................................................................4

Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS............................3

## INTRODUCTION

Hawaii House Bill 426 ("HB 426"), which took effect on July 1, 2023, flouts the Constitution and Acts of Congress in multiple respects.  It should be enjoined.

First, HB 426 violates the Second Amendment.  The Supreme Court just made clear that "the Second Amendment protects the possession and use of weapons that are 'in common use.'"  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022).  Accordingly, the only arms a state may ban consistent with the Constitution and our nation's "historical tradition" of firearm regulation are those not "in common use today," i.e., those that are "highly unusual in society at large." *Id.* at 2143.  Yet HB 426 bans the manufacture, sale, and marketing of firearms that Hawaii deems "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State," §134-B(b)(2), *even if they are in common use*.  Hawaii may not prohibit what the Second Amendment protects.

HB 426 also defies the federal Protection of Lawful Commerce in Arms Act ("PLCAA").  Congress passed the PLCAA to stamp out suits that seek to empower judges and juries to deploy nebulous state-law "reasonableness" standards to make licensed firearms manufacturers and sellers pay for harms caused by criminals who misuse their products.  *See Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009).  Yet HB 426 empowers state officials and private parties to do just that.  Because it

authorizes Hawaii and its citizens to use the court system to punish law-abiding firearms companies for others' crimes, HB 426 is preempted by the PLCAA.

HB 426 also directly regulates conduct that takes place entirely outside the state, in violation of the Constitution's limits on extraterritorial state regulation. Even if a manufacturer operating solely in Missouri complies with all federal and Missouri laws, it still could be held be liable under HB 426 if one of its firearms later found its way to someone who used it to commit a crime in Hawaii, so long as a Hawaii court deems the manufacturer's out-of-state marketing or theft-protection controls "[un]reasonable." §§134-A, 134-B(b)(2), (b)(3).  The Constitution does not allow a state to sit as overseer of conduct in its sister states.

HB 426 fares just as poorly under the First Amendment.  HB 426 imposes liability for "market[ing]" any firearm or related product that a Hawaii court decides is "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State."  §134-B(b)(2)-(b)(3).  The statute provides that a firearm is "abnormally dangerous" if it is "most suitable for assaultive purposes," §134-B(d)(1), but what that means is anyone's guess.  HB 426 further prohibits marketing products "targeted at minors"—including products that minors may lawfully use in Hawaii.  §134-B(d)(3).  Despite that extreme breadth, HB 426 says nothing about myriad forms of speech that could lead *directly* to criminal gun

violence.  Such radical over- and under-inclusiveness cannot be squared with the First Amendment, and the same flaws render HB 426 void for vagueness.

Plaintiff, the National Shooting Sports Foundation ("NSSF"), is thus more than likely to succeed on its claims.  And the remaining factors all favor injunctive relief.  NSSF is the leading trade association for the industry, and its members include all the nation's leading firearms manufacturers and sellers.  Subjecting them to an unconstitutional statute inflicts irreparable harm as a matter of law, especially when that statute restricts constitutionally protected speech.  And enforcing unconstitutional laws is always contrary to the equities and public interest.  The Court should grant NSSF's motion and enjoin enforcement of HB 426.

## BACKGROUND

1. In the 1990s, state and local governments initiated several lawsuits in response to concerns about violent crimes involving firearms.  Yet rather than go after the criminals responsible, they invoked unprecedented theories of tort liability and sued federally licensed manufacturers and distributors of legal firearms that were lawfully manufactured and sold.  Many suits failed, but winning in court was not the only objective:  Recognizing that "[t]he legal fees" needed to defend against the rising tide of suits "alone" would have been "enough to bankrupt the industry," Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS, state and local governments

3

"pressed on" with these novel suits, "regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry," Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

Congress passed the PLCAA to end those efforts. Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§7901-7903). The PLCAA's first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" for harm "caused by the criminal or unlawful misuse of firearm products" by third parties. 15 U.S.C. §7901(b)(1). To that end, the PLCAA broadly prohibits "any person," "including any governmental entity," from bringing any civil action against any licensed "manufacturer or seller" of firearms or related products for "relief[] resulting from the criminal or unlawful misuse of a qualified product by … a third party." *Id.* §§7902(a), 7903(2)-(6). That is not just a defense to liability; the PLCAA confers a substantive "immunity" from covered suits. *In re Acad., Ltd.*, 625 S.W.3d 19, 33-34 (Tex. 2021).

That immunity is subject to only a handful of exceptions. As relevant here, the PLCAA does not preempt actions in which a manufacturer or seller is alleged to have "knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm or related] product" where "the violation was a proximate

cause of the harm for which relief is sought."  15 U.S.C. §7903(5)(A)(iii).  This provision is now known as the "predicate exception" because, "to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation."  *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168 (D.C. 2008).  But not all statutes count:  The Ninth Circuit has squarely held that a statute that merely codifies the kinds of common-law tort theories that were invoked in pre-PLCAA suits (e.g., negligence and nuisance) does not qualify as a "predicate" statute, as such suits were "precisely the target of the PLCAA."  *Ileto*, 565 F.3d at 1136.

2.  The Supreme Court confirmed just last year that when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms.  *Bruen*, 142 S.Ct. at 2126.  Applying that test, the Court invalidated a law requiring law-abiding citizens to show a special need to carry a firearm outside the home.  *Id.* at 2134-56. In so doing, *Bruen* explained that our nation's historical tradition is to protect arms "in common use today."  *Id.* at 2134.  So, under *Bruen*, only arms that are *both* abnormally dangerous *and* "highly unusual in society at large" may be prohibited. *Id.* at 2143 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).

*Bruen* should have led states to reconsider their laws to make them more protective of Second Amendment rights; sadly, some have had the opposite reaction.

HB 426, which was signed into law on April 26, falls in the latter camp, imposing sweeping new restrictions on the ability to manufacture, sell, and acquire firearms. HB 426 imposes new "standards of conduct" on all "firearm industry member[s]," defined broadly to mean "a person, firm, … or any other entity … engaged in the manufacture, distribution, … marketing, [or] wholesale[] or retail sale of firearm-related products."    §§134-A, 134-B; *see* §134-A (defining "Firearm-related product").

First, HB 426 commands that industry members "shall … [e]stablish, implement, and enforce reasonable controls."  §134-B(b)(1).  HB 426 does not, however, identify what "controls" are "reasonable."  Instead, it defines "reasonable controls" in terms of the goals such "controls" should accomplish—namely, "reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:

> (1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under federal or state law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully;

> (2) Prevent the loss or theft of a firearm-related product from the firearm industry member; and

> (3) Ensure that the firearm industry member complies with all provisions of federal or state law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

§134-A.

The statute creates "a rebuttable presumption that [a] firearm industry member failed to implement reasonable controls" if "(1) [its] action or failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur," and "(2) [it] could have established, implemented, and enforced reasonable controls to prevent or substantially mitigate the risk that the harm would occur." §134-C(e). "If [this] rebuttable presumption is established … the firearm industry member [has] the burden of showing through a preponderance of the evidence that [it] established, implemented, and enforced reasonable controls." §134-C(f).

Second, HB 426 effectively bans an unknown and unknowable set of arms. Under §134-B(b)(2), industry members must "[t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide to a downstream distributor a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." Instead of employing *Bruen*'s common-use test, §134-B(b)(2) imposes a substantially less protective test for determining what arms people may keep and bear. Under HB 426, "[t]here shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if," *inter alia*, the product's "features render [it] most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and

recreational activities."  §134-B(d)(1).  The same presumption of illegality arises if a "firearm-related product is designed, sold, or marketed in a manner that is targeted at minors," §134-B(d)(3), even though it is *lawful* for minors to use firearms in Hawaii in various common circumstances.  Unlike other presumptions in the law, moreover, this one does not appear to be rebuttable.  *Cf.* §134-C(e) (describing the lack-of-reasonable-controls presumption as "rebuttable"); *see* p.7, *supra*.

Third, industry members may not "engage in any conduct related to the sale or marketing of firearm-related products that is in violation of this chapter."  §134-B(b)(3).  Together with §134-B(d), then, HB 426 oddly appears to ban the sale of certain firearms based on how they are marketed.

Any "person who has suffered harm in the State because of a firearm industry member's violation of [HB 426]," as well as "the Attorney General, or any county attorney or public prosecutor," "may bring a civil action" against an industry member "in a court of competent jurisdiction."  §134-C(b)-(c).  If a court finds that an industry member violated the statute, it may award injunctive relief, damages, and "[a]ny other appropriate relief."  §134-C(d).  In a suit under HB 426, traditional proximate cause principles do not apply.  "An intervening act by a third party, *including, but not limited to criminal use of a firearm-related product*, shall not preclude a firearm industry member from liability."  §134-C(g) (emphasis added). HB 426 took effect on July 1, 2023.  HB 426 §5.

8

## ARGUMENT

A party seeking an injunction must show a likelihood of success on the merits, irreparable harm absent preliminary relief, and that the balance of the equities and public interest favor an injunction. *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022). Likelihood of success matters most, but "a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

## I.    NSSF Is Likely To Succeed On The Merits Of Its Claims.

### A.    HB 426 Violates the Second Amendment.

"[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125. And as the Ninth Circuit has recognized, "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Laws that restrict the ability to purchase arms thus restrict conduct "presumptively protect[ed]" by the Second Amendment, meaning the state bears the burden of proving that such a law "is consistent with this Nation's historical tradition." *Bruen*, 142 S.Ct. at 2126. HB 426 is not remotely consistent with that tradition, as it not only effectively bans protected arms, but subjects industry members to an amorphous form of liability with no historical pedigree whatsoever.

First, HB 426 forbids firearm industry members from manufacturing, making, or selling any "firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." §134-B(b)(2).  And it creates an apparently unrebuttable presumption that a firearm is "abnormally dangerous"—and thus unlawful to manufacture, market, or sell—if it is "most suitable for assaultive purposes" or "designed, sold, or marketed in a manner that foreseeably promotes conversion of legal firearm-related products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms."  §134-B(d)(1)-(d)(3).  That is a blatant end-run around *Bruen*.  The Supreme Court has already articulated what our nation's historical tradition is when it comes to which arms are protected:  "[T]he Second Amendment protects … weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'"  142 S.Ct. at 2143.  There is no exception for common arms that a state considers too "dangerous," or better suited "for assaultive purposes," or sold or marketed in a disfavored manner.  If arms are "in common use today" for lawful purposes, *id.*, they cannot be banned.  Hawaii cannot displace that tradition with a test more to its liking.

Making matters worse, HB 426 provides no guidance as to what makes an arm "most suitable for assaultive purposes," or what constitutes designing, selling, or marketing an arm "in a manner that promotes conversion of legal firearm-related

products into illegal firearm-related products" or "is targeted at minors or other individuals who are legally prohibited from accessing firearms."  That is no small oversight.   Characteristics that might make a weapon "suitable for assaultive purposes" (or attractive to people "legally prohibited from accessing firearms") are quite likely the same characteristics that many citizens prioritize in selecting a firearm for self-defense.  *See Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023) (features like "[a] pistol grip," "[t]humbhole stocks," and "flash suppressors" all help enhance one's ability to fire "accura[tely]" while "decreas[ing] the risk of … firing stray shots").  That is why our nation's historical tradition does not focus on "assaultive" vs. "defensive" purposes, or "dangerousness" in isolation, but rather permits states to prohibit *only* those arms that are *both* "dangerous *and unusual*."  *Heller*, 554 U.S. at 627 (emphasis added); *see Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring in the judgment) ("[F]irearms cannot be categorically prohibited just because they are dangerous.").  Asking only whether a weapon is "abnormally dangerous," as HB 426 does, thus defies both the Supreme Court's teachings and the realities of self-defense.

Nor is there some free-floating Second Amendment exception for firearms "designed, sold, or marketed in a manner that is targeted at minors."  §134-B(d)(3). Many citizens wish to introduce their children to hunting or shooting sports, which is entirely lawful to do in Hawaii, *see, e.g.*, Haw. Rev. Stat. §134-5(a), and value a

11

firearm designed for minors precisely because it is safer and easier for a minor to use for those lawful purposes.  But Hawaii has reached the puzzling conclusion that any firearm "designed … in a manner that is targeted at minors" is abnormally dangerous and thus unlawful.  That too cannot be reconciled with the Second Amendment (or common sense).

HB 426's efforts to saddle licensed industry members with the costs of harms created by criminals are also inconsistent with historical tradition.  Indeed, as the Third Circuit explained just a few decades ago—and as Congress agreed in the text of the PLCAA—"[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented."  *Camden Cnty. Bd. of Chosen Freeholders v. Beretta*, 273 F.3d 536, 540-41 (3d Cir. 2001); *see also Ileto*, 565 F.3d at 1135 (highlighting Congress' finding that such "liability actions … are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States" (quoting 15 U.S.C. §7901(a)(7))).  Hawaii thus cannot come close to "demonstrating that [HB 426] is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S.Ct. at 2130.

## B.    HB 426 Is Preempted.

Under the PLCAA, a "civil liability action … against a manufacturer or seller of [firearms and related products]" that seeks "damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by … a third party"

12

"may not be brought in any Federal or State court."  15 U.S.C. §§7902(a), 7903(5)(A).  Yet HB 426 empowers state actors to sue licensed firearms manufacturers and sellers for harms caused by third parties who misuse their products.  That unabashed effort to circumvent the PLCAA cannot withstand scrutiny.

Hawaii presumably will argue that HB 426 is saved by the PLCAA's "predicate exception," which exempts certain lawsuits involving violations of federal or state law.  *See id.* §7903(5)(A)(iii).  But the Ninth Circuit has already rejected the argument that the predicate exception covers state statutes that merely codify the same common-law causes of action that Congress enacted the PLCAA to inter.  *See Ileto*, 565 F.3d at 1134-36.  The exception instead treats as "predicate statutes" only laws that impose the kinds of clear rules that industry members can knowingly violate (or not) *in real time*, not laws that merely invite the same "'judicial evolution' [that] was precisely the target of the PLCAA." *Id.* at 1136.  Any other conclusion "would allow the predicate exception to swallow the statute." *City of N.Y. v. Beretta*, 524 F.3d 384, 403 (2d. Cir. 2008).

While *Ileto* is binding on this Court no matter what, statutory text and context confirm that it is eminently correct.  The predicate exception saves "an action" from preemption only to the extent the action alleges that "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale

or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. §7903(5)(A)(iii).  That language presumes some obligation sufficiently concrete that an industry member can actually knowingly violate it at the time of manufacture or sale.  *See Nat'l Shooting Sports Found. v. Platkin*, 2023 WL 1380388, at *6 (D.N.J. Jan. 31, 2023) ("The knowingly requirement of the predicate exception necessitates the actor to have a sufficiently concrete duty to have knowingly violated a relevant statute.").

The illustrative examples Congress supplied in the predicate exception confirm the point, as they both involve violations of clear legal obligations or prohibitions.  *See* 15 U.S.C. §7903(5)(A)(iii)(I) (record-keeping violations); *id.* §7903(5)(A)(iii)(II) (conspiring with or aiding and abetting someone in a straw purchase).  Under basic principles of interpretation, the general "applicable to" language in §7903(5)(A)(iii) must be "construed to embrace only objects similar to those enumerated by" those two specific examples.  *Beretta*, 524 F.3d at 402; *accord Platkin*, 2023 WL 1380388, at *6.  "Indeed, if *any* statute that 'could be applied' to the sales and manufacturing of firearms qualified as a predicate statute, there would be no need to list examples at all."  *Ileto*, 565 F.3d at 1134.  And both of Congress' examples look nothing like HB 426, which effectively just commands NSSF's members to employ "reasonable controls" and then leaves it to judges to decide after the fact whether controls were sufficiently "reasonable."

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception does not cover statutes that merely codify (let alone expand) common-law duties of care.  Congress said right in the statute that the PLCAA forecloses efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products" "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5).  And "lawful" is best understood to mean "activities having been done in compliance with statutes like those described in" the immediately preceding finding:  "the Gun Control Act of 1968, the National Firearms Act, and the Arms [Export] Control Act."  *Beretta*, 524 F.3d at 402-03; *see* 15 U.S.C. §7901(a)(4).  Those regulatory regimes impose concrete obligations with which industry members can ensure compliance.  The predicate exception is thus best understood as encompassing only laws that likewise clearly define the line between right and wrong.  *See Platkin*, 2023 WL 1380388, at *6.

Yet HB 426 does the exact opposite.  By its terms, HB 426 does not require a "knowing[]" violation of anything.  It instead sets up a strict-liability offense based on any failure to "enforce reasonable controls."  §134-B(b)(2); *see* §134-A (defining "[r]easonable controls").  That unbounded reasonableness regime leaves NSSF's members guessing what judges and juries will deem insufficient.  It is totally

15

"contrary to the PLCAA to hold an industry member liable who complies with all laws but did not know that it failed to employ 'reasonable procedures, safeguards, and business practices[.]'" *Platkin*, 2023 WL 1380388, at \*6.

And HB 426 goes further still, discarding proximate cause.  The predicate exception explicitly permits only actions where a defendant's knowing violation of a law "was a proximate cause of the harm for which relief is sought."  15 U.S.C. §7903(5)(A)(iii).  HB 426, by contrast, provides that "[a]n intervening act by a third party, including but not limited to *criminal use of a firearm-related product*, shall not preclude a firearm industry member from liability."  §134-C(g) (emphasis added).  The PLCAA's whole point is to prevent states from using tort law to make industry members pay for harms caused by "criminal or unlawful misuse of" firearms by "third part[ies]."  15 U.S.C. §7903(5)(A).  That is why Congress made proximate cause non-negotiable.  And under true proximate cause, "foreseeability alone is not sufficient," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017); there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).  In stark contrast, HB 426 embraces an unbounded view of causation that the Supreme Court recently offered as a *reductio ad absurdum*.  *See Twitter, Inc. v. Taamneh*, 143 S.Ct. 1206, 1221 (2023) (rejecting the notion that "ordinary merchants could become

16

liable for any misuse of their goods and services, *no matter how attenuated their relationship with the wrongdoer*" (emphasis added)).

In short, "the text and purpose of the PLCAA show[] that Congress intended to preempt general tort theories of liability even in jurisdictions … that have codified such causes of action." *Ileto*, 565 F.3d at 1136.  For good reason:  The problem Congress had with the suits it enacted the PLCAA to stamp out is that they sought to "expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States" and constituted an "abuse of the legal system."  15 U.S.C. §7901(a)(6)-(a)(7).  Congress thus opted "[t]o prohibit [such] causes of action" entirely, *id.* §7901(b)(1), regardless of whether the cause of action was statutory.  Accordingly, "[t]o read [HB 426] as fitting within the predicate exception would run afoul of the goals of the PLCAA and would, in fact, 'gut the PLCAA.'" *Platkin*, 2023 WL 1380388, at *7.

### C.    HB 426 Exceeds the Constitution's Limits on Extraterritorial State Regulation.

The Constitution restricts the power of states to directly regulate out-of-state conduct.  That principle of states' equal sovereignty inheres in the very plan of the Convention.  *See Nat'l Pork Producers Council v. Ross*, 143 S.Ct. 1142, 1156-58 & n.1 (2023); *id.* at 1172-76 (Kavanaugh, J., concurring and dissenting in part); *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013) ("all States enjoy equal sovereignty").  Myriad constitutional provisions presuppose and reinforce that principle.  *See* U.S.

17

Const. art. I, §8, cl. 3; art. I, §10; art. IV, §1; art. IV, §2, cl. 1; amend. X; amend. XIV, §1, cl. 2.  Thus, "the territorial limits of state authority under the Constitution's horizontal separation of powers" are grounded not just in particular provisions, but in the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Ross*, 143 S.Ct. at 1156, 1157 n.1 (majority op.).  Those principles mean, quite simply, that a state cannot directly regulate conduct that neither occurs nor is directed within its borders.

HB 426 flouts that rule, as it subjects NSSF members to liability in Hawaii courts for conduct that occurred entirely out of state and was entirely lawful where and when it took place.  For instance, if firearm produced by a manufacturer in Ohio is one day criminally misused in Hawaii, a Hawaii judge could hold that Ohio-based manufacturer liable for used too lax of security measures at its Ohio plants—even if the manufacturer never sold the firearm to anyone in Hawaii, and even if it employed every security measure that Ohio and Congress imposed.  *See* Decl. of Kevin B. Reid ¶¶7-8 (Ruger has no manufacturing operations in Hawaii and does not sell directly to any civilian in Hawaii); Decl. of Susan Cupero ¶7 (same for Smith & Wesson). The Constitution does not permit this sort of extraterritorial regulation just because a product eventually finds its way into Hawaii.  *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-23 (1935); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (California law requiring art sellers to pay royalties

to the artist "violate[d] the dormant Commerce Clause" "as applied to out-of-state sales by California residents"). "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor does some other business in the regulating state. *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999); *see Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018) (enjoining California law purporting to "dictate the method by which" companies treated medical waste "outside of California").

Compounding the problem, HB 426 allows "[i]njunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law." §134-C(d)(1). That will inevitably result in extraterritorial regulation, as most firearm industry members do not reside in Hawaii. Indeed, for many companies, such relief would mean de facto nationwide injunctions. Such sweeping regulation-by-fiat is far beyond Hawaii's power. *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *cf. Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982) (plurality op.) (the "most obvious burden … impose[d] on interstate commerce arises from the statute's previously described nationwide reach").

Furthermore, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" within their borders. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Ross*, 143 S.Ct. at 1158-59. HB 426 does that too, as it imposes liability on out-of-state actors for commercial transactions occurring in other states. And the extreme burdens it imposes on interstate commerce outweigh any benefits, especially since the local interest in reducing crime within Hawaii could be achieved by other means with a far lesser impact on interstate commerce.

Indeed, Congress itself recognized in the PLCAA that the kind of litigation HB 426 invites would impose an "unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). And rightly so. To allow states to subject the firearms industry to sweeping lawsuits seeking to blame them for the actions of third parties over whom they have no control would render the Second Amendment a dead-letter. *See Edgar*, 457 U.S. at 642 (plurality op.) (considering effects if other states enacted similar laws). Making matters worse, since HB 426 creates liability based on the criminal conduct of third parties outside their control, and without regard to whether the industry member engaged in any conduct in or even directed at Hawaii, NSSF's members can do very little to lessen their risk of liability. Indeed, the only way to truly eliminate all risk of liability under

HB 426 would be to cease operations altogether. *See* Reid Decl. ¶¶14, 16-17; Cupero Decl. ¶¶11-18. If that is not an undue burden on interstate commerce, it is difficult to imagine what is.

### D.    HB 426 Violates the First Amendment.

HB 426 regulates—indeed, allows state courts *to enjoin*—protected speech. First, HB 426 regulates speech based on its content. The statute does not apply to *all* marketing; it applies only to "market[ing]" of "a firearm-related product." §134-B(d)(3). HB 426 thus on its face regulates speech based on content or "the topic discussed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022). In fact, the statute does not even apply to all such speech by all speakers—only the speech of "[f]irearm industry member[s]," i.e., those "engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products," falls within HB 426's proscriptive scope. §134-(A). That speaker-based discrimination is no accident. HB 426 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a point of view that Hawaii apparently disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

Yet the topics and views Hawaii has singled out do not fall into any of the "well-defined and narrowly limited classes of speech" that are unprotected by the First Amendment. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011).

21

To be sure, the First Amendment does not preclude liability for false, deceptive, or otherwise "misleading" commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But under HB 426, advertisements with entirely accurate specifications of lawful products may trigger liability if the marketed product is eventually deemed "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State," §134-B(b)(2), apparently *regardless of truthfulness*.  HB 426 likewise imposes liability for advertising "targeted at minors," §134-B(d)(3), even if the marketed product is lawful for minors to use.  That blunderbuss approach flunks First Amendment 101.  Truthful speech promoting lawful use of lawful products enjoys full constitutional protection, even if the products have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996) (plurality op.) (liquor).[1]

Hawaii therefore must affirmatively prove that HB 426 satisfies heightened scrutiny.  It cannot do so, or even come close.  Despite ostensibly being motivated by a desire to address gun violence, HB 426 does nothing to police the conduct of

---

[1] Making matters worse, a manufacturer can be liable under HB 426 for marketing, *in another state*, a firearm or related product that is *lawful in that state* if a Hawaii court later deems it "abnormally dangerous" as a matter of Hawaii law. §134-B(b)(2).  It is difficult to overstate the scope of constitutionally protected speech that HB 426 will chill absent this Court's intervention.

violent criminals or regulate vast swaths of speech—violent video games, direct incitements to violence, etc.—that may actually encourage criminal gun violence. HB 426 is thus "wildly underinclusive." *Brown*, 564 U.S. at 801-02. It is also radically overbroad, outlawing speech that is entirely truthful and non-misleading. And that is to say nothing of HB 426's prohibition on any marketing "targeted at minors," §134-B(d)(3), which prohibits marketing for conduct that Hawaii has expressly declared to be lawful. *See* Haw. Rev. Stat. §134-5(a); pp.11-12, *supra*. Such sweeping provisions cannot survive heightened scrutiny.

HB 426 also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). Yet HB 426 gives no guidance on what makes a firearm suitable for "assaultive purposes," which is no minor omission given that most firearms can be used for "defensive" and "offensive" purposes. NSSF's members are thus left with no guidance as to which firearms they "presumptively" cannot market at all. Those intractable vagueness problems leave regulated parties with no real choice but to err on the side of refraining from speech. *See* Reid Decl. ¶10; Cupero Decl. ¶10. HB 426 is thus bound to "provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as the statute's subjective abstractions do not articulate *at all*—let alone with the "narrow specificity" the Constitution demands, *NAACP v. Button*, 371 U.S. 415, 433 (1963)—what speech

23

may cause liability.  And nixing the constraint imposed by tradition proximate cause—marketing may lead to liability under HB 426 despite the actions of an "intervening … third-party," §134-C(g)—only makes matters worse.  Because any advertisement for a lawful product can create liability, any "legitimate" sweep of the marketing provisions is miniscule.  In short, those provisions "prohibit or chill" protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), and destroy the "breathing space" "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

### E.     HB 426 Is Void for Vagueness.

For many of the same reasons that HB 426 is unconstitutionally vague with respect to speech, it is also unconstitutionally vague under the Due Process Clause with respect to all the conduct it polices.  A law that forbids an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process," *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926), as do laws so malleable that they authorize "arbitrary [or] discriminatory enforcement," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And a more "stringent" vagueness test applies for statutes that "threaten[] to inhibit the exercise of constitutionally protected rights," or impose "quasi-criminal" penalties.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

HB 426 directly restricts speech and the other activities of those engaged in the lawful business of selling arms protected by the Second Amendment. And it authorizes damages, injunctive relief, and anything else a court deems necessary to prevent further violations or otherwise remedy harm. §134-C(d). HB 426 thus ushers in the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, the right to keep and bear arms. 15 U.S.C §7901(a)(6). The most "stringent" vagueness test in law therefore applies here several times over.

HB 426 flunks that test. The statute's attempt to supply a definition for "reasonable controls" only compounds the confusion: HB 426 issues a sweeping command that industry members adopt any and all "[r]easonable controls" to achieve various goals including, e.g., preventing the loss or theft of firearms. §§134-A, 134-B(b)(2). And again, it gives no guidance on what renders a product "most suitable for assaultive purposes." §134-B(d)(1). Due process demands more.

## II.    The Remaining Factors All Favor Injunctive Relief.

The constitutional injuries HB 426 inflicts amply satisfy the irreparable-injury factor, especially given its chilling effects on protected speech. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). And HB 426's harms go well beyond that. The PLCAA confers an immunity from suit, the loss of which cannot be undone. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). And HB 426 will cause "the constriction of [the]

25

market" for lawful firearms and related products—a textbook economic "injury" for which no redress will be available in light of the Eleventh Amendment. *Craig v. Boren*, 429 U.S. 190, 194 (1976); *see Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) (economic injuries irreparable where they are unrecoverable due to the Eleventh Amendment), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).

The equities and public interest favor an injunction as well. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (these factors "merge when the Government is the opposing party"). The Attorney General "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And HB 426 not only encroaches on federal authority by defying the PLCAA, *see United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (the public interest favored enjoining a state law that conflicted with "Congress' policy choice, articulated in a statute"), but tramples on First and Second Amendment rights. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022).

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.


DATED: Honolulu, Hawaii, July 17, 2023.

/s/ *Edmund K. Saffery*
EDMUND K. SAFFERY
FOREST B. JENKINS

PAUL D. CLEMENT (*phv pending*)
ERIN E. MURPHY (*phv pending*)
MATTHEW D. ROWEN (*phv pending*)
MARIEL BROOKINS (*phv pending*)

Attorneys for Plaintiff
NATIONAL SHOOTING SPORTS
FOUNDATION