ANNE E. LOPEZ (7609)
  Attorney General of Hawaiʻi
KALIKOʻONĀLANI D.
    FERNANDES (9964)
  Solicitor General
NICHOLAS M. MCLEAN (10676)
  First Deputy Solicitor General
Department of the Attorney
  General, State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Tel: (808) 586-1360
E-mail: kaliko.d.fernandes@hawaii.gov

ALLA LEFKOWITZ (PHV)
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
Telephone: (202) 545-3257
Email: alefkowitz@everytown.org

WILLIAM J. TAYLOR, JR. (PHV)
RYAN GERBER (PHV)
Everytown Law
P.O. Box 4184
New York, NY 10017
Telephone: (646) 324-8215
Email: wtaylor@everytown.org

*Attorneys for ANNE E. LOPEZ, in her official capacity as
Attorney General for the State of Hawaiʻi*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as Attorney General for the State of Hawaiʻi,<br><br>Defendant. | Civil No. 1:23-cv-00287-DKW-RT<br><br>**DEFENDANT ANNE E. LOPEZ'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. 13); DECLARATIONS OF GREGORY T. GUNDLACH, J.D., PHD; RYAN GERBER; DEAN TSUKADA; EXHIBITS 1–21; CERTIFICATE OF SERVICE**<br><br>District Judge: Chief Judge Derrick K. Watson<br><br>Magistrate Judge: Rom Trader<br><br>Hearing: October 20, 2023 at 10:00 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................4

STANDARD............................................................................................7

ARGUMENT ..........................................................................................8

    I.      NSSF Lacks Standing and the Case is Not Ripe....................................8

          A.    NSSF has not identified any conduct that is proscribed
               by Act 28 in which it or its members are engaged or wish
               to engage ...............................................................................10

          B.    NSSF's fear of enforcement is highly speculative and
               contingent on the behavior of parties not before this Court .....12

    II.     NSSF is Not Likely to Succeed on the Merits .....................................15

          A.    Act 28 does not violate the Second Amendment......................15

          B.    Act 28 is not preempted by PLCAA, and NSSF does not
               have a cause of action to enforce PLCAA in any event ...........21

          C.    Neither the dormant Commerce Clause nor any other
               constitutional provision to which NSSF points prohibits
               Act 28 ....................................................................................29

          D.    Act 28 does not violate the First Amendment .........................31

          E.    Act 28 is not void for vagueness...............................................37

    III.    NSSF's Members Will Not Suffer Irreparable Harm and the
          Balance of the Equities Favor Defendant............................................39

CONCLUSION ....................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Aargon Agency, Inc. v. O'Laughlin*,
　　70 F.4th 1224 (9th Cir. 2023) ..................................................................37

*Ams. for Prosperity Found. v. Bonta*,
　　141 S. Ct. 2373 (2021)............................................................................17

*Armstrong v. Exceptional Child Ctr., Inc*,
　　575 U.S. 320 (2015)................................................................................27

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
　　729 F.3d 937 (9th Cir. 2013) ..................................................................31

*Bd. of Trustees of State Univ. of New York* v. *Fox*,
　　492 U.S. 469 (1989).......................................................................... 36, 37

*Blessing v. Freestone*,
　　520 U.S. 329 (1997)................................................................................28

*Boardman v. Inslee*,
　　978 F.3d 1092 (9th Cir. 2020) ................................................................35

*Cal. Rifle & Pistol Ass'n v. City of Glendale*,
　　644 F. Supp. 3d 610 (C.D. Cal. 2022).....................................................18

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
　　271 F.3d 1141 (9th Cir. 2001) ..............................................................2, 39

*Caribbean Marine Servs. Co. v. Baldrige*,
　　844 F.2d 668 (9th Cir. 1988) ..................................................................40

*Carrico v. City & Cnty. of San Francisco*,
　　656 F.3d 1002 (9th Cir. 2011) ................................................................32

*Carver v. Lehman*,
　　558 F.3d 869 n.16 (9th Cir. 2009) ..........................................................19

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
　　447 U.S. 557 (1980)...................................................................... 3, 33, 35

*City of N.Y. v. Beretta U.S.A. Corp.*,
    524 F.3d 384 (2d Cir. 2008) ..........................................................................23

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005)......................................................................................29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)......................................................................................13

*Cox v. United States*,
    No. 3:11-cr-00022, 2023 WL 4203261 (D. Alaska June 27, 2023)..............20

*Coyote Publ'g, Inc. v. Miller*,
    598 F.3d 592 (9th Cir. 2010) .............................................................. 33, 35, 36

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)........................................................................................9

*Davis v. FEC*,
    554 U.S. 724 (2008).......................................................................................9

*Def. Distributed v. Bonta*,
    No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)..............15

*Delana v. CED Sales, Inc.*,
    486 S.W.3d 316 (Mo. 2016) ........................................................................26

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................................................................................ 20, 21

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) .......................................................................7

*Ellis v. Johnson*,
    No. EDCV 13-1318-VAP KK, 2015 WL 135893 (C.D. Cal. Jan. 7, 2015) .25

*First Resort, Inc. v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017) .....................................................................34

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995)......................................................................................35

*Fleck & Assocs. v. City of Phoenix*,
    471 F.3d 1100 (9th Cir. 2006) .................................................................9, 16

*Gammoh v. City of La Habra*,
    395 F.3d 1114 (9th Cir.), *amended on denial of reh'g*, 402 F.3d 875 (9th Cir.
    2005) ...........................................................................................................38

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)....................................................................................28

*Grandinetti v. Wes Mun*,
    Civ. No. 17-00215 DKW-KJM, 2017 WL 2312474 (D. Haw.
    May 26, 2017).................................................................................................7

*Grant v. Lamont*,
    No. 3:22-cv-01223, 2023 WL 5533522 (D. Conn. Aug. 28, 2023) ..............20

*Hart v. Massanari*,
    266 F.3d 1155 (9th Cir. 2001) .......................................................................19

*Hum. Life of Wash. Inc. v. Brumsickle*,
    624 F.3d 990 (9th Cir. 2010) .........................................................................39

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ............................................................. passim

*In re R.M.J.*,
    455 U.S. 191 (1982)......................................................................................36

*In re Sherretz*,
    40 Haw. 366 (1953) .........................................................................................5

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    959 F.3d 1201 (9th Cir. 2020) .......................................................................24

*Jones v. Google LLC*,
    73 F.4th 636 (9th Cir. 2022)...........................................................................24

*Junior Sports Mags. Inc. v. Bonta*,
    No. 22-56090, 2023 WL 5945879 --- F.4th ---- (9th Cir.
    Sept. 13, 2023)................................................................................ 33, 34, 35

*Kingdomware Techs. v. United States*,
  579 U.S. 162 (2016).................................................................................26

*Knodle v. Waikiki Gateway Hotel, Inc.*,
  69 Haw. 376 P.2d 377 (1987).....................................................................26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).....................................................................................8

*Mich. Corr. Org. v. Michigan Dep't of Corr.*,
  774 F.3d 895 (6th Cir. 2014) ......................................................................29

*Nat'l Ass'n for Gun Rts. v. Lamont*,
  No. 3:22-cv-1118, --- F. Supp. 3d ----, 2023 WL 4975979 (D. Conn.
  Aug. 3, 2023) ......................................................................................... 18, 19

*National Pork Producers Council v. Ross*,
  143 S. Ct. 1142 (2023)..................................................................... 3, 30, 31

*New Jersey. See Padilla-Ramirez v. Bible*,
   882 F.3d 826 (9th Cir. 2017) ......................................................................11

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022)............................................................. 18, 19, 20, 21

*NSSF v. Att'y Gen. of New Jersey*,
  80 F.4th 215 (3d Cir. 2023) ................................................................ passim

*NSSF v. Bonta*,
  3:23-cv-00945-AGS-KSC (S.D. Cal. filed May 23, 2023) ...........................7

*NSSF v. Ferguson*,
  2:23-cv-00113-MKD (E.D. Wash filed April 25, 2023) ................................7

*NSSF v. James*,
  604 F. Supp. 3d 48 (N.D.N.Y. 2022) ............................................ 4, 7, 23, 38

*NSSF v. Jennings*,
  Case No. 22-cv-1499, 2023 WL 5835812 (D. Del. Sept. 8, 2023) ..........7, 14

*NSSF v. Platkin*,
  No. CV226646(ZNQ)(TJB), 2023 WL 1380388 (D.N.J. Jan. 31, 2023)......23

*NSSF v. Raoul,*
    3:23-cv-02791 (S.D. Ill. filed Aug. 14, 2023) ..................................................7

*Or. Firearms Fed'n v. Kotek,*
    No. 2:22-cv-01815, --- F. Supp. 3d ----, 2023 WL 4541027 (D. Or. July 14,
    2023) ..........................................................................................................20

*Polk v. Yee,*
    36 F.4th 939 (9th Cir. 2022) ...........................................................................28

*Sprint Telephony PCS, L.P. v. Cty. of San Diego,*
    543 F.3d 571 (9th Cir. 2008) (en banc) ..........................................................27

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)..................................................................................9, 12

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) (en banc) ...................................... 2, 15, 16, 21

*Temple v. Abercrombie,*
    903 F. Supp. 2d 1024 (D. Haw. 2012)............................................................13

*Teter v. Lopez,*
    76 F.4th 938 (9th Cir. 2023) ................................................................. 13, 19

*Thomas v. Anchorage Equal Rts. Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) (en banc) ...................................... 8, 9, 12, 14

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ............................................................... 14, 37

*Tretta v. Osman,*
    No. 20STCV48910, 2022 WL 3334319 (Cal. Super. Ct. June 29, 2022).....27

*U.S v. Tilotta,*
    No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .....15

*U.S. v. Salerno,*
    481 U.S. 739 (1987)........................................................................ 2, 17, 27

*Unified Data Servs., LLC v. Fed. Trade Comm'n,*
    39 F.4th 1200 (9th Cir. 2022) .......................................................... 10, 11, 12

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023) ........................................................................19

*United States v. Escobar,*
    No. CRIM. 87-0074-M, 1987 WL 31141 (S.D. Cal. Sept. 30, 1987)..........38

*United States v. Kaczynski,*
    551 F.3d 1120 (9th Cir. 2009) ........................................................................18

*United States v. Krumrei,*
    258 F.3d 535 (6th Cir. 2001) ..........................................................................38

*United States v. Libertad,*
    No. 1:22-cr-644, --- F. Supp. 3d ----, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ..............................................................................................................18

*United States v. Ragen,*
    314 U.S. 513 (1942)........................................................................................38

*United States v. Torres,*
    911 F.3d 1253 (9th Cir. 2019) ........................................................................36

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982)...................................................................................3, 37

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008)........................................................................................17

*Winter v. NRDC,*
    555 U.S. 7 (2008)........................................................................................7, 40

*Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,*
    346 A.2d 269 (Pa. 1975).............................................................................4, 38

*Woods v. Steadman's Hardware, Inc.,*
    No. CV 12-33-H-CCL, 2013 WL 709110 (D. Mont. Feb. 26, 2013) ...........28

*Worth v. Harrington,*
    No. 21-cv-1348, --- F. Supp. 3d ----, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) ..............................................................................................................20

*Wyeth v. Levine,*
    555 U.S. 555 (2009)........................................................................................24

*Yim v. City of Seattle*,
   63 F.4th 783 (9th Cir. 2023) .............................................................................35

**Statutes**

15 U.S.C. § 7901 .........................................................................................2, 26

15 U.S.C. § 7902 ...................................................................................... 22, 28

15 U.S.C. § 7903 .................................................................................... passim

HRS § 134 ............................................................................................... passim

HRS § 626 ...........................................................................................................5

**INTRODUCTION**

This lawsuit challenges the constitutionality of Hawaiʻi's Firearms Industry Responsibility Act, enacted by the Hawaiʻi Legislature and signed by the Governor as Act 28 in April 2023. Act 28 creates a civil cause of action against members of the firearms industry that fail to establish reasonable controls to address the illegal distribution and theft of their inventory, or that sell firearm products that are abnormally dangerous and likely to create an unreasonable risk of harm to the public.

Act 28 is similar to laws adopted in seven other states—each of which is designed to protect the health and safety of state residents by promoting responsible sales and marketing practices in the firearms industry. Over the past two years, six of these laws have been challenged by the same plaintiff, the National Shooting Sports Foundation ("NSSF"), a firearm industry trade association that claims its members would have to entirely cease operations if the laws were not enjoined. But none of this has come to pass. As the Third Circuit observed in rejecting one such challenge, NSSF "repeatedly conjures the specter of 'sweeping liability' that will force its members to shutter their businesses," "[y]et its bold assertion is backed by no evidence." *NSSF v. Att'y Gen. of New Jersey*, 80 F.4th 215, 220 (3d Cir. 2023).

The same is true here: NSSF seeks the extraordinary remedy of a preliminary injunction, but has no evidence that any of its members have changed their business in any way or have been threatened with the sort of sweeping liability that they

imagine. Nor has NSSF pointed to any specific conduct or speech in which its members currently engage or plan to engage that would lead to such liability. NSSF thus lacks standing.

Making matters worse, NSSF pursues a facial challenge—seeking to enjoin all enforcement of Act 28 against any of its 10,000 members—but facial invalidation is "strong medicine," to be used "sparingly and only as a last resort." *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1155 (9th Cir. 2001) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). Because NSSF cannot show that "no set of circumstances" exists under which the law could be enforced, its motion must fail. *U.S. v. Salerno*, 481 U.S. 739, 745 (1987).

Each of NSSF's claims also fails on the merits. "[T]he Second Amendment does not independently protect a proprietor's right to sell firearms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) (en banc). And even if NSSF could bring a Second Amendment claim on behalf of its members' customers (which it cannot), it does not come close to establishing that the conduct regulated by Act 28 falls under the Second Amendment's plain text. In any event, the long history of weapons regulation in this country supports the constitutionality of Act 28.

NSSF's preemption claim fares no better. The Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7901 *et seq.* ("PLCAA"), bars *certain* claims from being brought against *certain* members of the gun industry. It is not a free pass

for members of the gun industry to strike down entire statutes that may hypothetically, some day in the future, be used to bring a lawsuit. And PLCAA's text explicitly allows lawsuits where a defendant "knowingly violated a State or Federal statute applicable to the sale and marketing" of firearms. *Id.* § 7903(5)(A)(iii). Act 28 is just such a statute.

NSSF's "Unconstitutional Extraterritorial Regulation" claim runs headlong into *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023), which rejected a reading of the dormant Commerce Clause that would bar state laws with an "extraterritorial effect." *Id.* at 155-56. While NSSF claims that Act 28 imposes "extreme burdens" on interstate commerce, Mot. at 20, its motion is entirely devoid of evidence to support that assertion. Nor is NSSF entitled to a preliminary injunction with respect to its First Amendment claim. Act 28's marketing provisions regulate "commercial speech related to illegal activity," which receives no constitutional protection. *See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 563-64 (1980).

NSSF's void-for-vagueness claim is also without merit. "[E]conomic regulation is subject to a less strict vagueness test," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982), and although NSSF takes issue with Act 28's use of the term "reasonable," "[m]any standards in the law are no more definite than a requirement of 'reasonableness,'" *Wm. Penn Parking Garage, Inc. v.*

*City of Pittsburgh*, 346 A.2d 269, 292 (Pa. 1975), and are not unconstitutionally vague as a result. *NSSF v. James*, 604 F. Supp. 3d 48, 65-67 (N.D.N.Y. 2022). NSSF's motion should be denied.

## BACKGROUND

Gun violence is an epidemic. However, the gun industry has tools that it can employ to minimize the devastation that gun violence causes. *See* Declaration of Gregory Gundlach at ¶¶ 26-43 ("Gundlach Decl."). One of these tools is the implementation of industry controls to prevent the diversion of firearms into the hands of individuals who should not have them, such as straw-purchasers, gun traffickers, and other prohibited possessors. *Id.* ¶¶ 31-37. Research, industry experience, and NSSF's own programs show that such measures can reduce gun violence. *Id*. ¶¶ 69-93.

To this end, the Hawaiʻi Legislature passed Act 28, effective July 1, 2023, to set certain baseline requirements for how "firearm industry member[s]" should manufacture, distribute, import, market or sell "firearm related products." HRS § 134-A. A "firearm industry product" is "a firearm, ammunition, a firearm precursor part, a firearm component, or a firearm accessory that meets any of the following conditions":

(1) The item is sold, made or distributed in [Hawaiʻi];
(2) The item is intended to be sold or distributed in [Hawaiʻi]; or
(3) The item is or was possessed in [Hawaiʻi] and it was reasonably foreseeable that the item would be possessed in [Hawaiʻi].

4

*Id.*

Act 28 operates in two primary ways.  First, firearm industry members must "[e]stablish, implement, and enforce reasonable controls." *Id.* § 134-B(b)(1). "Reasonable controls" are defined as "reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following" three things:

(1) "Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker," a person otherwise prohibited from possessing a gun under federal or state law, or a person who the firearm industry member believes is at risk of hurting himself or others.

(2) "Prevent the loss or theft of a firearm-related product from the firearm industry member."

(3) Ensure compliance with federal and state law and prevent a firearms industry member from "promot[ing] the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product."

*Id.* § 134-A.[1]

Second, firearm industry members must "[t]ake reasonable precautions to ensure that [they] do[] not sell, distribute, or provide to a downstream distributor a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." *Id.* § 134-B(b)(2). A firearm-related product is presumed[2] abnormally dangerous if:

---

[1]   These will be referred to as the "Reasonable Controls Provisions."

[2]   While NSSF suggests that this provision creates an irrebuttable presumption, *see* Mot. at 8, that is incorrect. Under Hawaiʻi law, presumptions are rebuttable unless otherwise specified. *See* HRS § 626-1, Rule 302 Commentary; *In re Sherretz*, 40 Haw. 366, 371 (1953) ("There is no magic in the words 'presume' . . . used in the statute. The word 'presume' is to take to be true an inference as to the existence of one fact not certainly known, from known or proved existence of another fact. It is

(1) its "features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities";

(2) it "is designed, sold, or marketed in a manner that foreseeably promotes" its conversion into an illegal product; or

(3) it "is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms."

*Id*. § 134-B(d). A firearm is not abnormally dangerous, however, based on its "inherent capacity to cause injury or lethal harm." *Id.* § 134-B(c).[3]

A violation of Act 28's provisions gives rise to a cause of action for damages, fees, or injunctive relief. *Id*. § 134-C(a), (d). It may be enforced by the Attorney General, local government officials, or private individuals who have been harmed. *Id*. § 134-C(b)-(c). No party has yet brought any civil action under Act 28.[4]

NSSF's complaint, filed on July 12, 2023, alleges that Act 28 is unlawful in its entirety. ECF No. 1 ("Compl."). On July 17, NSSF filed a motion for a preliminary injunction. ECF No. 13 ("Mot."). The motion is supported by two declarations from gun manufacturers. *See* ECF No. 13-2, Decl. of Kevin B. Reid ("Ruger Decl."); ECF No. 13-3, Decl. of Susan Cupero ("S&W Decl."). This is the

---

a substitute for evidence. The words 'conclusive presumption' give rise to a legal presumption of law that may not be rebutted.").

[3] These will be referred to as the "Abnormally Dangerous Provisions." Act 28 also prohibits engaging "in any conduct related to the sale or marketing of firearm-related products that is in violation of this chapter." HRS §134-B(b)(3).

[4] Act 28 provides that it shall be "construed and applied in a manner that is consistent with the requirements of the United States Constitution and the Hawaii State Constitution." HRS § 134-D(c). It also contains a severability provision.

sixth lawsuit NSSF has filed challenging similar laws.[5] NSSF has claimed in the preceding cases that its members have no choice but to shut down or face substantial liability if these laws are not enjoined. Declaration of Ryan Gerber at ¶¶ 3-7 ("Gerber Decl.").

## STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Grandinetti v. Wes Mun*, Civ. No. 17-00215 DKW-KJM, 2017 WL 2312474, at *2 (D. Haw. May 26, 2017) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)).  To obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20). "When the government is a party, the[] last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

---

[5] The others are in New York, New Jersey, Delaware, Washington, and California (a seventh has since been filed in Illinois). In New Jersey and Delaware, NSSF's lawsuits were dismissed for lack of standing. *New Jersey*, 80 F.4th at 223; *NSSF v. Jennings*, Case No. 22-cv-1499, 2023 WL 5835812 (D. Del. Sept. 8, 2023). In New York, where standing arguments were not raised, NSSF's case was dismissed on a 12(b)(6) motion and the case is currently on appeal. *See NSSF v. James*, 604 F. Supp. 3d 48. In Washington, California, and Illinois, preliminary injunction motions are currently pending.  *NSSF v. Bonta*, 3:23-cv-00945-AGS-KSC (S.D. Cal. filed May 23, 2023); *NSSF v. Ferguson*, 2:23-cv-00113-MKD (E.D. Wash. filed April 25, 2023); *NSSF v. Raoul*, 3:23-cv-02791 (S.D. Ill. filed Aug. 14, 2023).

**ARGUMENT**

## I.   NSSF Lacks Standing and the Case is Not Ripe.

As a threshold matter, NSSF is not entitled to a preliminary injunction because NSSF cannot establish that it has standing to assert its claims. NSSF identifies only a non-specific and speculative injury, and asks this Court for an advisory opinion in a dispute that is not ripe. Article III demands more.

A plaintiff must show three elements to establish Article III standing: (1) an injury that is "concrete and particularized" and either "actual or imminent"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that the injury will likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). As "[t]he party invoking federal jurisdiction," NSSF "bears the burden of establishing these elements." *Id.* at 561. "The constitutional component of the ripeness inquiry is often treated under the rubric of standing and . . . in measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138-39 (9th Cir. 2000) (en banc) (citation omitted).

"Pre-enforcement challenges are unusual. To bring one, the plaintiff must show that the stakes are high and close at hand." *New Jersey*, 80 F.4th at 223. A plaintiff must demonstrate "an intention to engage in a course of conduct arguably

8

affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The Ninth Circuit applies a three-part test in the pre-enforcement context: (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139 (citation omitted). Civil statutes are particularly unlikely to warrant pre-enforcement review, since "the same arguments made in pre-enforcement challenges can be raised as affirmative defenses later." *New Jersey*, 80 F.4th at 223 ("A brand-new civil tort statute, without more, does not justify a federal court's intervention.").

Two additional principles bear note. First, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 351-52 (2006). As part of this principle, a plaintiff must have standing to challenge each separate provision of a law independently. *Davis v. FEC*, 554 U.S. 724, 733-34 (2008). Second, to obtain associational standing, an entity like NSSF must show, among other things, that "at least one of its members would have standing to sue in his own right[.]" *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006).

**A.     NSSF has not identified any conduct that is proscribed by Act 28 in which it or its members are engaged or wish to engage.**

The gravamen of NSSF's claim to standing is that its members will either face the prospect of "sweeping liability under [Act 28]," Compl. ¶ 11, or be forced to cease operations. Ruger Decl. ¶¶ 10, 14, 16; S&W Decl. ¶¶ 10, 14, 17. However, NSSF does not point to any specific conduct that its members engage in that would lead to liability under Act 28. Thus, NSSF "utterly lacks, let alone states 'with some degree of concrete detail,' an allegation that [it] 'intend[s] to violate'" Act 28. *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210 (9th Cir. 2022).

Take the Reasonable Controls Provisions. These provisions require gun companies to implement reasonable controls designed to prevent the diversion of firearms to prohibited individuals, prevent the loss or theft of firearms, and otherwise ensure compliance with federal and state law. HRS §§ 134-A; 134-B(b)(1). NSSF provides no evidence that: (1) its members do not have, or refuse to implement, any such controls; (2) have been threatened with enforcement of Act 28 for failure to have such controls; or (3) have had to change their business in any way as a result of Act 28. NSSF offers nothing more than their declarants' complaint that they are "unable to determine" what will be deemed "reasonable." S&W Decl. ¶ 11; Ruger Decl. ¶ 11. That is not sufficient to maintain a pre-enforcement challenge. If it were, anyone would be able to challenge any of the vast number of civil or criminal statutes that contain "reasonableness" standards.

10

*Unified Data Services* is instructive. There, plaintiffs challenged an FTC letter ruling restricting soundboard technology. 39 F.4th at 1210-11. Plaintiffs claimed that the industry was "whipsawed between abandoning its business . . . and facing potentially ruinous enforcement actions and penalties," but they did not explain "'when, to whom, where, or under what circumstances' they would use soundboard technology but for the challenged policies." *Id.* at 1211 (citation omitted). The Ninth Circuit held that the complaint "utterly lack[ed]" the concrete detail required for Article III standing. *Id*. at 1210. The same is true here.

In NSSF's *New Jersey* case, NSSF claimed that the law "chills its members' manufacturing, marketing, and sales" of firearms. 80 F.4th at 220. There, as here, NSSF did not make specific allegations about *what* conduct it intended to engage in that was proscribed. *Id*. The Third Circuit could only "infer [] that its members plan to make, market, and sell guns[.]" *Id*. And these "generalized allegations [were] insufficient to satisfy Article III's requirements." *Id*. (citations omitted). There is no basis to depart here from the well-reasoned approach taken in *New Jersey*. *See Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017) ("As a general rule, we decline to create a circuit split unless there is a compelling reason to do so." (citations omitted)).[6]

---

[6] To be sure, there are differences between the statutes in this case and *New Jersey*, but they do not alter the analysis. Regarding the Abnormally Dangerous Provisions, NSSF's declarants assert that they are "unable to determine" what weapons are

11

NSSF may claim that it has standing to challenge the provision of Act 28 that creates a presumption that a product is "abnormally dangerous" if it is "designed, sold, or marketed in a manner that is targeted at minors." HRS § 134-B(b)(2), (d)(3). Smith & Wesson states that it manufactures "youth-model" firearms, which are designed "in a manner that is targeted at minors." S&W Decl. ¶ 15. Ruger similarly says it manufactures firearms that are "suitable for use by individuals with smaller hands/bodies and/or less grip strength, which conceivably could include minors[.]" Ruger Decl. ¶ 15. But even here, NSSF again fails to make a record other than these passing assertions. NSSF does not state which guns it considers "youth-model" or that these guns are sold into or regularly used in Hawaiʻi.

### B.   NSSF's fear of enforcement is highly speculative and contingent on the behavior of parties not before this Court.

A party may challenge a law before enforcement only if "there exists a credible threat of prosecution" under the law. *Driehaus,* 573 U.S. at 159. Here, "the record is devoid of any threat—generalized or specific—directed toward" NSSF members. *Thomas*, 220 F.3d at 1140. NSSF's doomsday forecasting of "sweeping liability" is made "without any indication that such [liability is] imminent or realistic." *Unified Data Servs*., 39 F.4th at 1211. NSSF's "highly speculative fear"

---

"abnormally dangerous." S&W Decl. ¶ 17; Ruger Decl. ¶ 12. These generalized assertions suffer from the same flaws as NSSF's claim in *New Jersey*. Namely, NSSF does not point to any specific firearm or product that it manufactures or sells into Hawaiʻi that it fears could lead to liability under Act 28.

appears to be largely based on the supposition that numerous parties will sue under

Act 28—which is insufficient to confer standing. *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 410-11 (2013); *see also Temple v. Abercrombie*, 903 F. Supp. 2d 1024,

1034 (D. Haw. 2012) ("[A] genuine threat of enforcement (by a private party) against

Plaintiffs would be contingent on several events beyond Plaintiffs' control[.]").[7]

NSSF itself demonstrates the speculative nature of its claim by concocting

hypotheticals that may never happen nor lead to liability under Act 28. Take this

example from NSSF's brief: "*if* [a] firearm produced by a manufacturer in Ohio is

one day criminally misused in Hawaii, a Hawaii judge *could* hold that Ohio-based

manufacturer liable for us[ing] too lax of security measures at its Ohio plants—*even

if* the manufacturer *never* sold the firearm to anyone in Hawaii, and *even if* it

employed every security measure that Ohio and Congress imposed." Mot. at 18

(emphases added). This hypothetical—contingent upon three "if" statements—is

---

[7] NSSF may cite *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *pet. for reh'g en banc filed*, No. 20-15948, Dkt. 135 (9th Cir. Sept. 20, 2023), for the proposition that a plaintiff need not "always prove 'a specific warning or threat to initiate proceedings[.]'" *Id.* at 946. But that is immaterial here. In *Teter*, the plaintiffs challenged Hawaiʻi's butterfly knife law and declared that they (1) previously owned butterfly knives; (2) disposed of them in response to Hawaiʻi's law; and (3) would purchase a replacement if the law were not in place. *Id.* Based on these claims about how the plaintiffs changed their conduct, the court did not require a "specific warning or threat." *Id.* Here, NSSF does not claim that it or its members have changed any conduct and instead raises the vague specter of civil liability for conduct that it does not specify. In the absence of stating a concrete plan to violate the law, NSSF's inability to show a threat of enforcement is fatal.

based on a misreading of the Hawai'i law and other safeguards built into the American legal system. For one, Act 28 only provides for liability based on out-of-state conduct if "it was reasonably foreseeable that the item would be possessed in the State." HRS § 134-A. And, of course, a court must have personal jurisdiction over a party for a suit to proceed. NSSF's outlandish hypotheticals merely demonstrate the premature nature of this suit.

This case is also not prudentially ripe. "The two guiding considerations for prudential ripeness are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022) (quoting *Thomas*, 220 F.3d at 1141). NSSF's lawsuit fails under the fitness prong because it "rests upon hypothetical situations[.]" *Thomas*, 220 F.3d at 1142. And NSSF will not suffer hardship because the "absence of any real or imminent threat of enforcement, particularly criminal enforcement, seriously undermines any claim of hardship." *Id*.[8]

Finally, there is no history of past enforcement of Act 28. All NSSF can conjure is that some of its members have been sued by cities in New York under a

---

[8] Act 28's private right of action does not alter this analysis. *See NSSF v. Jennings*, Case No. 22-1499-RGA, 2023 WL 5835812, at *2 (D. Del. Sept. 8, 2023) (holding that NSSF lacked standing to challenge Delaware's industry accountability law, even though it included a private right of action). As in *Jennings*, NSSF here "has not pointed to any lawsuit filed or threatened by a private party." *Id.* Moreover, any "harm" potentially caused by a private plaintiff's suit would not be traceable to the Attorney General. *Cf. Temple*, 903 F. Supp. 2d at 1035.

different statute. Ruger Decl. ¶ 18; S&W Decl. ¶ 18. "But a city's decision to sue under another state's law tells us nothing about the [Hawai'i] Attorney General's plans." *New Jersey*, 2023 WL 5286171, at *5.

## II.     NSSF is Not Likely to Succeed on the Merits.

### A.     Act 28 does not violate the Second Amendment.

#### 1.     Controlling Ninth Circuit authority precludes any direct Second Amendment claim by NSSF and its members.

NSSF argues that Act 28 violates the Second Amendment because the law "forbids firearm industry members from manufacturing, making, or selling" certain firearms and related products. Mot. at 10. But, as controlling Ninth Circuit authority makes clear, there is no Second Amendment right to engage in these activities. In *Teixeira*, the en banc Ninth Circuit held, based on text and history, that "the Second Amendment does not independently protect a proprietor's right to sell firearms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017). The same is true for any asserted right to manufacture guns. *Id.* at 690 n.24; *see also Def. Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (Second Amendment's plain text "quite-clearly" does not include an "implicit[]" right to "manufacture firearms"), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022); *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) ("The plain text of the Second Amendment does not cover [the] proposed course of conduct to commercially sell and transfer

firearms[.]"). NSSF and its members—which are alleged to include "manufacturers, distributors, and retailers of firearms," Compl. ¶ 11—thus cannot state a direct Second Amendment claim, let alone establish a likelihood of success on the merits.

> ### 2. NSSF fails to establish derivative standing on behalf of its members' individual customers.

NSSF also suggests that Act 28 implicates an individual's right to "acquire arms." *See* Mot. at 6, 9. But it has fallen far short of establishing the derivative associational standing it would need to bring a Second Amendment claim on behalf of its members' customers or other individuals seeking to exercise that "subsidiary" or "ancillary" right under the Second Amendment. *Teixeira*, 873 F.3d at 677-78.

Unlike the plaintiff in *Teixeira*, NSSF itself is not a gun seller and has no customers; it is a trade association. Compl. ¶ 11. NSSF's members are alleged to include "retailers of firearms," but none are identified. *Id.* Smith & Wesson and Ruger are not firearm retailers, but manufacturers without any operations in Hawaiʻi and which do not sell firearms directly to individuals in Hawaiʻi. Ruger Decl. ¶¶ 7-8; S&W Decl. ¶ 7. And nowhere in NSSF's submissions is there mention of any actual individual customers or "would-be customers," *Teixeira*, 873 F.3d at 678, or of any relationship such customers have with NSSF or any member of NSSF that actually sells firearms. The lack of any such evidence precludes derivative standing here. *See, e.g.*, *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1105 n.3 (9th Cir. 2006) (stating that, given the inadequate allegations in the complaint, a plaintiff

business entity "could not rely on the interests of its customers" for derivative standing).

### 3. Any derivative Second Amendment claim NSSF might bring on behalf of individual customers fails on the merits.

Even if NSSF could bring a derivative Second Amendment challenge to Act 28 on behalf of individual customers, that challenge would fail for two independent reasons. *First*, NSSF has not satisfied the rigorous standard governing facial constitutional challenges. NSSF seeks to enjoin the entirety of Act 28, *see* Mot. at 3; Compl. at 59-60, but a facial constitutional claim is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 745, or "show that the law lacks 'a plainly legitimate sweep,'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). NSSF's "'hypothetical' or 'imaginary' cases" where Act 28 might be enforced in a way that violates the Second Amendment simply do not suffice. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

Act 28, in fact, has numerous applications that NSSF does not dispute are lawful and comport with the Second Amendment—including restrictions on the marketing and sale of automatic firearms, and on the marketing and sale of weapons to straw purchasers and illegal firearms traffickers. Thus, because Act 28 "can be constitutionally applied in many cases, [NSSF]'s facial challenge must fail." *United*

*States v. Kaczynski,* 551 F.3d 1120, 1125 (9th Cir. 2009)*; see also, e.g.*, *Cal. Rifle & Pistol Ass'n v. City of Glendale*, 644 F. Supp. 3d 610, 619-20 (C.D. Cal. 2022) (finding that facial challenge to ordinance prohibiting firearms on city property failed because it was undisputed that firearms could be prohibited "on at least some city property," so the ordinance was not "unconstitutional in all its applications").[9]

*Second*, even without this insurmountable facial-challenge barrier, NSSF's claim would still fail on the merits. Under *Bruen*, a plaintiff must demonstrate that the Second Amendment's plain text covers the plaintiff's conduct. 142 S. Ct. at 2129-30. Only then must "[t]he government . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Here, NSSF fails to satisfy the initial, plain text inquiry.

NSSF contends that Act 28 violates the Second Amendment because the law's Abnormally Dangerous Provisions prohibit firearms and related products that are "in

---

[9] NSSF has suggested in a similar California challenge that the recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), somehow requires a different facial-challenge analysis for Second Amendment cases. But that is not so. *See, e.g.*, *United States v. Libertad*, No. 1:22-cr-644, --- F. Supp. 3d ----, 2023 WL 4378863, at *5 (S.D.N.Y. July 7, 2023) (post-*Bruen* facial Second Amendment challenge fails where it is based on "mere speculation" that a law might operate unconstitutionally "under certain circumstances"), *appeal docketed*, No. 23-6910 (2d Cir. Aug. 11, 2023); *see also, e.g.*, *Nat'l Ass'n for Gun Rights. v. Lamont*, No. 3:22-cv-1118, --- F. Supp. 3d ----, 2023 WL 4975979, at *6-7 (D. Conn. Aug. 3, 2023) (applying *Salerno* to law prohibiting assault weapons and large-capacity magazines), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023).

common use today," which, according to NSSF, simply "cannot be banned." Mot. at 1, 10. But that is the wrong analysis. Under *Bruen*, the Second Amendment covers only weapons "'in common use' today *for self-defense*," such as "the quintessential self-defense weapon," the handgun. *Bruen*, 142 S. Ct. at 2134 (emphasis added) (citation omitted); *see United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold inquiry," including whether "the weapon at issue is in 'common use' for self-defense." (citation omitted)).[10]

Act 28, by contrast, creates civil liability for the sale and distribution of only "abnormally dangerous" firearms and related products, which the statute presumes are those weapons whose "features render [them] most suitable for assaultive purposes *instead of lawful self-defense*," HRS § 134-B(d)(1) (emphasis added), or those that may be readily converted into illegal models or targeted to "minors or other individuals who are legally prohibited from accessing firearms," *id.* § 134-B(d)(2)-(3). NSSF—which bears the burden on the textual question, *see, e.g.*, *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *15—fails to identify even a single firearm

---

[10] *Teter*, 76 F.4th 938, has not changed the textual and "common use" analyses in the Ninth Circuit. It cannot overrule the binding authority of *Bruen* and *Alaniz*, *see, e.g.*, *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001), and, in any event, with a petition for rehearing en banc pending*, Teter* is not yet "final" or "settled Ninth Circuit law." *Carver v. Lehman*, 558 F.3d 869, 878 & n.16 (9th Cir. 2009).

or related product that is in common use for self-defense today that Act 28 prohibits. That failure alone defeats any Second Amendment claim.[11]

Moreover, even if NSSF had satisfied its textual burden, that would merely shift the burden to the government to demonstrate that the Abnormally Dangerous Provisions are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. And, as several courts since *Bruen* have concluded, there is a well-founded "history and tradition of regulating uniquely dangerous features of weapons and firearms to protect public safety." *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, --- F. Supp. 3d ----, 2023 WL 4541027, at *55 (D. Or. July 14, 2023), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.).[12] This history is in accord with the Supreme Court's pronouncement that "dangerous and unusual weapons" may be prohibited. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *see Bruen*, 142 S. Ct. at 2143.

---

[11] Nor does the Second Amendment protect accessories or devices that could convert a firearm into an illegal product. *See, e.g.*, *Cox v. United States*, No. 3:11-cr-00022, 2023 WL 4203261, at *7-8 (D. Alaska June 27, 2023) (noting that silencers are not protected by the Second Amendment). And NSSF correctly does not even contend that the Second Amendment covers those under 18. *See Worth v. Harrington*, No. 21-cv-1348, --- F. Supp. 3d ----, 2023 WL 2745673, at *8 (D. Minn. Mar. 31, 2023) (noting that "[n]o court has read the Second Amendment to cover those under the age of 18"), *appeal docketed*, No. 23-2248 (8th Cir. May 22, 2023).

[12] *See also Grant v. Lamont*, No. 3:22-cv-01223, 2023 WL 5533522, at *6 (D. Conn. Aug. 28, 2023) (citing cases), *appeal docketed*, No. 23-1344 (2d Cir. Sept. 28, 2023).

NSSF's remaining Second Amendment argument fails as well. It appears to suggest that the Reasonable Controls Provisions are unconstitutional because they "saddle licensed industry members with the costs of harms created by criminals." Mot. at 12. But because NSSF does not allege or offer evidence of any effect the law might have on law-abiding citizens' ability to acquire firearms, it "cannot possibly state a claim for relief under the Second Amendment." *Teixeira*, 873 F.3d at 673, 677-79. This is consistent with the Supreme Court's many assurances that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 627 & n.26; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And, contrary to NSSF's assertions, *see* Mot. at 12, commercial restrictions on firearm sales are historically rooted. *See Teixeira*, 873 F.3d at 683-87 (surveying the history and explaining "colonial governments substantially controlled the firearms trade").

**B.    Act 28 is not preempted by PLCAA, and NSSF does not have a cause of action to enforce PLCAA in any event.**

NSSF's preemption claim fares no better. PLCAA explicitly allows lawsuits based on violations of state statutes applicable to the sale and marketing of firearms. And in any case, PLCAA cannot be used to affirmatively challenge a statute since it does not create a private right of action. *See* 15 U.S.C. § 7903(5)(C).

### 1.      PLCAA's statutory terms.

PLCAA was passed to protect gun companies from certain lawsuits attempting to hold them liable for the misuse of their products by third parties. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1129 (9th Cir. 2009). It provides that "[a] qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. § 7902(a). A "qualified civil liability action" is:

> a civil action . . . brought by any person against a manufacturer or seller of a qualified product . . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . .

*Id*. § 7903(5)(A).[13]

PLCAA has six exceptions. *Id.* § 7903(5)(A)(i)-(vi). The relevant exception here is the third exception—the "predicate exception"—which permits an otherwise covered action to proceed where the defendant has:

> knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought[.]

15 U.S.C. § 7903(5)(A)(iii); *see also Ileto*, 565 F.3d at 1132.

### 2.      PLCAA does not preempt Act 28.

The text of PLCAA makes clear that lawsuits premised on knowing violations of Act 28 are exempted from PLCAA's scope. PLCAA expressly permits "*an action*

---

[13] In relevant part, a "qualified product" is a firearm or ammunition, or component thereof." *Id.* § 7903(4).

in which a manufacturer or seller of a qualified product knowingly violated a *State* or Federal *statute* applicable to the *sale or marketing* of the product[.]" 15 U.S.C. § 7903(5)(A)(iii) (emphases added). Act 28 is precisely such a statute.

After PLCAA's passage, courts initially struggled with exactly what the phrase "applicable to the sale or marketing" of firearms meant. *See e.g., Ileto*, 565 F.3d at 1133-38; *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 399-404 (2d Cir. 2008). The debate focused on whether any statute "capable of being applied" to the firearms industry qualified as a "predicate statute" or whether the statute had to explicitly refer to firearm sales and marketing. *Id.* But under any commonly accepted definition of "applicable," Act 28 is a statute "applicable to the sale and marketing" of firearms. *See NSSF v. James*, 604 F. Supp. 3d 48, 59 (N.D.N.Y. 2022) ("No reasonable interpretation of 'applicable to' can exclude a statute which imposes liability exclusively on gun manufacturers for the manner in which guns are manufactured, marketed, and sold.").

NSSF's arguments to the contrary are based on an interpretation of PLCAA completely unmoored from the operative statutory text. It argues that a qualifying predicate statute must provide "clear rules" or "clear legal obligations." Mot. at 13-14.[14] But this requirement is found nowhere in PLCAA's text, and courts will not

---

[14] *NSSF v. Platkin*, No. CV226646(ZNQ)(TJB), 2023 WL 1380388, (D.N.J. Jan. 31, 2023), which NSSF relies on for this proposition, has been vacated by the Third Circuit and is no longer good law. *New Jersey*, 80 F.4th at 21.

find a state law preempted "unless 'that [i]s the clear and manifest purpose of Congress.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). In express-preemption cases, courts focus on the statute's "plain wording," which "necessarily contains the best evidence of Congress'[s] preemptive intent." *Jones v. Google LLC*, 73 F.4th 636, 641 (9th Cir. 2022) (citation omitted).

NSSF complains of Act 28's requirement that gun-industry members implement "reasonable" controls or precautions, *see* Mot. at 14-15, but the drafters of PLCAA had no issue allowing a judge or jury to determine what is "reasonable"; the term "reasonable" or "reasonably" is used in three different exceptions, *including the predicate exception. See* 15 U.S.C. § 7903(5)(A)(iii)(II) (providing an example of a permissible lawsuit based on a predicate statute where the gun industry defendant sells a firearm, "knowing, or having reasonable cause to believe," that the buyer was prohibited); *see also id.* §§ 7903(5)(A)(ii),(v); 7903(5)(B).

NSSF's reliance on *Ileto* is misplaced. In *Ileto*, the plaintiffs argued that "California's general tort law"—namely, the torts of negligence and nuisance codified in California's civil code—could serve as predicate statutes. 565 F.3d at 1132–33. The court rejected this argument, pointing out that such a broad reading of "applicable to" would let the exception swallow the rule. *Id.* at 1134-35. The court ultimately found it "more likely that Congress had in mind only . . . statutes that

24

regulate *manufacturing*, importing, *selling, marketing*, and using firearms *or that regulate the firearms industry*—rather than *general* tort theories that happened to have been codified by a given jurisdiction." *Id.* at 1136 (emphases added). It was in this context—a concern over "ordinary common-law claims" not directed specifically at the firearms industry—that *Ileto* stated "that 'judicial evolution' was precisely the target of the PLCAA." *Id.*

NSSF also argues that Act 28 does not meet the predicate exception's knowledge and proximate cause requirements. But it is not the underlying statute that must meet those requirements; it is the "action." 15 U.S.C. § 7903(5)(A)(iii). In other words, in a future case where a plaintiff relies on Act 28 as a predicate, the plaintiff will have to prove that the Act 28 violation was knowing and was a proximate cause of the harm. That Act 28 includes a reasonableness standard does not change the analysis. It is not unusual for a knowing violation to include a reasonableness standard. *See, e.g.*, *Ellis v. Johnson*, No. EDCV 13-1318-VAP KK, 2015 WL 135893, at *8 (C.D. Cal. Jan. 7, 2015) ("[I]n California, a parent or person owing a common law duty to protect a child can be guilty as an aider and abettor to crimes arising out of child abuse if they 'knowingly fail[ed] to take reasonable steps to stop an attack . . . [on the] child." (alterations in original)).

Act 28 also does not "discard[] proximate cause." Mot. at 16. Instead, it states that "[a]n intervening act by a third party, including but not limited to criminal use

25

of a firearm-related product, shall not preclude a firearm industry member from liability under this part." HRS § 134-C(g). This is consistent with the law of proximate causation in Hawaiʻi, which uses foreseeability as the touchstone of the inquiry. *See Knodle v. Waikiki Gateway Hotel, Inc*., 69 Haw. 376, 393, 742 P.2d 377, 388 (1987) ("George Murphy's independent acts could not have superseded or excused the defendants' negligence if such acts were reasonably foreseeable."). And in any event, to get through PLCAA, a plaintiff will still have to meet PLCAA's proximate-cause requirement.

Finally, NSSF argues that PLCAA's enumerated findings show that it meant to preempt statutes like Act 28. But the "prefatory clauses" NSSF cites "cannot change the scope of the operative clause." *Kingdomware Techs. v. United States*, 579 U.S. 162, 173 (2016); *see also Delana v. CED Sales, Inc*., 486 S.W.3d 316, 322 (Mo. 2016) ("The general statement of purpose of the PLCAA does not redefine the plain language of a statute."). The tension that NSSF attempts to create between PLCAA's goals and Act 28 is illusory. PLCAA bars liability "for the harm solely caused by the criminal or unlawful misuse of firearm products . . . by others." 15 U.S.C. § 7901(b)(1). This is consistent with Act 28, which creates liability only for a firearm-industry member's *own* misconduct.[15]

---

[15] It is also important to note that PLCAA does not cover all "firearm industry members" covered by Act 28, but only "manufacturer[s]" and "seller[s]" that are federally licensed under the Gun Control Act (with the exception of ammunition

### 3. NSSF lacks a cause of action to pursue its PLCAA preemption claim.

NSSF lacks a cause of action to bring its preemption claim in any event. Although NSSF appears to base its preemption claim on the Supremacy Clause, *see* Compl. ¶ 71, "the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc,* 575 U.S. 320, 324-25 (2015) (citation omitted). And while federal courts sitting in equity may sometimes enjoin violations of federal law under *Ex Parte Young,* this power "is subject to express and implied statutory limitations." *Id.* at 327.

In *Armstrong*, the Supreme Court concluded that the "Medicaid Act preclude[d] private enforcement" because of "[t]he sheer complexity associated with enforcing [it], coupled with the express provision of an administrative remedy." *Id.* at 329. PLCAA is even more explicit: it states that "no provision of this chapter shall be construed to create a public or private cause of action or remedy." 15 U.S.C. § 7903(5)(C). And whether PLCAA is described as providing an affirmative defense

---

sellers). *Id.* § 7903(2),(6). So lawsuits against gun industry members who lack a federal firearms license, such as makers of firearm accessories like large-capacity magazines, or sellers of "ghost guns," are not barred by PLCAA. *See Ileto*, 565 F.3d at 1144-46 (PLCAA does not apply to claims against foreign gun manufacturer without a federal firearms license); *Tretta v. Osman*, No. 20STCV48910, 2022 WL 3334319, *1-2 (Cal. Super. Ct. June 29, 2022). Thus, there are numerous applications of Act 28 that are not impacted by PLCAA, and NSSF's facial preemption challenge necessarily fails. *Salerno*, 481 U.S. at 745; *see also Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en banc) (*Salerno* applies to "a federal preemption facial challenge to a state statute").

or an "immunity," *see Ileto*, 565 F.3d at 1142, its protection applies only to certain *actions*, not statutes. 15 U.S.C. §§ 7902(a), 7903(5)(A). Simply put, nothing in PLCAA's text or structure suggests that Congress intended to permit private parties to use PLCAA as a sword, rather than a shield. That is why, until the commencement of NSSF's litigation campaign, PLCAA had never been used as anything other than an affirmative defense.

For similar reasons, § 1983 does not supply a cause of action either. A plaintiff filing suit under § 1983 "must assert the violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). And Congress must create such rights "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). "[F]alling within the general zone of interest that the statute is intended to protect is not enough." *Polk v. Yee*, 36 F.4th 939, 944 (9th Cir. 2022) (citation omitted). Here, again, PLCAA expressly disclaims a private right of action. It would be anomalous for a court to imply a right of action under § 1983 when PLCAA rejects creating one itself. Indeed, as one court has observed, "PLCAA explicitly prevents its own use as a jurisdictional hook." *Woods v. Steadman's Hardware, Inc.*, No. CV 12-33-H-CCL, 2013 WL 709110, at *3 (D. Mont. Feb. 26, 2013).

Importantly, if a statute provides for its own "express, private means of redress," then that "is ordinarily an indication that Congress did not intend to leave

Case 1:23-cv-00287-DKW-RT    Document 38    Filed 09/29/23    Page 38 of 50    PageID.290

open a more expansive remedy under § 1983." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005). PLCAA does exactly that: it allows a gun industry defendant to assert PLCAA preemption by raising it as a defense.

"[E]ven in a case involving relief sought under *Ex parte Young*, courts must determine whether Congress intended private parties to enforce the statute by private injunction or for that matter by a declaratory judgment." *Mich. Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014). Where "neither [PLCAA] nor § 1983 nor *Ex parte Young* provides the private right of action . . . need[ed] to obtain declaratory relief against [the Attorney General]," "[t]his stops [NSSF's] declaratory judgment action in its tracks." *Id*. at 907.

### C.    Neither the dormant Commerce Clause nor any other constitutional provision to which NSSF points prohibits Act 28.

NSSF's extraterritorial regulation arguments are premised on a misunderstanding of Act 28 and are foreclosed by Supreme Court precedent. NSSF, moreover, cannot create a new unenumerated right based on six separate constitutional provisions it mentions in passing. *See* Mot. at 17-18.

To begin, NSSF asserts "that a state cannot *directly* regulate conduct that neither occurs nor is *directed within its borders*." Mot. at 18 (emphases added). But Act 28 regulates only conduct that has a *direct connection* to Hawaiʻi: the product at issue must be "sold, made, or distributed" or "intended to be sold or distributed" in Hawaiʻi, or "possessed in the State and it was reasonably foreseeable that the item

would be possessed in the State." HRS § 134-A. And while Act 28 may *indirectly* touch on out-of-state conduct, "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Ross,* 143 S. Ct. at 1155. A broad rule like the one posed by NSSF would "cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id*. at 1156.

In *Ross*, the Supreme Court upheld a California law prohibiting the in-state sale of pork products raised under cruel conditions, even though most pigs are bred outside of California, and the law necessarily influenced out-of-state conduct. *Id*. at 1149-65. The Court reiterated that "antidiscrimination . . . lies at the core of . . . dormant Commerce Clause jurisprudence," and that a dormant Commerce Clause claim must generally allege "purposeful discrimination against out-of-state economic interests." *Id.* at 1157, 1158. It rejected an "almost per se" rule that would enjoin any state law that had the "practical effect of controlling commerce outside the State[.]" *Id*. at 1154-56. Here, NSSF does not (and cannot) allege that Act 28 discriminates against out-of-state economic interests. Under *Ross,* this Court cannot enjoin Act 28 simply because it may impact commerce outside Hawaiʻi.

NSSF also argues that Act 28 unduly burdens interstate commerce. Mot. at 20. But "most statutes that impose a[n unconstitutional] substantial burden on interstate commerce do so because they are discriminatory," *Ass'n des Eleveurs de*

*Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013), which Act 28 is not. In any case, NSSF has not demonstrated how Act 28 unduly burdens its members. NSSF merely provides bald assertions from two companies that claim they would need to entirely shut down operations to avoid liability under Act 28. *See* Ruger Decl. ¶¶14, 16-17; S&W Decl. ¶¶ 11-18. These declarations are very similar to the declarations those same companies submitted almost two years ago in *NSSF v. James*, where the court denied NSSF's preliminary injunction motion and dismissed NSSF's complaint. Gerber Decl. ¶ 3. Since then, neither company has actually stopped operating, *id.* ¶¶ 8-17, or shown any other tangible consequence from Act 28. NSSF's arguments, moreover, could be made against any state law that could be applied to out-of-state manufacturers. Yet all manner of industries are subject to regulation in states that they choose to do business in, without any dormant Commerce Clause problem. *Ross*, 143 S. Ct. at 1156. NSSF's conclusory recitation of six different constitutional provisions does nothing to change this conclusion.

> ### D.    Act 28 does not violate the First Amendment.

NSSF lacks standing to bring its First Amendment claim, and the claim fails on the merits, in any event.

***Standing.*** In addition to the deficiencies identified *supra* at pages 10-15, NSSF's First Amendment claim suffers from further standing shortcomings. Specifically, NSSF has not stated that there is any speech in which it or its members

wish to engage that is arguably proscribed by Act 28. Simply invoking the First Amendment, "[w]ithout any description of intended speech or conduct," does not permit the court to "analyze whether what [a plaintiff] would like to do even arguably falls within the scope of" a statute. *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1007 (9th Cir. 2011).

All that NSSF provides is two declarations claiming that the declarants' companies are "unable to determine what marketing activity might be construed as a violation of [Act 28]" and thus to "avoid liability for such activity" they would need "to cease all marketing activity entirely." S&W Decl. ¶ 10; Ruger Decl. ¶ 10. This is nowhere near enough to maintain a facial, pre-enforcement challenge. There is no information regarding what kind of marketing the companies are engaged in or what statements they are worried about. Nor is there any indication that these companies have actually stopped marketing activities as a result of Act 28. In fact, both companies appear to still be marketing in Hawai'i. *See* Tsukada Decl. [16]

The *New Jersey* case is again instructive. NSSF argued that its members "are 'already suffering' an injury to their First . . . Amendment rights [] [b]ecause they

---

[16] A recent Ninth Circuit case provides an example of the sort of conduct change that does confer standing: "Fearing liability" under a California statute pertaining to marketing to minors, Junior Sports Magazines "ceased distributing the magazine in California and [] placed warnings on its website deterring California minors from accessing its content." *Junior Sports Mags. Inc. v. Bonta*, No. 22-56090, 2023 WL 5945879, at *4, --- F.4th ---- (9th Cir. Sept. 13, 2023).

do not know what marketing and manufacturing will be considered unreasonable, [and] the Law supposedly chills their protected conduct." 80 F.4th at 219. The Third Circuit rejected this argument because it lacked a "'threat of specific future harm,'" and was "backed by no evidence." *Id*. at 220 (citation omitted). So too here.

*Merits*. NSSF's First Amendment claim also fails because Act 28 regulates commercial speech and it meets the standards set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Under *Central Hudson*, "commercial speech related to illegal activity" receives no constitutional protection. *Id*. at 563-64; *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 606 (9th Cir. 2010) ("[T]he First Amendment extends no protection" to commercial speech that "concerns illegal activity or is misleading."). Act 28's marketing provisions regulate commercial speech directed at unlawful activity—namely, marketing for products that are "abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety," which presumptively includes: (1) marketing that "promotes the conversion of legal firearm-related products *into illegal firearm-related products*," and (2) marketing "targeted at . . . individuals *who are legally prohibited from accessing firearms*." HRS § 134B(d)(2), (3) (emphases added).[17] Act 28 also presumptively includes the marketing of

---

[17] In accordance with the Ninth Circuit's decision in *Junior Sports*, the Attorney General will not bring any enforcement action premised solely on marketing lawful firearms to minors, *see* HRS § 134B(d)(3), so long as *Junior Sports* remains binding

products that are "most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities[.]" HRS § 134-B(d)(1). This provision covers illegal weapons and accessories such as automatic firearms and assault pistols. *See* HRS §§ 134-4(e), 134-8.

Because NSSF brings this claim as a facial challenge, without stating what speech Act 28 regulates that its members engage in, the fact that Act 28 regulates commercial speech concerning unlawful conduct in and of itself defeats NSSF's First Amendment claim. On a First Amendment facial challenge, a law is generally only unconstitutional in "one of two ways: 'either [ ] it is unconstitutional in every conceivable application, or [ ] it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.'" *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1271 (9th Cir. 2017) (alteration in original) (citation omitted). As shown above, Act 28 has numerous constitutional applications since it prohibits marketing that targets unlawful conduct.

Even if the Court were to conclude that Act 28 does not primarily regulate speech concerning illegal conduct, Act 28 satisfies the intermediate scrutiny test in *Central Hudson*, whereby a government defendant need only show (1) that it has "a

---

circuit precedent. Therefore, insofar as NSSF challenges Act 28 as applied to marketing to minors, NSSF's arguments fail because, without a reasonable prospect of enforcement of that portion of Act 28 by the Attorney General, there is no basis for standing or injunctive relief.

governmental interest [that] is substantial," (2) that Act 28 "directly advances the governmental interest asserted," and (3) that Act 28 is "not more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566.[18]

First, Hawaiʻi's interest here—preventing the "unreasonable risk of harm to public health and safety" from gun violence—is substantial. *See Junior Sports Mags.*, 2023 WL 5945879, at *5 (noting that "[p]rotecting [] citizens from gun violence and intimidation" is a "substantial" governmental interest). Satisfying this prong requires a showing that "the harms [Hawaiʻi] recites are real and that its restriction will in fact alleviate them to a material degree." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (quotation marks omitted). "Common sense counsels that advertising tends to stimulate demand for products and services. Conversely, prohibitions on advertising tend to limit demand." *Miller*, 598 F.3d at 608; Gundlach Decl. ¶¶ 112-155 (explaining how responsible marketing limits harmful demand). The State has a clear and vested interest in reducing the demand for unlawful firearms and countering demand for people who are legally prohibited from possessing guns. *See United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019)

---

[18] Contrary to NSSF's arguments, "content-based restrictions of commercial speech are subject to intermediate scrutiny[.]" *Yim v. City of Seattle*, 63 F.4th 783, 793 n.14 (9th Cir. 2023). Act 28 does not regulate "speech based on the specific motivating ideology or perspective of the speaker" and is thus not viewpoint discriminatory. *Boardman v. Inslee*, 978 F.3d 1092, 1110 (9th Cir. 2020). Act 28 does not apply to "firearm industry members" because they hold a particular viewpoint; it applies because of the commercial transactions they market to customers. *Cf. id.*

("[T]he government has a[] strong interest in preventing people who already have disrespected the law . . . from possessing guns." (citations omitted)).

NSSF does not directly counter these points, and instead argues that Act 28 is underinclusive because it does not regulate "violent criminals" or speech that may encourage gun violence like video games. Mot. at 22-23. As an initial matter, Hawaiʻi has an expansive regulatory and criminal law regime dedicated to regulating firearms as set forth in HRS Chapter 134. Additionally, the question here is whether Act 28 materially advances Hawaiʻi's state interest, not whether Hawaiʻi could have gone even further than it did. *See Miller*, 598 F.3d at 608 ("Nevada *might* be able to reduce the buying and selling of sex acts to a greater degree by instituting a complete ban on prostitution . . . [b]ut it has chosen to take an approach to reducing demand that will not short-circuit the health and safety gains that come with partial legalization." (emphasis in original)).

*Central Hudson*'s final prong asks if the law is "more extensive than reasonably necessary" in light of the State's interest. *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989) (quoting *In re R.M.J.*, 455 U.S. 191, 207 (1982)). A defendant need only show a "'fit' between the legislature's ends and the means chosen to accomplish those ends," and need not show that it is the "least restrictive means." *Id.* at 480. As noted above, Act 28's marketing provisions are directed at unlawful conduct and are confined to marketing of a "firearm-related

36

product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State." HRS § 134-B(b)(2). Thus, on its face, Act 28 only regulates marketing that is particularly dangerous.

### E.    Act 28 is not void for vagueness.

A statute is unconstitutionally vague under the Due Process Clause if it "does not give a person of ordinary intelligence fair notice of what is prohibited," or if it lacks "any ascertainable standard for inclusion and exclusion." *Tingley v. Ferguson*, 47 F.4th 1055, 1089-90 (9th Cir. 2022) (quotation marks omitted). "An economic regulation"—like Act 28—"'is subject to a less strict vagueness test,' both because 'its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.'" *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1231 (9th Cir. 2023) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)).

In support of its void-for-vagueness challenge, NSSF points to the term "reasonable controls," Mot. at 25, but "[m]any standards in the law are no more definite than a requirement of 'reasonableness.'" *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 292 (Pa. 1975). "[A] statute is not void for vagueness merely because it uses the word 'reasonable' or 'unreasonable[.]'" *James*, 604 F. Supp. 3d at 68 (quotation omitted); *accord United States v. Krumrei*, 258 F.3d

37

535, 538 (6th Cir. 2001) (same); *United States v. Ragen*, 314 U.S. 513, 523 (1942) ("The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct."); *United States v. Escobar*, No. CRIM. 87-0074-M, 1987 WL 31141, at *7 (S.D. Cal. Sept. 30, 1987) ("The use of the term 'reasonable' as a standard regulating the assessment of costs does not render the statute vague."). Act 28 includes a level of statutory flexibility that has long been endorsed by the courts.

In any case, "otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity." *Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir.), *amended on denial of reh'g*, 402 F.3d 875 (9th Cir. 2005). Here, "[r]easonable controls" is defined by Act 28. It tasks firearm industry actors with implementing procedures designed to prevent: (1) straw purchases, (2) thefts and losses of firearms, and (3) violations of other state and federal law. HRS § 134-A. NSSF's argument that it cannot figure out how to implement reasonable procedures designed to prevent firearm diversion cannot be given much credence, given that it has established numerous protocols designed to do just that. Gundlach Decl. ¶¶ 53-59.

NSSF also takes issue with the phrase "most suitable for assaultive purposes" in HRS § 134-B(d)(1), Mot. at 25, but does not even attempt to show how this

commonly used term is unconstitutionally vague. The statutory provision itself provides further guidance by contrasting "assaultive purposes" with "lawful self-defense, hunting, or other legitimate sport and recreational activities." HRS § 134-B(d)(1). This provision reaches weapons and accessories like assault pistols, automatic firearms, and silencers that are already unlawful in Hawai'i. *Id.* §§ 134-4(e), 134-8, 134-8.5.

Even if there may be close cases at the margins, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010) (citations omitted). Facial invalidation is "strong medicine" to be used "sparingly and only as a last resort." *Cal. Tchrs.*, 271 F.3d at 1155 (citations omitted).  It is not appropriate here.

## III.   NSSF's Members Will Not Suffer Irreparable Harm and the Balance of the Equities Favor Defendant.

NSSF has also failed to satisfy the three remaining *Winter* factors. Under the second factor, plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. For the same reasons that NSSF has not demonstrated injury sufficient to confer standing—i.e., there is no evidence that its members have been forced to shutter (or even alter) their businesses—it cannot show irreparable harm. *See* Section I. Moreover, "[b]ecause the threat of civil

liability is too attenuated and conjectural to constitute a basis for [] standing, . . . this injury is too speculative to constitute an irreparable harm justifying injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) (internal citation omitted). Thus, NSSF's claim that it will suffer irreparable harm if a lawsuit is filed against one of its members misses the mark. Moreover, NSSF's assertion that PLCAA is an immunity statute and harms cannot be undone ignores that courts are well equipped to promptly decide any claim to immunity.

Nor do the balance of harms or public interest favor an injunction. By reducing the diversion of guns onto the illegal market and decreasing gun crime, Gundlach Decl. ¶¶ 69-93, Act 28 promotes responsibility in the firearms industry. This supports denying the motion. By contrast, NSSF's argument that the balance of the equities tips in its favor is contingent on its members suffering a constitutional injury. As explained above, no such constitutional injury has been established.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court deny NSSF's Motion.

DATED:  Honolulu, Hawaiʻi, September 29, 2023.

/s/ Kalikoʻonālani D. Fernandes
KALIKOʻONĀLANI D. FERNANDES
    Solicitor General
NICHOLAS M. MCLEAN
    First Deputy Solicitor General

40

ALLA LEFKOWITZ*
WILLIAM J. TAYLOR, JR.*
RYAN GERBER*
    Special Deputy Attorneys General
    *Admitted *Pro Hac Vice*

Attorneys for Defendant ANNE E. LOPEZ,
in her official capacity as Attorney General
for the State of Hawaiʻi