# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI‘I

NATIONAL SHOOTING SPORTS FOUNDATION,

Plaintiff,

v.

ANNE E. LOPEZ, in her official capacity as Attorney General for the State of Hawai‘i,

Defendant.

Civil No. 1:23-cv-00287-DKW-RT

**DECLARATION OF GREGORY T. GUNDLACH, J.D., PhD.**

District Judge:
Chief Judge Derrick K. Watson

Magistrate Judge:
Rom Trader

Hearing:
October 20, 2023 at 10:00 a.m.

## TABLE OF CONTENTS

Introduction ... 1
I. Qualifications ... 1
II. Compensation ... 2
III. Materials ... 2
Assignment ... 3
Summary of Opinions ... 3
Firearm Diversion: Any Movement Of Firearms From The Legal To The Illegal Marketplace Through An Illegal Method Or For An Illegal Purpose ... 5
I. Key Sources of Firearm Diversion ... 6
II. Role of Federal Firearm Licensees in Firearm Diversion ... 9
A Small Proportion Of Federal Firearms Licensees Account For A Large Proportion Of Diverted Firearms ... 12
I. Small Proportion of Dealers ... 12
II. Small Proportion of Manufacturers ... 14
III. Other Evidence ... 14
Firearm Diversion Has Been Recognized As A National Problem And Approaches And Strategies For Limiting Its Occurrence Have Long Been Publicly Advanced ... 16
I. Problem of Firearm Diversion ... 16
II. Approaches to Reduce Firearm Diversion ... 17
III. Strategies for Limiting Firearm Diversion ... 18
The Problem Of Firearm Diversion And How To Limit Its Occurrence Has Been Known And Contemplated By Members Of The Firearm Industry ... 23
I. Awareness of the Diversion Problem ... 24
II. Members of the Industry Understand How to Limit the Occurrence of Firearm Diversion ... 25
Information, Programs, And Materials For Safeguarding Against Firearm Diversion Have Long Been Available To Members Of The Firearm Industry, Including Specifically From NSSF ... 27
I. Project ChildSafe (previously Project HomeSafe) ... 27
II. Don't Lie for the Other Guy ... 28
III. Suicide Prevention ... 28
IV. Operation Secure Store ... 29
Some Members Of The Firearm Industry Have Engaged In Efforts To Safeguard Their Downstream Distribution System From Firearm Diversion ... 30
I. Industry Member Participation in Safeguards ... 30
II. Smith & Wesson, Inc.'s Participation in Safeguards ... 31

III. Sturm, Ruger & Company, Inc.'s Participation in Safeguards ........... 32
Research Demonstrates That Safeguards Against Firearm Diversion Can Help To Limit Its Occurrence And Resulting Harmful Effects .................... 33
I. Limiting Product Sales of "Saturday Night Specials" ........................ 33
II. Strong Retailer Oversight and Background Check Requirements for Private Handgun Sales .......................................... 35
III. Safeguards Against Diversion Occurring Through Non-store/Non-stocking FFLs, Guns Show, and Straw Purchases ............. 37
IV. Permit-to-Purchase Requirements, Comprehensive Background Checks, and Oversight of Gun Retailers ........................................... 38
V. Multiprong Retail Firearm Inventory Security .................................. 39
VI. Information and Informational Campaigns ........................................ 40
Upstream Members Of The Firearm Industry Commonly Take Steps To Control The Distribution And Advertising Practices Of Their Downstream Distribution Partners ........................................................... 41
I. Stocking and Authorized Dealer Programs ....................................... 42
II. Smith & Wesson, Inc.'s Authorized Dealer Program ......................... 42
III. Minimum Advertised Price Policies ................................................. 43
IV. Smith & Wesson, Inc.'s Unilateral Minimum Advertised Price Policy ................................................................................... 45
Firearm Manufacturers' Stocking And Authorized Dealer Programs Can Help To Enhance The Impact And Reduce The Cost Of Safeguards Against Firearm Diversion ......................................................................... 47
I. Glock's Stocking Dealer Program ..................................................... 47
II. Smith & Wesson's Authorized Dealer Program ................................ 48
Efforts To Control And Limit The Distribution And Advertising Risks Associated With Firearms ARE Consistent With, And Follows From, The Broader Concepts Of "Countermarketing" And "Demarketing" ........... 49
I. Marketing Management as the Management of Demand ................... 49
II. Unwanted and Unwholesome Demand ............................................. 50
III. Countermarketing and Demarketing Against Unwholesome Demand ................................................................................... 51
IV. Countermarketing and Demarketing Against Firearm Diversion ....... 52
Efforts To Control And Limit The Distribution And Advertising Risks Associated With Firearms Are Also Consistent With, And Follow From, Accepted Conceptions Of Marketing As a Profession And Discipline ................................................................................... 53
I. Marketing Accountability Standards Board ....................................... 53
II. Marketing of Firearms and Related Products .................................... 54
Other Industries Regularly Adopt Safeguards To Limit The Distribution And Advertising Risks Associated With Their Products ..................................... 55
I. Tobacco Industry ............................................................................. 55

II. Alcohol Beverage Industry ........ 57
III. Chemical Products Industry ........ 58
IV. Fertilizer Industry ........ 60
V. Pyrotechnic Products Industry ........ 61
VI. All-Terrain Vehicle Industry ........ 62
Other Industries Voluntarily Refrain From, Or Otherwise Limit, Their Marketing And Advertising to Prevent Or Reduce The Liklihood of Underage Sales ........ 63
I. Alcohol Beverage Industry ........ 64
II. Food and Beverage Industry ........ 69
III. Other Industries ........ 72
Exhibit 1: Curriculum Vitae ........ 74
Exhibit 2: Materials Relied Upon ........ 75
Exhibit 3: Safeguards Against Firearm Diversion ........ 76
Exhibit 4: Trackstreet MAP Pricing Tips for the Firearms Industry ........ 77
Exhibit 5: Trinity Force Dealer Agreement ........ 78

# INTRODUCTION

## I. QUALIFICATIONS

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am the Coggin Distinguished Professor of Marketing in the Department of Marketing and Logistics at the Coggin School of Business, University of North Florida. I was previously the John Berry, Sr. Professor of Business at the University of Notre Dame from 1987 to 2003. I have a Ph.D. in marketing, a J.D., and an M.B.A. from the University of Tennessee, Knoxville. I have taught undergraduate and MBA courses in marketing at the University of Notre Dame and the University of North Florida, as well as courses for business executives.

3. My specialty is in the field of marketing. I am the Past Vice President of Marketing for the Academic Council of the American Marketing Association, Past Chair of the American Marketing Association's Special Interest Group on Marketing and Society and Past Associate Editor for the Journal of Public Policies & Marketing. I have served as a member of Editorial or Advisory Boards for the leading publications in the field of marketing. My areas of concentration, research, and expertise include marketing strategy and the public policy issues that attend marketing and marketing strategy.

4. I have extensive marketing experience by virtue of my professional work, teaching, and consultations with branches and agencies of the United States and state governments, large and small companies, professional and trade associations, public and private institutions, and members of the legal community. I have also conducted forensic investigations of marketing and marketing strategy, including analysis of the marketing and distribution practices of members of the firearms industry.

5. I have published books and numerous articles about marketing, marketing channel management, and retail trade practices, including articles about marketing, marketing channel management, and retail trade practices found in the firearms industry. A copy of my current curriculum vitae is attached to this Declaration as Exhibit 1. My curriculum vitae also lists prior cases in which I have offered expert opinion or testimony.

## II. COMPENSATION

6. I am being compensated for services performed at an hourly rate of $500. The compensation I receive is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinions.

## III. MATERIALS

7. As part of my analysis in connection with the preparation of this Declaration, I have reviewed and relied upon information, documents, declarations,

and materials referenced, cited, or referred to in the body of this Declaration. A list of these materials is attached to this Declaration as Exhibit 2.

## ASSIGNMENT

8. The Department of the Attorney General for the State of Hawai'i has requested that I offer an opinion in this matter on reasonable controls available to the firearms industry to combat the problems of firearm diversion and unwholesome (i.e., harmful) demand.

## SUMMARY OF OPINIONS

9. Based upon my review of the court documents and declarations in this case, and my own study, expertise, and experience, I have reached the following opinions. First, firearm diversion involves any movement of firearms from the legal to the illegal marketplace through an illegal method or for an illegal purpose. Second, a small proportion of Federal Firearms Licensees account for a large proportion of diverted firearms. Third, firearm diversion has been recognized as a national problem and approaches and strategies for limiting its occurrence have long been publicly advanced. Fourth, the problem of firearm diversion and how to limit its occurrence has been known and contemplated by members of the firearm industry. Fifth, information, programs, and materials for safeguarding against firearm diversion have long been available to members of the firearm industry,

including specifically from the National Shooting Sports Foundation (NSSF). Sixth, some members of the firearm industry have engaged in efforts to safeguard their downstream distribution system from firearm diversion. Seventh, research demonstrates that safeguards against firearm diversion can help to limit its occurrence and resulting harmful effects. Eighth, upstream members of the firearm industry commonly take steps to control the distribution and advertising practices of their downstream distribution partners. Nineth, firearm manufacturers' stocking and authorized dealer programs can help to enhance the impact and reduce the cost of safeguards against firearm diversion. Tenth, efforts to control and limit the distribution and advertising risks associated with firearms is consistent with, and follows from, the broader concepts of "countermarketing" and "demarketing." Eleventh, efforts to control and limit the distribution and advertising risks associated with firearms are also consistent with, and follow from, accepted conceptions of marketing as a profession and discipline. Twelfth, other industries regularly adopt safeguards to limit the distribution and advertising risks associated with their products. Thirteenth, other industries voluntarily refrain from, or otherwise limit, their marketing and advertising to prevent or reduce the likelihood of underage sales.

## FIREARM DIVERSION: ANY MOVEMENT OF FIREARMS FROM THE LEGAL TO THE ILLEGAL MARKETPLACE THROUGH AN ILLEGAL METHOD OR FOR AN ILLEGAL PURPOSE

10. "Firearm diversion" is any movement of firearms from the legal to the illegal marketplace through an illegal method or for an illegal purpose.[1] Some distinguish "trafficking" as more limited than "diversion," where trafficking is the illegal diversion of legally owned firearms from lawful commerce into unlawful commerce often for profit.[2] Under this definition, a criminal who steals a firearm from a licensee for his own personal use is participating in diversion but not trafficking.

11. Individuals not legally allowed to purchase or possess firearms and those that use firearms in the commission of a crime are known to obtain their firearms through a variety of sources. This may include federal firearms licensed (FFL) retailers who are willing to sell under the counter; strawman purchasers who buy guns on behalf of others; guns stolen from commercial places, common carriers (like FedEx or USPS), vehicles, and homes; firearm traffickers who buy firearms in

[1] Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (June 2000); Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *Crime Gun Trace Reports (1999) National Report,* Nov. 2000, at 41, https://www.atf.gov/resource-center/docs/ycgii-report-1999-highlightspdf-0/download.

[2] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, *supra* note 1.

loosely regulated jurisdictions and resell them elsewhere; and unlicensed sellers who buy and resell firearms.[3] Gun shows are another source.[4] Multiple sales (i.e., 2 or more firearm sales in 5 days) have also been associated with crime.[5]

## I. KEY SOURCES OF FIREARM DIVERSION

12. Prior to passage of laws that prohibited public release of ATF data,[6] an early study and published report by the Bureau of Alcohol, Tobacco, and Firearms (now the Bureau of Alcohol, Tobacco, Firearms and Explosives) (ATF) found that of 1,530 trafficking investigations from 1996 to 1998 involving 84,128 diverted firearms, FFLs were associated with the largest number of diverted firearms—over 40,000 firearms.[7] This includes unscrupulous and corrupt FFLs that

---

[3] *Id.*

[4] *Id*.

[5] *Federal Firearms Act of 1976*, H.R. Rep. No. 94-1103, at 28 (1976); U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis* (Jan. 11, 2023), https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-crime-guns-volume-two.

[6] Samantha Raphelson, *How The NRA Worked To Stifle Gun Violence Research*, NATIONAL PUBLIC RADIO (April 5, 2018), https://www.npr.org/2018/04/05/599773911/how-the-nra-worked-to-stifle-gun-violence-research; Nidhi Subbaraman, *United States to Fund Gun-Violence Research After 20-Year Freeze* (Dec. 17, 2019), https://www.nature.com/articles/d41586-019-03882-w.

[7] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, *supra* note 1.

do not follow existing laws and engage in illegal sales.[8] It also includes non-storefront/non-stocking "kitchen table" FFLs who conduct sales out their homes,[9] their automobiles,[10] or through businesses that do not stock firearms or take precautions against theft.[11] The study also found that gun shows were responsible for 26,000 diverted firearms and straw purchasers were responsible for 26,000. Unlicensed sellers were also a source of diverted firearms accounting for 23,000.[12] Unlicensed sellers range from individuals who knowingly sell guns to criminals from their personal collections to interstate gun runners that purchase guns to sell to gangs and drug organizations.[13] Firearms stolen (i.e., thefts) from FFLs, residences, and common carriers involved almost 9000 firearms.[14] Sales transactions involving multiple firearms (i.e., multiple sales) are also associated with diverted firearms.[15]

---

[8] *Id.*

[9] Julius Wachtel, *Sources of Crime Guns in Los Angeles, California*, 21 POLICING: AN INT'L J. POLICE STRATEGIES & MGMT. 220, 222 (1998), https://www.policeissues.org/Sources.pdf.

[10] U.S. General Accounting Office, *Federal Firearms Licensees: Various Factors Have Contributed to the Decline in the Number of Dealers,* at 28 (Mar. 29, 1996), https://www.gao.gov/assets/ggd-96-78.pdf.

[11] Steven Brill, *Firearm Abuse: A Research and Policy Report,* at 108 (1977), https://www.ojp.gov/pdffiles1/Photocopy/40042NCJRS.pdf.

[12] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, *supra* note 1.

[13] *Id.*

[14] *Id.*

[15] *Federal Firearms Act of 1976*, *supra* note 5, at 28; *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume Two*:

(continued…)

In most of the investigations, ATF agents uncovered only one pathway through which guns were diverted or trafficked 80.8 percent of the time.[16]

13. A summary description of the key sources of firearm diversion is included below. These channels have persisted over time[17] and continue to be major sources of firearm diversion today.[18]

**Key Sources of Firearm Diversion**[19]

| Source | Description |
|---|---|
| **Gun shows** | Temporary and informal gathering of purchasers and sellers for the purpose of conducting firearms transactions. |
| **Strawpurchases** | Purchasers who buy guns on behalf of those who are prohibited because of their age, criminal record, or other status. |
| **Multiple sales** | Two or more firearms purchased by an unlicensed person within a five-day period. |
| **Theft** | Firearms stolen from commercial places, common carriers, and other locations. |

---

*Crime Gun Intelligence and Analysis, supra* note 5.

[16] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers, supra* note 1.

[17] Anthony A. Braga, et al., *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URBAN HEALTH: BULLETIN NEW YORK ACADEMY MEDICINE 779 (June 2012).

[18] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis, supra* note 5; U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume One: Firearms in Commerce* (May 5, 2022), https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download.

[19] *Adapted from* Kevin D. Bradford, et al., *Countermarketing in the Courts: The Case of Marketing Channels and Firearm Diversion*, 24 J. PUB. POLICY & MKTG. 284 (2005), https://www.jstor.org/stable/30000666.

| | |
|---|---|
| **Non-store/ Non-stocking FFL dealers** | Licensed firearms marketers known as "basement bandits," "kitchen table" dealers, and "car trunk" dealers who operate out of their residences, vehicles, and other noncommercial premises to sell firearms to prohibited persons, through an illegal method, or for an illegal purpose. |
| **Unscrupulous or corrupt FFLs and unlicensed sellers** | Licensed firearms marketers (FFLs) who are allied with the criminal element and unlicensed "street" dealers who buy firearms with the purpose of reselling them to prohibited persons, through an illegal method, or for an illegal purpose. |

14. Virtually all guns used in crime originate with a licensed dealer[20] and first pass through the "primary," or legal, market distribution system.[21] One early study found that 94% of the total number of surveyed handguns used in serious crime were sold initially by retail dealers.[22] Today, FFLs remain the primary source of diverted firearms.[23]

## II. ROLE OF FEDERAL FIREARM LICENSEES IN FIREARM DIVERSION

15. Because federal firearms licensees have access to a large volume of firearms, they are associated with and can influence the number of firearms illegally

[20] *Federal Firearms Licensing: Hearing Before the Subcommittee on Crime and Criminal Justice of the House Comm. on the Judiciary*, June 17, 1993, 103d Cong. 69 (1994), https://www.ojp.gov/pdffiles1/Digitization/150790NCJRS.pdf.

[21] Bureau of Alcohol, Tobacco and Firearms, U.S. Dep't of the Treasury, *A Progress Report: Gun Dealer Licensing and Illegal Gun Trafficking,* at intro (Jan.1997).

[22] *Federal Firearms Act of 1976*, *supra* note 5, at 26.

[23] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis, supra* note 5; *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume One*: *Firearms in Commerce, supra* note 18.

diverted.[24] For example, although FFLs were involved in just under 10% of trafficking investigations, they were associated with the largest number of diverted firearms - suggesting their significant role in diversion and that prevention efforts on their part can also disproportionally reduce overall diversion.[25]

16. FFL dealers have been identified as a key point of control to limit the risk of diversion.[26] The Gun Control Act of 1968 recognizes this as the basis for setting up a system in which only licensed dealers can sell firearms, and subjecting dealers to certain rules.[27]

17. As described, FFL dealers may contribute to diversion in many ways. This includes retailers becoming allied with criminals to engage in illegal sales.[28] They may also sell guns to illegal purchasers, as in the case of non-storefront "kitchen table" gun dealers who conduct sales out their homes,[29] their

---

[24] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers, supra* note 1, at 15.

[25] *Id.* at xi.

[26] *Federal Firearms Licensing: Hearing Before the Subcomm. on Crime and Criminal Justice of the House Comm. on the Judiciary*, *supra* note 20, at 5.

[27] *Id.* at 1.

[28] Jeffrey Spiegler & John Sweeney, *Gun Abuse in Ohio*, ADMINISTRATION OF JUSTICE COMM., AFFILIATE OF GOVERNMENTAL RESEARCH INSTITUTE (June 1975) (included in appendix to 1975 Congressional hearings, Part 4 (Cleveland), pp. 1510, 1584).

[29] *Sources of Crime Guns in Los Angeles, California*, *supra* note 9, at 222.

automobiles,[30] through businesses that do not stock firearms or take precautions against theft,[31] and at gun shows.[32]

18. FFL dealers may also contribute to diversion through failing to take precautions to avert straw-purchase transactions,[33] not being cognizant of the association of multiple sales and their criminal use,[34] and not being sensitive to other factors related to diversion, *e.g.*, differences in regulations across states,[35] geographical influences,[36] and such phenomena as the "time to crime" (i.e., an unusually short sale-to-crime interval is considered an indicator of firearm diversion).[37]

---

[30] *Federal Firearms Licensees: Various Factors Have Contributed to the Decline in the Number of Dealers, supra* note 10*,* at 28.

[31] *Firearm Abuse: A Research and Policy Report, supra* note 11, at 108.

[32] U.S. Dep't of the Treasury and U.S. Dep't of Justice, *Gun Shows: Brady Checks and Crime Gun Traces,* at 8 (1999), https://www.ojp.gov/ncjrs/virtual-library/abstracts/gun-shows-brady-checks-and-crime-gun-traces.

[33] U.S. Dep't of Justice, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, at 30 (2001), https://www.justice.gov/archive/opd/gunviolence.htm.

[34] *Federal Firearms Act of 1976*, *supra* note 5, at 28.

[35] Brian J. Siebel, *City Lawsuits Against the Gun Industry: A Roadmap for Reforming Gun Industry Misconduct*, 18 ST. LOUIS PUBLIC L. REV. 247, 269 (1999), https://scholarship.law.slu.edu/plr/vol18/iss1/12.

[36] *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, *supra* note 1, at 42.

[37] *Sources of Crime Guns in Los Angeles, California*, *supra* note 9, at 224.

19. Finally, among other factors, FFL dealers may also contribute to diversion through ignoring ATF regulations,[38] failing to maintain records, or refusing to cooperate in providing records helpful to others interested in limiting the risk of firearm diversion.[39]

## A SMALL PROPORTION OF FEDERAL FIREARMS LICENSEES ACCOUNT FOR A LARGE PROPORTION OF DIVERTED FIREARMS

20. There is considerable evidence that a small percentage of licensed gun *dealers* account for a large proportion of the firearms diverted to crime. Similarly, there is considerable evidence that a small percentage of licensed gun *manufacturers* account for a large proportion of firearms diverted to crime.

### I. SMALL PROPORTION OF DEALERS

21. One ATF study of firearms traced from the scene of a crime found that "a small number of licensed dealers account for a large portion of the firearms traced" -- approximately 60% of the guns traced to crime had origins with only approximately 1% of the nation's gun dealers.[40] Another study found that 1160

---

[38] Glenn L. Pierce, et al., THE IDENTIFICATION OF PATTERNS IN FIREARMS TRAFFICKING: IMPLICATIONS FOR FOCUSED ENFORCEMENT STRATEGIES – A REPORT TO THE U.S. DEP'T OF TREASURY BUREAU OF ALCOHOL, TOBACCO AND FIREARMS OFFICE OF ENFORCEMENT, WASHINGTON, DC 5 (Jan. 1995).

[39] *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy, supra* note 33, at 29.

[40] U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives, *Commerce in Firearms in the United States* (February 2000),

(continued…)

dealers, or approximately 1% of the more than 100,000 dealers in 1998, were the source of 34,626 crime guns – 45% of the guns used in crime during the year and successfully traced to dealers.[41] A study of handgun sales in Maryland found that 14% of the dealers in the state sold 92% of the crime guns and that 5%, or 31 dealers, sold at least 50 crime guns each; together accounting for nearly 75% of the crime guns.[42]

22. It has been argued that the number of crime guns traced to a gun dealer is influenced by their sales volume and retail gun sales have been shown to be concentrated – according to the ATF 2.5% of gun dealers sold over 50 percent of estimated gun sales in the U.S. from 2017-2020.[43] However, studies offer evidence that the number of guns sold is an inadequate predictor of the number of guns subsequently linked to violent and firearm-related crimes.[44]

---

https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB2000102002.xhtml.

[41] Barbara Vobejda and Sharon Walsh, *The Dealers*, THE WASHINGTON POST (June 8, 1999), https://www.washingtonpost.com/archive/politics/1999/06/08/the-dealers/0b137b48-fbad-4c1e-b274-0e38d5459a11/.

[42] Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, Report to the National Institute of Justice, U.S. Department of Justice (2007), p. 5, https://www.ojp.gov/pdffiles1/nij/grants/221074.pdf.

[43] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis, supra* note 5, p. 65 (Estimated minimum sales volume, 2017-2020, license types 1, 2, 7).

[44] Garen J. Wintemute, Phillip J. Cook, and M. A. Wright (2005), *Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of*

(continued…)

## II. Small Proportion of Manufacturers

23. In regard to manufacturers, according to ATF data, between 2017 and 2021 pistols were the most frequently traced crime gun accounting for 68% of the 1,922,577 traced crime guns (this figure increased to 74.5% in 2021).[45] Of the 1,306,804 pistol type crime guns traced during this time period, five manufacturers accounted for almost 60% (779,566) of the traced pistols.[46] Nearly 20% (255,055) were manufactured by a single manufacturer.[47] In another study of over 91,000 crime guns recovered by police departments across 31 cities in 2020 and 2021, four gun manufacturers accounted for over 50% of the guns recovered at crime scenes.[48]

## III. Other Evidence

24. Overall and focusing on loss incidents, ATF data shows a similar pattern -- from 2016-2020 there was an average of 86,920 FFLs (including dealers,

---

*Guns Used in Violent and Firearm Related Crimes*," 11 Injury Prevention, 357–63, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730299/pdf/v011p00357.pdf. Garen J. Wintemute, *Ring of Fire: The Handgun Manufacturers of Southern California*. Violence Prevention Research Program, https://drgo.us/wp-content/uploads/2018/03/RingofFire1994.pdf.

[45] *Federal Firearms Act of 1976*, *supra* note 5, at 28; *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume Two*: *Crime Gun Intelligence and Analysis, supra* note 5, at 16.

[46] *Id.* at 19.

[47] *Id.*

[48] Everytown Research & Policy, *Who is Manufacturing Crime Guns?*, Everytown (January 19, 2023), https://everytownresearch.org/report/city-level-data-crime-gun-recoveries/.

manufacturers, etc.), of which only 5% (4,507) reported a loss incident.[49] Moreover, of those reporting a loss incident, nearly 19% (843) reported multiple loss incidents.[50] In total, from 2016-2020 loss incidents involving 45,346 firearms were reported by FFLs.[51] Loss incidents refers to firearms in which the FFL has a record of acquiring the firearm into their inventory but later cannot account for the disposition of the firearm.[52] Thefts refers to firearms unlawfully taken during a burglary, robbery, or larceny.[53] Loss incidents (which may include thefts) occur more frequently than reported thefts from FFLs.[54]

25. Similarly, focusing on FFL compliance inspections and their results a similar pattern is observed. For example, ATF conducted 6,643 firearm compliance inspections in 2021.[55] These inspections resulted in only .47% (31) revocations and 2.2% (149) warning conferences.[56] Firearms Compliance Inspections are conducted to ensure compliance with applicable federal, state and

---

[49] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume One*: *Firearms in Commerce, supra* note 18, at 106.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 104.

[53] *Id.* at 104.

[54] *Id.*

[55] U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Compliance Inspection Reports*, https://www.atf.gov/firearms/firearms-compliance-inspection-results.

[56] *Id.*

local laws and regulations, and to educate licensees on the specific requirements of those laws and regulations and include review of required records.[57] A notice of revocation may be issued where a firearm is found to have been transferred to a prohibited person, among other violations.[58] Where a violation(s) does not warrant a notice of revocation, ATF may issue a report of violation, send a warning letter, or hold a warning conference (or meeting) with the industry member.[59]

## FIREARM DIVERSION HAS BEEN RECOGNIZED AS A NATIONAL PROBLEM AND APPROACHES AND STRATEGIES FOR LIMITING ITS OCCURRENCE HAVE LONG BEEN PUBLICLY ADVANCED

### I. PROBLEM OF FIREARM DIVERSION

26. As early as 1976, members of Congress recognized the problem of firearm diversion and the sources from which criminals acquire their guns.[60]

27. In 1997, then President Bill Clinton identified the ease with which children and others legally prohibited from possessing firearms can acquire firearms as a "major national problem."[61] In response, he established the specific goal of making it more difficult for firearms to pass into the illegal market.[62]

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Federal Firearms Act of 1976*, *supra* note 5.

[61] *A Progress Report: Gun Dealer Licensing and Illegal Gun Trafficking, supra* note 21.

[62] *Id.*

28. Early reports from ATF confirm that firearm diversion is a significant aspect of gun crime.[63] The United States Department of Justice (DOJ) also recognized that members of the industry must do much more to design and distribute their products to reduce the problems of crime guns.[64]

## II. APPROACHES TO REDUCE FIREARM DIVERSION

29. A basic and straightforward approach for addressing the problem of firearm diversion was identified as early as 1975 by then ATF Director Rex Davis: "It is my opinion that handgun control must be approached by looking first at the source of the guns and how they enter into and remain in circulation."[65]

30. In 2001, the U.S. Department of Justice outlined steps that gun manufacturers and importers could take to limit the risk of diversion.[66] These include to "identify and refuse to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchases; develop a continual training program for dealers and distributors covering compliance with firearm laws, identifying straw-purchase scenarios and securing inventory; and develop a code of conduct for dealers and distributors, requiring them to implement inventory, store

---

[63] *Crime Gun Trace Reports, supra* note 1, at ix.

[64] *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy, supra* note 33, at 39.

[65] *Firearms Legislation: Hearings Before the Subcomm. on Crime of the House Comm. on the Judiciary*, 94th Cong. (1975, p. 150).

[66] *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy, supra* note 33.

security, policy and record keeping measures to keep guns out of the wrong hands, including policies and postpone all gun transfers until NICS [background] checks are completed."[67]

## III. STRATEGIES FOR LIMITING FIREARM DIVERSION

31. Researchers have also identified concrete steps that firearm industry members can take to reduce the rate and risks of firearm diversion for each of the primary pathways of firearm diversion.[68] Incorporating key dimensions of marketing management (i.e., data and information systems, relationship management, channel structure, and governance), these categories of safeguarding strategies and tactics are shown in the table attached as Exhibit 3, and further discussed below.

### A. Gun Shows

32. To reduce firearm diversion that occurs through gun shows, firearm industry members can require full background checks for all gun show sales, and can maintain records about all gun show purchases. Firearm industry members can also require that any of their firearms sold at gun shows occur through licensed FFLs. They can enact strict controls of firearms at gun shows, including tracking

[67] *Id.* at 34.

[68] *Countermarketing in the Courts: The Case of Marketing Channels and Firearm Diversion, supra* note 19.

inventory and displays. Members can also monitor such shows and have random compliance inspections.

33. Other potential precautionary measures include prohibiting sales to distributors or dealers who sell firearms at gun shows, or to limit downstream distribution to only authorized distributors and dealers. Another option is to require distribution agreements and codes of conduct by distributors and dealers to raise awareness of the dangers of firearm diversion through gun shows and to encourage reasonable precautions to prevent their occurrence. Such agreements can also be used to impose consequences on distributors and dealers who fail to comply with such codes of conduct.

**B. Straw Purchases and Multiple Sales**

34. To reduce firearm diversion occurring through straw purchases and multiple sales (which have been associated with the occurrence of firearm diversion), firearm industry members can ensure their employees are trained on identifying and deterring straw purchases and multiple purchase scenarios. Members can also require mandatory record-keeping and sharing of purchases sufficient to monitor the occurrence of multiple sales. Members can also impose restrictions on multiple sales by limiting sales to just one firearm per month per buyer, which can guard against their occurrence. Upstream firearm industry members can provide straw purchase detection and deterrence training and can

institute monitoring and compliance inspections to ensure that these limitations are being followed.

35. To exert influence and aid in the adoption of these efforts, upstream firearm industry members can reduce the number of intermediaries in their sales channels and permit sales only through direct channels, or through retailers dedicated to their brand (i.e., exclusive channels) or to brands like theirs (i.e., selective channels). As with gun shows, distribution agreements and codes of conduct can also be relied upon to encourage and impose consequences on dealers who fail to comply and thereby provide an effective deterrent measure to reduce straw purchases and multiple purchases.

**C. Theft**

36. To deter and safeguard against diversion occurring through thefts, firearm industry members can require and monitor adherence to the mandatory record-keeping of purchases to track missing firearms. Distributors and dealers can adopt inventory tracking and security plans, run background checks on employees, institute guidelines and training on inventory management and safe storage, require mandatory liability insurance coverage, use secure carriers and no discerning shipment labels, and monitor and conduct compliance inspections. Upstream firearm industry members can also require downstream partners (i.e., distributors, buying groups, retailers, etc.) to adopt these measures and to provide information

regarding their inventory tracking systems, and can institute mandatory reporting protocols for inventory shortages or lost or stolen firearms.

37. To exert influence and aid in adoption of these efforts firearm industry members can reduce the number of intermediaries (e.g., distributors, buying groups, wholesaler, etc.) in their sales chains and permit sales only directly to retailers, through approved intermediaries, and/or through exclusive and selective channels. As with gun shows and other sources of firearm diversion, distribution agreements and codes of conduct can be an effective tool to encourage and impose consequences on distributors and dealers who fail to comply.

**D. Non-store and Non-stocking Dealers**

38. To reduce firearm diversion through non-store and non-stocking dealers (i.e., dealers who do not operate out of a storefront or do not maintain a stock of a manufacturer's products), upstream firearm industry members can require information about the nature of the premise, location, hours of operation, and merchandising confirmation of such dealers, and also require photographs of distributor and dealer premises to verify that firearms are only being sold at brick-and-mortar retailers. Members can also require distributors and dealers to have firearms as their primary business and require a retail place of business to become a retailer.

39. Upstream firearm industry members can also require non-store and non-stocking dealers to carry a full line of products and invest in minimum levels of

merchandising and promotion to qualify as a distributor or dealer, thereby establishing standards and creating financial incentives for limiting diversion. As with the other channels for firearm diversion, members can monitor and conduct compliance inspections as well. Additionally, members can refuse to deal with Internet dealers and limit distribution channels to only authorized distributors and dealers. As with the other channels for diversion, distributor agreements and codes of conduct can also be an effective precautionary measure to encourage and impose consequences on distributors and dealers who fail to comply.

**E. Unscrupulous FFLs and Unlicensed Sellers**

40. To reduce firearm diversion through unscrupulous FFLs, upstream firearm industry members can require confirmation of distributor and dealer licenses and permits. They can maintain information about the nature of the dealer's or distributor's hiring practices, employee qualifications, and training for employees. They can also require mandatory retention and reporting of ATF "trace" requests, which are requests from ATF used to track where and how a gun used in a crime was obtained.

41. Members can also require certification of compliance with state and local law and licensing provisions and verify the FFL status of a distributor or dealer before agreeing to sell to them. Members can require dealers or distributors to conduct background checks on their employees, and provide mandatory training on laws and regulations. As with the other channels for firearm diversion, members

can monitor and have compliance inspections, and terminate relationships with those who violate the law or fail to comply with safeguard requirements.

42. Additionally, where the information is available, members can refuse to sell firearms to people with known criminal indictments or high levels of crime guns. They can also require that any sales be made directly to the retailer (versus through a distributor or other intermediary) and by disallowing transfers or sales from dealer-to-dealer, thereby permitting the manufacturer or distributor more oversight of the retailer. They can also establish corporate-owned distributors and dealers to enable them to exert more direct control. Distribution agreements and codes of conduct can also be used to encourage and impose consequences on distributors and dealers who fail to comply.

43. Many, if not all, of the aforementioned strategies for limiting the various sources of firearm diversion, can be applied to limit firearm diversion occurring through unlicensed sellers.

## THE PROBLEM OF FIREARM DIVERSION AND HOW TO LIMIT ITS OCCURRENCE HAS BEEN KNOWN AND CONTEMPLATED BY MEMBERS OF THE FIREARM INDUSTRY

44. Members of the industry have been aware of the problem of firearm diversion for some time. They have also discussed the need to limit its occurrence and the steps needed to do so.

## I. AWARENESS OF THE DIVERSION PROBLEM

45. In July 1993, for example, a National Shooting Sports Foundation (NSSF) memo prepared by then NSSF Marketing Director, Doug Painter, offers a scathing critique of gun manufacturers' distribution systems and calls for a "proactive industry strategy" to: (1) address the "potential for illegal firearms transactions through ostensibly 'legal' FFL channels," and (2) "minimiz[e] the possibility of illegal transactions through unscrupulous FFL holders."[69]

46. Similarly, in February of 1996, former Senior Vice President of Marketing and Sales for Smith & Wesson, Robert Hass, stated in a sworn affidavit that members of the gun "industry as a whole are fully aware of the criminal misuse of handguns."[70]

47. Many members of the firearm industry have previously been shown in a federal district court to have been aware of the different forms of firearm diversion or to have received trace requests suggesting their awareness.[71] Empirical

[69] Report of Gregory T. Gundlach, *NAACP v. Accusport et al,* U.S. District Court, Eastern District of New York, 99 CV 3999 (JBW), 99 CV 7037 (JBW).

[70] *Id.*

[71] Testimony of Gregory T. Gundlach, *NAACP v. Accusport et al,* U.S. District Court, Eastern District of New York, 99 CV 3999 (JBW), 99 CV 7037 (JBW).

research also offers evidence of their knowledge of the different forms of firearm diversion.[72]

## II. Members of the Industry Understand How to Limit the Occurrence of Firearm Diversion

48. As early as 1993, NSSF and other firearm industry members understood that focusing on the sources of diversion and taking steps to limit these sources offered a "thesis" and "framework" through which they could address firearm diversion.[73]

49. In 1994 the Sporting Arms and Ammunition Manufacturers' Institute (SAAMI) decided to "take the initiative" and set "the agenda, defining the issues and leading the discussion not allowing others to do so for us." [74] Recommendations for limiting firearm diversion were developed, including a proposal to establish a "Safety Board" and to develop a retailers "Code of Ethics" that called for firearm retailers to "go beyond" existing regulations and adhere to "standards of responsible" retailing including to not knowingly sell firearms suspected to being "purchased for delivery to another individual (strawpurchase)."[75]

---

[72] Gregory T. Gundlach, et al., *Marketers' Knowledge and Actions Against Illegal Demand Withing the U.S. Firearms Industry: A Framework and Evidence for Addressing Gun Violence*, unpublished manuscript (2023).

[73] Report of Gregory T. Gundlach, *supra* note 69.

[74] *Id.*

[75] *Id.*

50. In January 1995, Art Wheaton of Remington Arms Co., and a member of the NSSF Board of Governors, suggested that SAAMI "may have an opportunity to take a chapter from the Alcohol and ATV industries to put forth a major safety campaign" to address firearm diversion.[76]

51. In November 1996, after Mr. Painter of NSSF attended an American Association of Suicidology Conference on Youth Suicide by Firearms he recommended that the SAAMI Safety Committee "research …the effectiveness of specific safety programs," "[r]eview and assess technical and other product developments," and "[s]erve as a clearinghouse for industry safety information and developments." [77]

52. A March 17, 2000 agreement signed by Smith and Wesson offers further evidence of industry members' knowledge of how to limit firearm diversion. The agreement's provisions included sales and distribution controls to help keep guns out of the hands of criminals, help law enforcement solve gun crimes, and reduce firearms accidents, including through required background checks at gun shows. Other safeguards included instituting a code of conduct for distributors and dealers to make every effort to eliminate sales of firearms that might lead to illegal possession and/or misuse by criminals, juveniles, and other prohibited persons,

---

[76] *Id.*

[77] *Id.*

including through recognized sources of diversion. Provisions also contemplated actions against those who violated the standard and steps to limit such violations.[78] According to the U.S. Department of Justice, the agreement represented commonsense, practical measures that could be embraced by the gun industry as a matter of responsible business practices.[79]

## INFORMATION, PROGRAMS, AND MATERIALS FOR SAFEGUARDING AGAINST FIREARM DIVERSION HAVE LONG BEEN AVAILABLE TO MEMBERS OF THE FIREARM INDUSTRY, INCLUDING SPECIFICALLY FROM NSSF

53. For some time, NSSF has specifically offered information, programs, and materials to members of the firearm industry for safeguarding against firearm diversion and the misuse of firearms.

### I. PROJECT CHILDSAFE (PREVIOUSLY PROJECT HOMESAFE)

54. Started around 1999, Project Homesafe (now "Project Childsafe")[80] involves a partnership by the NSSF with law enforcement agencies nationwide to distribute free firearm safety kits, including free locking devices for inclusion by manufacturers with the sale of new firearms. According the NSSF, more than 70 million free locking devices have been included with the sale of new firearms since

---

[78] *Id.*

[79] *Id.*

[80] National Shooting Sports Foundation, *Project ChildSafe*, https://www.nssfrealsolutions.org/programs/project-childsafe/.

1998. Firearm locking devices and safe storage practices help to prevent the misuse and theft of firearms by making guns less accessible to children, unauthorized persons, and those who might harms themselves or another.

## II. Don't Lie for the Other Guy

55. Started in 2000, "Don't Lie for the Other Guy"[81] involves a partnership by NSSF with the ATF to reduce firearm diversion resulting from straw purchases through an educational program to assist firearm retailers in detecting and preventing straw purchases. The goal of the program is to reduce firearm straw purchases at the retail level and to educate would-be straw purchasers of the penalties of knowingly participating in an illegal firearm purchase. The program includes a kit that contains education information and online resources, including numerous videos about how to detect and prevent straw purchasing of guns.

## III. Suicide Prevention

56. Begun in 2016, the NSSF's suicide prevention initiative and program[82] involves a partnership with the American Foundation for Suicide Prevention to develop a suicide prevention toolkit to help firearms retailers and others understand risk factors and warning signs related to suicide, and to

---

[81] National Shooting Sports Foundation, *Don't Lie for the Other Guy*, https://www.nssfrealsolutions.org/programs/dont-lie/.

[82] National Shooting Sports Foundation, *Suicide Prevention*, https://www.nssfrealsolutions.org/programs/suicide-prevention/.

understand where to find help and encourage secure firearms storage options that can help to prevent the misuse and theft of firearms.

57. The program includes a toolkit, documents, podcasts, and other education materials. The toolkit is free to order and contains a poster, counter cards, window signs, a brochure for customers and a brochure providing guidance in the event a business experiences a suicide. As part of the educational aspects of the program, dealers are asked to educate their staff about warning signs, risk factors, and intervention techniques by having them watch the NSSF's "SHOT" University e-learning module.

## IV. Operation Secure Store

58. Launched in 2017, "Operation Secure Store"[83] involves a partnership by the NSSF with the ATF to reduce firearm diversion resulting from firearm thefts and burglaries through educational programming, including an ongoing series of regional seminars hosted by ATF. Additionally, NSSF matches ATF reward offers for information regarding firearm burglary and theft.

59. The program also includes numerous videos, research and data, a security toolkit, and other resources. The program focuses on five areas: "Education and Awareness," "Assessment and Risk Analysis," "Planning and Strategy,"

[83] National Shooting Sports Foundation, *Operation Secure Store*, https://www.nssfrealsolutions.org/programs/operation-secure-store/.

"Engagement" and "Response," with a focus on providing a wide array of solutions to mitigate risks and protect FFLs against firearm thefts and burglaries.[84]

**SOME MEMBERS OF THE FIREARM INDUSTRY HAVE ENGAGED IN EFFORTS TO SAFEGUARD THEIR DOWNSTREAM DISTRIBUTION SYSTEM FROM FIREARM DIVERSION**

60. Past research has shown that members of the firearm industry have engaged in steps to limit firearm diversion.

61. A large-scale industry study of manufacturers and distributors published in 2010[85] found, for example, that, while safeguarding practices were on average very low in the firearm industry, some manufacturers and distributors participated in safeguards designed to reduce diversion through unscrupulous and corrupt dealers, non-store/non-stocking dealers, gun shows, straw purchases, and thefts. According to the researchers, a hallmark of the studied safeguards was their previous identification, articulation, and advancement by stakeholders from the firearms industry.

**I. INDUSTRY MEMBER PARTICIPATION IN SAFEGUARDS**

62. As reported in the study, the more heavily adopted safeguards involved diversion occurring through unscrupulous/corrupt dealers, non-store/non-

---

[84] *Id.*

[85] Gregory T. Gundlach, et al., *Countermarketing and Demarketing Against Product Diversion: Forensic Research in the Gun Industry*, 29 JOURNAL OF PUBLIC POLICY & MARKETING 103 (2010).

stocking dealers, straw purchases, and gun shows. For diversion involving unscrupulous/corrupt dealers, the safeguards included refusing to sell to indicted dealers. For diversion involving non-store/non-stocking dealers, the safeguards included requiring direct dealers or program dealers to have a storefront place of business and requiring that distributors sell to dealers who, in turn, only sell to storefront places of businesses. For diversion involving straw purchases, the safeguards included disseminating materials on straw purchases to others in their distribution system. For diversion involving gun shows the safeguards included restricting their distributors from selling at gun shows.

## II. Smith & Wesson, Inc.'s Participation in Safeguards

63. Smith & Wesson, Inc. has previously been shown in a federal district court to have been aware of the different forms of firearm diversion and found to have engaged in safeguards to limit in various ways their occurrence.[86]

64. Smith & Wesson, Inc. was previously shown to have been aware of the different forms of firearm diversion or to have received trace requests suggesting their awareness and found to have engaged in safeguards to limit the occurrence of firearm diversion. Smith & Wesson, Inc. engaged in safeguards to limit diversion occurring through non-storefront dealers by requiring direct dealers or program dealers to have a storefront place of business. Smith & Wesson, Inc.

[86] *NAACP v. Accusport et al,* U.S. District Court, Eastern District of New York, 99 CV 3999 (JBW), 99 CV 7037 (JBW).

was also found to have engaged in safeguards to limit diversion occurring through gun shows by restricting their distributors from selling at gun shows or from selling to dealers who, in turn, sell at gun shows.

65. According to Smith & Wesson Inc.'s current Vice President of Sales, Smith & Wesson continues to sell to independent, federally licensed distributors and buying groups who, in turn, sell the products throughout the United States to independent, federally licensed retailers.[87]

## III. Sturm, Ruger & Company, Inc.'s Participation in Safeguards

66. Sturm, Ruger & Company, Inc. has previously been shown in a federal district court to have been aware of the different forms of firearm diversion and found to have engaged in safeguards to limit in various ways their occurrence.[88]

67. Sturm, Ruger & Company, Inc. was previously shown to have been aware of the different forms of firearm diversion or to have received trace requests suggesting their awareness and found to have engaged in safeguards to limit the occurrence of firearm diversion. Sturm, Ruger & Company, Inc. engaged in safeguards to limit diversion occurring through non-storefront dealers by requiring that their distributors only sell to dealers that have a storefront place of business.

---

[87] Declaration of Susan Cupero on Behalf of Smith & Wesson, Inc., *National Shooting Sports Foundation v. Anne E. Lopez, Attorney General of the State of* Hawai'i, United States District Court for the District of Hawai'i, Civil No. 1:23-CV-00287 DKW-RT (2023).

[88] *NAACP v. Accusport et al, supra* note 86.

Sturm, Ruger & Company, Inc. was also found to have engaged in safeguards to limit diversion occurring through strawpurchases by disseminating materials on strawpurchases to others in their distribution system.

68. According to Sturm, Ruger & Company, Inc.'s current Vice President, General Counsel, and Corporate Secretary, Sturm, Ruger & Company, Inc. continues to sell to independent, federally licensed distributors who, in turn, sell the products throughout the United States to independent, federally licensed retailers.[89]

## RESEARCH DEMONSTRATES THAT SAFEGUARDS AGAINST FIREARM DIVERSION CAN HELP TO LIMIT ITS OCCURRENCE AND RESULTING HARMFUL EFFECTS

69. Studies of the effects of safeguards against firearm diversion demonstrate that safeguards can limit the occurrence of firearm diversion and reduce its harmful effects.

### I. LIMITING PRODUCT SALES OF "SATURDAY NIGHT SPECIALS"

70. One study from 2006 offers evidence that reforms to the sales practices of licensed gun dealers reduced the supply of new guns to criminals.[90]

---

[89] Declaration of Kevin B. Reid, Sr. on Behalf of Sturm, Ruger & Company, Inc., *National Shooting Sports Foundation v. Anne E. Lopez, Attorney General of the State of* Hawai‘i, United States District Court for the District of Hawai‘i, Civil No. 1:23-CV-00287 DKW-RT (2023).

[90] Daniel W. Webster, et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. URBAN HEALTH 778 (May (continued…)

According to the study, reforms to the sales practices of just one licensed gun store—which before May 1999, sold more than half of the guns recovered from criminals in Milwaukee—resulted in a 44 percent decrease in the flow of new guns to criminals in the city.

71. The changes in practices occurred after a highly publicized government study in May 1999 revealed that a single Milwaukee-area gun shop was the nation's leading seller of guns that were later recovered from criminals. Two days after the study was publicized, the dealer announced that his store would no longer sell small, inexpensive handguns, sometimes known as Saturday Night Specials, that are commonly used in crime.

72. After the change in the retailer's sales practices, researchers tracked the number of guns that police recovered from criminals within one year of retail sale. An unusually short sale-to-crime interval is considered an indicator of illegal gun trafficking (i.e, diversion).

73. According to the study, the store's change in sales policy was associated with a 96 percent decrease in the number of small, inexpensive handguns that were recovered from criminals in Milwaukee that were recently sold by the store. There was also a 42 percent reduction in other types of guns sold by the gun dealer and soon recovered from a criminal.

---

2006) https://doi.org/10.1007/s11524-006-9073-2.

74. The reductions in Milwaukee occurred abruptly after the change in the dealer's sales practice and appear to be directly attributable to those reforms—a finding supported by the fact that the study authors saw no change in gun trafficking in three comparison cities in the Midwest.

75. According to the study's lead researcher, "Our study shows that changes in a single gun dealer's sales practices led to a dramatic reduction in the supply of new guns to criminals in Milwaukee. Increased scrutiny of the few gun dealers linked to the most crime guns has the potential to significantly reduce the supply of new guns to criminals in many other U.S. cities."[91]

## II. STRONG RETAILER OVERSIGHT AND BACKGROUND CHECK REQUIREMENTS FOR PRIVATE HANDGUN SALES

76. Another study from 2009 examined the effects of gun policies on gun trafficking by estimating the effects of key components—both individually and jointly—of a regulatory scheme designed to prevent diversion of firearms into the illicit market.[92] These components included: (1) regulation and oversight of gun retailers, (2) private sales regulations requiring potential buyers to undergo a

[91] John Hopkins, Bloomberg School of Public Health, *Reforms to Sales Practices of Licensed Gun Dealer Reduced Supply of New Guns to Criminals*, (September 27, 2006), https://publichealth.jhu.edu/2006/webster-gun-dealer).

[92] Daniel W. Webster, et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH 525 (May 2009), https://doi.org/10.1007/s11524-009-9351-x.

background check prior to purchasing a gun from private individuals, and (3) permit-to-purchase licensing laws that provide law enforcement agencies some discretion to deny purchase applications to those who might pose some risk.

77. The cross-sectional study of 54 U.S. cities employed data on state laws governing gun sales, a survey of law enforcement agencies' practices to promote compliance with gun sales laws, and crime gun trace data to examine associations between these policies and practices with gun trafficking indicators.

78. Regulations demonstrate strong oversight of firearm dealers if the state law required: (1) a state or local dealer license, (2) record keeping of firearm sales, (3) dealers' records and premises to be available to law enforcement for inspections, and (4) prompt reporting of thefts of firearms from dealers. Regulation of private handgun sales were operationalized based upon the presence of sales regulations requiring potential buyers to undergo a background check prior to purchasing a gun from private individuals.

79. According to the results of the study, comprehensive regulation and stronger oversight of gun dealers and state regulation of private sales of handguns were each associated with significantly lower levels of intrastate gun trafficking.

## III. SAFEGUARDS AGAINST DIVERSION OCCURRING THROUGH NON-STORE/NON-STOCKING FFLS, GUNS SHOW, AND STRAW PURCHASES

80. A large-scale industry study published in 2010 studied the effects of marketing and distribution safeguards directed at the six primary pathways of firearm diversion – diversion occurring through (1) unscrupulous/corrupt dealers, (2) non-store/non-stocking FFLs, (3) guns shows, (4) straw purchases, (5) multiple sales, and (6) thefts.[93] According to the researchers, safeguards directed at diversion through non-storefront/non-stocking dealers, gun shows, and straw purchases were found to significantly reduce diversion. A hallmark of each the studied safeguards were their previous identification, articulation, and advancement by stakeholders within the firearms industry.

81. The study examined an array of safeguards for each of the different pathways of diversion. For example, safeguards against diversion occurring through non-store/non-stocking retailers included whether a manufacturer analyzed trace information to identify problem distributors or dealers, and whether a manufacturer had stopped, would not sell, or would stop selling to indicted dealers.

82. Safeguards against diversion occurring through guns shows included whether a manufacturer restricted their distributors from selling at guns

[93] *Countermarketing and Demarketing Against Product Diversion: Forensic Research in the Gun Industry, supra* note 85.

shows, restricted their distributors from selling to dealers who, in turn, sell at gun shows, and restricted their direct or program dealers from selling at gun shows.

83. Safeguards against diversion occurring through straw purchases included whether a manufacturer had disseminated materials on straw purchases to others in their distribution system and trained others in their distribution system on straw purchases.

84. As concluded by the researchers the safeguarding efforts engaged in were found to be associated with a reduction in firearm diversion.[94]

## IV. Permit-to-Purchase Requirements, Comprehensive Background Checks, and Oversight of Gun Retailers

85. A review, published in 2015, of available evidence from studies published between 1999 and August 2014 examined the effects of policies designed to keep firearms from high-risk individuals in the United States.[95]

86. According to the results, certain laws intended to prevent prohibited persons from accessing firearms—including permit-to-purchase requirements, comprehensive background checks, strong regulation and oversight of gun dealers,

[94] *Id.* at abstract.

[95] Daniel W. Webster and Garen J. Wintemute, *Effects of Policies Designed to Keep Firearms from High-Risk Individuals*, 36 Ann. Rev. Pub. Health 21 (March 2015), https://www.annualreviews.org/doi/10.1146/annurev-publhealth-031914-122516.

and requiring gun owners to promptly report lost or stolen firearms—are associated with reductions in diversion of guns to criminals.

87. As concluded by the researchers, "Mounting evidence indicates that certain laws intended to increase the accountability of firearm sellers to avoid risky transfers of firearms are effective in curtailing the diversion of guns to criminals,…"[96]

## V. Multiprong Retail Firearm Inventory Security

88. An NSSF 2023 publication reports that firearms stolen during FFL burglaries dropped by nearly 65 percent over 5 years (2017-2021) and that a multipronged approach to retail firearm inventory security was associated with this reduction in stolen firearms.[97]

89. The multi-prong approach involved "Education and Awareness," "Assessment and Risk Analysis," "Planning and Strategy," "Engagement" and "Response" to help retailers enhance the security of their retail firearm inventory.[98] The approach was developed as part of the NSSF's Operation Secure Store, a

[96] *Id.* at 34.

[97] Larry Keane, *AFT Data Confirms 'Operation Secure Store' Has Positive Impact*, NATIONAL SHOOTING SPORTS FOUNDATION (Mar. 17. 2023), https://www.nssf.org/articles/atf-data-confirms-operation-secure-store-has-positive-impact/#:~:text=New%20ATF%20Data%20on%20FFL,criminals%20takes%20a%20monumental%20effort (Special note: The publication does not report the methodology employed to determine the reported results).

[98] *Id.*

partnership by NSSF with ATF and DOJ to provide brick-and-mortar firearm retailers with educational resources and services to better secure their inventory and reduce robberies and burglaries.

90. According to NSSF President and CEO Joe Bartozzi in testimony to the Connecticut state legislature's Joint Judiciary Committee: "Retailers are the first line of defense against criminals and would-be criminals."[99] Referring to NSSF's Operation Secure Store, as described by Mr. Bartozzi, when neighborhood firearm retailers use industry tools and resources to improve their inventory security, they are backstopping against possible criminal behavior that could endanger their communities.[100]

## VI. INFORMATION AND INFORMATIONAL CAMPAIGNS

91. A recent study from 2023, examined the effects of manufacturers awareness and knowledge of the different pathways through which firearms are diverted, and their likelihood of taking precautionary measures to limit the occurrence of firearm diversion.[101] The research shows that increasing awareness and knowledge of the pathways for firearm diversion increases the likelihood that

[99] *Id.*

[100] *Id.*

[101] *Marketers' Knowledge and Actions Against Illegal Demand Withing the U.S. Firearms Industry: A Framework and Evidence for Addressing Gun Violence, supra* note 72.

manufacturers will take precautionary measures to safeguard against diversion of their firearms.

92. As reported by the researchers, manufacturers' awareness and knowledge of specific source of diversion significantly increased the probability that the manufacturer would use a safeguard to limit its occurrence. This result was found for manufacturers that possessed knowledge of diversion occurring through non-store/non-stocking firearm dealers, straw purchases, unscrupulous firearm dealers, gun shows, and diversion occurring due to thefts.

93. According to the researchers, the results support the view that actions like informational and educational campaigns to improve firearm marketers' awareness and knowledge of illegal demand for their firearms can help to reduce gun violence.

## UPSTREAM MEMBERS OF THE FIREARM INDUSTRY COMMONLY TAKE STEPS TO CONTROL THE DISTRIBUTION AND ADVERTISING PRACTICES OF THEIR DOWNSTREAM DISTRIBUTION PARTNERS

94. Firearm manufacturers commonly engage in efforts to control their downstream distribution partners. These include marketing programs and arrangements that impose conditions and requirements on the distribution and advertising practices of their distributors and dealers.[102]

[102] Report of Gregory T. Gundlach, *supra* note 69.

## I. STOCKING AND AUTHORIZED DEALER PROGRAMS

95. Stocking and authorized dealer programs involve an agreement between a firearm manufacturer and a firearm dealer wherein the dealer agrees to purchase, promote, and resell the manufacturer's products according to terms and conditions set forth in the agreement in return for benefits from the manufacturer.

96. As an example, Glock, Inc.'s Stocking Dealer Program requires dealers to agree to engage in various "Best Practices" and adhere to specified "Responsibilities." [103] Glock also requires dealers to abide by established "Sales Efforts" and "Rules of Conduct," and to refrain from "Unauthorized Sales Practices" including certain store and merchandising practices and advertising and promotional practices.[104] Glock, Inc.'s program agreement also provides for "Termination" of a dealer for the "breach of any of its obligations." [105]

## II. SMITH & WESSON, INC.'S AUTHORIZED DEALER PROGRAM

97. Smith & Wesson, Inc.'s Authorized Dealer program application requires dealers to "pledge and agree" to a "Code of Responsible Business Practices." [106] The Code requires that the dealer "maintain a store premise," be

---

[103] Glock, Inc., *GLOCK Stocking Dealer Program*, https://www.ezgun.net/media/rebates/incentives/GLOCKStockingDealerAgreement10162017.pdf.

[104] *Id.*

[105] *Id.*

[106] Smith & Wesson, Inc., *Authorized Dealer Application*, https://p.widencdn.net/f3nz1s/SW_Authorized_Dealer_Application0418.

"familiar with and comply with all laws," and "employ trained and competent personnel."[107] The Code also requires that a dealer "not sell or advertise" new Smith & Wesson, Inc. products through certain publications and media, and to not "knowingly sell firearms to straw purchasers," among other business practices. [108]

98. According to Smith & Wesson, Inc., at its sole discretion it may "suspend or terminate" the authorized status of any dealer in the event a claim is brought by a government or law enforcement agency in which the business or distribution practices of the authorized dealer are called into question. [109]

## III. Minimum Advertised Price Policies

99. Firearm manufacturers also employ minimum advertised price policies (MAPs) in their arrangements with distributors and retailers. MAP policies restrict downstream sellers from advertising a manufacturer's products below an established price. These policies typically extend to all forms of advertising (e.g., Internet, social media, websites, television, radio, newspaper, magazines, mailers, posters, signage, flyers, displays, counter signage, etc.)

100. Like other marketing programs, the terms and conditions of MAP policies typically include provisions for implementing, monitoring, enforcing, and suspending and/or terminating violators that do not follow the policies. Third party

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

companies that offer 24/7 monitoring to detect and report policy violations market their services to assist firearm manufacturers in their efforts.[110]

101. Smith & Wesson, Inc.,[111] Beretta USA Corp., [112] Glock, Inc.,[113] Sig Sauer,[114] Walther Arms, Inc.,[115] Maxim Defense Industries, LLC,[116] Trinity Force Corp.,[117] FN America, LLC,[118] among others employ MAP policies. Members of the firearm industry that sell firearm related products such as Comp-Tac[119] also employ MAP policies.

---

[110] TrackStreet, *MAP Pricing Tips for the Firearms Industry*, December 23, 2019, attached hereto as Exhibit 4.

[111] Smith & Wesson, *Unilateral Minimum Advertised Price Policy*, https://assets.contentstack.io/v3/assets/bltb61dcb3c40854cd9/blt93f8a2006c0d9230/63d43c7bffb41a7454dbea0a/map-policy.pdf.

[112] Beretta USA Corp., *Minimum Advertise Price (MAP) Policy*, June 6, 2018, https://usdealers.beretta.com/map-policy.

[113] Glock, Inc. *Unilateral Distributor/Dealer Minimum Advertised Price Policy*, November 1, 2010, https://www11.davidsonsinc.com/ManufMaps/Glock-MAP-policy.pdf.

[114] Sig Sauer, *Minimum Advertised Pricing Policy*, January 17, 2018, https://www.krollcorp.com/Files/Forms/2018%20SIG%20SAUER%20MAP%20Policy.pdf.

[115] Walther Arms, *MAP Pricing Policy – US Market*, https://waltherarms.com/wp-content/uploads/2022/06/Walther-Arms-Inc.-MAP-Policy.pdf.

[116] Maxim Defense, *Terms and Conditions – Maxim Defense*, https://maximdefense.com/terms-and-conditions/.

[117] Trinity Force Corp., *Dealer Agreement*, attached hereto as Exhibit 5.

[118] FN America, LLC, *FN American Minimum Advertised Price (MAP) Policy*, https://fnamerica.com/map-policy/.

[119] Comp-Tac, *Comp-Tac MAP Policy*, https://www.comp-tac.com/comp-tac-

(continued…)

102. MAP policies have been described as "invaluable for gun makers."[120] The NSSF maintains published information to help retailers understand the use and ramifications of MAP policies and agreements.[121]

## IV. SMITH & WESSON, INC.'S UNILATERAL MINIMUM ADVERTISED PRICE POLICY

103. Smith & Wesson, Inc. has a "Unilateral Minimum Advertised Price Policy."[122] According to Smith & Wesson, Inc., their MAP policy is "vital to the protection of our brand integrity and will be vigorously enforced in an appropriate manner."[123]

104. Smith & Wesson's May 16, 2023 MAP policy covers more than 150 products[124] and their policy applies to "all advertising by Retailers in the United States" including "Internet Platforms."[125] The policy also covers "all forms of advertisements … in any and all media."[126] As stated by Smith & Wesson, "Any

map#:~:text=It%20is%20Comp%2DTac's%20unilateral,DPL%E2%80%9D)%2C%20except%20only%20where.

[120] *MAP Pricing Tips for the Firearms Industry*, *supra* note 110.

[121] David L. Cahn, *Setting Prices – A Pandora's Box*, National Shooting Sports Foundation (March 25, 2015), https://www.nssf.org/articles/setting-prices-a-pandoras-box/.

[122] *Unilateral Minimum Advertised Price Policy*, *supra* note 111.

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] *Id.*

advertising method that provides for or suggests a price below the minimum advertised price violates this MAP Policy.[127]

105. The terms and conditions of Smith & Wesson, Inc.'s policy are "strictly enforced" with violations resulting in actions ranging from "written warnings" and "suspension" to "termination" and "permanent placement on the Do Not Sell List" which means that Smith & Wesson will no longer sell to the retailer.[128] Smith & Wesson maintains through its policy that it is "free to choose the Retailers with whom it will conduct business."[129]

106. To "ensure consistent compliance" with its MAP policy, Smith & Wesson employs a "MAP Administrator."[130] The MAP Administrator is responsible for "implementation" and "enforcement" of the policy's requirements.[131] Sales personnel that become aware of violations to the MAP policy are directed to submit a written report to the MAP Administrator identifying offending retailers.[132]

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

## FIREARM MANUFACTURERS' STOCKING AND AUTHORIZED DEALER PROGRAMS CAN HELP TO ENHANCE THE IMPACT AND REDUCE THE COST OF SAFEGUARDS AGAINST FIREARM DIVERSION

107. Firearm manufacturers' efforts to control the distribution and advertising practices of their downstream distribution partners through stocking and authorized dealer programs help to enhance the impact and reduce the cost of their marketing and advertising strategies. They can also help enhance the impact and defray the costs of safeguarding against firearm diversion. Two programs illustrate this potential.

### I. GLOCK'S STOCKING DEALER PROGRAM

108. Under Glock's Stocking Dealer Program, in addition to dealer responsibilities that ensure consistency and thereby enhance the impact and reduce the costs of Glock's marketing and advertising, dealers receive promotional materials (e.g., signage, banners, counter mats, price tags, etc.), educational opportunities (e.g. free access to their Armorer's Course), and instructional literature (e.g., safety brochures, safe action stickers, preventive maintenance manuals, etc.) among other resources.[133] Where used, these materials, opportunities, and literature help Glock dealers to enhance the impact of their marketing and advertising strategies and defray their costs.

[133] *GLOCK Stocking Dealer Program*, *supra* note 103.

109. Where requested, Glock stocking dealers can also receive assistance in obtaining "materials and information for training employees in recognizing attempts to illegally purchase firearms, recognizing that firearms may be being diverted (intentionally or otherwise) for later sale or transfer to those not legally entitled to purchase, and in responding to those attempts."[134] Where used, this assistance and information can help to enhance the impact and reduce the cost of safeguarding against firearm diversion by Glock's stocking dealers. Glock stocking dealers are to also receive a "gun lock" and "written safety information" for distribution with every Glock firearm.[135]

## II. Smith & Wesson's Authorized Dealer Program

110. Similarly, as described in Smith & Wesson's Authorized Dealer program application, in addition to dealer responsibilities and obligations that ensure consistency and thereby enhance the impact and reduce the costs of Smith & Wesson's marketing and advertising, dealers receive access to exclusive promotions, an exclusive point of sale merchandising program, educational seminars and schools, new product announcements and updates, referral services and listing on Smith & Wesson's website, among other benefits.[136] Where employed, this access, programs, seminars, schools, announcements, updates,

[134] *Id.*

[135] *Id.*

[136] *Authorized Dealer Application*, *supra* note 106.

services, and listings help Smith & Wesson dealers to enhance the impact of their marketing and advertising strategies and defray their costs.

111. Smith & Wesson dealers are also to receive a "locking device" and "all applicable safety and instruction manuals" as provided by Smith & Wesson.[137] Where used, these devices and instructions can help to enhance the impact and reduce the cost of safeguarding against firearm diversion by Smith & Wesson's authorized dealers.

## EFFORTS TO CONTROL AND LIMIT THE DISTRIBUTION AND ADVERTISING RISKS ASSOCIATED WITH FIREARMS ARE CONSISTENT WITH, AND FOLLOWS FROM, THE BROADER CONCEPTS OF "COUNTERMARKETING" AND "DEMARKETING"

112. Efforts to control and limit the distribution and advertising risks associated with firearm diversion are consistent with, and follow from, more basic principles of marketing and marketing management known as "countermarketing" and "demarketing."

### I. Marketing Management as the Management of Demand

113. First advanced over 50 years ago, conceptions of marketing management as "demand management" provide the foundation for these concepts

[137] *Id.*

(i.e., countermarketing and demarketing) and their application to circumstances involving unwanted demand for a good or service.[138]

## II. UNWANTED AND UNWHOLESOME DEMAND

114. In addition to creating and maintaining demand for a good or service, at times, marketers may also be confronted with unwanted demand.[139] This can include too much demand for a firm's capacity (e.g., a sold-out hotel or overbooked airplane, etc.), but also unwholesome demand. Unwholesome demand is the desire for goods, services, or activities that reduce individual and societal welfare. Classic examples of industries with significant unwholesome demand include many of the so-called vice products: alcohol and related products, tobacco and related products, illicit and prescription drugs, and other products for which safety or other societal concerns exist.[140] In the firearms context, this would include the purchase and use of firearms by unauthorized and at-risk persons and for use in crime.

[138] Philip P. Kotler and Sidney Levy, *Demarketing, Yes, Demarketing,* 49 HARV. BUS. REV. 74 (1971).

[139] Philip P. Kotler, *The Major Tasks of Marketing Management*, 37 J. MKTG. MGMT. 42 (Oct. 1973), https://doi.org/10.2307/1250357.

[140] Thomas C. Kinnear and Cynthia J. Frey, *Demarketing of Potentially Hazardous Products: General Framework and Case Studies*, 7 J. CONTEMP. BUS. 57 (1979).

## III. COUNTERMARKETING AND DEMARKETING AGAINST UNWHOLESOME DEMAND

115. Following basic principles of marketing management, when confronted with unwholesome demand, the marketer's "task" is to engage in countermarketing or demarketing to counter or limit the demand. Demarketing involves discouraging demand in general or on the part of a certain class of customers, either temporarily or on a continuing basis.[141] Countermarketing, a stronger strategy, involves total repudiation of the relevant demand, such as by getting rid of undesirable customers, or preventing certain types of transactions.[142]

116. Many strategies for countermarketing and demarketing a good or service are available to marketers -- prices may be raised, product quality may be altered, service and promotion can be reduced and/or convenience altered.[143] The concepts of countermarketing and demarketing extend to all aspects of marketing management.[144]

117. Accounts of the application of countermarketing and demarketing are widely documented in the marketing literature. This includes, for example, countermarketing and demarketing to encourage conservation during energy

[141] *Countermarketing in the Courts: The Case of Marketing Channels and Firearm Diversion, supra* note 19.

[142] *Id.*

[143] *Id.*

[144] *Id.*

shortages through reduction in the number of retail outlets sold to, retail product allocation systems, requirements for reduced hours of retail operation, and discontinuance of promotional incentives. It also includes countermarketing and demarketing to manage tourism and preserve natural resources through increased prices, restrictive access permits, and persuasive promotional campaigns.[145] It further includes countermarketing and demarketing to discourage dysfunctional demand for night-time emergency healthcare services through persuasive communications and information.[146]

## IV. Countermarketing and Demarketing Against Firearm Diversion

118. Applied to the problem of firearm diversion, countermarketing and demarketing encompasses not only the design and management of a manufacturer's or distributor's retail distribution system and strategy, but also the design and management of other marketing strategies. This includes promotional strategies (e.g., advertising campaigns, sales practices, etc.), product strategies (e.g., product

[145] Sue Beeton and Richard Benefield, *Demand Control: The Case for Demarketing as a Visitor and Environmental Management Tool*, 10 J. Sustainable Tourism 497 (2002).

[146] Annabelle Mark and Richard Elliott, *Demarketing Dysfunctional Demand in the UK National Health Service*, 12 Int'l J. Health Planning and Mgmt. 297 (Dec. 4, 1998), https://onlinelibrary.wiley.com/doi/abs/10.1002/%28SICI%291099-1751%28199710/12%2912%3A4%3C297%3A%3AAID-HPM493%3E3.0.CO%3B2-X.

design, accessories, etc.), and pricing strategies (e.g., initial price, price management, etc.). Thus, countermarketing and demarketing applied to firearm diversion contemplates a comprehensive approach to reducing its occurrence.

## EFFORTS TO CONTROL AND LIMIT THE DISTRIBUTION AND ADVERTISING RISKS ASSOCIATED WITH FIREARMS ARE ALSO CONSISTENT WITH, AND FOLLOW FROM, ACCEPTED CONCEPTIONS OF MARKETING AS A PROFESSION AND DISCIPLINE

119. Efforts to control and limit the distribution and advertising risks associated with firearm diversion are also consistent with, and follow from, accepted conceptions of marketing as offered by the leading professional associations in marketing and advertising.

### I. Marketing Accountability Standards Board

120. According to the Marketing Accountability Standards Board's Universal Marketing Dictionary,[147] "marketing is the activity, set of institutions, and processes for creating, communicating, delivering, and exchanging offerings that have value for customers, clients, partners, *and society at large*" (emphasis added).[148] Established in 2011, the Universal Marketing Dictionary was developed in collaboration with the leading professional organizations in marketing -- the

[147] Marketing Accountability Standards Board, The Universal Marketing Dictionary, https://marketing-dictionary.org/.

[148] *Id.* (The definition of marketing adopted by the Marketing Accountability Standards Board first originated with the American Marketing Association in 2007).

American Marketing Association, the Association of National Advertisers, and the Marketing Science Institute. An objective was to "enhance marketing … accountability through a commonly understood language of marketing."[149] The dictionary and its definitions serve as a respected resource for the profession.

121. The Marketing Accountability Standards Board's definition addresses the role and responsibility of marketing in society and thereby provides guidance to those involved in marketing.[150] By defining marketing to provide value to customers, clients, partners, and society at large, the definition implies that the role and responsibility of marketers is to provide value broadly and to avoid or curtail practices that do not provide such value.[151] These requirements help those involved in marketing understand the implications of their practices by exposing them to the scrutiny of those occupying domains and holding perspectives beyond marketing.[152]

## II. Marketing of Firearms and Related Products

122. Extended to the marketing of firearms (and related products), the definition implies that the role and responsibility of those who market firearms is to

---

[149] *Id.*

[150] Gregory T. Gundlach and William L. Wilkie, *AMA's New Definition of Marketing: Perspective and Commentary on the 2007 Revision*, 28 PUB. POL. & MKTG. 259-264 (2009).

[151] *Id.*

[152] *Id.*

provide value broadly and to avoid or curtail practices that do not provide such value. In practice, this implies that those engaged in the marketing of firearms should create firearms, communicate information about their firearms, manage delivery of their firearms, and facilitate exchanges of their firearms in ways that not only have value for their individual customers, clients, and partners, but that also have value for society at large. It further implies that those engaged in the marketing of firearms should avoid or curtail practices that do not provide such value.

## OTHER INDUSTRIES REGULARLY ADOPT SAFEGUARDS TO LIMIT THE DISTRIBUTION AND ADVERTISING RISKS ASSOCIATED WITH THEIR PRODUCTS

123. Many companies that market products which have the potential for harm adopt safeguards to limit the distribution and advertising risks associated with their products, specifically with regard to selling to unauthorized persons, those that will misuse the product, or selling to persons who will divert the product to illegal use.

### I. TOBACCO INDUSTRY

124. The "We Card" program is a manufacturer advised and supported organization serving the nation's tobacco retailers (and other age-restricted

products).[153] Under the program retailers are considered to play a "critical role in preventing the sale of age-restricted products to underage customers."[154] Participants in the program receive access to a wide array of educational and training programs and materials to limit the purchase of tobacco products by minors.[155]

125. Among other materials, the program includes a "Retailer Pledge," an e-learning center; a template for developing retailer product sales policies; a "Guide to Best Practices;" a catalog containing point-of-purchase materials such as age-of-purchase calendars, signage, stickers, decals, guides and tip sheets; access to ID scanner and age verification tools and technology; initial, refresher, and booster training courses for employees and managers, and monetary incentives, among other materials.[156]

126. Under the program, participating retailers utilize door and window decals, counter signs, employee pins, minimum age calendars, and hand-outs to educate and answer customer questions.[157] A detailed employee guide and training

[153] We Card Web Center, http://www.wecard.org.

[154] We Card Web Center, *Dear Retailer Letter*, https://www.wecard.org/dear-retailer.

[155] We Card Web Center, *supra* note 153.

[156] *Id.*

[157] *Id.*

videos are also provided along with access to an e-learning center.[158] The guide and training videos offer information on how to ask for an ID, how to say "no," how to spot a fake ID, state law information and information on federal laws.[159]

127. Professional trainers teach proven techniques that clerks can use to reject attempts to buy tobacco and vaping products illegally.[160] Retailers are also offered self-assessment surveys to assist in the identification of best practices suited for their individual stores.[161] The program also includes the termination of benefits and incentives to retailers who are fined or convicted of selling tobacco to minors.[162]

## II. Alcohol Beverage Industry

128. Distillers, producers, and suppliers of alcohol products offer training and other programs to retailers for the identification of strawman transactions and monitoring for illegal transactions.

129. One such program is the "Training in Intervention Procedures for Servers of Alcohol" (TIPS) program that offers servers and sellers of alcohol products skills for serving responsibly and avoiding selling to minors, including

---

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.*

checking IDs, managing intoxication levels, and reducing incidents of drunk driving.[163]

130. Another program, the "Being a Responsible Server" (BARS) program is a secret shopper program that helps keep servers and sellers vigilant about checking IDs.[164] Participating establishments pay the BARS program to be monitored by BARS checkers who make random visits to their stores and purchase alcohol beverages.[165]

## III. CHEMICAL PRODUCTS INDUSTRY

131. The International Council of Chemical Associations (ICCA) created the "Responsible Care"[166] program, which includes a signatory "Global Charter,"[167] formal "Commitment,"[168] and a voluntary "Stewardship Code,"[169] to "prevent the

---

[163] Training in Intervention Procedures for Servers of Alcohol Training, https://www.tipsalcohol.com/.

[164] Being a Responsible Server Program, https://www.barsprogram.com/howitworks.htm.

[165] *Id.*

[166] International Council of Chemical Associations, *Responsible Care*, https://icca-chem.org/focus/responsible-care/.

[167] International Council of Chemical Associations, *Responsible Care Global Charter* (May 29, 2014), https://icca-chem.org/wp-content/uploads/2020/06/RC-Global-Charter-FINAL.pdf.

[168] International Council of Chemical Associations, *Responsible Care Commitment*, https://icca-chem.org/focus/responsible-care/.

[169] International Council of Chemical Associations, *Responsible Care*, *Voluntary Product Stewardship Practices to Prevent Diversion of 1,4-Butanediol and Gamma Butyrolactone*, https://icca-chem.org/wp-

(continued…)

misuse and diversion of … chemicals for unlawful purposes."[170] The code requires adherence to extensive distribution and customer requirements to ensure the legitimate use of dangerous chemicals.[171]

132. The American Chemistry Council "Responsible Care Program" actively participates, offers guidance, and encourages its members (1) in how to evaluate the risks associated with chemical distribution and employ methods to reduce those risks, (2) to meet or exceed all regulations and industry standards governing chemical distribution, (3) to provide emergency advice and/or assistance to people on the scene in the event of a chemical distribution emergency, and (4) to develop new technologies and methods to improve chemical distribution safety.[172] Participating members that participate and follow their guidelines and achieve a reduction in their incident rates are given awards.[173]

---

content/uploads/2021/12/voluntary-product-stewardship-code.pdf.

[170] *Responsible Care*, *supra* note 166.

[171] *Responsible Care*, *Voluntary Product Stewardship Practices to Prevent Diversion of 1,4-Butanediol and Gamma Butyrolactone*, *supra* note 169.

[172] American Chemistry Council, *Responsible Care: Driving Safety & Industry Performance*, https://www.americanchemistry.com/chemistry-in-america/responsible-care-driving-safety-industry-performance?gclid=CjwKCAjw67ajBhAVEiwA2g_jEHNKFFxVDz5zw7F7_fwceA5PGWR1VO1QsvBguUxOvqFboYy1H-TisRoCjFgQAvD_BwE.

[173] *Id.*

## IV. FERTILIZER INDUSTRY

133. The National Academies of Sciences, Engineering and Medicine has provided a report on reducing the threat of improvised explosive device attacks by restricting access to precursor chemicals including ammonium nitrate commonly found in fertilizers.[174] The procedures require ammonium nitrate sellers to deny sale or transfer of ammonium nitrate to those who (1) do not possess a valid ammonium nitrate registered User Number, (2) a valid photo ID, and (3) are not authorized by a person possessing a valid ammonium nitrate registered User Number to act on their behalf as an agent.[175]

134. The Illinois Fertilizer & Chemical Association has identified indicators of "suspicious purchasing behavior" including (1) being a new customer who is not from the area, (2) refusing to provide an address where the fertilizer will be used or delivered, (3) possessing little knowledge of application methods or fertilizers, among others.[176] To safeguard sales of the chemical, the association

[174] Cybersecurity & Infrastructure Security Agency, *Ammonium Nitrate Security Program*, https://www.cisa.gov/resources-tools/programs/ammonium-nitrate-security-program#:~:text=The%20Ammonium%20Nitrate%20Security%20Program,to%20prevent%20the%20misappropriation%20or.

[175] *Id.*

[176] Illinois Fertilizer & Chemical Association, *Indicators of Suspicious Purchasing Behavior - Report to IFCA*, https://www.ifca.com/security_display/?id=433&title=Indicators+of+Suspicious+Purchasing+Behavior+-+Report+to+IFCA.

encourages members of the industry to require a valid ID from all new customers, keep records of purchases, talk to customers, ask questions and listen to and observe responses, watch for people and actions that are out of place, make note of suspicious statements, people and/or vehicles, and to notify enforcement authorities if something seems wrong.[177]

135. In 2019, the Agricultural Retailers Association[178] (ARA) aimed to enhance the health, safety, and security performance of agricultural retail facilities by formalizing an alliance with The Fertilizer Institute (TFI), ARA, and the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA). The alliance builds upon the stewardship efforts associated with the "Responsible Ag" program, a voluntary initiative created in 2014 by TFI and ARA to enhance health, safety, and security performance at agricultural retail facilities.[179]

## V. PYROTECHNIC PRODUCTS INDUSTRY

136. The American Pyrotechnics Association[180] (APA) encourages safety in the design and use of all types of fireworks, provides industry safety information and support to its members, and promotes the responsible regulation of the

---

[177] *Id.*

[178] Christopher Glen, *Alliance Between Industry and Regulators Shows Fertilizer and Ag Retailers are Serious About Safety*, THE FERTILIZER INSTITUTE (February 19, 2019), https://www.tfi.org/newsroom/2019/OSHA_Alliance

[179] *Id.*

[180] American Pyrotechnics Association, https://www.americanpyro.com/.

fireworks industry. They also assist member companies in understanding and complying with their regulatory responsibilities.

137. Through various partnerships, the APA Safety & Education Foundation offers a "Fireworks Safety Coloring Activity" book for distribution to minors, promotes "Celebrate Safety" campaigns to raise awareness in the safe use of fireworks at the point of sale, and distributes to retailers "In the Bag for Safety" shopping bags that list safety tips for purchasers.[181]

138. The APA also offers customized training at meetings and through their APA University on Department of Transportation HazMat Training, Occupational Safety, and Health Administration Compliance Training, entry level driver training, train the trainer for display operators, and train the trainer for special effect pyrotechnics.[182]

## VI. All-Terrain Vehicle Industry

139. In the all-terrain-vehicle industry, the Specialty Vehicle Institute of America (SVIA), that serves manufacturers and distributors of all-terrain vehicles in the U.S., promotes the safe and responsible use of all-terrain vehicles through rider programs, public awareness campaigns, and safety-driven state legislation.[183]

---

[181] American Pyrotechnics Association, *APA's Safety & Education Foundation*, https://www.americanpyro.com/safety-foundation.

[182] *Id.*

[183] Specialty Vehicle Institute of America, https://svia.org/.

140. As a part of their efforts, SVIA offers training for dealerships to encourage safe selling practices.[184] Describing to dealers the important role they play in promoting the safe use of all-terrain vehicles, according to the SVIA, "[a]s the vital link between the manufacturer and the purchaser, you're expected to do your part to ensure the safety of your customers by being well-informed about basic ATV safety principles, rider training, and matching an appropriate ATV to the rider"[185]

## OTHER INDUSTRIES VOLUNTARILY REFRAIN FROM, OR OTHERWISE LIMIT, THEIR MARKETING AND ADVERTISING TO PREVENT OR REDUCE THE LIKLIHOOD OF UNDERAGE SALES

141. Beyond adopting safeguards to limit the distribution and advertising risks of underage sales (e.g., We Card tobacco program, TIPs alcohol beverage program, BARS alcohol beverage program), other industries also voluntarily refrain from, or otherwise limit, their marketing and advertising to prevent or reduce the likelihood of underage sales.

---

[184] Specialty Vehicle Institute of America, *ATV Sales Force Training for Dealerships*, https://svia.org/atv-sales-force-training-for-dealerships/.

[185] *Id.*

## I. ALCOHOL BEVERAGE INDUSTRY

142. The three major alcohol supplier trade associations – the Distilled Spirits Council of the United States,[186] the Wine Institute[187] and the Beer Institute,[188] – have adopted voluntary advertising and marketing codes designed to reduce the likelihood that alcohol advertising will, by its content or placement, target consumers below the legal drinking age.[189] Most alcohol advertisers have pledged to comply with at least one of the voluntary self-regulatory codes.[190]

143. The Distilled Spirits Council of the United States Code of Responsible Practices for Beverage Alcohol Advertising and Marketing sets forth standards for responsible and appropriate advertising and marketing.[191] The code includes that "Advertisements Appealing to Children Are Inappropriate" and that

---

[186] Distilled Spirits Council of the United States, *Code of Responsible Practices for Beverage Alcohol Advertising and Marketing*, https://www.distilledspirits.org/code-of-responsible-practices/.

[187] Wine Institute, *Wine Institute's Code of Advertising Standards*, https://wineinstitute.org/our-work/responsibility/social/ad-code/.

[188] Beer Institute, *Advertising and Marketing Code*, https://www.beerinstitute.org/policy-responsibility/responsibility/advertising-marketing-code/.

[189] Federal Trade Commission, *Self-Regulation in the Alcohol Industry*, REPORT OF THE FEDERAL TRADE COMMISSION (March 2014), https://www.ftc.gov/system/files/documents/reports/self-regulation-alcohol-industry-report-federal-trade-commission/140320alcoholreport.pdf.

[190] Federal Trade Commission, *Alcohol Advertising* (September 2013), https://consumer.ftc.gov/articles/0391-alcohol-advertising.

[191] *Code of Responsible Practices for Beverage Alcohol Advertising and Marketing*, *supra* note 186.

"Marketing that primarily appeals to individuals under the age of 21 is inappropriate."[192] According to the code, advertising and marketing materials are considered to primarily appeal to persons below the legal purchase age if they have special attractiveness to such persons beyond the general attractiveness for persons of legal purchase age.[193]

144. In order to provide clarity and guidance, a non-exhaustive list of inappropriate content is specified in the code including depictions of a "child" or portrayals of "objects, image, or cartoon figures that primarily appeal to persons below the legal purchase age," "brand identification – including logos, trademarks, or names – on clothing, toys, games, game equipment, or other items intended for use primarily by persons below the legal purchase age" among others.[194]

145. The code covers both the responsible placement and content of beverage alcohol advertising and marketing materials, as well as provides detailed digital and media buying guidelines.[195] The code applies to all activities in the United States undertaken to advertise and market distilled spirits, as well as beer and wine brands marketed by members of The Beer Institute and the Distilled

[192] *Id.*

[193] *Id.*

[194] *Id.*

[195] *Id.*

Spirits Council of the United States.[196] The code also covers the advertising and marketing of distilled spirits brands of nonmembers.[197] The code includes a complaint review and action process.[198]

146. The Wine Institute's Code of Advertising Standards establishes Guidelines for responsible content and placement of all communications involving wine and wine coolers by active members of the Wine Institute.[199] According to the Wine Institute, members shall adhere to both the "letter and the spirit" of the code.[200] The code guidelines apply to "all advertising in all forms – including, but not limited to Internet, mobile and other digital marketing communications, product labels, packaging, direct mail, point-of-sale, outdoor, displays, sponsorships, promotions, radio, television, movies, video, print media and product placements."[201] The code includes a "complaint" and "complaint review process."[202]

147. Under the code guidelines, "Wine advertising shall encourage the responsible consumption of wine and shall be adult-oriented and socially

---

[196] *Id.*

[197] *Id.*

[198] *Id.*

[199] *Wine Institute's Code of Advertising Standards*, *supra* note 187.

[200] *Id.*

[201] *Id.*

[202] *Id.*

responsible."[203] In particular, "Any advertisement which has particular appeal to persons below the legal drinking age is unacceptable, even if it also appeals to adults."[204] Further, "Wine should not be advertised or marketed in any manner directly or primarily appealing to persons below legal drinking age."[205]

148. Following the code guidelines, wine content of advertising should not: "Show models and personalities as wine consumers in advertisements who are or appear to be under the legal drinking age."[206] Wine advertising should also not "Use music, language, gestures, cartoon characters, or depictions, images, figures, or objects that are popular predominantly with children or otherwise specifically associated with or directed toward those below the legal drinking age, including the use of Santa Claus or the Easter Bunny."[207] Further wine advertising should not "Be presented as being related to the attainment of adulthood or associated with "rites of passage" to adulthood" or "Suggest that wine is similar to another type of beverage or product (e.g., milk, soda, candy) having particular appeal to persons below the legal drinking age."[208] In addition, wine advertising should not "Use entertainment or sports celebrities having a particular appeal to persons below the legal drinking

[203] *Id.*

[204] *Id.*

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] *Id.*

age" and the use or selection of entertainment or sports celebrities "should be substantiated by research demonstrating the basis for selection and periodically evaluated."[209]

149. Under the guidelines, wine advertising shall not be placed in "media with substantial underage appeal" and shall not "Appear in children or juvenile magazines, newspapers, television programs, radio programs or other media specifically oriented to persons below the legal drinking age."[210] Further, wine advertising should not "Appear in any media where more than 26.3% of the audience is underage (determined by using reliable, up-to-date audience composition data)."[211] In addition, "Members shall be mindful that online advertising may be viewed by underaged individuals and shall take steps to ensure that online content remains consistent with provisions of this code."[212]

150. The Beer Institute Advertising and Marketing Code[213] sets forth Guidelines[214] for responsible advertising and marketing. These guidelines include that "Advertising or marketing materials should avoid elements that appeal

---

[209] *Id.*

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] *Advertising and Marketing Code*, *supra* note 188.

[214] *Id.*

primarily to persons under the legal drinking age."[215] According to the guidelines, advertising and marketing materials appeal primarily to persons below the legal drinking age if they have "special attractiveness to such persons beyond their general attractiveness for persons of legal drinking age."[216] In considering whether beer advertising and marketing materials appeal primarily to persons below the legal drinking age, brewers are to take into account symbols, language, music, gestures, entertainers or celebrities, cartoon characters, and groups or organizations, among other elements contained in the materials.[217] The guidelines apply to all beer-branded advertising and marketing materials created by or under the control of the brewer.[218]

## II. FOOD AND BEVERAGE INDUSTRY

151. Launched as part of an internal restructuring of the Council of Better Business Bureaus, Inc., BBB National Programs administers industry voluntary self-regulation and dispute resolution programs previously administered by the Council of Better Business Bureaus, Inc.[219] The programs are intended to create a better experience for consumers and a fairer playing field for businesses.[220]

[215] *Id.*

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] BBB National Programs, https://bbbprograms.org/.

[220] *Id.*

BBB National Program Partners include leading companies from different industries including leading food and beverage suppliers.[221] Two of their programs specifically establish voluntary standards for children's advertising of food and beverage products -- the Children's Food and Beverage Advertising Initiative[222] and the Children's Confection Advertising Initiative.[223]

152. The Children's Food and Beverage Advertising Initiative was created to improve the landscape of food advertising to children and to address the unique vulnerabilities of children under the age of 13.[224] Under the initiative, participants voluntarily commit that, in advertising primarily directed to children, they will either not advertise foods or beverages to children at all or advertise only products that meet the Children's Food and Beverage Advertising Initiative's strict Uniform Nutrition Criteria.[225] Participants also do not advertise in elementary schools.[226] Additionally, all participants have a policy to not engage in advertising primarily directed to children under age six.[227] The initiative's standards cover child-directed TV, print, radio, digital media, product placements and product

---

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.*

[225] *Id.*

[226] *Id.*

[227] *Id.*

integrations, and mobile media.[228] All participants must comply with the core principles (i.e., standards) of the program, develop a company-specific pledge that details how it will meet the standards, and submit information to demonstrate that they have complied.[229] A program administrator monitors compliance and requires participants to submit detailed self-assessments annually.[230] Many of the leading food, beverage, and restaurant companies in the United States participate in the program.[231]

153. The Children's Confection Advertising Initiative was created to allow small-to-medium sized confectionery companies to take part in industry self-regulation.[232] All participants make the same commitment to not engage in child-directed advertising for children under age 13, joining the five confectionery companies that participate in the Children's Confection Advertising Initiative.[233] The initiative was created in partnership with the National Confectioners

---

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] *Id.*

[232] *Id.*

[233] *Id.*

Association.[234] Together, the confectionary companies in the program make most of the candy on store shelves in the United States.[235]

### III. Other Industries

154. BBB Programs also offers Self-Regulatory Guidelines for Children's Advertising[236] that apply across industries to national advertising directed toward children under age 13 appearing in any medium.[237] The "paramount principle" underlying the guidelines is that advertisers should recognize that they have special responsibilities to children and that children have limited knowledge, experience, sophistication, and maturity. [238] Thus, "advertisers should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are viewing or hearing advertising."[239]

155. Among other guidance, "Advertisements must not condone or encourage practices that are detrimental to children's health."[240] In particular, "Advertisers targeting children should not knowingly advertise products that are

---

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] *Id.*

[238] *Id.*

[239] *Id.*

[240] *Id.*

illegal to sell to children or pose a risk to their health and safety, e.g., tobacco, e-cigarettes, alcohol, or prescription drugs."[241] In this respect, "Advertisers should take into account that children are prone to exploration, imitation, and experimentation and may imitate product demonstrations or other activities depicted in advertisements without regard to risk."[242] In addition, "Advertisements for children's products should show them being used by children in the appropriate age range" and "Advertisements should not portray adults or children in unsafe situations or in acts harmful to themselves or others."[243]

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 28th day of September 2023.

Gregory T. Gundlach, J.D., PhD

[241] *Id.*

[242] *Id.*

[243] *Id.*