GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

EDMUND K. SAFFERY      5860-0
   esaffery@goodsill.com
FOREST B. JENKINS      9761-0
   fjenkins@goodsill.com
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

CLEMENT & MURPHY, PLLC

PAUL D. CLEMENT (*phv*)
ERIN E. MURPHY (*phv*)
MATTHEW D. ROWEN (*phv*)
MARIEL BROOKINS (*phv*)
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900

Attorneys for Plaintiff

NATIONAL SHOOTING SPORTS FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>       PLAINTIFF,<br><br> vs.<br><br>ANNE E. LOPEZ, ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>       DEFENDANT. | CIVIL NO. 1:23-CV-00287 DKW-RT<br><br>PLAINTIFF'S REPLY BRIEF IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION; CERTIFICATE OF SERVICE<br><br><br>JUDGE: Hon. Derrick K. Watson |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ...................................................................... 1

ARGUMENT ........................................................................... 1

   I.    NSSF Has Established Standing And Ripeness .................................. 1

   II.   NSSF Is Likely To Succeed On The Merits...................................... 8

        A.    HB 426's Sweeping Ban on "Abnormally Dangerous" Arms Violates the Second Amendment ...................................... 8

        B.    HB 426's Other Provisions Violate the Second Amendment Too ............................................................... 13

        C.    HB 426 Authorizes Preempted Qualified Civil Liability Actions .................................................................. 14

        D.    HB 426 Cannot Constitutionally Apply to Out-of-State Conduct .................................................................. 18

        E.    HB 426 Violates the First Amendment.................................... 20

        F.    HB 426 Is Void for Vagueness ................................................ 23

   III.   The Remaining Factors All Favor Injunctive Relief.......................... 25

CONCLUSION ......................................................................... 25

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
  141 S.Ct. 2373 (2021)..........................................................................22

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022)..............................................................4, 5

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)............................................................................18

*Bruni v. City of Pittsburgh*,
  824 F.3d 353 (3d Cir. 2016)...............................................................13

*Cal. Rest. Ass'n v. City of Berkeley*,
  65 F.4th 1045 (9th Cir. 2023)...............................................................4

*Cal. Trucking Ass'n v. Bonta*,
  996 F.3d 644 (9th Cir. 2021).................................................................5

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
  273 F.3d 536 (3d Cir. 2001)...............................................................14

*Clark v. City of Seattle*,
  899 F.3d 802 (9th Cir. 2018).................................................................7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................9, 10, 11, 14

*Doe v. Reed*,
  561 U.S. 186 (2010)............................................................................14

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021)...............................................................14

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011)...............................................................13

*Garmong v. Tahoe Reg'l Plan. Agency*,
  806 F.App'x 568 (9th Cir. 2020)...........................................................1

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
    143 S.Ct. 1444, (2023) ...................................................................................16

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ....................................................7, 15, 17, 25

*In re Coleman*,
    560 F.3d 1000 (9th Cir. 2009) .........................................................................7

*Johnson v. United States*,
    576 U.S. 591 (2015) .......................................................................................25

*Junior Sports Mags. Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) ..................................................................21, 22

*Legato Vapors, LLC v. Cook*,
    847 F.3d 825 (7th Cir. 2017) ....................................................................19, 20

*Lopez-Valenzuela v. Arpaio*,
    770 F.3d 772 (9th Cir. 2014) ....................................................................12, 13

*Luis v. United States*,
    578 U.S. 5 (2016) .............................................................................................8

*Moore v. Urquhart*,
    899 F.3d 1094 (9th Cir. 2018) .......................................................................18

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S.Ct. 2111 (2022) ..............................................................................10, 13

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ...................................................................................18, 20

*NSSF v. New Jersey*,
    80 F.4th 215 (3d Cir. 2023) ..........................................................................1, 6

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ............................................................................................7

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) .......................................................................19

*Sam Francis Found. v. Christies, Inc.*,
  784 F.3d 1320 (9th Cir. 2015).................................................................18, 20

*Sekhar v. United States*,
  570 U.S. 729 (2013)...........................................................................................8

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011).........................................................................................21

*Sprint Telephony PCS, L.P. v. Cnty. of San Diego*,
  543 F.3d 571 (9th Cir. 2008)...........................................................................14

*State ex rel. Becerra v. Sessions*,
  284 F.Supp.3d 1015 (N.D. Cal. 2018) ...............................................................7

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)...................................................................................3, 4, 7

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017)..........................................................................1, 8

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023)...............................................................1, 3, 9, 10

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022)........................................................................3, 7

*TransUnion LLC v. Ramirez*,
  141 S.Ct. 2190 (2021).......................................................................................4

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022)............................................................................6

*Unified Data Servs. v. FTC*,
  39 F.4th 1200 (9th Cir. 2022)............................................................................6

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023)..........................................................................10

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982)........................................................................................24

*VIP of Berlin, LLC v. Town of Berlin*,
    593 F.3d 179 (2d Cir. 2010) ...............................................................24

**Constitutional Provisions**

U.S. Const. amend. II ...............................................................................9

**Statutes**

15 U.S.C §7901(a)(6)............................................................................24

15 U.S.C. §7901(a)(7)...........................................................................14

15 U.S.C. §7902(a) .................................................................15, 17, 18

15 U.S.C. §7902(b) ...............................................................................18

15 U.S.C. §7903(5)(A)..................................................................15, 16

15 U.S.C. §7903(5)(C)..........................................................................17

42 U.S.C. §1983 ....................................................................................16

Cal. Bus. & Prof. Code §22949.80(a)(1) ............................................21

Haw. Rev. Stat. §134-1....................................................................2, 11

Haw. Rev. Stat. §134-8(a)................................................................2, 11

N.J. Stat. Ann. §2C:58-35(a)(1).............................................................6

**Other Authorities**

Compl, *City of Buffalo v. Smith & Wesson Brands, Inc.*,
    No. 1:23-cv-00066 (W.D.N.Y. Jan. 23, 2023) ..............................5, 23

Henry Decl., *NSSF v. Raoul*, No. 3:23-cv-02791
    (S.D. Ill. Sept. 15, 2023) .................................................................3

Pet. for Reh'g, *Teter v. Lopez*, No. 20-15948
    (9th Cir. Sept. 20, 2023)..................................................................3

## INTRODUCTION

HB 426 is unconstitutional and preempted.  In trying to defend it, the AG mischaracterizes NSSF's claims, fails to respond to several of NSSF's arguments, and ignores contrary precedent.  The Court should enjoin enforcement of the statute.

## ARGUMENT

### I.   NSSF Has Established Standing And Ripeness.

**A.** The notion that NSSF lacks standing blinks reality.  Because "[s]tanding is not dispensed in gross," *Garmong v. Tahoe Reg'l Plan. Agency*, 806 F.App'x 568, 571 (9th Cir. 2020), NSSF addresses its challenges to each provision in turn.

1. It is bedrock law that manufacturers and sellers have standing to challenge laws that ban the products they make and sell.  *See Teter v. Lopez*, 76 F.4th 938, 945 n.4 (9th Cir. 2023) (discussing *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc)).  That is precisely what Sections 134-B(b)(2), (b)(3), and (d) do.

HB 426 makes it unlawful to "sell, distribute, or provide to a downstream distributor a firearm-related product that," in the state's view, "is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State."[1]  §134-B(b)(2); *see also* §134-B(b)(3).  There is no dispute that NSSF's members sell firearms and other products that come within HB 426's

---

[1] As the AG acknowledges, the New Jersey law in *NSSF v. New Jersey*, 80 F.4th 215 (3d Cir. 2023), is not analogous to HB 426's ban on "abnormally dangerous" arms. *See* AG.Br.11 n.6 (acknowledging "differences between the statutes").

definition of "firearm-related product."  *See* §134-A.  And while NSSF does not believe that any of its members' products are *in fact* "abnormally dangerous," Hawaii clearly disagrees.  Hawaii already bans dozens of models of semiautomatic handguns that are perfectly lawful in the overwhelming majority of states, *see* Haw. Rev. Stat. §§134-1, -8(a); it is a matter of public record that many of those firearms are manufactured and sold by NSSF's members in other states; and the AG admits that §134-B(b)(2) covers such arms, AG.Br.33-34, 39.  NSSF's members thus now face liability if, for instance, someone brings one of those firearms into Hawaii, on the theory that they did not "[t]ake reasonable precautions" to prevent it.  §134-B(b)(2).[2]

HB 426 also makes it presumptively unlawful to sell or market any firearm that "is designed, sold, or marketed in a manner that is targeted at minors."  §134-B(b)(2), -(c), -(d)(3).  NSSF members sell and market many "youth-model firearms," which are "smaller size and lighter weight" than standard models—and are "obviously 'designed … in a manner that is targeted at minors.'"  S&W Decl. ¶15; *see also* Henry Decl. ¶¶12-14, *NSSF v. Raoul*, No. 3:23-cv-02791 (S.D. Ill. Sept. 15,

---

[2] The AG claims that NSSF is "misreading … the Hawai'i law"; in her view, HB 426 "provides for liability based on out-of-state conduct [only] if 'it was reasonably foreseeable that the item would be possessed in the State.'"  AG.Br.13-14 (quoting §134-A).  But she has no answer for what the text of the statute actually says.  If a court finds an industry member to have failed to take "reasonable precautions" to keep certain products out of the hands of "downstream distributors" that sell to retailers in Hawaii under §134-B(b)(2), then "it was reasonably foreseeable that [those products] would be possessed in the State" under §134-A by definition.

2023), Dkt.27-1 (listing examples of firearms it "manufactures, markets, and sells" that are "specifically designed for use by minors").  The AG does not deny that such products fall within HB 426's ambit, or that such products are currently available for sale in and shipment to Hawaii, or that marketing such (lawful) products *to adults* who want to take their children hunting is now presumptively illegal under HB 426.

And that is not the half of it.  The AG recently filed a brief in the Ninth Circuit asking that court to rehear a case the AG lost.  The brief describes as "highly dangerous weapons" all manner of firearm-related products *that currently are lawful in Hawaii*, *see* Pet. for Reh'g 19, *Teter v. Lopez*, No. 20-15948 (9th Cir. Sept. 20, 2023), Dkt.135-1, apparently on the theory that those products are "most suitable for assaultive purposes" (whatever that means), *see* §134-B(d)(1).  The AG presumably plans to enforce HB 426 against those lawful products as well.

NSSF thus amply satisfies "the traditional requirements for a pre-enforcement challenge."  *Teter*, 76 F.4th at 945.  "*Driehaus* set the general standard for pre-enforcement standing."  *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).  Under *Driehaus*, Article III is satisfied when plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest," but that conduct is "arguably … proscribed by [the] statute," and their fear of enforcement is "not imaginary or wholly speculative."  573 U.S. at 160-61.  The AG does not contest the first two

elements. Instead, she complains that NSSF has not alleged "any specific conduct that its members engage in that would lead to liability under [HB 426]." AG.Br.10. That is wrong; as just explained, NSSF's members sell products that are now presumptively unlawful to sell under HB 426. But it is also beside the point, as "the Supreme Court has instructed that plaintiffs need not do that" to satisfy *Driehaus*. *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022); *see Driehaus*, 573 U.S. at 163. While a plaintiff must show a "sufficiently realistic" "feared future injury," it need not "explicitly confess to intended future conduct that is violative of the law it seeks to challenge." *Arizona*, 34 F.4th at 849-51. Absent a promise that the state will not enforce the law in the way plaintiffs fear—which the AG notably has not made—all that is required is a concrete plan to engage in conduct that "more than … hypothetical[ly]" could be said to violate the law. *Id.* at 850.

In short, NSSF, whose members manufacture and sell products that Sections 134-B(b)(2), (b)(3), and (d) ban, plainly has standing to challenge those provisions. *See Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1049 (9th Cir. 2023).[3]

2. In addition to banning arms, HB 426 creates liability for licensed commerce

---

[3] The AG claims (at 16) that NSSF lacks "derivative standing on behalf of its members' individual customers." But not one case supports the AG's theory that an association lacks standing even when it satisfies the associational-standing requirements (as NSSF plainly does) just because the legally protected interest on the merits ultimately belongs to the association's members' customers. Where the *legal* right rests has nothing to do with standing; "under Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2205 (2021).

in arms that the AG deems "[un]reasonable." Under §134-B(b)(1), "firearm industry member[s] shall … [e]stablish, implement, and enforce reasonable controls," which §134-A defines to "mean[] reasonable procedures, acts, or practices that are designed, implemented, and enforced to," *inter alia*, "[e]nsure that the firearm industry member complies with all provisions of federal or state law." Given the breadth of that prohibition—apparently not even *actual compliance* with all other laws is enough to satisfy it—NSSF's members face a very real threat of being sued simply for their lawful commerce. *See, e.g.*, Compl. ¶11; Ruger Decl. ¶¶7-8. Indeed, some NSSF members are already facing exactly the kinds of suits under similar state laws that they fear the AG will use HB 426's "reasonable controls" provision to bring. *See, e.g.*, Compl., *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 1:23-cv-00066 (W.D.N.Y. Jan. 23, 2023), Dkt.1-1. Yet the AG has conspicuously declined to disavow her intention to bring the very same kinds of claims here.

This is thus a paradigm case for pre-enforcement review. The Ninth Circuit has consistently held that a state's "refusal to disavow enforcement … is strong evidence that the state intends to enforce" a law and that a plaintiff's "members face a credible threat." *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021). And while the AG has not yet enforced HB 426, which took effect on July 1, 2023, that is of no moment. "Where the challenged statute is new, as here, the history of past enforcement carries little, if any weight." *Arizona*, 34 F.4th at 850.

The AG's cited cases are at the opposite end of the spectrum.  In *New Jersey*, the state "disavowed" any intent to enforce the challenged law against NSSF members for "unreasonable" conduct unless the state had reason to believe that a member's "sale, manufacturing, … or marketing of a gun-related product" violated some *other* statute, such that the conduct would be "unlawful in itself."  80 F.4th at 221; *see* N.J. Stat. Ann. §2C:58-35(a)(1).  That disavowal materially altered the Article III analysis.  There is nothing remotely similar here.  As for *Unified Data Services v. FTC*, 39 F.4th 1200 (9th Cir. 2022), that was a challenge to a regulation of soundboard technology—but the plaintiffs failed "to state to what extent [they] currently use soundboard technology … and whether they plan to use it in the future"; in other words, they had no plan to *engage* in conduct that the challenged law regulated.  *Id.* at 1210-11.  This case could not be more different.  NSSF members indisputably intend to continue making, selling, and marketing their products, and they have identified specific practices for which they fear the AG will sue them under HB 426.  NSSF thus has standing to challenge §134-B(b)(1) as well.

**B.** Ripeness is satisfied for the same reasons.  In a pre-enforcement challenge, the constitutional ripeness inquiry is the same as the standing inquiry.  *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022).  As for prudential ripeness, the AG's argument fails straight off.  *Driehaus* highlighted the impropriety of dismissing a case on prudential grounds when, as here, the plaintiff alleges an Article III injury.

573 U.S. at 167.  Consistent with that aviso, the Ninth Circuit has not only "cast doubt on the prudential component of ripeness," *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018), but "declined to reach prudential ripeness when constitutional ripeness is satisfied," *State ex rel. Becerra v. Sessions*, 284 F.Supp.3d 1015, 1031 (N.D. Cal. 2018).  "Prudential ripeness" simply has no role to play here.

In all events, this case is fit "for judicial decision," and NSSF members will suffer "hardship" from "with[eld] court consideration." *Tingley*, 47 F.4th at 1070.  On the fitness prong, the AG does not deny that the issues are purely legal or that HB 426 is final.  Instead, she argues that more facts are needed to resolve NSSF's claims.  But she is notably silent on what those additional facts are—likely because "further factual development … would do little to aid the court's decision" on NSSF's purely legal claims.  *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009).  As for hardship, HB 426 presents "the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993).  In fact, denying review would force NSSF members to choose to either refrain from constitutionally protected activity or risk proceedings *from which they are immune as a matter of law* under the PLCAA.  *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142 (9th Cir. 2009).  That is an immediate hardship that warrants immediate review.

## II.   NSSF Is Likely To Succeed On The Merits.

### A.   HB 426's Sweeping Ban on "Abnormally Dangerous" Arms Violates the Second Amendment.

1. The AG's lead merits argument is that a law that bans the sale of a class of arms does not even implicate the Second Amendment.  That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).  It is also (unsurprisingly) foreclosed by binding circuit precedent.  Because a state may not gut a constitutional right by attacking the means by which it is exercised, *see Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring), and because "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, the Ninth Circuit has squarely held that "the core Second Amendment right" encompasses laws that effectively prohibit citizens' ability to acquire a class of arms, *id.*

Remarkably, the AG claims that *Teixeira* precludes NSSF from bringing this suit.  But *Teixeira* squarely held that "a gun store … has derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers." *Id.* at 678.  And while the state protests that NSSF brought this suit on behalf of its members, not individuals, AG.Br.15-16, that is a distinction without a difference:  NSSF's members are just as free to invoke the rights of the customers they serve as Mr. Teixeira was to invoke the rights of the customers he sought to serve.  *See supra* n.3.

The threshold question here thus boils down to whether the "firearm-related

products" that HB 426 bans are "arms" as the Second Amendment uses that term. *Teter* could not be clearer about this.  Because the Second Amendment's text covers "the right of the people to keep and bear Arms," U.S. Const. amend. II, and because one cannot "keep" or "bear" something one may not acquire, the threshold textual question in that case was simply whether butterfly knives "fit the general definition of 'arms.'"  *Teter*, 76 F.4th at 949.  The same is true here; a ban is a ban, regardless of whether it operates via the threat of civil liability against manufacturers and sellers (as here) or via criminal prosecution of individuals (as in *Teter*).  And, here as there, the answer to whether the banned products "fit the general definition of 'arms'" is decidedly yes.  As *Teter* explained, the term "arms" in the Second Amendment means "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and thus includes not only "armour of defence," but "[w]eapons of offence" as well.  *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008); *Teter*, 76 F.4th at 949.  And under that "original public meaning," "all firearms constituted 'arms,'" because all firearms (and components integral to their operation, such as ammunition feeding devices) are "things" that one "takes into [one's] hands" for "defence" or "offence."  *Teter*, 76 F.4th at 949; *see Heller*, 554 U.S. at 581 ("The 18th-century meaning is no different from the meaning today.").

The AG disputes this, *see* AG.Br.19 & n.10, but she cannot relitigate a case she just lost in the Ninth Circuit.  *Teter* emphatically "reject[ed] Hawaii's argument

that the purported 'dangerous and unusual' nature of butterfly knives means that they are not 'arms' as that term is used in the Second Amendment." 76 F.4th at 949. As the court explained, "*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.'" *Id.* at 949-50 (quoting *Heller*, 554 U.S. at 627). "It did not say that dangerous and unusual weapons are not arms. Thus, whether [the arms it bans] are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis." *Id.* at 950.[4]

2. Therein lies the problem with Hawaii's ban on "abnormally dangerous" arms. Under HB 426, Hawaii can ban "the sale" of arms *regardless of whether they are* "*unusual*." *See* §134-B(b)(2)-(b)(3). But under *Bruen* and *Teter*, states cannot ban an arm unless they show at the historical-tradition step *both* that the arm they want to ban "has uniquely dangerous propensities" *and* that the arm is "unusual," i.e., not "commonly possessed by law-abiding citizens for lawful purposes." *Teter*,

_____

[4] The AG insists that common use belongs in the textual inquiry and that *Teter*'s square holding to the contrary cannot mean what it says in light of *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023). But *Alaniz* did not hold anything to the contrary; it simply "assume[d], *without deciding*, that step one of the *Bruen* test [was] met" there. *Id.* at 1129 (emphasis added). That—plus the fact that *Alaniz*'s unreasoned statement is inconsistent with *Bruen*, *see N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2128 (2022) (explaining that the rule that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time'" derives from "the *historical tradition* of prohibiting ... 'dangerous and unusual weapons'" (emphasis added))—is why *Teter* correctly ignored *Alaniz*.

76 F.4th at 950.  Yet, under HB 426, Hawaii may hold industry members liable for selling a "firearm-related product" even if it is "commonly possessed by law-abiding citizens for lawful purposes"; all that matters under HB 426 is whether the arm "is abnormally dangerous" (whatever that means).  §134-B(b)(2).

3. The AG's facial-challenge argument misses the mark.  If a law by its terms bans a class of arms that the Constitution protects, it is facially unconstitutional— even if a state could validly restrict some of those same arms under a more targeted law.  That much follows directly from *Heller*.  No one denies that *some* handguns are "dangerous and unusual"; indeed, Hawaii itself takes that position, as it bans several models of handguns.  *See* Haw. Rev. Stat. §§134-1, -8(a).  Yet the Supreme Court nonetheless held the District of Columbia's handgun ban unconstitutional *on its face* because the class of arms the District chose to single out is, as a "class," protected by the Constitution.  *See Heller*, 554 U.S. at 628.  So too here: Arms do not fall outside the ambit of the Second Amendment just because they are "abnormally dangerous" or "targeted at minors."  To be sure, *some* such arms may be *both* abnormally dangerous *and* unusual.  But Hawaii cannot salvage the ban it *has* enacted by noting that it could enact some other, narrower ban.  By that logic, an outright ban on *all* arms would be facially constitutional, simply because not every arm is constitutionally protected.  That is not and cannot be the law.

None of that is unique to the Second Amendment.  It is always the rule that

11

states cannot save facially deficient laws by hypothesizing some other narrower law. The Ninth Circuit's en banc decision in *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (2014), is illustrative.  That case concerned a set of Arizona laws that barred undocumented immigrants charged with certain crimes from receiving "any form of bail or pretrial release." *Id.* at 775.  Undocumented immigrants charged with crimes that triggered detention without bail under the laws brought a class action arguing that the laws violated due process.  *Id.* at 775-76.  The class included people who would be denied bail even if their individualized facts could be considered.  But the court still held the laws "facially unconstitutional," because the process they provided *all* arrestees failed the "heightened substantive due process scrutiny" that the relevant precedent required.  *Id.* at 788-89.  The court went on to put a finer point on it:  Even though some of the people that would be detained under the challenged laws "could be detained consistent with due process *under a different categorical statute*," the challenged statute was still "facially unconstitutional" because it violated the applicable constitutional "decision rule."  *Id.* at 789 (emphasis added). *That*, the court explained, is what it means for there to be "no set of circumstances … under which [a law] would be valid."  *Id.* (ellipsis in original).

The question for this Court is simply whether HB 426 on its face violates the relevant constitutional "decision rule."  *See id.* at 789 & n.13.  If "a statute fails the relevant constitutional test" *on its face*, then "it can no longer be constitutionally

applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016); *accord Ezell v. City of Chicago*, 651 F.3d 684, 697-98 (7th Cir. 2011). The relevant constitutional decision rule here, as *Bruen* and *Teter* make clear, is that a state cannot ban any class of arms unless the state proves that it is *both* "abnormally dangerous" *and* not commonly owned by law-abiding citizens for lawful purposes. But the arms ban on its face allows Hawaii to ban arms without showing that the arms are unusual. §134-B(b)(1). The provision is thus unconstitutional *in all applications*—regardless of whether some of the arms HB 426 prohibits could constitutionally be banned "under a different categorical statute" that on its face was consistent with the applicable constitutional standard. *See Lopez-Valenzuela*, 770 F.3d at 789.

### B. HB 426's Other Provisions Violate the Second Amendment Too.

No historical tradition supports the sweeping liability HB 426 authorizes courts to impose on firearm industry members. The AG certainly points to none— and neither NSSF nor the Court is "obliged to sift the historical materials for evidence to sustain [a law]. That is [the state's] burden." *Bruen*, 142 S.Ct. at 2150.

The AG tries to evade her burden by invoking dicta from *Heller*, which she says instructs that "'laws imposing conditions and qualifications on the commercial sale of arms' are 'presumptively lawful.'" AG.Br.21. Even if this dictum survives *Bruen*, it cannot save §134-B(b). Requiring a manufacturer to, e.g., "implement[]

and enforce reasonable controls" on its "marketing," §134-B(b)(1), (b)(3), is *not* a "condition[] … on the commercial sale of arms." Conditions on sale happen at the point of sale, not three entities up the chain. In all events, the universe of "laws imposing conditions … on the commercial sale of arms" contemplated by *Heller* is limited to laws that are "longstanding," 554 U.S. at 626-27 & n.26, and the sprawling "reasonableness" theories HB 426 revives are the opposite of longstanding. *See* 15 U.S.C. §7901(a)(7) (PLCAA findings); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540-41 (3d Cir. 2001) ("unprecedented").

### C.    HB 426 Authorizes Preempted Qualified Civil Liability Actions.

1. The AG attacks a strawman. NSSF has not brought a "facial preemption challenge" seeking to enjoin the AG from enforcing HB 426 in all instances.[5] *Contra* AG.Br.26 n.15. The "scope of injunctive relief is dictated by the extent of the violation established," *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021), which is precisely why all NSSF is seeking on its preemption claim (putting aside NSSF's other claims) is an injunction precluding the AG from

---

[5] The AG cites *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc), for the proposition that "*Salerno* applies to 'a federal preemption facial challenge to a state statute.'" AG.Br.27 n.11 (quoting 543 F.3d at 579 n.3). True—but *Salerno* does not apply to preemption challenges that do not seek to have a state law deemed preempted in all of its applications. The point is important. NSSF argues that the conflict with the PLCAA is apparent in the text of HB 426—i.e., "on its face." But a claim that is "facial" only in that descriptive sense does not require invalidating a law in its entirety; "the relief that" follows from it is limited "to the extent of th[e conflict]." *Doe v. Reed*, 561 U.S. 186, 194 (2010).

invoking HB 426 to bring "qualified civil liability action[s]" against NSSF members.

The AG does not deny that HB 426 authorizes actions that fit that bill.  Nor could she.  Under §134-C(c), "the attorney general … may bring a civil action" against licensed manufacturers and sellers "to enforce [HB 426] and remedy harm caused by a violation of [it]."  In such an action, "the court may award" "[d]amages" and "[a]ny other appropriate relief necessary to … remedy the harm caused," §134-C(d)(2), (4), even if the direct cause of the harm for which redress is sought was "intervening … criminal use of a firearm[]" "by a third party," §134-C(g).  Such a suit under HB 426 would indisputably constitute a "qualified civil liability action" under the PLCAA.  *See* 15 U.S.C. §7903(5)(A).  But the PLCAA is pellucid:  "A qualified civil liability action may not be brought in any … court."  *Id.* §7902(a).

Few such suits would (or even could) come within the terms of the predicate exception, §7903(5)(A)(iii).  "To meet the requirements of the predicate exception," it is not enough that a statute "pertain[s] specifically to sales and manufacturing." *Ileto*, 565 F.3d at 1134-35.  *Ileto* made crystal clear that a state statute that codifies "general tort theories of liability that traditionally have been embodied in the common law" is not and cannot be "a predicate statute," because the whole point of the PLCAA was to prevent state and local governments from using nebulous tort-law concepts to impose after-the-fact liability on industry members who comply with all the myriad concrete rules and regulations that govern them. *Id.* at 1135-36.

To be sure, some actions under HB 426 would not be preempted.  For instance, an action seeking only "[i]njunctive relief sufficient to prevent the firearm industry member … from further violating the law," §134-C(d)(1), would not be preempted, because it would not seek "damages … or other relief, resulting from the … criminal or unlawful misuse of a [firearm] product by … a third party," 15 U.S.C. §7903(5)(A), and so would not be a "qualified civil liability action" at all, *see id.*  Similarly, an action arising under HB 426 alleging that an industry member "knowingly made a[] false entry in … any record required" for firearm sales (and that that knowing violation "was a proximate cause of the harm for which relief is sought") would not be preempted, because it would fit within the predicate exception.  But, again, NSSF is not seeking to enjoin the AG from bringing those sorts of cases.  All NSSF is asking for is an injunction barring the AG from using HB 426 to bring "qualified civil liability action[s]" against NSSF and its members.

2. Unable to deny that much of what HB 426 authorizes is preempted, the AG contends that this Court is powerless to entertain NSSF's claim.  That is doubly wrong:  Both 42 U.S.C. §1983 and *Ex parte Young* supply the necessary authority.

Section 1983 creates a cause of action to enforce against state actors, *inter alia*, "immunities secured by the Constitution and [federal] laws."  42 U.S.C. §1983.  Section 1983's "unqualified reference to 'laws'" sweeps in *all* federal laws.  *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 143 S.Ct. 1444, 1450 (2023).  That makes

this an easy case, as the Ninth Circuit has squarely held that "the PLCAA … creates a substantive rule of law granting immunity to certain parties" (licensed sellers and manufacturers) "against certain types of claims" (qualified civil liability actions). *Ileto*, 565 F.3d at 1142.  And rightly so, as the PLCAA's core command is that "[a] qualified civil liability action *may not be brought* in any Federal or State court."  15 U.S.C. §7902(a) (emphasis added).  A state actor who plans to bring a suit in violation of that provision thus plans to deprive industry members of the immunity the PLCAA grants—precisely the kind of state action Section 1983 exists to prevent.

Section 7903(5)(C) of the PLCAA does not undermine that conclusion in the slightest.  The obvious import of that provision is to make clear that the PLCAA does not create a cause of action to *sue* industry members.  That is clear from the fact that it immediately follows the enumeration of *exceptions* to the PLCAA's prohibition on bringing qualified civil liability actions, providing a "rule of construction" as to how those exceptions should be interpreted.  *See id.* §7903(5)(C).  Thus, the only thing "anomalous," AG.Br.28, would be to read into that rule of construction *protecting* industry members an implicit abrogation of their rights under Section 1983.

Section 1983 aside, federal courts have inherent equitable power to "enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws"; only "statutes with a detailed remedial scheme" can "displace[]" the "remedy available under *Ex parte Young*," *Moore v. Urquhart*, 899 F.3d 1094, 1103

(9th Cir. 2018); and the PLCAA plainly does not fit that bill.  Again, the PLCAA does not provide a remedy at all; it provides only a prohibition:  "A qualified civil liability action may not be brought in any Federal or State court."   15 U.S.C. §7902(a).  Nothing in the PLCAA even hints that this prohibition may be enforced only defensively.  Indeed, the PLCAA directed courts to "immediately dismiss[]" *sua sponte* any "qualified civil liability action that [was] pending" on the date it took effect.  *Id.* §7902(b).  And unlike the purely political remedy in *Armstrong*, nothing about that command is "judicially unadministrable."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015).  Courts enforce it all the time in the defensive context, and they are every bit as capable of doing so in the offensive context.

### D.     HB 426 Cannot Constitutionally Apply to Out-of-State Conduct.

The AG misunderstands what it means for a state law to "directly regulate" out-of-state conduct.  *See generally Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (distinguishing a state law "that '*directly* regulate[d] transactions which [took] place … wholly outside the State'" from a state law that only *affects* out-of-state conduct); *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1321-24 (9th Cir. 2015) (en banc) (invalidating a California law insofar as it "directly regulate[d] the conduct of [a] seller … for a transaction that occurs wholly outside the State").  Direct regulation happens when a state seeks to impose liability based on "transactions completed wholly out of state" because they are "non-compliant"

with its own law.  *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1102-03 (9th Cir. 2013).  That is exactly what HB 426 does, imposing liability on out-of-state actors for non-compliant transactions and acts undertaken wholly out of state (and in full compliance with both federal and state law where they take place).

The AG counters (at 29-30) that because §134-A's definition of "firearm-related product" is limited to products with some connection to Hawaii, HB 426 "regulates only conduct that has a direct connection to Hawai'i."  That is incorrect.  The "reasonable controls" provision does not regulate products; it regulates conduct: "procedures, acts, or practices," *see* §134-A.  A manufacturer can be held to violate that provision based entirely on its out-of-state sales or out-of-state manufacturing processes, if a Hawaii court deems it "reasonably foreseeable" that one of the products sold or manufactured out of state would wind up in Hawaii.  *See* §134-A.  That is direct regulation, and it would be unconstitutional to apply HB 426 that way.

The AG's contrary theory is identical to the theory rejected in *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017).  That case involved a law that "dictate[d] how out-of-state manufacturers must build and secure their facilities, operate assembly lines, clean their equipment, and contract with security providers, if any of their products are sold in Indiana."  *Id.* at 830.  Indiana argued that because the law did not kick in unless and until an out-of-state manufacturer's products were sold in-state, there was no direct out-of-state regulation.  The Seventh Circuit rejected that

19

theory: While a state may impose "requirements on [] products sold in [its borders]," it "may not try to achieve that goal by direct extraterritorial regulation of the manufacturing processes and facilities of out-of-state manufacturers." *Id.* at 834.

That is precisely what HB 426 does. HB 426 requires manufacturers to "implement" "reasonable procedures … that are designed" to "[p]revent the loss or theft of [their] product[s] from [their facilities]." §§134-B(b)(1), 134-A. For those like Smith & Wesson and Ruger, which "do[] not have any manufacturing operations in Hawaii," Reid Decl. ¶7; Cupero Decl. ¶7, *only* out-of-state conduct could "fail to comply with [that] requirement." §134-B(a). And the requirement to take "reasonable precautions to ensure a firearm industry member does not … provide to a downstream distributor a firearm-related product that is abnormally dangerous," §134-B(b)(2), is even worse; it appears (at least) to require inserting new terms in sales contracts with distributors—transactions that take place out of state.

HB 426 *directly* regulates out-of-state conduct. It thus "facially violates the 'dormant' Commerce Clause" "as applied to out-of-state sales" and other out-of-state conduct. *Sam Francis*, 784 F.3d at 1322-23; *see also Ross*, 598 U.S. at 376 n.1.

### E.     HB 426 Violates the First Amendment.

1. HB 426's marketing restrictions are facially unconstitutional. Laws like HB 426 that "impose[] a burden based on the content of speech and the identity of the speaker" demand "heightened scrutiny"—and "[c]ommercial speech is no

exception." *Sorrell v. IMS Health Inc*., 564 U.S. 552, 566-67 (2011).  The AG

focuses her argument on the *Central Hudson* test, but even that more lenient standard

cannot save HB 426.  *See Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1116

(9th Cir. 2023) ("assuming" that *Central Hudson* applied, but still invalidating the

marketing restrictions in California Business & Professions Code §22949.80).

Indeed, this case follows *a fortiori* from *Junior Sports*.  The statute at issue

there made it unlawful for "[a] firearm industry [to] advertise, market, or …

promot[e] any firearm-related product in a manner that … reasonably appears to be

attractive to minors."  *Id.* at 1114 (quoting Cal. Bus. & Prof. Code §22949.80(a)(1)).

The Ninth Circuit held the statute facially unconstitutional because it restricts

"protected speech" more broadly than the "*Central Hudson* framework" allows.  *Id.*

at 1116.  The court reached that result for three reasons, all of which apply here to

an even greater degree, as HB 426's speech restrictions sweep even more broadly.

First, HB 426 "facially regulates speech whose content concerns lawful

activities and is not misleading," "encompass[ing]" not only "messages about legal

use of guns by minors," but also truthful marketing "directed at adults … whenever

that speech might also reach minors."  *Id.* at 1116-17.  The AG notably does not deny

that HB 426 proscribes commercial speech even if it is not misleading and even if it

does not promote unlawful conduct (e.g., ads to adults about youth models).

Second, "[u]nder *Central Hudson*, a state seeking to justify a restriction on

commercial speech bears the burden to … provide evidence establishing 'that the harms it recites are real'" and "that its speech restriction will '*significantly*' alleviate those harms." *Id.* at 1117.  But Hawaii has "provided no evidence … that minors are unlawfully using firearms because of advertisements for guns by the firearm industry," *id.* at 1119; *see also id.* at 1118-19 & n.2, or that criminals are misusing firearms because of truthful, non-misleading ads touting firearms' lawful features.

Third, even if HB 426 "significantly slashes gun violence and unlawful use of firearms among minors," it still "imposes an excessive burden on protected speech." *Id.* at 1119.  By its terms, it "ban[s] advertisements promoting safer guns for minors—for example, a hunting rifle designed for young hunters that has less recoil or that comes with a more secure trigger safety—if they are directed at minors and their parents." *Id.* at 1120.  "A speech restriction of that scope is not constitutionally sound under any standard of review." *Id.*  And HB 426 is even broader, not only banning, e.g., ads promoting safer guns for minors (which are "targeted at minors" by definition, *see* §134-B(d)(3)), but also ads touting lawful features of firearms that the state believes "most suitable for assaultive purposes," §134-B(d)(1).

HB 426's speech restrictions thus fail *Central Hudson*'s tailoring requirement. That means that they are facially unconstitutional.  After all, "[t]he lack of tailoring … is categorical—present in every case." *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2387 (2021).  That is why the *Junior Sports* court vindicated the

plaintiffs' facial challenge even though §22949.80 covers *some* speech that falls outside the First Amendment (e.g., ads that actually encourage unlawful acts).  And that dooms the AG's argument that NSSF's "facial challenge" to HB 426's marketing restriction fails just because some of the speech it covers is "unlawful."  AG.Br.34.

3. HB 426's prohibition on firearms suitable for "assaultive purposes" is also hopelessly vague.  As NSSF has shown, *see* PI.Br.23-24, *any* ad for a lawful product may be grounds for liability under HB 426's amorphous standards—forcing members to refrain from exercising First Amendment rights.  The AG offers no response to this reality.  Instead, she complains that NSSF has not said exactly what ads its members plan to pull.  *See* AG.Br.32.  Setting aside the problem that NSSF *has* identified products that is worried it can no longer lawfully advertise, *see supra* pp.2-3, that is not how a vagueness challenge works.  To the extent NSSF's members cannot tell which lawful marketing the AG will deem violative of the "assaultive purposes" provision, that is the whole problem.  And while the AG apparently would prefer to sweep this issue under the rug, NSSF members have no such luxury, as suits recently filed under a similar law—which fault them for, e.g., marketing based on traits as unremarkable (and fully lawful) as "ease of concealment" or "capacity," *see, e.g.*, *City of Buffalo* Compl., *supra*, at ¶¶1, 32—make all too clear.

## F.   HB 426 Is Void for Vagueness.

HB 426 is also unconstitutionally vague as to all other conduct it polices.

Remarkably, the AG defends HB 426 only under the "less strict vagueness test" that applies to laws that do not implicate constitutional rights. AG.Br.37. But while economic regulations are typically "subject to a relaxed vagueness test, … laws that might infringe constitutional rights [are subject] to the strictest of all." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010). The "most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982). Whatever room for debate there may be about whether HB 426 *violates* the First or Second Amendment, no one can deny that it *implicates* both. Indeed, HB 426 threatens to "impos[e] liability on an entire industry" that enables the exercise "of a basic constitutional right" (the right to keep and bear arms). 15 U.S.C §7901(a)(6). The most "stringent vagueness test" known to law thus applies to NSSF's vagueness challenge, even setting aside the statute's speech restrictions. *Hoffman Ests.*, 455 U.S. at 499. And HB 426 flunks that test, for the reasons explained in NSSF's opening brief (at 24-25).

The AG tries to rebuff NSSF's arguments only by caricaturing them. *Contra* AG.Br.37-38, the problem with HB 426's "reasonable controls" requirement is not that the term "reasonable" is an empty vessel. The problem is that the way HB 426 defines "reasonable controls" makes it impossible to know where the line is. Under §134-A, "compl[ying] with all provisions of federal [and] state law" that impose

24

concrete obligations on members of the firearm industry *is not enough* to fall on the right side of the line.  That is the definition of a law "so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).

## III.   The Remaining Factors All Favor Injunctive Relief.

NSSF is likely to succeed on its claims; that is enough for irreparable injury. In all events, the chilling effect HB 426 has on constitutionally protected speech, the loss of immunity from suit, and the irrevocable economic injury it will cause all suffice to show that NSSF and its members will suffer irreparable injury without injunctive relief.  The AG has no response to the argument that HB 426 will constrict the market for lawful arms—a textbook economic injury for which no redress could be sought.  And her claim that "courts are well equipped to promptly decide any claim to immunity," AG.Br.40, misses the mark; forcing members to litigate HB 426 claims would defeat the whole point of the "immunity" the PLCAA grants them. *Ileto*, 565 F.3d at 1142.  Even if an NSSF member *won* a suit brought under HB 426, it still would have suffered irreparable injury simply by virtue of having been forced to defend against it.  Finally, the AG has nothing to say about the wall of precedent holding that the public interest always favors enjoining laws that flout constitutional rights; nor does she deny that enjoining an invalid law causes a state no harm as a matter of law.  *See* PI.Br.26.  That suffices to tip the final factors in NSSF's favor.

## CONCLUSION

For the foregoing reasons, the Court should grant NSSF's motion.

DATED: Honolulu, Hawaii, October 6, 2023.

/s/ *Edmund K. Saffery*
EDMUND K. SAFFERY
FOREST B. JENKINS

PAUL D. CLEMENT (*phv*)
ERIN E. MURPHY (*phv*)
MATTHEW D. ROWEN (*phv*)
MARIEL BROOKINS (*phv*)

Attorneys for Plaintiff
NATIONAL SHOOTING SPORTS
FOUNDATION