1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3

4    NATIONAL SHOOTING SPORTS      )  CIVIL NO. 23-00287-MWJS-RT
     FOUNDATION,                   )
5                                  )  Honolulu, Hawaii
                    Plaintiff,     )
6                                  )  March 22, 2024
          vs.                      )
7                                  )  PLAINTIFF'S [13] MOTION
     ANNE E. LOPEZ, ATTORNEY GENERAL )  FOR PRELIMINARY INJUNCTION
8    OF THE STATE OF HAWAII,       )
                                   )
9                   Defendant.     )
     _____)

10

11                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MICAH W.J. SMITH
12               UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff        EDMUND K. SAFFERY, ESQ.
     National Shooting        Goodsill Anderson Quinn & Stifel LLP
15   Sports Foundation:       First Hawaiian Center
                              999 Bishop Street, Suite 1600
16                            Honolulu, Hawaii 96813

17                            MATTHEW D. ROWEN, ESQ.
                              Clement & Murphy, PLLC
18                            706 Duke Street
                              Alexandria, Virginia 22314
19
     For the Defendant        NICHOLAS MATTHEW MCLEAN, ESQ.
20   Anne E. Lopez,           KALIKO'ONALANI D. FERNANDES, ESQ.
     Attorney General         Office of the Attorney General
21   of the State of          425 Queen Street
     Hawaii:                  Honolulu, Hawaii 96813
22
                              ALLA LEFKOWITZ, ESQ.
23                            Everytown Law
                              P.O. Box 14780
24                            Washington, D.C. 20044
     (Continued)
25

```
 1   APPEARANCES (Continued):

 2                              RYAN GERBER, ESQ.
                               Everytown Law
 3                             450 Lexington Avenue
                               P.O. Box 4184
 4                             New York, New York 10017

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   Official Court          ANN B. MATSUMOTO, RPR
     Reporter:               United States District Court
23                            300 Ala Moana Boulevard, C-338
                              Honolulu, Hawaii 96850
24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

1  FRIDAY, MARCH 22, 2024                          9:58 A.M. O'CLOCK

2          COURTROOM MANAGER:  Civil 23-00287-MWJS-RT, National

3  Shooting Sports Foundation versus Anne E. Lopez.

4          This case is called for a hearing on plaintiff's

5  motion for preliminary injunction.

6          Counsel, please make your appearances for the record,

7  starting with the plaintiffs.

8          MR. SAFFERY:  Good morning, Your Honor.  Edmund

9  Saffery and Matthew Rowen on behalf of plaintiff National

10 Shooting Sports Foundation.  Mr. Rowen will be presenting the

11 arguments on behalf of plaintiff.

12         THE COURT:  Good morning, counsel.

13         MR. GERBER:  Good morning, Your Honor.  Ryan Gerber

14 on behalf of the defendant.  I'm joined by my colleagues.

15         MS. LEFKOWITZ:  Alla Lefkowitz.

16         MR. McLEAN:  Nicholas McLean.

17         MS. FERNANDES:  And Kaliko'onalani Fernandes.

18         THE COURT:  Good morning, counsel.

19         We're here this morning on NSSF's motion for a

20 preliminary injunction.  Before we get started I just want to

21 make a record of the items that I have reviewed in preparation

22 for the hearing today.  I'll make reference to the dates on

23 which items were filed and also my understanding of what the

24 items are.

25         Please, you can be seated.  My apologies.  I keep

1    forgetting to say that.

2              If you have any questions about any of the items I

3    tick off or if there's anything I've missed, please just let me

4    know.

5              The items I've reviewed in preparation for the

6    hearing today include, at ECF Docket Number 13, NSSF's motion

7    for a preliminary injunction as well as the memorandum in

8    support and two declarations, a declaration from Kevin B. Reid

9    and a declaration from Susan Capero.

10             I've also reviewed the motion for leave to file amici

11   curiae brief, which I intend to grant if the Court reaches the

12   merits of the relevant issues.  I likely will deny it as moot

13   if I don't.

14             I've reviewed ECF entry 38, which is the Attorney

15   General's memorandum in opposition as well as a declaration of

16   Gregory Gundlach, a declaration of Mr. Gerber, a declaration of

17   Mr. Tsukada and 21 exhibits.

18             I've reviewed the reply brief that's docketed at

19   ECF 42, the reply brief from NSSF.

20             I have also reviewed the notice by NSSF that was

21   filed at ECF 48, NSSF versus Bonta.  This is the decision of

22   Judge Schopler out of the Southern District of California.

23             I've reviewed the supplemental authority submitted by

24   the Attorney General, docketed at ECF 50.  And this is the

25   Ninth Circuit's order vacating for en banc rehearing the panel

1    opinion in Teter versus Lopez.

2            I've also reviewed the notice by the Attorney General

3    docketed at ECF 55, and this is NSSF versus Ferguson, the

4    decision out of the Eastern District of Washington.

5            I've reviewed the submission docketed at ECF 56,

6    which is the submission by NSSF providing the declaration,

7    updated declaration of Mr. Anthony Imperato, and I've

8    considered that.

9            I've also considered and reviewed the entries

10   docketed at 57 and 58 of the docket.  And these are the

11   supplemental briefs filed both by NSSF and the Attorney

12   General.

13           And then finally, I have a copy here and have also

14   reviewed the notice that was filed, I believe yesterday by the

15   Attorney General, with the Central District of California's

16   decision in Richards versus Newsom.

17           Does either party believe that there are materials

18   the Court should have considered but overlooked?

19           MR. ROWEN:  No, Your Honor.

20           MR. GERBER:  No, Your Honor.

21           THE COURT:  Thank you.

22           Because it's NSSF's motion, I propose to begin with

23   argument from counsel for NSSF.  Mr. -- is it Rowen?

24           MR. ROWEN:  Rowen.

25           THE COURT:  Rowen.  Rowen.  Okay, my apologies.

1          Before I call you up -- and I'm sorry for the false

2     start, but before I call you up, I just want to say a couple of

3     things both about procedure, and I want to highlight a few of

4     the issues that I'm especially interested in hearing argument

5     on.

6          My hope is that each party's argument will not go

7     longer than 45 minutes, but I have reserved the courtroom for

8     the entire day.  And so if in the event that that becomes

9     necessary, we can go for as long as the arguments continue to

10    be productive.  But it seems to me that at least as a goal,

11    particularly since there's been a significant amount of very

12    helpful briefing from both parties, that we should be able to

13    keep the arguments within the realm of 45 minutes or even less.

14         I plan, regardless of how long the arguments take, to

15    take a short break at the beginning of each hour.  And so, for

16    example, at 11:00 o'clock, I plan to take something like a

17    five-minute bathroom break and also a chance for the court

18    reporter to rest her -- her hands.  And if arguments are

19    ongoing at 12:30, then I would propose to take something like a

20    45-minute break.  I'll see what the parties actually prefer

21    about that, and we can confer at the relevant time if it's

22    necessary.

23         But we would then come back after a short lunch break

24    and continue for the rest of the afternoon, continuing to take

25    breaks at sort of the hour mark.

1           As I indicated, I want to give both parties some

2    guidance on the issues the Court is especially interested in

3    hearing argument about.

4           I am especially interested in hearing argument on

5    Article III standing as to all of the claims.  For NSSF, I'm

6    especially interested in focusing on what conduct NSSF believes

7    its members are engaged in that is arguably proscribed by the

8    state statute or whether there is any conduct that NSSF members

9    have taken as a result of the statute that would potentially be

10   harmed.

11          For the Attorney General, I would like to focus among

12   other things on the Attorney General's enforcement positions.

13   The briefing refers to a few situations, I think, where the

14   Attorney General has suggested that enforcement actions or

15   certain interpretations of the statute are unlikely.  And I'd

16   just like to make sure I have a clear record on which issues

17   are actual disavowals of enforcement versus just that a state

18   court might interpret a statute in a particular way.

19          On the merits I am especially interested in hearing

20   argument on the dormant commerce clause.  In particular, I'm

21   interested in hearing argument on paragraph 3 of the definition

22   of firearm-related product, which is in Section 101.  This

23   provision appears to extend the reach of the statute to any

24   product, quote, possessed in the state so long as it was,

25   quote, reasonably foreseeable that the item would be possessed

1   in the state.  And I'm interested in hearing argument on
2   whether this provision, which appears to have the effect of
3   extending the reach of all of the other provisions of the
4   statute, is consistent with the dormant commerce clause, from
5   both parties.

6           And then finally, I am especially interested in
7   hearing arguments on severance or possible severance and on the
8   scope of a hypothetical injunctive remedy.  In particular, if
9   the Court does conclude that paragraph 3 is a part of the
10  statute that has to be enjoined, I'd like to hear argument as
11  to whether the Court should enjoin just that provision or
12  whether injunctive relief would need to sweep more broadly.
13  And I know there's been some discussion about it in the
14  briefing.  I'd be interested in hearing a little more argument
15  on that point.  But again, I do want to make clear that the
16  Court comes to the bench with an open mind on all issues, both
17  standing and merits.

18          I respect that in the -- in our adversarial system
19  the lawyers make their arguments, and I intend to allow both of
20  you to do that.  I have some questions, and I'll ask them along
21  the way.  But I would like you to have a chance to argue your
22  case.  And so, Mr. Rowen, we'll begin with you.

23          MR. ROWEN:  Thank you, Your Honor.  Matthew Rowen for
24  the plaintiff.

25          So as Your Honor has set off on a course, I'll start

1   with standing.  And as Your Honor knows, standing is not

2   dispensed in gross.  So I think it's important to look at the

3   different provisions of the statute, what they at least

4   arguably proscribe, and what conduct NSSF members are currently

5   engaged in that falls within the terms of the statute.

6           So with respect to subsections (b)(2) and (b)(3) --

7           THE COURT:  And I do want to just quickly interrupt

8   you there, and I hope that this isn't in too much of a

9   contradiction to what I just said about allowing the parties to

10  argue their case, but you just referenced the conduct that

11  could be proscribed, and we'll discuss that.

12          Before we go any further in that realm, just for

13  housekeeping purposes, is NSSF arguing that there is any

14  conduct or behavior that NSSF members have changed because of

15  concerns about the statute, or should the Court just be

16  focusing the conduct they're currently engaged in or maybe

17  conduct they're not engaged in that they believe they could be

18  facing enforcement actions in the future because of?

19          MR. ROWEN:  So the latter, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          MR. ROWEN:  And, I mean, the members' view is that

22  this is an unconstitutional and preemptive statute and that it

23  extends far into the mainland.  We'll get into the merits in a

24  second.  But their view is that it's precisely these sorts of

25  statutes that the federal courts have long recognized the

1    pre-enforcement review is available, so they shouldn't have to

2    change conduct that -- I mean, the Congress itself recognized

3    in the PLCAA it's just not arguably effective with a

4    constitutional interest but is vital to the exercise of a

5    fundamental constitutional right.

6         So the answer to your question is the latter.

7         And in terms of the actual conduct at issue, so

8    Sections (b)(2) and (b)(3), the analysis here is exactly the

9    same as it was in the Bonta decision.

10        So (b)(2) and (b)(3) at the very least, at least

11   arguably prohibit selling and marketing youth-model firearms.

12        My friend on the other side makes some hay about,

13   well, this just says, you know, you have to take reasonable

14   precautions not to.  I'm pretty confident that selling is

15   failing to take reasonable precautions not to sell.

16        So -- and I haven't heard them argue otherwise

17   because I don't think they can.  So I don't think there's any

18   reasonable dispute that NSSF members are currently engaged in

19   conduct that at the very least is presumptively unlawful under

20   Sections (b)(2) and (b)(3).  And for purposes of Article III,

21   that's the end of the ballgame.  So they sell these products;

22   they manufacture these products; they market these products.

23        So for all of our claims, with respect to Sections

24   (b)(2) and (b)(3), there's clearly Article III standing.  My

25   friends on the other side don't dispute the last two

1    traceability and requirement prongs.  They also don't dispute

2    the last two associational standing prongs, germaneness and the

3    neater individual participation --

4          THE COURT:  We'll both have to speak more slowly, I

5    think.

6          MR. ROWEN:  The appellate lawyer in me.  I'm used to

7    a clock.

8          THE COURT:  I --

9          MR. ROWEN:  I apologize.

10          THE COURT:  I understand.

11          MR. ROWEN:  So the germaneness requirement and the

12    third, Hunt requirement of requiring individual participation

13    other than to establish standing.  None of that's disputed,

14    obviously.  All but the last of those are constitutional, so

15    Your Honor would have to look at those yourself.  But I don't

16    think there's any reasonable dispute that traceability,

17    redressability, and germaneness are satisfied or that

18    individual participation is required.  So all we're really

19    talking about here is the injury in fact component.  And it's

20    just black letter law, going back to Craig versus Boren, if not

21    earlier, that a law that restricts a product that you make or

22    sell confers injury in fact that allows you to challenge that.

23          THE COURT:  I do want to jump in here and raise one

24    of the issues I think I see with the standing argument.  It

25    would be one thing if NSSF members were selling, manufacturing,

1    or marketing youth firearms here in Hawaii, for example.  In

2    that instance, I think a case like Craig v. Boren would be

3    entirely on point.

4           In a statute that says that a manufacturer, a

5    retailer, a marketer of those firearms, which I very much

6    understand your argument that I -- I too have difficulty seeing

7    how you could avoid not taking reasonable precautions to not

8    sell youth firearms.  Got a lot of double negatives there, but

9    if you're actually selling them or if you're actually marketing

10   them.  The Attorney General can address that.

11          But the issue in this case, I think, is that the

12   statute has sort of what I would describe as three extending

13   rings of coverage, so to speak.  And so the first of the rings,

14   which I believe, and you can confirm for me, NSSF doesn't

15   dispute, at least here at this stage for the preliminary

16   injunction motion purposes, is that there -- that NSSF members

17   are not selling those models or other models here in Hawaii

18   themselves, correct?

19          MR. ROWEN:  So I think the answer to that question is

20   it depends on exactly what you mean.  So, I mean, I want to

21   take a step back.  I will answer the question directly.

22          THE COURT:  Of course.

23          MR. ROWEN:  But I think it's important to look at

24   what the statute says.  So the product definition in 134-A

25   limits the -- the product definition, but the statute doesn't

1   regulate products.  The statute regulates conduct.  And so as I

2   read the statute -- and we've made this argument in our briefs

3   and I haven't heard the Attorney General disavow it.  As I read

4   the statute, manufacturing and selling and marketing on the

5   mainland is perfectly fair game for a lawsuit brought by the

6   Attorney General or a private party under House Bill 426.

7           THE COURT:  And you would take the position that

8   that's the case even if an NSSF member is not selling or

9   marketing firearm-related products?

10          MR. ROWEN:  So I would love for the statute not to

11  apply that way.

12          THE COURT:  Okay.

13          MR. ROWEN:  But textually I don't see how it can.  So

14  as I read the statute, so long as -- you know, the definitional

15  section, it's complicated for me to refer to it because there

16  isn't a subsection attached to it.

17          But the definitional section, it uses the passive

18  voice, and the operative subject of the clauses is each the

19  item.  The item is sold.  The item is marketed.

20          THE COURT:  Right.

21          MR. ROWEN:  And if you go then look at the operative

22  provisions in Section 134-B, those are all focused on the

23  conduct of the firearm industry member.

24          And unless the Attorney General --

25          THE COURT:  I see what you're saying.

1          MR. ROWEN:  -- wants to come forward and say, no, no,

2    no, Mr. Rowen, you've read this wrong, as long as your members

3    are not actively selling a particular model in Hawaii, that if

4    a criminal then later misuses that firearm we won't sue them.

5    But I have a pretty good idea that they're not going to say

6    that.

7          THE COURT:  We'll leave it to them to decide on that.

8          I do see that your argument would gain a significant

9    amount of strength from the notion that all of those references

10   to Hawaii in the definition of firearm-related product become

11   irrelevant when you look at the actual codes of conduct, so to

12   speak.  And that when it comes to the codes of conduct, it's

13   basically any participant in the firearm industry.  And so if

14   you're selling a firearm in Texas, I think as one of your

15   hypotheticals suggests, you are bound by the code and Section

16   102(b) -- (b)(1) to provide, you know, reasonable controls in

17   connection with those products, regardless of whether they have

18   any nexus whatsoever to Hawaii.

19         Now, I think the question that I have with that

20   interpretation, and maybe you can help me understand why what

21   I'm about to say is -- is in a potential response to it, is

22   when I look at Section 134-102, where the conduct provisions

23   are placed, (b)(1), (2), and (3) all begin with the phrase "A

24   firearm industry member shall."  And so that's a reference to

25   firearm industry members.

1          So then when I go back and look at the definitions, I
2     look at the definition of firearm industry member and it refers
3     to basically any -- any sort of entity imaginable, at least
4     that I could imagine, involved in various types of activities
5     concerning firearm-related products.
6          And so one possible way of interpreting the
7     statute -- and see if the Attorney General shares this view or
8     doesn't share the view, and it could have some consequences for
9     standing, I agree -- is do you become a member of the firearm
10    industry for purposes of the statute, not sort of colloquially
11    speaking, because of course NSSF represents members of the
12    firearm industry.  But do you become a member of the firearm
13    industry within the meaning of this provision, or within the
14    definitional section, only if you are involved in the
15    manufacture, distribution, importation, marketing, wholesale or
16    retail sale of firearm-related products, in which case it then
17    builds in those nexus to Hawaii requirements; or is it really
18    any firearm industry member?  And I do think those are two
19    different paths.  And I very much agree with you, Mr. Rowen.  I
20    think depending on which path is -- is the correct one -- or
21    really for purposes of standing, whether either path is
22    arguable, as you put it, that could have a pretty significant
23    effect on whether there's standing.  But just -- and I'll
24    continue to the AG at the appropriate time, but I do want to
25    hear your argument.

1        Why shouldn't the Court read firearm industry member

2   within the -- the sense provided by the statute as referring to

3   a more limited subset, if you will, of firearm industry members

4   who are actually involved in conduct related to firearm-related

5   products, which in turn is sort of a defined term within the

6   statute?

7        MR. ROWEN:  So three responses to that, Your Honor.

8   The first, as Your Honor acknowledged for the standing inquiry,

9   it's just whether something is arguably proscribed.  So if Your

10   Honor is struggling with exactly which one of these is right in

11   the Article III context, the tie goes to a constitutional

12   challenger.

13        So the second point is I would be happy to enter into

14   a consent decree with the Attorney General that says that in

15   order to be a firearm industry member and therefore subject to

16   House Bill 426, you actually have to manufacture in Hawaii,

17   sell in Hawaii, or market in Hawaii, and that just selling on

18   the mainland to a distributor that then sells into Hawaii isn't

19   enough.

20        THE COURT:  I was about to think this might turn into

21   a settlement conference, but I doubt it only because I think

22   even if you -- even if the Attorney General takes the position

23   that firearm industry member sort of brings with it the -- the

24   qualifications of firearm-related product, you still have the

25   problem that I was sort of hinting at before, which is

1   firearm-related product in turn has sort of three kind of

2   spheres, so to speak, and each one seems a bit broader than the

3   prior one.  So it begins with what you just referred to as I

4   understand it, firearm-related products that are sold, made, or

5   distributed in Hawaii.  So that's one of the ways that you --

6   that something would be defined a firearm-related product.  And

7   if the Attorney General agrees and if ultimately the Court

8   views that as being part of firearm-related member, then that's

9   also one of the ways that you could become a firearm industry

10  member.

11          The second is that you intend to sell or distribute,

12  as I understand it.  So that's a little bit broader than the

13  proposed settlement.  I -- yeah, I know that this is not a

14  settlement conference but -- and then the third circle, where

15  as I had indicated at the outset I sort of see the potentially

16  most serious questions, is the possessed in Hawaii and

17  reasonably foreseeable that it would be.

18          And so when it comes to that provision, it is much

19  broader than the first two, broader than I think what NSSF

20  would be prepared to stipulate to or consent to.  And so it

21  does mean, however, that there's some kind of connection to

22  Hawaii that's required, right?  So it narrows -- if that

23  argument is accepted, it would narrow somewhat the point you

24  had been making earlier, I believe, which is it would not be

25  the case that any firearm industry member anywhere in the

1    United States, even without any conceivable connection to

2    Hawaii, would still be bound by the reasonable controls

3    provision.  It would instead be that you have to meet that

4    possessed in Hawaii and be reasonably foreseeable requirement.

5            Interested in your thoughts on that and, of course, I

6    want to hand the microphone back to you as well since you're

7    the attorney.

8            MR. ROWEN:  Sure.  So, I mean, you know, all I can

9    say is the statute says what it says.  I think that it's

10   important that the definition uses the passive voice where the

11   item is the thing that has to be sold in Hawaii.

12           Now, again, if the Attorney General, even a -- you

13   know, a -- a more limited consent decree, wants to say, no, no,

14   no, no, subparagraphs 1 and 2, the actor there has to be the

15   firearm industry member, great, we'll enter into that consent

16   decree and then that will have an effect on the various claims.

17   I think if they did that it wouldn't defeat any of our claims,

18   that it would change the scope of relief that we may be

19   potentially entitled to.

20           But, you know, unless and until the Attorney General

21   is willing to say that the statute doesn't mean what it seems

22   to say, I -- I don't think that we can operate, you know, that

23   they're not going to enforce it consistent with what it said,

24   given that, you know, the Ninth Circuit law's very clear on

25   this.  It's very different from the Third Circuit law; that the

1  Attorney General's failure to disavow enforcement of the

2  statute is strong evidence that the Attorney General intends to

3  enforce it in the manner that's feared and that the threat of

4  enforcement is credible.

5       And, you know, we've given the Attorney General many

6  opportunities.  And as I understand it, the only thing they've

7  been willing to say, and I know you'll ask my friends on the

8  other side, is, well, we won't violate what the Ninth Circuit

9  said the First Amendment means in Junior Sports Magazines.

10      So I'm glad to hear them say that, but I don't take

11 that as much of a concession, let alone a disavowal.

12      So, I mean, for purposes of (b)(2) and (b)(3) I think

13 our standing's clear.  I think, you know, this shades slightly

14 into the merits, but they've raised sort of a derivative

15 standing argument, which is not an Article III argument for

16 purposes of a Second Amendment claim; it's a prudential

17 standing argument, right?  It's a third-party standing issue.

18          THE COURT:  Okay.

19          MR. ROWEN:  Right?  It's whether we have a claim.

20 And there is no case of which I'm aware, I've looked long and

21 hard, that has said that if one member of an association would

22 have derivative third-party standing that nonetheless you can

23 say there's no standing because of the double layer.  I haven't

24 found a single case, and I don't think it would make any sense.

25 Because again, that's a prudential doctrine, and this Court has

1   a virtually unflagging obligation to exercise Article III

2   jurisdiction when it has it, and I don't think that a doctrine

3   like prudential standing or prudential ripeness, you know, is

4   proper for the Court to exercise jurisdiction when there is a

5   credible threat of enforcement and the Attorney General has

6   declined opportunities to disavow enforcement.

7           THE COURT:  Could I ask you, and I could have been

8   misunderstanding the point, but you seem to be drawing a -- or

9   I thought I was hearing a potential distinction between what

10  the Attorney General has said in her briefs, to the effect that

11  it will not enforce the junior model provision, at least as to

12  marketing, versus what would count as a disavowal for a

13  standing purposes.

14      Do you think there's a difference there?  And if so,

15  what's the difference?

16          MR. ROWEN:  So, I mean, I do think there is a big

17  difference.  I mean, so one, you know, a disavowal would be, so

18  if you look at paragraph 18 of Ms. Cupero's declaration, she

19  says, you know, my company, Smith & Wesson, has been sued under

20  a similar statute for marketing in other states things that

21  promote the lawful features of firearms, like ease of

22  concealment and capacity.

23          And the Attorney General has steadfastly declined to

24  say that she will not enforce the reasonable controls provision

25  or the abnormally dangerous provision or (b)(3) to bring

1  exactly that kind of lawsuit against the members of NSSF, who

2  all you need to do is look at Google, see that Smith & Wesson

3  and Ruger are still marketing the fact that you can conceal a

4  handgun, which was the entirety of the basis for the allegation

5  with respect to the ease of concealment.

6           THE COURT:  This is a -- the reference you're making

7  is to the case that was brought by the City of Buffalo; is

8  that --

9           MR. ROWEN:  Yes.

10          THE COURT:  Okay.  So I can, of course, ask the

11  Attorney General about that.

12          But let's say that the Attorney General does, at

13  least as to certain aspects of the law, say that is -- it

14  disavows enforcement of -- and maybe even uses that word, that

15  it disavows enforcement of the marketing provisions as to youth

16  models in particular and that it disavows enforcement as to

17  youth-model marketing so long as Junior Sports is binding law

18  in the Ninth Circuit.

19          At least with -- I know the marketing as to ease of

20  capacity and so forth would be a separate matter.  But at least

21  with respect to junior models and Junior Sports, why would --

22  why wouldn't that be highly relevant to the question of whether

23  you have standing at this stage for a pre-enforcement

24  challenge?

25          MR. ROWEN:  So two responses.  I mean, first, I just

 1    think there's a legal difference between recognizing binding

 2    precedent and affirmatively disavowing when there is no, you

 3    know, dead bang binding precedent, although on some of these we

 4    think there is.  I just think those are horses of a different

 5    color.

 6              And then, you know, the second thing is the fact that

 7    the Attorney General, you know, has said we will comply with

 8    the logic of that opinion, I don't think that can prevent us

 9    from at the very least obtaining a declaratory judgment with

10    respect to the First Amendment claim and that application of

11    that provision.  It may be at the very least that might be a

12    reason not to enjoin in this preliminary stage with respect to

13    applications that the Attorney General has said correctly that

14    they would be unconstitutional in doing.  But I don't think

15    that defeats our standing.

16              THE COURT:  I think -- I think where I -- where I see

17    the issue for you is the third part of the Driehaus test.  And

18    I think we agree that that's the test, right?  It's course of

19    conduct with sort of constitutional significance, that it's

20    arguably proscribed.

21              I think when it comes to the youth model -- and

22    you've made -- obviously you'd made arguments about Junior

23    Sports and so forth.

24              But then the third part of it is a serious or

25    credible concern about enforcement, right?  And so -- and that

1    isn't speculative or so forth.

2            And I think the -- the challenge that I see when

3    you're assessing whether NSSF has standing, as to a provision

4    that the Attorney General is saying she will not enforce, is

5    how do you art -- just as a practical matter.  Maybe there's

6    some sort of legal way of looking at it, and I'm interested in

7    hearing any cases that would suggest that.

8            But in a sort of real-world practical sense, you

9    know, person on the street, so to speak, here is the Attorney

10   General to say it is our commitment to the Court that we will

11   not enforce that provision so long as Junior Sports is law.

12           How -- how would the Court write an opinion that says

13   it nonetheless concludes that there is a credible non-

14   speculative threat of enforcement of that provision?  I think

15   that's the question.

16           MR. ROWEN:  So I think in this context you can avoid

17   most of the complications because the deadline to file cert

18   hasn't passed yet.  So the way that I read the footnote, they

19   say as long as it remains binding precedent.  So it's currently

20   binding.  There remains a legal and practical possibility that

21   it will not be binding on them at some point.

22           THE COURT:  I do -- that is true.  Although I suppose

23   what you're saying is -- and I guess the question would be what

24   if it gets vacated pending the consideration of a higher court,

25   and I could ask the Attorney General about that.

1          I -- I assume what the Attorney General's position is

2    is that it would not enforce that provision until it were told

3    that Junior Sports is wrong.  And so let's say hypothetically

4    that that is the Attorney General's -- I see your point, which

5    is to say, you know, there are situations -- this happened to

6    Teter just -- just recently.

7          There are situations where a panel decision gets

8    vacated, and it would be inappropriate, I think, for the Court

9    to conclude that there is no realistic likelihood of

10   enforcement because the only way the Attorney General would

11   enforce Junior Sports is if it turns out that Junior Sports

12   doesn't constrain the Attorney General, in which case there

13   wouldn't actually be a merits problem.  It would be

14   inappropriate for the Court to reach that conclusion if there's

15   some sort of gap period in between the vacating of a decision

16   and the ultimate resolution of whether it was right or wrong.

17   So that can be addressed.

18          But I think if the position is there won't be

19   enforcement until -- unless and until the Attorney General

20   receives guidance of a court that Junior Sports is actually

21   mistaken, in that -- in that situation, which may turn out to

22   be hypothetical when I turn to the Attorney General, but I just

23   want to make sure I understand NSSF's position.

24          How do you still articulate a non-speculative concern

25   about enforcement?

1          MR. ROWEN:  So, I mean, I think it's non-speculative
2   because the terms of their sort of limited disavowal are by
3   their nature limited.
4          And so I think it'd be different if they said, you
5   know, for all time we agree that this is the law and we won't
6   -- you know, we won't enforce it no matter what.  But they
7   haven't said that.
8          And that's why, you know, actually out of respect,
9   the attorney general of any state, to abide by his or her oath.
10  And that's why I sort of affirmatively offered, but maybe you
11  don't need to preliminarily enjoin the Attorney General from
12  enforcing those applications, because we expect that she will
13  live up to the representations that we've made.  But there's
14  still a credible threat of enforcement as soon as -- you know,
15  if the hypothetical that they've baked into their disavowal
16  comes into effect.  And, you know, Your Honor said then there
17  wouldn't be a merits problem.  I mean, I vehemently disagree
18  with that, that, you know, Junior Sports Magazine was one sort
19  of example, and we'll get into the --
20         THE COURT:  I just mean as to the specific issue that
21  was resolved in your favor in Junior Sports.
22         MR. ROWEN:  Right.
23         THE COURT:  If the Supreme Court were to say --
24  hypothetically speaking.  I'm not going to speculate about that
25  now.  But if the Supreme Court were to say that Junior Sports

1    was wrong on that issue, then there wouldn't be a merits

2    problem anymore as to that specific issue is all I mean.

3              MR. ROWEN:  Understood.

4              THE COURT:  All right.

5              MR. ROWEN:  So I'm happy to continue talking about

6    standing.

7              THE COURT:  I would like to ask just a few other

8    questions before we maybe turn to the dormant commerce clause

9    or other issues.

10             MR. ROWEN:  Sure.

11             THE COURT:  We could also talk about the PLCAA.

12             But as I understand it, just basically speaking as

13   we're talking about standing here, the standing that NSSF is

14   asserting is -- is associational standing, right?  There's no

15   suggestion that NSSF itself either has suffered any harm or

16   fears any harm, correct?

17             MR. ROWEN:  That's correct.

18             THE COURT:  Okay.  So that the question as I'm

19   looking at the preliminary injunction materials, the question

20   is, you know, I -- I have read Mr. Reid's declaration,

21   Ms. Capero's declaration, Ms. Imperato's declaration, and they

22   have described -- these are three members who have laid out

23   some details about their operations, conduct of their

24   businesses, and NSSF's position is that it has sort of

25   associational standing based on these members who have

1    specified the conduct that their concern is arguably

2    proscribed, right?  Am I understanding that correctly?

3              MR. ROWEN:  I believe so, yes, Your Honor.

4              THE COURT:  Okay, okay.

5              And it does seem clear to me that Ruger, Smith &

6    Wesson, and Henry Repeating Arms are all members of NSSF,

7    right?

8              MR. ROWEN:  (Nods.)

9              THE COURT:  And they're distributing, manufacturing

10   and distributing firearms.

11             And here's sort of the question that I have.  Apart

12   from the -- the youth models that are specifically identified

13   in Imperato's declaration, we've talked about that either in

14   the context of standing or with respect to other issues, but

15   are there any particular models of firearms that are

16   specifically identified as such in any of the declarations?

17             MR. ROWEN:  So, no, but I don't believe that that's

18   remotely a problem for --

19             THE COURT:  It may not be.

20             MR. ROWEN:  -- Article III.

21             THE COURT:  Right.  You may be able to make the

22   argument in a different way, but --

23             MR. ROWEN:  Right.

24             THE COURT:  -- your argument is not, you know, with

25   respect to Ruger or with respect to Smith & Wesson, here are

 1   specific firearms.  We're not going to concede that they're

 2   unlawful, of course, but these specific firearms, we have

 3   concerns that the Hawaii Attorney General would bring an

 4   enforcement action on the premise that they're unlawful.  You

 5   haven't done that, right?  So you're at least, with the

 6   exception of the specific youth models, you're making sort of a

 7   more, I guess, holistic type of standing argument.

 8        MR. ROWEN:  Well, so we haven't done that.  I mean,

 9   in part, we think, you know, the complaint itself satisfies

10   standing.  But to the extent that Your Honor disagrees under

11   cases like Warth against Seldon, going back to the '70s, there

12   would be no problem with Your Honor saying, you know:  Hey,

13   NSSF, I think you would have standing if you could aver X, and

14   then we could come back with a declaration.

15        My friend on the other side has said, oh, that, you

16   know, would violate Local Rule 7.2.  But they haven't filed a

17   motion to dismiss, so we actually didn't have a procedurally

18   proper opportunity to file declarations, which is why we didn't

19   attach it in our reply brief, the Imperato declaration.

20        THE COURT:  Sure.

21        MR. ROWEN:  But if Your Honor, you know, thinks that

22   there are certain things that would be necessary because

23   Article III standing is always the Court's prerogative to raise

24   on its own, there's a longstanding Supreme Court doctrine

25   saying the Court can, you know, say this is what's -- you know,

1    it might take to get standing.

2              THE COURT:  Sure.  And it's true there is no, at

3    least -- at least not in this case there's no motion to

4    dismiss.  But you would agree it is the -- the burden of the

5    parties seeking relief to actually establish standing, right?

6              MR. ROWEN:  Of course.

7              THE COURT:  So right, so --

8              MR. ROWEN:  Of course.

9              THE COURT:  Right.

10             MR. ROWEN:  And --

11             THE COURT:  And so with respect to a preliminary

12    injunction, it is your burden, right?  To come forward with

13    that evidence establishing that you have standing for each of

14    the claims that you're seeking relief on.

15             MR. ROWEN:  Of course.  And, I mean, with respect to

16    the abnormally dangerous provision particularly, like I don't

17    think that there's any real-world debate that NSSF members

18    manufacture, market, and sell products that the Attorney

19    General of Hawaii believes are covered by that provision.

20             I mean, we cited to the en banc petition in Teter in

21    our reply brief that the Attorney General filed, where she very

22    clearly made -- you know, point to, well, if Teter isn't

23    vacated then states won't be able to do things like ban, you

24    know, assault long guns, which are currently lawful in Hawaii

25    and which NSSF members, you know, if by what they mean by that

1   they meant semi-automatic rifles that can accept a detachable

2   magazine, like the AR-15, the most common rifle in the United

3   States, then it's just not disputed and it's a matter of public

4   record known to the Attorney General that Colt, and Ruger, and

5   Smith & Wesson all make millions of those.

6           So --

7           THE COURT:  Is your suggestion, though, that in

8   considering whether there's standing for purposes of your

9   preliminary injunction motion the Court should be sort of

10  scouring the public record to figure out if there's standing

11  for your claims?

12          MR. ROWEN:  So --

13          THE COURT:  I could -- you know, my instinct is that

14  it's your burden to present the evidence in court, right?

15          And so, for example, you make a reference in your

16  submissions to the Imperato declaration.  And so that there's

17  no -- no question about whether it was part this Court's

18  record, I asked at the status conference that you submit it,

19  right?

20          There hasn't been a request for judicial notice of

21  any other information.  And I think -- I think at the status

22  conference you took the position that that wasn't necessary, I

23  believe.

24          And so do you -- is your position that in a situation

25  like this the -- the Court should be going beyond the -- the

1   preliminary injunction record that's presented?

2            And I understand your arguments with respect to that

3   record, but I think it's a separate question of whether I

4   should be going onto Google, so to speak, as you referred to

5   earlier, and trying to see if in the real world, as you put it,

6   there might be standing had maybe other facts been presented in

7   a declaration.  Is that your position that that's what the

8   Court should be doing?

9            MR. ROWEN:  So, I mean, I would qualify it a little

10  bit, which is to say that with respect to things that are

11  legislative facts, so that it would fall --

12           THE COURT:  Sure.

13           MR. ROWEN:  -- within the advisory committee note to

14  Federal Rule of Evidence 201 --

15           THE COURT:  Right.

16           MR. ROWEN:  And the fact that Ruger and Smith &

17  Wesson manufacture semi-automatic rifles is pretty clearly like

18  the definition of a legislative fact, because it would be

19  relevant to constitutional lawmaking and legislating in courts

20  across the country.  So with respect to facts like those, that

21  are not bounded by the Federal Rules of Evidence, which the

22  Kenneth Culp Davis article that the Advisory Committee Note to

23  Rule 201 references, says, like, legislative facts are just not

24  constrained by the Federal Rules of Evidence.

25           So with respect to things like that I think it would

1  be perfectly appropriate.

2          If Your Honor disagreed, the reason I brought up

3  cases like Warth against Seldon is if Your Honor thinks it

4  needs to be in the record, I think, Your Honor, you know, the

5  natural thing to do would be to say:  I can't grant preliminary

6  injunctive relief until I know you have this.  So, you know,

7  you need to provide it.

8          I don't think that we need to do that because, again,

9  I think that the record is clear enough on its face.

10          THE COURT:  I -- what -- I mean, I guess the issue I

11  have is with the -- the notion that the Court should be asking

12  for materials up until the point where standing is established.

13          Because the way that I see it is it's the claimant's

14  burden to establish standing, right?  And it's sort of the

15  Court's responsibility to look at the materials, look at the

16  arguments you've made and make a decision, right?

17          MR. ROWEN:  So I agree with that completely.

18          THE COURT:  Okay.

19          MR. ROWEN:  And our position is we have clearly

20  established standing.

21          THE COURT:  I understand.  And I -- that's a separate

22  question.  I just --

23          MR. ROWEN:  Right.

24          THE COURT:  Because, you know, there's sort of a --

25  it is true that a court proceeding ends up sort of fencing in a

1    certain set of materials that the Court looks at, and there

2    might be all sorts of other things out there in the world that

3    could possibly be helpful for one party or the other, but the

4    idea behind creating a record in a preliminary injunction or

5    even at a trial or in a summary judgment motion is to have a

6    defined set of materials that the Court's considering so that

7    it can make a decision as to those materials.  And so -- and I

8    know, and we're discussing the arguments you've made about

9    those materials, that the only -- the only concern I have is

10   with the notion that it's actually not about those materials,

11   that the Court has almost sort of an inquisitorial obligation

12   to do its own investigation in real-world facts and say, you

13   know, I think actually you might be able to establish the

14   following three things, so why don't you go ahead and submit

15   something.

16          That is emphatically not what the Court intended to

17   convey with the request for the Imperato declaration, for

18   example.  It was simply that you had a reference to a

19   declaration that had been filed in another court.  It created

20   for me the impression that you wanted the Court to consider it

21   in this record, and that's why I had asked you specifically

22   file it.

23          But I -- we don't need to discuss the point further.

24   I just wanted to make sure that you share my view, and I think

25   you do, that it is appropriate for the Court to look at the

1    materials you've submitted, right?  And make a decision based

2    on that.

3              MR. ROWEN:  Yes, of course, Your Honor.

4              THE COURT:  Okay.  Okay.

5              MR. ROWEN:  Our only point is if Your Honor thinks

6    that facts that have been made available to the Court but are

7    not in the record would establish standing and that what's in

8    the record would not establish standing, there's

9    longstanding doctrine that allows the Court to say, you know,

10   hey, file a judicial notice motion or lose.

11             THE COURT:  Sure.  Okay.

12             MR. ROWEN:  And that's my only point.

13             THE COURT:  I see.  Okay.

14             MR. ROWEN:  I'm not asking you to become a member of

15   the French judiciary.

16             THE COURT:  It's not just --

17             MR. ROWEN:  Yeah.  So I'm happy to answer any

18   additional questions on standing.  But hearing none, I'd like

19   to turn to the dormant commerce clause and the

20   extraterritoriality --

21             THE COURT:  Sure.

22             MR. ROWEN:  -- issue in the Bonta decision.

23             THE COURT:  Okay.

24             MR. ROWEN:  So we think that the Bonta decision on

25   this point was exactly right and that there is no delta between

1    what at least the (b)(2) and (b)(3) here do and what the

2    abnormally dangerous provision in California Assembly Bill 1594

3    did.  You know, exactly like the California statute on which

4    this statute was based, House Bill 426 directly regulates

5    out-of-state conduct by out-of-state parties with no or only

6    the slightest connection to the state.  And the Supreme Court

7    went out of its way to make clear that that's still

8    unconstitutional.  And I've looked long and hard, and I haven't

9    found a single court that's accepted the argument since Ross

10   that the direct regulation doctrine is dead.

11          I also haven't found a single case that says that

12   authorizing the imposition of liability for out-of-state

13   conduct is not direct regulation.

14          The critical difference between this statute and the

15   statute that was at issue in the Pork Producers case is that

16   the only thing that violated that statute was selling in state.

17          The plaintiffs there did not make the argument that

18   Prop 12 directly regulated out-of-state conduct.  Their

19   argument was that because California is such a big market,

20   inevitably in the real world the sort of ephemeral effect of

21   this statute will be to change conduct out of state.  They used

22   the words "directly control," but they did not make an -- I

23   think specifically disavowed, if I'm remembering my briefs

24   correctly, that they were making a direct regulation claim of

25   the sort that the Edgar plurality --

1                THE COURT:  Could I ask you just with reference to

2        the Kauai statute here, just to make sure that I'm kind of

3        tracking the argument.

4                So, for example, thinking about Ross, if the issue

5        were just that first -- the paragraph 1 of the definition of

6        firearm-related product, which deals with the sale, making,

7        or distributing in Hawaii of firearms.  And if any of the NSSF

8        members were to say, you know, Hawaii is such a significant

9        market for firearms, you know, that we are going to have to

10       change our practices on the mainland to be able to continue

11       selling in Hawaii, that is what Ross said does not -- or need

12       not be held to violate some extraterritoriality principle,

13       correct?

14               MR. ROWEN:  Correct.

15               THE COURT:  Okay.

16               MR. ROWEN:  So an example we pointed to in our

17       supplemental brief is, if I have it correctly, Section 134,

18       dash, 8.5.  I'll bet if I got it wrong.  And that's the

19       prohibition on bump stocks.  And that statute is explicit, that

20       what's prohibited under that statute is selling in Hawaii,

21       manufacturing in Hawaii.  And if that's what the statute said,

22       then a direct regulation claim would lose because it wouldn't

23       directly regulate anything out of state.

24               THE COURT:  Okay.  Now, by extension, would you

25       concede -- and you don't need to concede.  I just want to know

1    the extent of your argument.

2                Would you concede that a similar logic under Ross

3    would apply to the second paragraph, which relates to intended

4    sales in Hawaii?  As long as what we're talking about is the

5    actual member at issue?

6                MR. ROWEN:  So, no.

7                THE COURT:  Yeah.

8                MR. ROWEN:  And I just want to be clear that so long

9    as we're talking about --

10                THE COURT:  Of course.

11                MR. ROWEN:  -- member at issue on one and two, and

12    it's not just the item got there.

13                THE COURT:  Right.

14                MR. ROWEN:  So putting that to the side, I don't

15    think so.

16                And, I mean, you know, intent is a slippery concept.

17    And at some level every sort of commercial enterprise intends

18    that their market will be universal.  And, you know, if you

19    look at Hawaii law cases that talk about the idea of intent and

20    duty, it's pretty broad.  And, I mean, even in like the

21    personal jurisdiction context, cases like Ford now have taken a

22    pretty sweeping view of sort of intended consequences of

23    ordinary commercial acts.

24                So, you know -- and this statute doesn't use the

25    language of like specific intent.  So just based on the text of

1    this statute, I don't think that, you know, this comes within

2    sort of the exception that, you know, the Footnote 1 in Ross

3    may have been contemplating.

4            I'm happy to hear from my friends on the other side,

5    like, oh, no, no, you've overread the statute, but I don't --

6    you know, I'm skeptical that that's going to be what they say

7    because the statute says what it says.  And I think the point

8    of the whole statute, I mean, the statute only applies to

9    firearm industry members.  As we pointed out in our

10   supplemental brief, there are almost none in Hawaii.

11           I mean ten -- eight total firearms were manufactured

12   in Hawaii in 2021.  13.1 million were manufactured in the

13   United States.

14           As far as I know, zero major manufacturer has any

15   operations in the state.  So the idea that the Attorney General

16   is going to say, no, actually, this statute is just like the

17   bump stock statute, and it only applies to volitional conduct

18   in Hawaii, I think that would destroy the whole statute.  I'm

19   happy for them to say that, but I don't think that's textually

20   or purposefully available.

21           THE COURT:  Okay.  I think where your argument -- you

22   know, intended to be sold or distributed, depending on what

23   that means, it could be broader or narrower.  But where your

24   argument gains the most traction is with that third paragraph,

25   right?  Where what we're now talking about is items that are

1    possessed in Hawaii, and the requirement is that it be

2    reasonably foreseeable that they would have ended up here.

3            And I -- I see the sort of intuitive appeal of the

4    argument, but what's -- what's the best case sort of factually

5    that's closest to a situation where we're not talking about

6    general reference to an attempt to regulate out-of-state

7    conduct because of effects in some general sense --

8            MR. ROWEN:  Right.

9            THE COURT:  -- but a case where you specifically have

10   a situation of a product actually being in a state, and the

11   whole regulation turns on the product being there?

12           Do you have an example of that?  I think Edgar isn't

13   quite that, I think, because -- because of all the ways in

14   which the shareholders in Illinois didn't have to be part of

15   the transaction and so forth.

16           Do you have an example of a case where you actually

17   have a product, you know, but a court somewhere has nonetheless

18   said that that isn't enough of a connection to the state for it

19   to stop being direct regulation of out-of-state conduct?

20           MR. ROWEN:  So, yes.  These laws are few and far

21   between, because states typically don't regulate except with --

22   except with reference to their own territorial jurisdiction.

23   So we don't have a lot, but there are some.

24           So the sort of most -- I think most on point example

25   is Legato Vapors in Seventh Circuit, where part of that theory

 1   was sort of a flavor of the Ross theory that's now been

 2   interred.  But part of it was also this statute tells me in

 3   Indiana -- I'm getting the states wrong.  But it tells me out

 4   of state how many security guards I have to have at my

 5   out-of-state plant, and it says that that's a violation.  So

 6   that's one.  And that was for e-liquids that then came into the

 7   state.

 8           California, I mean, the California statute AB 1594 is

 9   another one.  California has a statute called Assembly Bill 824

10   that was enacted in either 2019 or 2020, that is one of these

11   sort of activist statutes that attempts to regulate the sale of

12   prescription -- excuse me -- settlement of patent disputes.

13   And currently there's an injunction entered by a district court

14   holding that to the extent that applies to settlements entered

15   and negotiated out of state, even if the products, the drugs

16   wind up in California, that that exceeds the attorney general's

17   or the state's authority under the Constitution.

18           There's a very similar statute at issue in Minnesota,

19   the case, I believe we cited to it, it's called Association for

20   Accessible Medicines versus Ellison, E-L-L-I-S-S-O-N, if I can

21   spell.

22           And there is that statute and then there's a similar

23   one in Illinois that is a direct pricing statute.  And then,

24   you know, on the pricing side, Association for Accessible

25   Medicines versus Frosh, a Fourth Circuit opinion, where

1   Maryland passed a statute that purported to regulate the price

2   of off-patent and generic prescription drugs.  And it didn't

3   apply to retail sales.  It applied only to manufacturer to

4   wholesaler sales.  And the Court said that that was facially

5   unconstitutional because it exceeded the territorial bounds of

6   the state.  And I'm happy to provide Your Honor with citations

7   for those.

8           THE COURT:  And I think I do have the citations for

9   possibly all of them.  The -- one of the questions I have about

10  those cases is that many of them, perhaps not all of them,

11  involved sort of price-related regulations, right?

12          And you would agree that when it comes to sort of the

13  extraterritorial reach of a -- of a law, an effort to sort of

14  regulate prices across state lines comes at the heart of --

15  from one angle.  There are plenty of different ways to get to

16  the heart of the dormant commerce clause, but that's one of the

17  ways of sort of coming sort of close to a core concern of the

18  dormant commerce clause, right?

19          MR. ROWEN:  I mean, yes and no.  I mean, so I think

20  my answer to that would have been closer to just yes before the

21  Pork Producers decision.  Because Edgar is the decision that

22  Footnote 1 mentions, and Edgar's not a pricing case; it's a

23  business takeover law.

24          And, I mean, I think, you know, the pricing cases

25  were always the easiest to see that what was happening was

1    direct regulation of out-of-state conduct.

2          But if the Attorney General's theory of her power is

3    correct, then the Attorney General could pass a statute that

4    regulates produce sellers.  And they'd say, you know, okay, you

5    sold produce in LAX or SFO, right next to the Royal Hawaiian

6    gates.  You know you -- it's at least reasonably foreseeable

7    that somebody's going to try to bring in produce from the

8    mainland.  That's unlawful in Hawaii.

9          And under their theory, they could enjoin, which the

10   statute allows Hawaii state courts to do, that out-of-state

11   selling, irrespective of the price term.  That can't be what

12   our Constitution allows.  But that is exactly what this statute

13   authorizes.

14         I mean I think the remedial point is very important.

15   Section 134-C authorizes injunctive relief necessary or -- to

16   prevent the violation.  That's the language of the statute.

17   And as the Attorney General made clear at I think it's page 26

18   of her preliminary injunction opposition, the violation here is

19   the firearm industry member's conduct.  That's also what's very

20   clear in Section 134-B(a), that the violation is the failure to

21   abide by the standard of conduct.

22         So that conduct, which happens out of state, can be

23   enjoined under the statute.  And it's a violation.  The words

24   are shall be a violation under Section 134, (b)(1), if I have

25   my numbers correct.

1           THE COURT:  Yeah.  I think the -- one of the

2   questions I have about the dormant commerce clause challenge

3   is -- is the question of severability.  I flagged that at the

4   outset.

5           Let's say hypothetically speaking the Court were to

6   conclude that there is a problem with at least the reasonably

7   foreseeable part of the definition of firearm-related product.

8   Maybe not the other parts, but at least with respect to that

9   provision.

10          Why wouldn't it -- I know you have other merits

11  arguments, First Amendment, Second Amendment, vagueness and the

12  PLCAA.  But at least with respect to the dormant commerce

13  clause, why wouldn't it adequately address the concerns that

14  NSSF has identified in this lawsuit to simply enjoin that

15  aspect of the law?

16          In particular what I'm referring to is that

17  paragraph 3 of the definition of firearm-related product that

18  allows enforcement to extend beyond sales that happen here,

19  that are intended to happen here, but rather focuses on guns

20  that are here where it was reasonably foreseeable they would

21  arrive?

22          MR. ROWEN:  So three responses.  The first is I

23  believe Your Honor, in order to do that, would have to adopt a

24  limiting construction for paragraphs 1 and 2, in the manner

25  that we've discussed previously during this colloquy, that it's

1    not just enough for the item to be sold, made, or distributed

2    in the state, that the firearm industry member who is a

3    defendant needs to be the one who did that.  So I think that's

4    one problem with that approach, because otherwise you've in

5    some ways made the problem worse.

6         The second thing is I don't think the state has made

7    this argument.  So, I mean, I -- maybe I missed it in their

8    briefs.  But I don't think that they have.

9         THE COURT:  It might have been in a -- I think it was

10   in the supplement.

11        MR. ROWEN:  It may be.

12        THE COURT:  So very recently filed.  Right.

13        MR. ROWEN:  And if they have then --

14        THE COURT:  Right.

15        MR. ROWEN:  -- you know, strike what I just said.

16        THE COURT:  Right.  No.  Right.

17        I don't think you've had a chance to fully respond to

18   it, so that's why I want to make sure you've had a chance to

19   address it now.  And I'll give, obviously, the Attorney General

20   her response as well.

21        MR. ROWEN:  And then just my third response --

22        THE COURT:  Sure.

23        MR. ROWEN:  -- quickly is that's the products

24   definition.  So even if you've adopted the limiting

25   construction for paragraphs 1 and 2, and you want to just sort

1    of say that it would violate the dormant commerce clause to

2    apply Section 134-B in cases where the conduct was out of state

3    but it was reasonably foreseeably possessed, I think that's

4    very actually difficult to do, given that, as Your Honor

5    mentioned, like the product definition is sort of all the way

6    at the core of the actual operative provision.  And again, the

7    statute and the Attorney General have been explicit that what

8    the statute actually regulates is the conduct.  So, you know, I

9    don't quite know how you would sever it in a way that, for

10   instance, Sam Francis did.  But, you know, there the

11   severability analysis makes perfect sense.  The statute says

12   "or."  It's very clear.  You follow ordinary California

13   severability rules; it's easy.

14            I think the reason why Judge Schopler didn't go down

15   that route in the Bonta case, in addition to the fact that they

16   didn't make that argument, is that you have to rewrite the

17   statute in order to get there.  And I submit that I'm not an

18   expert in Hawaii severability law, but I've looked at it.  And

19   I haven't seen a case that says, yes, you can rewrite a statute

20   from the root all the way up in order to abide by a

21   severability provision.  And I think that would be inconsistent

22   with sort of ordinarily rules of federal litigation.

23            I understand that severability's a state law

24   doctrine.  But when it's a federal constitutional violation and

25   the only way a federal court can sort of cabin an injunction is

1  by rewriting the statute, I don't think that's an appropriate

2  exercise of the Article III authority.

3           THE COURT:  Okay.  I do want to quickly ask you a

4  question about the Second Amendment.

5           MR. ROWEN:  Sure.

6           THE COURT:  Do you agree that -- you know, we could

7  use different ways of describing it, but what we're ultimately

8  talking about is the right of the individuals who would like to

9  purchase firearms, the Second Amendment right of the

10  individuals who would like to purchase the firearms that is at

11  stake.  And the argument that you make here is that you have

12  under Article III the ability, as is sometimes the case in

13  other contexts as well, to bring a lawsuit based on the -- the

14  Second Amendment rights of those individuals because, and you

15  cite Texeira, those individuals couldn't get the firearms they

16  want if you were prohibited from selling them.

17           Is that in sum and substance the nature of your

18  Second Amendment interest here?

19           MR. ROWEN:  So as a matter of Ninth Circuit law,

20  that's correct.

21           THE COURT:  Okay.

22           MR. ROWEN:  We don't agree that --

23           THE COURT:  Understood.

24           MR. ROWEN:  -- Jackson and Texeira are correct and we

25  think -- and after Bruen there's a very good argument that that

 1  wouldn't -- because that argument wouldn't fly in the First

 2  Amendment context, it shouldn't fly in the Second Amendment

 3  context.  But even putting that -- all of that aside with all

 4  the appropriate caveats, yes, I think under the Ninth Circuit

 5  law that I think this Court would be on to follow, that's

 6  right, that there's no freestanding right, but Texeira and

 7  Jackson say to sell, so it is a derivative sort of third-party

 8  standing issue.

 9        But both Texeira -- and Texeira is explicit, that the

10  Second Amendment wouldn't mean much without the ability to

11  acquire arms.  So the idea that a state could ban or heavily

12  regulate a class of arms and yet the manufacturers and sellers

13  of those arms couldn't assert the rights of their customers but

14  a would-be gun store operator could, like that just doesn't

15  wash.

16        THE COURT:  Could I -- and I think this tees up the

17  issue of Texeira having been decided before Bruen, but Texeira

18  used sort of that two-step analysis that's verboten now.

19        But the analysis appears to be that if you're trying

20  to bring a claim basically on behalf of other people who hold

21  the right, that what the Court has to look at is the extent to

22  which the regulation on you actually creates that kind of

23  burden, right?  And so it's like, is it an impermissible

24  burden.

25        Do you read Texeira differently or --

1          MR. ROWEN:  I do.  Because --

2          THE COURT:  Okay.

3          MR. ROWEN:  -- I think if you read it that way,

4     that'd be inconsistent with Craig against Boren.  I mean that

5     law just restricted 18- to 20-year-olds from drinking, and the

6     proprietor of the bar could still sue.

7          THE COURT:  No, I think the question is whether any

8     regulation, whether it's, for example, where you can set up

9     your store or anything else, whether the nature of that

10    regulation creates a sufficiently significant burden on the

11    interests or the rights of the individual purchasers.

12         You -- do you view Texeira as standing for something

13    different from that?

14         MR. ROWEN:  So what I view Texeira as saying -- and,

15    you know, obviously some of this has been abrogated.

16         What I view Texeira as saying is we're going to do

17    sort of penumbral analysis at the front end to figure out

18    whether you have prudential standing.  And then they say you

19    failed to state a claim because, yeah, you have like penumbral

20    rights to assert in a derivative matter, but the Second

21    Amendment doesn't protect that.

22         And I think it -- you know, Texeira talks about

23    failure to state a claim throughout the whole opinion.  It

24    actually doesn't use Article III language.

25         THE COURT:  Right, right.

1          MR. ROWEN:  And so that's why, you know, I'm sort of

2    quibbling with the way Your Honor's characterizing it, but I

3    think it's ultimately a merits decision.

4          THE COURT:  I'm not saying I disagree with that.  But

5    in assessing whether -- let me maybe put it this way.

6          In assessing whether there has been a violation of

7    the Second Amendment, is the appropriate way to read Texeira

8    that any regulation of a gun retailer needs to pass through the

9    steps of Bruen?  Or is it instead that the question is, an

10   individual has a right, right protected and recognized by Bruen

11   and Heller and so forth; and the question is whether a

12   regulation of a manufacturer or retailer creates an

13   impermissible burden on the individual's right.

14         MR. ROWEN:  Well, see, what I'd say is it's

15   definitely not the latter.

16         THE COURT:  Okay.

17         MR. ROWEN:  Bruen makes crystal clear that the nature

18   of the burden is not part of the analysis.

19         THE COURT:  But that's as to individuals, right?

20         MR. ROWEN:  So as to -- no, no, no, no.  As to any

21   regulation of firearms and related products.

22         I mean, Bruen obviously was an individual case, but

23   nothing that it says there says that this analysis is limited

24   to individuals.  And it talks at length that the analysis is

25   plain text does the regulation cover conduct that's covered by

1   the plain text, and then has the government demonstrated a

2   history and tradition that supports it.

3           And so, I mean, I think -- the reason we're having a

4   little bit of trouble answering your questions is --

5           THE COURT:  Sure.

6           MR. ROWEN:  -- some of Texeira is now just bad law.

7           THE COURT:  Sure.

8           MR. ROWEN:  Some of Texeira I think may sustain.  But

9   I think the part that's sustained is sort of the common sense

10  notion that goes back to Craig against Boren, but this

11  third-party standing doctrine is not an obstacle to asserting

12  constitutional rights.  And here, I mean, I think the

13  constitutional analysis is very straightforward.  On (b)(2) and

14  (b)(3) -- we'll put (b)(1) to a side for a second.  But on

15  (b)(2) and (b)(3), this is either a ban or something very close

16  to a ban of a broad class of arms.  So --

17          THE COURT:  What's your position for saying that?

18  Because I think about -- this is a facial challenge, right?

19  You're not -- you're not arguing that this statute, the

20  abnormally dangerous language, for example, as applied to some

21  of the firearms at issue, would be unconstitutional under the

22  Second Amendment; your argument is just this definitional

23  category is unconstitutional and --

24          MR. ROWEN:  Correct.

25          THE COURT:  I -- I know the Attorney General cited

1    the Washington State Grange case from about 2008.  And some of

2    the things that Justice Thomas says in that opinion are, you

3    know, Court should be careful in a facial challenge not to go

4    beyond the statute's facial requirements and speculate about

5    hypothetical or imaginary cases.

6              The Court acknowledges that in that case the courts

7    -- the state courts hadn't had an opportunity to construe the

8    law in the context of actual disputes, or to accord the law a

9    limiting construction.

10             And, you know, there's a discussion about avoiding

11   the risk of premature interpretation of statutes on the -- on

12   the basis of factually barebone records.

13             There's a suggestion that a court in a facial

14   challenge should consider limiting constructions offered either

15   by state courts or by the enforcing authorities.

16             So in light of all those things, I can see that the

17   argument that -- abnormally dangerous, for example, could end

18   up banning whole categories of firearms as an argument, I can

19   understand that's your argument, that it could end up being

20   construed to ban firearms that are constitutionally protected

21   that count as arms for which there's no history of enforcement

22   sufficient to justify.

23             But how does the Court get there in a facial

24   challenge I guess is the question.

25             MR. ROWEN:  Sure.  And so, I mean, I think Heller is

1    a perfect illustration of why the Attorney General's

2    description of how facial challenges works is incorrect.

3            So the DC law in Heller banned possession of

4    handguns.  Some handguns are fully automatic.  All nine

5    justices seemed to at least not dispute the idea that fully

6    automatic firearms could be banned.

7            And yet the Court took the statute as it found it,

8    looked to the criteria that the face of the statute applied,

9    and said, no, this criteria, we're not going to imagine --

10           THE COURT:  Right.

11           MR. ROWEN:  -- hypothetical cases.

12           THE COURT:  Right.

13           MR. ROWEN:  We take the statute as we find it, on its

14   face.  And if the criteria on the face of the statute is

15   inconsistent with the relevant constitutional decision rule,

16   then it's facially unconstitutional, even if some of the

17   firearms there that are prohibited could be constitutionally

18   prohibited under a narrower categorical statute.  Lopez-

19   Valenzuela says that specifically.  So that was the due process

20   case in --

21           THE COURT:  Yes.  Correct.

22           MR. ROWEN:  And, you know, the Attorney General says,

23   well, that's about individual determinations.  And

24   respectfully, no.  The relevant due process standard, which

25   comes from Salerno, is either you need individualized

1    determinations for -- you know, for bail, or you need a

2    narrowly defined class of people.  And the Court said had this

3    been a different narrower class, maybe that would be enough.

4           But because we take the statute as we find it, and

5    this class is not narrow enough, the fact that some of the

6    actual plaintiffs in that case could constitutionally be denied

7    bail without a hearing did not defeat the facial challenge.

8           If that weren't the rule, Heller would have come out

9    the other way.  Junior Sports Magazines would have come out the

10   other way.  Because, of course, Junior Sports Magazines,

11   California's lead argument was you don't need to do

12   constitutional scrutiny because some of what's covered by this

13   statute is marketing to kids, and marketing to kids in

14   California is unlawful.

15          And what the Ninth Circuit said is, yet that's true

16   that that's covered by the statute, but that's not how facial

17   challenges work.  You have to apply the relevant constitutional

18   decision rule.  And the relevant constitutional decision rule,

19   there -- they said, you know, we'll put strict scrutiny to the

20   side, but they said there, it's intermediate scrutiny.  And

21   they said on its face, even though some of what the statute

22   covered clearly could constitutionally be proscribed, on its

23   face the statute is still facially unconstitutional because it

24   flunked the relevant constitutional decision rule.

25          THE COURT:  Is this argument -- and this is going to

1   be the last question I ask before we take a short break.  But

2   just to kind of wrap up this point, is this argument that

3   you're making limited to the abnormally dangerous provision, or

4   are you suggesting that firearms that can readily be converted

5   into illegal firearms in common use is a class, if you see what

6   I mean?  Because I understand the idea that handguns, that's a

7   class, and you can decide is that protected by the Constitution

8   or not.

9           MR. ROWEN:  Right.

10          THE COURT:  I can also understand your argument that

11  abnormally dangerous, because it doesn't track the common

12  use -- I understand your argument, doesn't track the common use

13  test.

14          MR. ROWEN:  Right.

15          THE COURT:  So as a constitutional rule of decision,

16  that's not consistent.  I understand that argument.

17          How does that argument work with respect to the

18  category, if you will, of firearms that readily can be

19  converted into illegal firearm-related products or firearms

20  that are targeted at minors or other individuals who are

21  legally prohibited?  Does the facial challenge work as to those

22  two, or are you really just focused on the abnormally dangerous

23  provision?

24          MR. ROWEN:  So, yes.  I mean, so a facial challenge

25  works as to those two.  Again, I mean, these are sort of --

1    these are presumptions.  These are not the only way --

2                THE COURT:  Sure.

3                MR. ROWEN:  -- that an arm can be deemed abnormally

4    dangerous.  And in our view, Bruen and Heller make it very

5    clear that in order to ban a class of arms, you -- the state

6    needs to prove that the arms are both dangerous and unusual.

7    Nothing in this statute on its face bakes in the unusual part.

8                So maybe some of the firearms that are cabined --

9    that are captured -- excuse me -- by these paragraphs that

10   we're talking about could constitutionally be prohibited.  But

11   it's the state's burden to try again and pass a statute that's

12   constitutional on its face.

13               THE COURT:  Mr. Rowen, I thank you for your argument.

14   I will take a five-minute break.  I will check with you when we

15   come back in five minutes if you'd like to make any additional

16   argument.

17               I think it has been productive.  We've gone over the

18   45-minute suggestion that I had made, but as I said at the

19   beginning, it was just a suggestion.

20               So when we come back in five minutes, I'll first

21   check with you to see if there's any other argument you'd like

22   to make; and if not, I'll turn to counsel for the Attorney

23   General.  Thank you.

24               MR. ROWEN:  Thank you, Your Honor.

25               COURTROOM MANAGER:  All rise.

1        (The proceedings recessed at 11:07 a.m. until 11:13 a.m.)

2            THE COURT:  And, counsel, you may be seated as well.

3            Mr. Rowen, as promised, I'd like to now turn to you

4    and see if you have any additional arguments that you'd like to

5    make.

6            MR. ROWEN:  I think unless Your Honor has any

7    specific questions, I'll reserve anything else for rebuttal.

8            THE COURT:  Great.  Okay.  Thank you so much.

9            MR. ROWEN:  Thank you.

10           THE COURT:  I'll turn now to counsel for the Attorney

11   General.

12           MR. GERBER:  Good morning, Your Honor.  Brian Gerber

13   for the Attorney General.

14           I will be arguing standing, and I will address any

15   questions that the Court has about preemption under the

16   Protection of Lawful Commerce and Arms Act.  And then as

17   discussed at the status conference, I will turn things over to

18   my colleague, Ms. Lefkowitz, who will address the remaining

19   issues, including the dormant commerce clause, due process,

20   First Amendment, and I -- I think that that's all.

21           So, you know, to begin with standing I would like to

22   make three points where I will address a lot of issues that

23   were discussed in Mr. Rowen's argument just before.

24           The first point, and this was talked about before, is

25   that, you know, there's really no conduct that is described

1  here that is arguably proscribed by Act 28.  The second point

2  I'd like to make is that there is no evidence that any NSSF

3  member faces a credible threat of enforcement under the

4  standards set forth in the Ninth Circuit case law.

5          And finally, I would like to talk about the fact that

6  this is a hypothetical dispute and is really seeking an

7  advisory opinion.

8          So one point where the Attorney General and NSSF

9  agree is that standing is not dispensed in gross.  Standing is

10  provision-specific, it is claim-specific, and it is relief-

11  specific.

12          So with that, I'd first like to turn to the

13  reasonable controls provision, which was not addressed much in

14  Mr. Rowen's argument but I think is important to set the table.

15          So there is now a growing consensus in the federal

16  courts, starting with the New Jersey case, then going to the

17  Delaware case, the California case and the Washington case,

18  that under substantially the same allegations and evidence that

19  NSSF has provided there is no standing for NSSF to challenge

20  the reasonable controls provision.

21          And I think the New Jersey decision really guides the

22  way on this, and the logic of that decision I think disposes of

23  this entire case on standing.

24          NSSF there and here, you know, has stated that

25  they're being faced with a choice between ceasing lawful

1    operations on one hand or facing ruinous liability.  And this

2    is a choice that really has just not come to pass.

3              THE COURT:  Could I stop you there?  That your use of

4    the word lawful, is it correct that in the New Jersey case

5    there was a concession that reasonable controls didn't extend

6    beyond conduct that was not unlawful elsewhere?

7              MR. GERBER:  That -- that is not correct, Your Honor.

8              THE COURT:  Okay.

9              MR. GERBER:  And I'd like to point you to two sources

10   on that specifically.  The first is the Third Circuit decision

11   itself.  And I'll quote from page 221 of that opinion there.

12             The opinion states:  Instead, the Attorney General

13   insists that the law covers only industry members' own

14   misconduct.  Granted, we are not just -- we are not sure just

15   how far the Attorney General's view of misconduct sweeps.

16             You know, so there again, that is not something that

17   was crucial to the Third Circuit's opinion.  You know, it was

18   quite clear that they didn't know exactly the enforcement plans

19   of the Attorney General.

20             You know, and then second, if you turn to the oral

21   argument -- it's available on the Third Circuit's website.  You

22   know, when you look at what the deputy solicitor general in

23   that case actually states, he was distinguishing on the one

24   hand between solely making and selling guns, which he referred

25   to as lawful conduct, and on the other hand, talking about

1    culpable misconduct, which he said was either tortious or it

2    was something that was unlawful.

3              So, you know, I don't think that distinction holds

4    up.

5              You know, and here, turning back to the reasonable

6    controls provision, you know, NSSF has not stated that its

7    members do not have or refuse to implement reasonable controls.

8    They have not stated, as Mr. Rowen just conceded, that they

9    have changed their business practices in any way.  You know,

10   nor have they said that they've been threatened with

11   enforcement by the Attorney General of the State of Hawaii.

12             Now, I think all of this applies with equal force to

13   the abnormally dangerous provision.

14             THE COURT:  Before we turn to the abnormally

15   dangerous provision, let me just ask you this about the

16   reasonable controls provision; because there is language in the

17   reasonable controls provision, I think this is paragraph 1,

18   defining what reasonable controls include, that refers to --

19   and I'm going to read it here:  A person -- you're not supposed

20   to sell and so forth -- to a person who the firearm industry

21   member has reasonable cause to believe is at substantial risk

22   of using a firearm-related product to harm themselves or

23   another.  It does then go on to say:  Or of possessing or using

24   a firearm-related product unlawfully.

25             What is the Attorney General's position on the

1    meaning of this language "harm to another"?  Because I do think

2    that if that includes literally harm to another, that that

3    presumably would include lawful self-defense, no?

4            MR. GERBER:  Well, you know, I think read in its, you

5    know, broadest possible way that that is possible, Your Honor.

6            You know, I think again, focusing the Court on, you

7    know, what I think is the critical issue here and threat of

8    enforcement, you know, I think it's highly unlikely that there

9    would ever be an enforcement action brought, you know, when a,

10   you know, a gun was actually used in -- in lawful self-defense.

11           You know, that -- that doesn't seem like the sort of

12   Heartland case and is -- you know, fits into, you know, what I

13   think would be the Clapper line of cases about a highly

14   speculative fear, but, you know, several events having to come

15   to pass before we would ever go down that path of having to,

16   you know, interpret that exact language in the provision.

17           THE COURT:  Can I just make sure that the record's

18   clear on this?

19           Is the Attorney General preserving -- I want to make

20   sure if what you're saying is just as a prediction of how

21   things likely will go in the world; it's unlikely that we'll

22   ever argue that a firearm manufacturer lacked reasonable

23   controls because they sold a firearm to someone who wanted to

24   use it for self-defense.

25           Or is what you're saying that the Attorney General

1   disavows that type of enforcement, would not bring an

2   enforcement action against someone -- against a firearm

3   industry member because they sold, knowingly sold,

4   intentionally sold, had a marketing strategy to sell firearms

5   to individuals who are exercising their constitutional right to

6   have a firearm for lawful self-defense, right?

7            Does the Attorney General actually want to preserve

8   some enforcement discretion in that area?  Or do you disavow

9   the notion that intentionally selling a firearm or maybe

10  inadvertently selling a firearm or having reasonable cause to

11  believe that you're selling a firearm to someone who wants to

12  use it for lawful self-defense would fall within an enforcement

13  action?

14           MR. GERBER:  Well, you know, I think at this stage,

15  you know, I -- I would not make any formal disclaimer of -- of

16  enforcement.  I think it's just, you know, something that's

17  highly unlikely, and that's something that we, you know, might

18  revisit specifically.

19           But, you know, again, you know, I think it is -- it

20  is enough that in -- in this posture, you know, we really don't

21  have the reasonable fear that it will be enforced in that

22  manner.

23           You know, that -- that would be dependent on quite a

24  few events taking place.  And then, you know, you know, a

25  position outside of the Heartland, I think, that -- that would

 1  be taken be in a specific case.  So I hope that clarifies.

 2              THE COURT:  I think -- I think it does.

 3              But would you agree that if -- if the Attorney

 4  General is, at least not for purposes of the preliminary

 5  injunction proceeding, prepared to concede that she wouldn't

 6  bring an enforcement action against a company that sold a

 7  firearm to someone who wants to buy it for lawful self-defense,

 8  do you have an argument for why lawful self-defense isn't at

 9  least plausibly or arguably something that would apply to

10  virtually every gun?

11              MR. GERBER:  Well, so I -- you know, I -- I don't --

12  perhaps I should take the disavowal position.  You know, I

13  don't -- it's certainly --

14              THE COURT:  I'm happy to take a pause if you'd like

15  to confer, and I understand, you know, I -- I believe you're

16  sort of -- you're working with the Attorney General.  I know

17  that you want to be careful about the positions you take on

18  behalf of the Attorney General.

19              But let me put to this way.  It seems to me that if

20  the Attorney General intends or even wants to preserve the

21  possibility of bringing an enforcement action against any

22  firearm retailer who sells a firearm where there's substantial

23  cause to believe it might be used for a lawful self-defense,

24  that that's, number one, I think pretty problematic, I think.

25  But number two, when it comes to standing, which is what we're

1   discussing here, it seems to me the sort of thing that would

2   likely apply to just about any firearm.

3           And if that's the case, then, the possibility for

4   NSSF establishing standing at this stage becomes a lot larger.

5   Do you see what I mean?  So if you want to take a five-minute

6   break, we can do that.

7           MR. GERBER:  I would request that, Your Honor.  Thank

8   you.

9           THE COURT:  Okay.  That's no problem.

10          COURTROOM MANAGER:  All rise.

11          Court stands in recess.

12      (The proceedings recessed at 11:24 a.m. until 11:26 a.m.)

13          THE COURT:  Mr. Gerber.

14          MR. GERBER:  Yes.  So thank you, Your Honor, for

15  allowing me to take the time there.

16          So, you know, we do disavow enforcement in that way

17  of if it's sold for, you know, lawful self-defense.

18          You know, we read that provision more generally to

19  apply if there's someone who, you know, has immediate threat

20  to, you know, unlawfully harm another person --

21          THE COURT:  I see.  Okay.

22          MR. GERBER:  -- with the firearm.

23          THE COURT:  Okay.

24          MR. GERBER:  And I appreciate the Court allowing me

25  to confer prior to making that disavowal.

1         THE COURT:  I also appreciate your being careful

2   about the disavowals you make on behalf of the Attorney

3   General, because if you are going to make a disavowal obviously

4   it needs to be one that the Attorney General will abide by.  So

5   I appreciate your care with that.

6         And it -- just to be clear, so your disavowal is to

7   interpreting essentially harm to another as allowing an

8   enforcement action where that harm to another is lawful

9   self-defense, basically?

10         MR. GERBER:  Yes, that is correct, Your Honor.

11         THE COURT:  Okay.  Okay.  You can proceed with your

12   argument.

13         MR. GERBER:  So I would like to turn to the

14   abnormally dangerous provision now, if the Court doesn't have

15   any other questions --

16         THE COURT:  I don't.

17         MR. GERBER:  -- on unreasonable controls.

18         So, you know, again, I think two preliminary points

19   about how the abnormally dangerous provision functions are

20   important to discuss prior to turning to the specific

21   allegations and evidence in this case.

22         You know, the first is the abnormally dangerous

23   provision, the operative command there is to take reasonable

24   precautions to prevent.  And again, this is about the firearm

25   industry members' own misconduct.  And that, you know, bleeds

1   into the -- the second point, which is that that conduct needs

2   to have a connection to Hawaii.  You know, at the end of the

3   abnormally dangerous provision it says unreasonable health and

4   safety within the state.  You know, and again, the enforcement

5   mechanism of Act 28 is that you have to bring a civil cause of

6   action for harm that, you know, has occurred in the state or

7   can be brought on behalf of the people of the State of Hawaii

8   from the Attorney General.

9           You know, so all of that really rose in the direction

10  of there having to be a connection between the firearm industry

11  members' failure to take reasonable precautions and that

12  product ending up in the state of Hawaii.

13          Now, again, there has been, you know, some discussion

14  in Mr. Rowen's argument about, you know, just how far the

15  definition of firearm-related product extends and how that

16  interacts with the other provisions of the act.

17          You know, what I would point the Court to here is

18  that the firearm-related product definition is used in the

19  definition of firearm industry member and is incorporated into

20  that definition, and that, you know, that three-part test in

21  the firearm-related product definition is then incorporated

22  into that.

23          And then it's again incorporated into the -- the

24  operative commands, and, you know, here, to take reasonable

25  precautions to prevent the firearm industry member is the -- is

 1    the person that must -- is the entity that must do so.

 2           So, you know, I think with -- you know, with those

 3    two in mind, you know, I'd like to turn to the -- you know, the

 4    youth-model allegations.

 5           THE COURT:  And before you make that pivot, just so

 6    that I can ask the question while we're on the topic.  And so I

 7    am understanding the Attorney General's argument, because what

 8    Mr. Rowen -- I think I mispronounced your name a moment ago.  I

 9    apologize for that.  What Mr. Rowen raised was the concern that

10    the Attorney General would interpret, or a court would

11    interpret this provision as applying to firearm manufacturers

12    regardless of whether their products have a nexus to Hawaii or

13    not.

14           He obviously has other arguments that don't depend on

15    that.  But just in terms of that interpretation, am I correct

16    in understanding that the Attorney General does not have that

17    view of the statute; which is to say, the Attorney General has

18    the view of the statute that restricts the meaning of firearm

19    industry member to those that have some relation -- the stated

20    definitional relation to a firearm-related product?

21           MR. GERBER:  Yes.  That -- that is correct, Your

22    Honor.  And, you know, just to take one step back, I think that

23    is a position that we've been consistent on, in, you know, our

24    memo in opposition and also in our supplemental brief on the

25    dormant commerce clause, about, you know, just how this -- this

1  provision operates.

2          You know, so that is, you know, that is how we

3  interpret this, this particular provision.

4          You know, so, now, if I may turn to the -- the youth

5  model, you know, allegations in the declarations specifically,

6  you know, again there -- there -- you know, the Imperato

7  declaration, which was submitted, you know, just a couple of

8  weeks ago, is perhaps the most specific on what types of

9  youth-model firearms are there.  You know, then there's also

10  the -- the Smith & Wesson and the Ruger allegations there.

11          But, you know, again, none of them state that they

12  are currently selling youth-model firearms into the state of

13  Hawaii or that, you know, even these are the sort of firearms

14  that are regularly used in Hawaii, or that there's, you know,

15  some sort of request for access such that they might, you know,

16  reasonably foreseeably end up in the state of Hawaii.  And, you

17  know, without that nexus to Hawaii, that is just not a

18  sufficient allegation that has been made.

19          You know, one somewhat --

20          THE COURT:  And could I ask you there, are you aware

21  of any -- any enforcement action that any party has brought

22  under 426, to date?

23          MR. GERBER:  I am -- I am not, Your Honor.

24          THE COURT:  Okay.

25          MR. GERBER:  I don't think it's ever been enforced.

```
 1              THE COURT:  Okay.  Okay.  And I do agree.  I don't
 2   believe there's anything in the record about where the Henry
 3   Repeating firearms generally ended up or where they've been
 4   found or sold.  Is that your view of the record as well?
 5              MR. GERBER:  Yes.
 6              THE COURT:  Okay.
 7              MR. GERBER:  That is -- that is correct.
 8              THE COURT:  I want to make sure I'm understanding,
 9   though, because there are two separate issues with respect to
10   the Henry Repeating Arms/Imperato declarations.  On the one
11   hand the abnormally dangerous definition presumptively treats a
12   firearm as abnormally dangerous if it's marketed in a way that
13   is targeted to minors, correct?
14              MR. GERBER:  (Nods.)
15              THE COURT:  And then the second way --
16              Was that a "yes," sir, just for the record?
17              MR. GERBER:  I'm sorry.  I was just listening to Your
18   Honor.  I don't think that was a yes to that question
19   specifically but --
20              THE COURT:  Okay.  Are the two ways in which a fire
21   -- a youth-model firearm could be presumed abnormally dangerous
22   is -- are, one, if it's designed in a way that's targeted to
23   minors and, two, in a way that's marketed to minors?
24              MR. GERBER:  Yes, I think those are two sources of
25   evidence --
```

1              THE COURT:  Okay.

2              MR. GERBER:  -- that are pointed to for abnormally

3     dangerous firearms.

4              THE COURT:  Okay.  I think you've just mentioned a

5     moment ago the -- the youth models that Mr. Imperato describes

6     that are -- you know, they're designed for -- for youth to use,

7     correct?

8              MR. GERBER:  Yes, that is correct.

9              THE COURT:  And so your argument with respect to

10    those firearms is that the evidence doesn't show that they've

11    ended up in Hawaii or that they're sold in Hawaii and so forth.

12             MR. GERBER:  Yes, or -- or that there are any, you

13    know, circumstances where they're reasonably foreseeably ending

14    up in Hawaii.

15             THE COURT:  Okay.  And then your position as I

16    understand it, with respect to the marketing side of the

17    equation, is that the Attorney General has disavowed any

18    enforcement of that marketing provision for as long as Junior

19    Sports remains good law here in the Ninth Circuit; is that

20    correct?

21             MR. GERBER:  Yes, that -- that is correct, Your

22    Honor.  You know, just one other point I would like to make on

23    that.

24             You know, the Henry Repeating Arms declaration

25    specifically states that they do not market to youth, they only

1    market to adults.  You know, so I think on that question

2    specifically there -- there's just not, you know, evidence in

3    the record about that.

4            But, you know, I'm happy to more generally talk about

5    the disavowal of enforcement in light of the Junior Sports

6    decision, if that would --

7            THE COURT:  I think that would be helpful.  You heard

8    some of the arguments that Mr. Rowen made.  I do think there's

9    a procedural concern about the qualifications in the Attorney

10   General's disavowal.  And I would like to make sure that, to

11   the extent the Court takes that disavowal into consideration

12   deciding whether there's standing that -- that I actually

13   understand the scope of the disavowal and don't sort of credit

14   it beyond what the Attorney General actually intends.

15           So if you wouldn't mind making a clear record on what

16   exactly the Attorney General's disavowing there, that would be

17   helpful.

18           MR. GERBER:  Yes, Your Honor.

19           So, you know, for the -- the relevance of the Junior

20   Sports decision in that, you know, that is the binding law of

21   this circuit.  And the Attorney General will not take an

22   enforcement action, you know -- and, you know, I would say

23   until and unless the Supreme Court says that that is wrong, I

24   think that is how Your Honor phrased it before.  And, you know,

25   it -- I think, you know, we have to look at sort of the time

1    frame of when we're assessing standing.  And that time frame is
2    now.
3              You know -- you know, I think there would be many,
4    many, many hypothetical things that would come into play, you
5    know, that are pretty unlikely to happen in order for the
6    Supreme Court to take the case and to, you know, reverse and,
7    you know, say that there was a different interpretation of law.
8              You know, I think if that were to occur, the Attorney
9    General would, you know, confer and see if they were going to
10   change their position or not.
11             But, you know, for now I think we're -- we're quite
12   clear that we're not going to enforce that provision in light
13   of the Junior Sports decision.
14             THE COURT:  And so does that mean, for example, if
15   the Supreme Court were hypothetically to grant cert that in the
16   time period between when a cert is granted and when a decision
17   from the Supreme Court is issued, the Attorney General at least
18   as to that time period is preserving at least the discretion to
19   consider whether to bring an enforcement action?
20             MR. GERBER:  You know, I -- I don't think the
21   Attorney General would bring an enforcement action in that
22   time.  You know, I think we can, you know, disclaim enforcement
23   of that --
24             THE COURT:  Okay.
25             MR. GERBER:  -- that time frame as well.

1           You know, I think it's really if -- you know, if the
2    law were changed on this issue, you know, if there was a
3    pronouncement from the Supreme Court that the -- you know, the
4    Ninth Circuit panel was wrong, then we would revisit at that
5    time.  But, you know, I think, yes.
6           THE COURT:  You see the concern that Mr. Rowen is
7    describing, because to the extent that the Court were to take
8    into consideration a disavowal in evaluating whether there's a
9    credible threat for standing purposes, if the disavowal could
10   possibly actually disappear at some -- at some potentially
11   predictable date, sort of within the time period of a cert
12   petition, you know, that -- that at least somewhat lessens the
13   strength of the disavowal and maybe strengthens the standing
14   argument.
15          It -- you know, whether -- whether it, you know, tips
16   it over one way or the other is a separate question.  But I
17   think it's important to make that record clear.
18          MR. GERBER:  So, you know, I would like to make a
19   more general point on disavowals of enforcement before I go
20   into a few others, where I think, you know, we can disavow
21   enforcement.
22          You know, and I think, you know, the Ninth Circuit
23   law on this about disavowal of enforcement really needs to be
24   understood in context.  And, you know, the Ninth Circuit
25   applies the three-part test to determine whether it was a

1    credible threat of enforcement.

2        The first part of that test is whether there is a

3    concrete plan to violate the law.  The second part of that test

4    are specific warnings or threats.  And the third part of

5    that -- that test is, you know, enforcement history.  Which,

6    you know, they've said when there's, you know, a new law that

7    that's -- you know, that plays less a factor into it.

8        But, you know, it is the concrete plan and the --

9    that really then dictates whether a disavowal is meaningful.

10       So, you know, I would say in the ordinary course,

11   when someone states a course of conduct that they are currently

12   engaged in that is arguably proscribed by statute, the Attorney

13   General or the other enforcement official can take a look at

14   that concrete plan and they can say, yes, I am going to

15   enforce, you know, and a disavowal there is quite, you know,

16   meaningful.

17       But in the absence of the concrete plan, as, you

18   know, we don't have here, we do not have the conduct in the

19   record that NSSF members wish to engage in that's arguably

20   proscribed.

21       You know, it's really asking the Attorney General to

22   make, you know, disavowal of enforcement in a vacuum and to,

23   you know -- you know, have these issues decided without, you

24   know, knowing precisely what -- what is going to, you know,

25   happen there.

1          THE COURT:  And I can understand, Mr. Gerber, that

2     it -- you know, it puts the -- it would put the enforcer of a

3     statute in I think an unfair position to have to disavow all

4     sorts of things that maybe are very hypothetical, might depend

5     on certain circumstances and so forth.

6          But certainly when there is, and I think as you're

7     saying, some clear indication on the record that a -- that a

8     party or a plaintiff is possibly engaged in conduct that has

9     some constitutional significance, and where a statute could

10    possibly be ready as proscribing it, then -- then a disavowal

11    becomes quite important, right?  Would you agree with that?

12          MR. GERBER:  When -- when there is that concrete

13    plan, yes --

14          THE COURT:  Okay.

15          MR. GERBER:  -- then I think it is meaningful

16    evidence.

17          THE COURT:  With respect to Henry Repeating Arms,

18    maybe it's a separate issue whether any of those firearms have

19    ended up in Hawaii with sufficient regularity to create a risk

20    that there would be a reasonable foreseeability.

21          But putting that issue to the side, you've seen

22    Mr. Imperato's declaration.  He identifies what I believe he

23    describes as some of Henry Repeating Arms' most popular rifles

24    and other firearms that are used for hunting and sport and so

25    forth.

1          If I'm understanding Judge Schopler's opinion in the

2     Southern District of California correctly, it was on the -- the

3     sale aspects of youth models that he found that there was

4     standing.

5          And I believe it was because the Attorney General of

6     California in that case disavowed enforcement as to marketing

7     but did not disavow enforcement as to sales.

8          Is it fair to say that that's the Attorney General's

9     position here as well?

10    MR. GERBER:  Well, it -- you know, it's a similar

11    position, I think, to the Attorney General of California that

12    was taken.

13         You know, I will note that there is, you know, a

14    difference in the California and Hawaii law on this point.

15         You know, and in particular when you look at the

16    Hawaii reasonable -- abnormally dangerous provision, you know,

17    that requires someone to take reasonable precautions to

18    prevent.  You know, and I think without having that second fact

19    of whether they are actually sold into Hawaii or, you know,

20    regularly used into Hawaii, you know, again, we don't really

21    have enough in the record right now to make a determination

22    about enforcement, you know, for Henry Repeating Arms or -- or,

23    you know, Smith & Wesson or Ruger or any of the other NSSF

24    members, you know, on that, on that specifically.

25         You know, and -- and just, you know, another point

1   that was raised in Mr. Rowen's argument, and I think this was

2   raised in the reply brief as well, is, you know, they said that

3   they manufacture assault pistols, which are already, you know,

4   unlawful in Hawaii.  And I think, you know, again, this really

5   illustrates the point, right?  These are already unlawful in

6   Hawaii.  And unless we know that the firearm industry member is

7   not taking reasonable precautions to prevent them from ending

8   up in Hawaii, you know, again there's -- there's nothing to,

9   you know, disavow there, right?  It -- it's -- you know, I

10  think it needs to be read as a whole and not just sort of

11  isolated and segmented.

12          THE COURT:  I understand.

13          Do you recall the portion of Mr. Rowen's argument

14  where he referenced a part of Ms. Capero's declaration that

15  describes certain features of a firearm?  And I believe his

16  position was that the Attorney General believes that those

17  features are unlawful or abnormally dangerous.

18          Do you recall that part of Mr. Rowen's argument?  And

19  if so, do you have a position on that?

20          MR. GERBER:  Yes, I do.  I think he was specifically

21  referring to, you know, assault rifles in -- in that context,

22  which are not currently, you know, unlawful in Hawaii.

23          And, you know, it is the Attorney General's position

24  that that assaultive purposes, you know, presumption in the

25  abnormally dangerous provision is limited to unlawful arms.

1        You know, and if you look at the tail clause of -- of

2   that, you know, it doesn't apply to, you know, lawful recrea --

3   or legitimate recreational purposes or sports shooting, I think

4   is what it says.

5        So, you know, that, you know, that's how we get to

6   that, you know, as a textual matter.  So, you know, no, it

7   is -- you know, it's not the case that those would be

8   abnormally dangerous under -- under this act.

9        THE COURT:  And would you also agree then, in light

10  of that, in light of the distinction that's drawn in paragraph

11  (d)(1) between firearms that are most suitable for assaultive

12  purposes and then contrast with firearms for lawful

13  self-defense, hunting, or other legitimate sport, so forth, in

14  light of that, in paragraph (d)(1), would you agree that the --

15  those popular rifles that are sold by Henry Repeating Arms

16  would not be considered abnormally dangerous, which are

17  described as for hunting and sport and so forth?

18       MR. GERBER:  Yes.  If they were otherwise, you know,

19  lawful in Hawaii, under that particular provision, yes.

20       THE COURT:  Okay.  Okay, you can continue.

21       MR. GERBER:  You know, obviously, you know, the youth

22  model and other, you know, portions come into play as well.

23       THE COURT:  There's the youth-model issue.  I

24  understand.  I understand that part.

25       MR. GERBER:  Okay.  I just wanted to be clear on that

1    point.

2          So, you know, another, you know, just point more

3    generally on -- on the -- you know, the disavowal of

4    enforcement and how this relates to the concrete plan, you

5    know, I think really if you take this to its logical

6    conclusion, a plaintiff could come into court without a

7    concrete plan to violate the law, without anything, and

8    manufacture Article III jurisdiction, you know, simply by

9    asking the Attorney General in litigation to state whether or

10   not, you know, she is going to enforce the law in -- in a

11   number of, you know, specific ways that may or may not, you

12   know, be realistic, you know, or likely to happen.

13         And that's, you know, simply not what the law is on

14   this credible threat of enforcement; where, you know, again,

15   we're talking about whether harm is imminent and whether, you

16   know, there is going to be some -- an enforcement action that

17   is imminently going to take place.

18         So there are, you know, just a couple of other points

19   that I wanted to mention where we can, you know, make

20   disavowals of enforcement on, you know, the sort of scant

21   record in front of us.

22         You know, one of them is in its reply brief NSSF

23   talks about the scope of the injunction if it were to be issued

24   for the Protection of Lawful Commerce in Arms Act.  And it says

25   all that we want, you know, is an injunction prohibiting the

1   Attorney General from bringing a qualified civil liability

2   action against NSSF.

3          Now, a qualified civil liability action is a

4   case-specific inquiry.  It has, you know, six exceptions in

5   that.  You know, I think it, you know, is going to determine on

6   each individual case whether it is.  But the Attorney General,

7   you know, can disclaim enforcement of this law.  To the extent

8   that PLCAA applies, the Attorney General will not bring an

9   action that she believes fits into qualified civil liability

10  action.

11         You know, these two laws need to be read in harmony

12  with one another.  So, you know, that's just another point.  I

13  think there's not really disagreement there.

14         You know, I don't think that that entitles NSSF to an

15  injunction that would then, you know, put the Attorney General

16  at the peril of contempt sanctions in perpetuity, you know, if

17  she were to bring something that she believed was not a

18  qualified civil liability action and the Court later would

19  determine something different.  You know --

20         THE COURT:  I suppose, Mr. Gerber, what you would

21  also say is that there's no evidence in the record suggesting

22  that the Attorney General has any history of bringing lawsuits

23  that are not -- that are sort of clearly unfounded in those

24  senses.

25         MR. GERBER:  That is -- that is correct, Your Honor.

1    And the Attorney General is duty bound to abide by the law,

2    which includes federal law, of course.

3            You know, an injunction of this nature, you know,

4    this sort of obey the law injunction, you know, probably would

5    not meet the specificity requirements of Rule 65(d); you know,

6    again, because the inquiry into whether something is a

7    qualified civil liability action is going to be fact and

8    case-specific.

9            So, you know, and then one other -- one other point

10   that, you know, I wanted to make, that has been brought up in

11   briefing and in various different points.  The enforcement

12   mechanism, again, is important for Act 28.  You know,

13   enforcement is not a rubber stamp.  And when you have an

14   enforcement mechanism that you have to come into court and you

15   have to, you know, plead your case and prove it, you know,

16   other principles come into play, such as personal jurisdiction

17   and, you know, choice of law principles, you know, in

18   certain -- in certain contexts.

19           You know, and the Attorney General can say that, you

20   know, again, she is going to comply with federal law and that

21   the Attorney General is not going to bring an action that she

22   does not believe there is personal jurisdiction over the

23   defendant.

24           You know, again, so some of these, you know,

25   far-flung hypotheticals about, you know, an Ohio plant, you

 1    know, making a gun and then it, you know, accidentally ending

 2    up in the state of Hawaii, you know, those -- those just simply

 3    wouldn't lead to liability.

 4            THE COURT:  I do want to make sure that I have a

 5    clear record on that.  Because, you know, so, for example,

 6    Judge Schopler identified a hypothetical.  If I have it correct

 7    here, it's a Tennessee manufacturer who makes an abnormally

 8    dangerous product or product that's considered abnormally

 9    dangerous by the relevant enforcement authority.  It gets

10    shipped to Arizona.  It's stolen, brought to California.

11            And I guess the question is, Judge Schopler thought

12    that it was arguable that that would fall within the reasonably

13    foreseeable provision, I suppose.  Is what you're saying that

14    under similar circumstances -- let's imagine that there's a

15    Tennessee manufacturer, makes what the Hawaii Attorney

16    General -- just stipulate for the moment -- considers an

17    abnormally dangerous product.  It gets shipped to Arizona.

18    From Arizona it gets stolen.  It gets brought somehow, plane,

19    boat, you name it, here, here to Hawaii.

20            If those are the facts, there's nothing else, would

21    the Attorney General believe that there's personal jurisdiction

22    over those sorts of facts?

23            MR. GERBER:  No, I do not believe there'd be personal

24    jurisdiction in Hawaii in that case.

25            And, you know, again, I think Your Honor's reference

1   to a boat or a plane, you know, I think that's -- you know,

2   it's emphasized even more.  Hawaii does not have a neighbor

3   like Arizona to California, and it would be even more, you

4   know, difficult to bring that gun from, you know, from the

5   mainland or, you know, from Alaska to -- to Hawaii.

6          So, you know, I think that there wouldn't be personal

7   jurisdiction in that case.

8          THE COURT:  Is it fair to say that the Attorney

9   General in considering whether the presence of a firearm in

10  Hawaii is reasonably foreseeable would take into consideration

11  the fact that, for example, you know, California and New York,

12  for example, are fairly large markets; a seller in Arizona

13  maybe has a higher likelihood of knowing that firearms could

14  end up there; and that Hawaii's different; are those facts that

15  you're saying the Attorney General would be taking into

16  consideration in enforcement actions?

17         MR. GERBER:  Yes, that is correct, Your Honor.

18         And I think, you know, as you noted, it's a matter of

19  the reasonably foreseeable prong in firearm-related products

20  and also just a matter of personal jurisdiction jurisprudence.

21         You know, and again if someone comes in and, you

22  know, steals that product and then, you know, takes it to

23  Hawaii, it's hard to see how there would be personal

24  jurisdiction over, you know, the manufacturer that initially

25  sold that gun, you know, on the facts that are stipulated in

1   that hypothetical.

2         And, you know, I think unless Your Honor has specific

3   questions on the enforcement part, I would like to move to, you

4   know, the last -- the last part of my argument.

5         You know, again, here, and this has come into play a

6   lot, you know, in -- in our colloquy, I think this is really a

7   hypothetical dispute.  You know, we do not have the facts on

8   the ground here, where, you know, NSSF is claiming that they

9   are doing something and there is going to be imminent harm to

10  them.

11        You know, instead, they have to come up and posit

12  these hypotheticals, you know, which are not based on real-

13  world facts.  And I think this goes to both standing and

14  ripeness, you know, in the constitutional and prudential

15  component of ripeness; that in order for them to try and get

16  into an Article III court, they need to manufacture these

17  issues, when they're not issues that they have presented any

18  evidence or actually existent today or are, you know,

19  imminently going to happen in the future, as required by the

20  Driehaus case.

21        THE COURT:  To what extent do you think the beginning

22  of a response to that argument, at least, is what I believe

23  Mr. Rowen will say when he gets back up; which is that part of

24  the reason why they believe they have standing here is because

25  of how broad some of the provisions in the statute are, which

1  is to say, you know, if you have a -- if you have a narrowly

2  tailored statute, it's clearly going to regulate a certain

3  amount of conduct.  And then if a party is trying to speculate

4  about hypotheticals, it's probably harder to do that.

5          But not saying it's the case here.  But if you have a

6  statute that has some provisions that are quite broad and just

7  on their face, then there's a -- there's a larger universe of

8  potential conduct that could be covered, right?  And so a

9  regulated party would say that that's where their concern is

10  coming from.

11          What's your response to that, both as a general

12  matter and as to whether it fairly applies to this provision

13  here?

14          MR. GERBER:  Well, two responses to that, Your Honor.

15          You know, first, I think it's useful to look at the

16  standing analysis in the Isaacson case, which is a Ninth

17  Circuit case that, you know, was cited in both the California

18  and Washington District Court opinion there.  And that was a

19  vagueness challenge.  And, you know, the -- the -- that was to,

20  you know, an abortion law; and abortion providers came into

21  court, and they stated specifically what their conduct was

22  before the law and also how they changed their conduct after

23  the law.

24          You know, they said, you know, this is quite broad,

25  and we're not sure how it's going to apply.  But it was still,

1  you know, that conduct changed, which was the present injury

2  there.  You know, and also the credible threat of enforcement

3  came through, you know, specific warnings and threats when the

4  court -- when the Ninth Circuit went through the imminent

5  injury analysis.

6          So I think, you know, looking at -- at that sort of

7  analysis is useful, and it's a useful counterpoint to what we

8  have here, which is, you know, really them just saying it's,

9  you know -- we're not exactly sure what it means; therefore we

10 have standing.  I think you need more than just -- than just

11 that.

12         You know, and again, I think that would apply in sort

13 of, you know, any -- any regulated industry with a new statute,

14 that they could, you know, come up with ways in which it could

15 be applied or, you know, here, oftentimes misapplied, you know,

16 that seems to be a concern of theirs, that this is going to be

17 misapplied against their members.  But there needs to be

18 something more than just that for Article III standing.

19         THE COURT:  I appreciate that.  I believe,

20 Mr. Gerber, you also mentioned that you'd be discussing

21 preemption.  I assume you're talking about the PLCAA there.

22         MR. GERBER:  Yes, Your Honor.  I think I -- unless

23 the Court had some questions on that, since it wasn't addressed

24 in Mr. Rowen's argument, if there's something specific you'd

25 like to hear, I'm happy to address any of those issues.

1        THE COURT:  I -- I don't -- I don't think so.  I

2   think that issue was fairly well briefed.

3        MR. GERBER:  Okay.

4        THE COURT:  So if you have nothing else you'd like to

5   bring up, bring up on, that's -- I think we'll turn to

6   Ms. Lefkowitz.

7        MR. GERBER:  Thank you, Your Honor.

8        THE COURT:  Would you like to -- I'm happy to go

9   through the process.  This may actually work better, Mr. Rowen,

10  if you'd like to come up and rebut.  And then we can just do

11  two rebuttals.

12       MS. LEFKOWITZ:  My -- my only concern is that I think

13  there's some intersection between the dormant commerce clause

14  and standing.

15       THE COURT:  And standing.  I -- I almost had -- I

16  almost wanted to ask you some questions while there was -- to

17  be candid.  So it might make sense just to finish the rebuttal,

18  if you're okay with that, and then you can have the last word.

19       MR. ROWEN:  Sure.  Whatever Your Honor Wants.

20       THE COURT:  Or if there's a specific point you'd like

21  to make, I'm happy to hear it now.

22       MR. ROWEN:  Yeah.  So --

23       So Mr. Gerber took litigating positions that I want

24  to know if the Attorney General's willing to put on the

25  record --

1          THE COURT:  Sure.  That's a fair --

2          MR. ROWEN:  -- in writing.

3          THE COURT:  That's a fair -- that's a fair question.

4          MR. ROWEN:  So Mr. Gerber said that they believe that

5    the abnormally dangerous provision is, quote, limited to

6    unlawful arms, despite the fact that the definition is very

7    different.

8          THE COURT:  I -- I believe my understanding there --

9    and this may have been my fault in just kind of the way I was

10   asking questions.  But I believe that was specifically -- go

11   back to it -- a reference to assaultive purposes.

12         MR. ROWEN:  So -- but I just want to be clear.

13         So is -- you know, is the Attorney General willing to

14   enter into a consent decree that semi-automatic rifles with

15   detachable magazines, the most popular rifle in the country,

16   which are lawful in Hawaii, do not fall within that provision?

17   Because that -- that's what he said.  And so either they can

18   take that position or then what he said is essentially

19   meaningless.

20         THE COURT:  I -- I don't know if it's meaningless so

21   much as it carries a little less significance, right?  Because

22   I think if the -- the question is a predictive one to some

23   extent, right?  What is the Attorney General going to do in

24   light of a statute like this and in light of the behavior and

25   conduct in businesses of NSSF's members.

1        And the question is, is there -- you know, is there a

2    serious threat of enforcement.

3        It's certainly true that if the Attorney General were

4    willing to sort of sign a stipulation and so forth, that that

5    would be very significant.  But I'm not sure that it's

6    insignificant that attorneys who're representing the Attorney

7    General as officers of the court are -- are stating that the

8    Attorney General would not take certain positions if you see

9    what I mean.

10       MR. ROWEN:  No, I understand that, Your Honor.  I

11   just want it to be clear on what their position is.

12       THE COURT:  That, I understand.  That, I understand.

13   Right.

14       MR. ROWEN:  And so, you know, I -- if they want to

15   put it in writing with consultation, I think that -- you know,

16   with the actual Attorney General's office, because I understand

17   the limits for what Mr. Gerber can say without consultation.  I

18   mean I think that would be appropriate because I do think that

19   would change the standing analysis, not -- maybe not

20   dispositively, but -- and this may bleed into what

21   Ms. Lefkowitz is going to talk about.

22       But I didn't hear Mr. Gerber disavow their view -- or

23   our view and our fear that out-of-state selling and

24   out-of-state marketing and out-of-state manufacturing can be

25   the basis of a suit under this statute.

1           THE COURT:  I -- so here's -- here's what I

2    understand, and then I can quickly turn to Mr. Gerber.  I do

3    appreciate your raising it, because you want to make sure that

4    there's a clear record on -- on disavowals, especially if the

5    Court's going to take them into consideration in deciding

6    whether there's standing.

7           So that the first is about the scope of the

8    abnormally dangerous provision and in particular with whether

9    the Attorney General is disavowing or just predicting it's

10   unlikely -- there's a big difference between those two -- that

11   an enforcement action would be brought against, say, an AR-15

12   or other firearms that are not currently unlawful under Hawaii

13   law.  So that's part of it.

14          And the second part of it I think is -- why don't you

15   remind me what the second part of your problem is.

16          MR. ROWEN:  The second part of it is are they taking

17   the position that out-of-state selling --

18          THE COURT:  Yes, okay.

19          MR. ROWEN:  -- out-of-state manufacturing,

20   out-of-state marketing cannot be a violation, or are they just

21   taking a position that they're not going to bring suit where

22   they don't have jurisdiction.

23          THE COURT:  Yes.  Thank you.

24          It does seem to me -- although I'll ask Mr. Gerber to

25   come back up and confirm it.  It does seem to me that the

1  position he was taking, at least as to the latter, was -- was

2  fairly definitive.  Not so much as an interpretation of the

3  statute but just as a position about personal jurisdiction.

4        MR. ROWEN:  Right.  I think --

5        THE COURT:  And so --

6        MR. ROWEN:  I heard him say two different things, and

7  that's why I sort of felt like jumping up.

8        THE COURT:  I understand.  And I appreciate that.  I

9  appreciate that, Mr. Rowen.

10       Mr. Gerber, so the two questions -- and if you need

11  any additional time to confer, I invite it.  It was clear to me

12  based on how Mr. Gerber handled the earlier question I had

13  about disavowals that he's been very careful about the rep --

14  the nature of his representation.  He's not going to make a

15  disavowal unless it's coming from the Attorney General.  I

16  think the record clearly supports that.

17       But I do think it is also important to make a clear

18  record about what those disavowals are.

19       So both in terms of the scope of abnormally dangerous

20  weapons and whether that covers or potentially covers weapons

21  that are not currently otherwise unlawful under Hawaii law and

22  then, second, whether Judge Schopler's hypothetical of a

23  firearm that gets stolen and it gets brought by anyone else to

24  Hawaii, whether the Attorney General would ever take the

25  position that there's personal jurisdiction there without some

1    other material set of facts.

2            I'm happy to turn Mr. Gerber and ask those two

3    questions.  Mr. Rowen, does that accurately capture -- I'm

4    sorry.  I'll slow down.

5            Does that accurately capture the questions that you'd

6    like further clarification about?

7            MR. ROWEN:  So on the -- the first one, yes.  On the

8    second one, the only sort of quibble that I would have is the

9    premise of that question assumes that it is the Attorney

10   General's view that out-of-state selling, out-of-state

11   manufacturing, and out-of-state marketing can be the basis of a

12   violation of the suit provided that there is jurisdiction.

13           So that is the question that I -- I'm sort of most

14   interested in rather than any particular hypothetical.

15           THE COURT:  I -- I understand that.  And I will

16   say -- and Mr. Rowen, I'm happy to turn to Mr. Gerber now.

17           But in considering the standing question as opposed

18   to whether we were, for example, at, you know, state court

19   trying to actually interpret the statute, in interpreting the

20   standing question, I think the question is whether the Attorney

21   General would bring an enforcement action under certain types

22   of circumstances.

23           And so it may well be that what the Attorney

24   General's had a full chance to discuss and consider carefully

25   before taking a position in court really is just about personal

1    jurisdiction.

2            We'll make a clear record about that if that is what

3    it is, and that'll be the extent of it.  To the extent that the

4    Attorney General's prepared to take a broader position on the

5    reasonably foreseeable language as an interpretation of the

6    statute, I'm happy to turn to that as well.  So Mr. --

7            MR. ROWEN:  Thank you, Your Honor.  And I apologize

8    for sort of intervening.

9            THE COURT:  No, not at all.  I appreciate your

10   raising the issue, and I think it'll help make a clear record

11   on what's being conceded and what's not.  So thank you.

12           MR. ROWEN:  Thank you, Your Honor.

13           THE COURT:  Mr. Gerber.

14           MR. GERBER:  Your Honor, if we may just have a moment

15   to confer.

16           THE COURT:  Of course.  Of course.

17           Do you think it'll be a long enough -- I don't want

18   to sort of do the ceremony of leaving and coming back if it's

19   not necessary.  I'm happy to just hang out here for as long as

20   you need if you think it'll be a relatively quick conferral.

21           MR. GERBER:  I think it will be very quick.

22           THE COURT:  Okay.

23           MR. GERBER:  (Confers off the record.)

24           MS. LEFKOWITZ:  Good morning, Your Honor -- or good

25   afternoon, Your Honor.  I'm not sure.

1          THE COURT:  Good afternoon.

2          MS. LEFKOWITZ:  Alla Lefkowitz for the Attorney

3    General.

4          I -- I figured I would answer Mr. Rowen's question,

5    given I think that they bleed a little bit into the dormant

6    commerce clause.

7          So on the first question with regard to the

8    interpretation of assaultive purposes prong, the position of

9    the Attorney General is that that prong is coextensive with

10   firearms that are otherwise illegal, either in Hawaii or

11   nationwide; or if, for example, something becomes illegal at a

12   later date, then it would be at that time coextensive with that

13   firearm but only in that case.  So I hope that clarifies the

14   record on that.

15         THE COURT:  I think it does.  I see Mr. Rowen

16   nodding.

17         MR. ROWEN:  Yes, for the record.

18         THE COURT:  That probably -- thank you.  That

19   probably comes to some relief, brings maybe some relief to you

20   for your clients.  Maybe not complete relief.  No pun intended.

21         But what about the second issue?

22         MS. LEFKOWITZ:  Then with regard to the second issue,

23   the position of the Attorney General is that she will not be

24   bringing enforcement action where she believes she does not

25   have personal jurisdiction.

1            I don't believe -- the second portion of the question

2    that Mr. Rowen was asking does not follow from the lack of

3    personal jurisdiction.  There can, of course, be out-of-state

4    marketing or out-of-state sales that is directed out of state.

5    But the Attorney General will not be bringing enforcement

6    actions where she doesn't believe that she has personal

7    jurisdiction over a particular entity.

8            THE COURT:  I do see how this bleeds into the

9    dormant --

10           MS. LEFKOWITZ:  Right.

11           THE COURT:  -- commerce clause.

12           MS. LEFKOWITZ:  Right.

13           THE COURT:  So I appreciate your handling that so we

14   can jump right into that now.

15           It is 12:00 o'clock, so my proposal would be that we

16   touch -- take on this issue for maybe ten more minutes.

17           MS. LEFKOWITZ:  Sure.

18           THE COURT:  And then we'll take a -- we'll take a

19   lunch break and come back and finish up arguments.

20           But I understand the Attorney General to essentially

21   concede, or at least take the position, that a state's

22   legislative authority as to matters that are occurring outside

23   of the state is roughly coextensive with the scope of personal

24   jurisdiction; is that correct?

25           MS. LEFKOWITZ:  It is.  And I think that's what

1  actually Edgar says, that those two really are coextensive.

2  And I -- so I think it is important vis-a-vis the questions

3  that the Court had and Mr. Rowen had about what exactly the

4  Act 28 actually says and what exactly it does.

5         So primarily, Act 28 is a law that was passed to

6  protect the health and safety of Hawaiians.  And I think that's

7  really important because it shows that it really is targeted at

8  firearm products that are directed at Hawaii.

9         It only applies to firearm products that are in fact

10  directed into Hawaii.  And it can only be enforced by

11  individuals who are harmed by those products in Hawaii or by

12  the Attorney General or other government official to remedy

13  that exact same harm.

14         THE COURT:  And I think you're about to touch on

15  this, but what I just want to make sure that I'm training your

16  arguments on is how -- to how well does that square with the

17  paragraph that refers to and extends the scope of firearm-

18  related product to firearms that are possessed here where it's

19  reasonably foreseeable that they would be here.

20         MS. LEFKOWITZ:  Absolutely.  And I do agree that

21  under Ross that -- that prong is the closer call.  I think --

22  under National Pork Producers the first two prongs to me seem

23  clearly permit -- permissible.

24         The reasonably foreseeable prong I think is also

25  permissible under the dormant commerce clause.  And I just --

1    to address your maybe earlier question from yesterday, I do

2    also think it's -- I mean it is clearly severable from the --

3    from the act.  The act itself says that provisions that are

4    found to be unconstitutional are -- are severable, so just to

5    address that question that I note the Court had.

6         THE COURT:  And, actually since we're on that topic,

7    not to interrupt the flow of your argument, but I know

8    Mr. Rowen made the argument that it would require a substantial

9    amount of rewriting of the statute to accomplish that, which --

10   which, of course, is not the sort of thing that a court should

11   lightly entertain.

12        But would the Attorney General have any concern --

13   well, I understand the Attorney General would not want any part

14   of the statute --

15        MS. LEFKOWITZ:  Right.

16        THE COURT:  -- to be enjoined.

17        But if the Court's conclusion were that that

18   particular provision, focusing on firearms possessed here,

19   where it's reasonably foreseeable that they'd arrived here.  So

20   it's not sort of the more active engagement with the State of

21   Hawaii that sales or intended sales, I think, pertain to.  But

22   it's sort of is it reasonably foreseeable to a manufacturer or

23   seller of a firearm that the firearm could end up here.

24        As to that provision, we can talk about the --

25   whether that's a fair interpretation of the provision.  I think

 1    you're about to touch on that, if I'm not mistaken.  I'd like

 2    to hear argument about it.  But assume for the moment that the

 3    Court were to conclude that that part of the statute should be

 4    enjoined.

 5            Is there any reason why the Court couldn't simply

 6    enjoin that aspect of the definition and leave the rest of the

 7    statute alone?

 8            MS. LEFKOWITZ:  No, I think your -- the Court

 9    could -- could issue that kind of injunction just for that

10    particular -- the reasonably foreseeable prong.

11            I -- you know, looking at it, just the standard --

12    the -- kind of the -- the general rule for whether something

13    can be severed is whether grammatically the law would still

14    make sense.

15            THE COURT:  Right.

16            MS. LEFKOWITZ:  And I think, looking at the law here,

17    you know, this is a separate prong in and of itself, so I don't

18    see any problem.  And there's no reason to think that the

19    Hawaii legislature wouldn't have passed this without -- without

20    this particular -- the entire law without that prong.  So I do

21    think that test is met.

22            And, you know, getting back to -- to -- to exactly

23    what conduct is being regulated by this particular prong, it --

24    the law does not apply to any out-of-state gun company that

25    is -- that does not direct the sale of a firearm product into

1  Hawaii when somehow, through some third-party action that is

2  unbeknownst and/or unplanned by the company, the firearm ends

3  up in Hawaii.

4      And I think the faulty premise in NSSF's argument is

5  that once a firearm leaves a manufacturer that it has no idea

6  what happens to it.  You know, for example, Glock or Smith &

7  Wesson or Ruger just put firearms out there, and lo and behold,

8  it somehow ends up in Hawaii with no planning by the firearms

9  manufacturer.  And I just -- that's not the reality of the

10  firearms industry.  And there's no evidence in the record that

11  that is actually how the firearm industry -- how the firearm

12  industry works and -- the Gundlach, Gregory Gundlach

13  declaration that we submitted actually goes into detail about

14  how firearms manufacturers enter into contracts with retailers

15  directly to manage how firearms are sold, to set all sort of

16  rules for how those firearms are sold.

17      So this idea that a firearm, you know, Glock or some

18  other national manufacturer, just puts a gun out there and then

19  it has no control over what happens to the firearm, it's just a

20  faulty premise.

21      THE COURT:  I -- there may not be evidence in the

22  record to support this, but I think one of the hypotheticals --

23  just give me a second here.  I want to make sure I know where

24  this one came from.

25      But there was a hypothetical that I believe NSSF

1   suggested, that was in sum and substance -- and I can't recall

2   which briefs, but I think I -- Ohio manufacturer.

3           MS. LEFKOWITZ:  Right.

4           THE COURT:  Or Ohio retailer of a firearm.  And so

5   it's not just that you have no idea what happens to the

6   firearm; it's instead that a retailer selling a firearm that is

7   hypothetically speaking lawful in Ohio, unlawful in Hawaii, and

8   let's say that the retailer either doesn't know that or maybe

9   doesn't care because they don't sell firearms in Hawaii, or

10  they don't intend to.

11          And then that Ohio retailer is selling a firearm to

12  an individual who makes comments during the sale about how

13  they're moving to Hawaii.

14          Why wouldn't that, just in terms of the language of

15  the statute, be an instance of a firearm being possessed in

16  Hawaii in a way that's reasonably foreseeable?  Do you see what

17  I mean?

18          MS. LEFKOWITZ:  I think that's certainly the closest

19  call.  I mean, the -- certainly the manufacturer in that

20  particular case, there would be no implication that at the time

21  the manufacturer directed the firearm to the -- to the retailer

22  that that was going to go to Hawaii.

23          Not knowing anything else about that particular

24  hypothetical, if that individual said that he was essentially

25  about to move to Hawaii the next day and planning on taking

1    that firearm, I do in fact think that it's reasonably

2    foreseeable, and in that case the retailer is directing the --

3    you know, the firearm into Hawaii.

4         THE COURT:  Would you say, though, that there's a

5    personal jurisdiction here in Hawaii in a situation like that?

6         MS. LEFKOWITZ:  You know, I think the personal

7    jurisdiction there is -- is difficult.  Or is complicated.  You

8    know, there are -- there is some case law, for example, from

9    the New York Court of Appeals, that if a customer happens to

10   come to a store and it's -- you know, that store isn't

11   generally selling into Hawaii, but the customer just happens to

12   be in California, for example, that that would not be -- there

13   would not be personal jurisdiction.

14        If -- and I'll give you -- and I can give you a

15   more -- a maybe -- on the other side of the spectrum example.

16        There are certain firearm retailers, for example --

17   and I don't know to the extent that this applies in Hawaii --

18   that are located right over the border of a particular state.

19        And where that particular retailer --

20        THE COURT:  That would be hard here.

21        MS. LEFKOWITZ:  What?  Yeah.  Exact -- which is I

22   guess why it's, you know, difficult to -- to discuss

23   hypotheticals.

24        But where the retailer -- I'm so sorry.

25        THE COURT:  We both need to slow down.

1          MS. LEFKOWITZ:  I speak very -- yeah.

2          Where the retailer in one state that is right over

3     the border, for example, from Arizona to California, keeps

4     selling to someone who they have reason to believe is bringing

5     them into California because, for example, the police have come

6     there and said, hey, like, your -- your guns keep ending up in

7     California, I do think that that is exact -- that that is

8     exactly the kind of conduct that would be covered by the

9     reasonably foreseeable prong, and also would -- there would be

10    personal jurisdiction in that kind of case.

11         I also do think --

12         THE COURT:  I assume that even in those factual

13    hypothetical circumstances there would be a question about

14    whether there's anything the retailer or manufacturer

15    reasonably could do, right?  To avoid the problem.

16         MS. LEFKOWITZ:  Absolutely.  And I do think that's a

17    pretty important difference between the California law and the

18    Hawaii law.  Like, the abnormally dangerous provision of the

19    Hawaii law only asks -- or only requires that that retailer

20    take reasonable precautions.

21         And that I think Your Honor mentions earlier the idea

22    of, you know, what if someone just doesn't care where their

23    firearms end up.

24         And again, I do think the declaration of Gregory

25    Gundlach makes clear that manufacturers and distributors do

1   care where their firearms end up, that they're not just putting

2   them out there.  But to the extent they take the view, for

3   example, which I think is very likely, a manufacturer has a

4   regional distributor and that regional distributor, you know,

5   only -- and there's actually quite a few personal jurisdiction

6   cases on this -- only distributes firearms to California,

7   Hawaii, and Alaska; and the distributor and the manufacturer

8   kind of adopt this head-in-the-sand approach and says, well, I

9   don't -- it doesn't matter to me whether they end up in

10  California.

11              That, I do think, would, you know -- would violate

12  Act 28 because they are not taking reasonable precautions, even

13  though they have reason to believe that those firearms are

14  going to end up in Hawaii.  And in fact, of course, they have

15  to end up in Hawaii and then they have to actually cause harm

16  in Hawaii.

17              THE COURT:  Okay.

18              MS. LEFKOWITZ:  And I do -- I do think it's important

19  to also note that the abnormally dangerous provision also has

20  an additional jurisdictional hook on top of all of this.

21              And that is it -- you know, for -- and I just want to

22  make sure I have this pulled up.  Take reasonable precautions

23  to the -- to ensure that the firearm industry member -- again,

24  someone who's already engaged in the sale or marketing of -- of

25  Hawaii-directed product -- does not sell or distribute it to a

1   downstream distributor, a firearm related product that is

2   abnormally dangerous --

3           I'm sorry -- and likely to create an unreasonable

4   risk of harm to public health and safety in the state.

5           So there, when you're -- especially when you're

6   interpreting the abnormally dangerous provision, it is not only

7   that the firearm has to be -- has to end up in Hawaii; it has

8   to be reasonably foreseeable that it ended up in Hawaii, but

9   also -- but also that it was likely to create an unreasonable

10  risk of harm in the state.

11          Those three jurisdictional hooks, I -- the Attorney

12  General submits, are more than enough to meet the -- the test

13  of -- of National Pork Producers v. Ross, and I think is very

14  different from what is in Footnote 1 to that decision.

15          THE COURT:  So it seems basically the distinction

16  you're drawing, and I appreciate your distinguishing between

17  these two situations carefully, is a situation on the one hand

18  where there might be personal jurisdiction and the statute

19  might apply because there's sufficient evidence to show that a

20  retailer or manufacturer actually sort of knows that their

21  conduct is -- the natural or probable consequences --

22          MS. LEFKOWITZ:  Right.

23          THE COURT:  -- of their conduct is that these

24  firearms are ending up here may be sufficient to infer that

25  they intended on some level for that to be the case versus, on

1    the other hand, hypotheticals like Judge Schopler's

2    hypothetical, where a firearm is stolen, or it's sold to

3    someone who behaves in a way that's not what the manufacturer

4    intended or expected, or something like that.

5             MS. LEFKOWITZ:  Absolutely.

6             THE COURT:  Right.

7             MS. LEFKOWITZ:  I think that's probably where the

8    biggest disconnect is between the parties and frank -- and the

9    Attorney General's disagreement with the Bonta decision.

10            It seems to assume that a firearm that ends up in

11   California or Hawaii by some, you know, convoluted -- not

12   planned approach, that that would result in liability under

13   Act 28.  And what Act 28 actually says is that at the time of

14   the actual transaction at issue there has to be an expectation

15   or an intent to sell the -- to have the product come up and

16   it end up in Hawaii.

17            And I know -- and I know -- I think we were going to

18   take a break.  I wanted to mention just one more case that I

19   thought was -- that I thought was helpful to me to at least

20   understand this.

21            This is a case that Mr. Rowen mentioned, the

22   Association of Accessible Medicines v. Ellison that -- recently

23   from the District of Minnesota.  And that's a case, I believe,

24   related to generic drugs that were -- regulated generic drugs

25   and how they were sold in the state of Minnesota.

1        And the court there found the law to be -- to violate

2    the dormant commerce clause even after Ross.  And -- but there

3    the court says:  The state indicated that the act imposes

4    liability on manufacturers whose drugs wind up in Minnesota

5    even if the manufacturer has done everything in its power to

6    prevent its drugs from being resold in Minnesota.

7        That's just not this -- this case.  And I think

8    that is -- it's not this law, and I think that was really what

9    distinguishes the -- these two cases here.

10        THE COURT:  Okay.  I appreciate that.  I do want to

11    ask -- I now want to ask one final question.  And I -- we may

12    have touched on this to some extent, but I just want to make

13    sure that the record's clear since we're on this topic.

14        The -- the definition of firearm-related product,

15    Mr. Rowen raised the concern -- and I -- you know, he makes a

16    statutory interpretation argument that when you look at those

17    three provisions, the item is sold, made, or distributed in

18    Hawaii, number one, the item -- the item, it's sort of passive

19    voice, right?  The item is intended to be sold or distributed

20    in the state or, in again passive voice, the item is or was

21    possessed in the state, and it was reasonably foreseeable that

22    the item would be possessed in the state.

23        Is it the Attorney General's position that as long as

24    any person within the chain of a firearm arriving in Hawaii

25    meets these mens rea requirements that the sort of initial

1    manufacturer or marketer can be held liable?  Or does the party

2    you're actually enforcing the statute against need to have

3    sold, need to have intended, need to have had it be reasonable,

4    reasonably foreseeable as to them?

5            MS. LEFKOWITZ:  It's the latter, the latter one.

6    It's the party actually has to have the expectation or the

7    intent --

8            THE COURT:  Okay.

9            MS. LEFKOWITZ:  -- to sell in Hawaii.  And I -- you

10   know, I --

11           THE COURT:  I will say again I see Mr. Rowen nodding.

12   It's not -- again, not complete relief, but I think it probably

13   helps to assuage at least some of the broadest concerns that a

14   company would have.

15           Because you can see how it would be an issue if

16   somebody steals a firearm, distributes it in Hawaii.  It has

17   now been distributed in Hawaii.  So to the extent that the

18   initial manufacturer is now on the hook for that, that would be

19   a problematic interpretation.

20           MS. LEFKOWITZ:  I -- I agree, and the Attorney

21   General agrees.  I did just want to say, you know, I jotted

22   this down, according to the recent Ninth Circuit decision

23   from -- it's Yim v. City of Seattle.  It says:  We are not

24   required to terminate a statute in a formalistic manner when

25   such an interpretation would produce a result contrary to the

1   statute's purpose or lead to an unreasonable result.

2         And I think that -- that interpretation is very

3   relevant here as well.

4         THE COURT:  And as a kind of final point, does that

5   argument gain force from the provision that's in Section 134-D,

6   which provides some guidance on interpretation?

7         MS. LEFKOWITZ:  Absolutely.

8         THE COURT:  Which says --

9         MS. LEFKOWITZ:  Absolutely.  Yes.

10        THE COURT:  -- among other things that it should be

11   construed in a manner that's consistent with, among other

12   things, the U.S. Constitution?

13        MS. LEFKOWITZ:  Absolutely.

14        THE COURT:  So on that note we'll take -- what do the

15   parties think about taking a 40-minute break so that we have a

16   clear sense that we'll just be back at one o'clock?  Does that

17   work for everyone?  It can be a longer break if you all would

18   prefer.

19        MS. LEFKOWITZ:  I can say that I -- unless the Court

20   has any questions, I had a very short point I wanted to make on

21   the Second Amendment.

22        Of course, if the Court has any other questions.  So

23   I wasn't planning on being up here for more ten minutes.

24        THE COURT:  Okay.

25        MS. LEFKOWITZ:  So it really is up to Mr. Rowen.

1            THE COURT:  Mr. Rowen, would you prefer to just kind

2    of power through it?

3            MR. ROWEN:  Yes, Your Honor.

4            THE COURT:  Okay.  Let me also ask the court

5    reporter.

6            (Off the record.)

7            THE COURT:  Let me see if -- Ms. Lefkowitz, would it

8    be reasonable to anticipate maybe five to ten more minutes from

9    you and then, Mr. Rowen, maybe 15 or so from you or less?

10           MR. ROWEN:  Well, I think quite a bit less than 15.

11           THE COURT:  Okay.  Okay.  Why don't we just take care

12   of things now then.  Thank you so much.  I really appreciate

13   the parties working that out.  Ms. Lefkowitz.

14           MS. LEFKOWITZ:  Thank you, Your Honor.

15           So turning -- one second.

16           Turning to the Second Amendment, as Mr. Rowen

17   acknowledged, the law of the circuit is that there's no free --

18   free-standing right to sell or market firearms.  That's exactly

19   what Texeira v. Alameda County says.

20           So the only -- the only Second Amendment claim that a

21   gun industry member can make in this circuit is that it can

22   make a derivative claim on behalf of the individuals -- on the

23   individual rights of its customers.

24           And NSSF has entirely failed to do that here.  And

25   I -- I would just like to address this derivative standing

1    aspect.  And I think it's -- what's notable is in the actual

2    complaint, the complaint itself is entirely bereft of any

3    concrete allegations pertaining to actual injuries to

4    individuals.

5         In fact, what paragraph 11 of the complaint says:

6    NSSF serves the interest of its members, which are impaired by

7    the threat of sweeping liability under HB 426, not only to its

8    members but to their employees and agents.

9         Indeed, NSSF members in the past have been targets of

10   exactly the kind of suits that HB 426 authorizes and recently

11   have been sued under similar statutes enacted in the past few

12   years.

13        NSSF is authorized to bring this action on their

14   behalf.  That is the focus of the complaint here.  The focus of

15   the complaint here is not on individual rights.

16        I'd like to make just a quick comparison to Texeira

17   and how this case is different from Texeira and why there is no

18   derivative standing.  And I don't -- also like to address a

19   recent case from the Ninth Circuit called Tingley, if I'm

20   pro -- Tingley v. Ferguson.

21        That is a case where a therapist brought a First

22   Amendment claim on behalf of both himself and a minor client.

23        And the Court there held that the therapist had

24   failed to establish derivative standing, or third-party

25   standing, on behalf of its -- on behalf of its minor client,

1    because the complaint just didn't have any concrete allegations

2    about what harm -- what actual harm there was to -- to the

3    patient.

4            But the other thing that Tingley v. Ferguson stated,

5    and it was quoting the Supreme Court for this, the case is

6    Kowalski v. Tezmer, is when -- when courts make an exception

7    for third-party standing -- because, of course, that is an

8    exception to the general rules of standing -- there has to be a

9    close relationship between the third parties whose rights --

10   whose right it claims would be violated and the plaintiff.

11           And so in the case of Texeira, that was a gun -- a

12   prospective gun store who had done a study in his community and

13   determined that there were people in the community who wanted

14   to -- that gun store to open, who felt there was a need for it.

15           And in the actual hearing to get the zoning

16   ordinance, the zoning certificate that he wanted, there were

17   individuals who stood up and testified that they -- that they

18   wanted that gun store.

19           Here -- and, of course, it was a gun store.

20           There are no claims like that here.  There's no close

21   relationship here, right?  This is an association that

22   represents gun industry members, who I presume include

23   retailers as well as manufacturers.  And then farther down the

24   line is its customers.  And this is exactly the concern that

25   the Supreme Court had in Kowalski, is when the chain of

1    connection between those, the plaintiff and the third party, is

2    so attenuated it's not really clear what that -- that the

3    plaintiff is actually vindicating the rights of the people

4    down -- you know, people down the chain.

5             THE COURT:  I think that argument is strongest when

6    it comes to sort of the reasonable controls and the precautions

7    that a manufacturer or retailer is supposed to take to -- to do

8    a number of things, including avoid the unlawful diversion of

9    firearms and illegal conversion and so forth.

10            Where maybe the argument is a little less persuasive

11   is to the extent that it is fair to characterize Act 28 as for

12   any reason sort of prohibiting a certain category of firearms.

13            So I do think the Attorney General's position on that

14   tends to -- to reduce the concerns about this.  But those

15   concerns I think are still there with respect, for example, to

16   the -- to the youth-model firearms, right?  Which sort of

17   firearms designed for -- for minors are presumptively

18   abnormally dangerous.

19            So to the extent that you have individuals who want

20   to buy that category of firearms, the -- that seems to me a

21   situation where we're not -- we're not talking about the

22   reasonable controls.  We're not really talking about the

23   reasonable precautions so much or the marketing.  What we're

24   actually talking about is a law that might make it difficult or

25   impossible for individuals to buy a category of firearms that

1    has now been declared presumptively abnormally dangerous.  So

2    I'd be interested in hearing your response to that.

3              MS. LEFKOWITZ:  Absolutely, Your Honor.

4              I mean, I do think it's important -- and I will

5    address why we still think there's no Second Amendment claim

6    for -- for the abnormally dangerous provision.  But I do want

7    to point out that the complaint doesn't have any allegations

8    that says individuals in Hawaii want to purchase this --

9              THE COURT:  That's -- that's -- right.

10             MS. LEFKOWITZ:  (simultaneous speaking) -- which I

11   think is pretty critical here.

12             But if we -- you know, if we were to get to the Bruen

13   test and to ask, you know, whether the plain text of the Second

14   Amendment covers the conduct here with regard to abnormally

15   dangerous, what -- what NSSF has really entirely failed to do

16   is it -- is what is required by United States v. Alaniz, which

17   is to show that these firearms are in common use for self-

18   defense.

19             So, for example, you know, the fact it talks about

20   these youth-model firearms, there's no showing, and none of the

21   declarations say that these -- what I think it characterizes as

22   firearms -- well, I won't -- I won't try to characterize what

23   the features are, but that those particular firearms are in

24   common use for self-defense anywhere, much less Hawaii.  So I

25   just don't think it meets the test.

1          You know, and -- you know, the Attorney General here

2    has taken the position that the assaultive purposes provision

3    is coextensive with the illegal firearms, the same -- the test

4    is also not met there.  And then, of course, you know,

5    devices --

6          THE COURT:  And just so I'm clear on that point, so

7    is -- are -- this is a place where I want to make sure I'm

8    understanding the position of the Attorney General.

9          Is there some other provision of Hawaii law that

10   renders unlawful firearms that are designed for youth, or is

11   this actually sort of the one place where because you're

12   specifically in this context --

13         MS. LEFKOWITZ:  Yes.

14         THE COURT:  -- talking about a kind of firearm, or

15   the design or sale of a kind of firearm, is that the one place

16   where it actually is Act 28 that renders --

17         MS. LEFKOWITZ:  Abs -- yes, that is correct.

18         THE COURT:  Okay.  Okay.

19         MS. LEFKOWITZ:  That is correct.

20         But there still would have to be a showing that that

21   firearm is in common use for self-defense under the test.

22         THE COURT:  I understand.  Putting aside the Second

23   Amendment for purp -- for a second, I just wanted to make sure

24   I understood the -- what the Attorney General understood the

25   statute, the state statute to mean.

1          So as to other types of firearms, and we made, I

2     think, a clear record on AR-15s and so forth.  Maybe some day

3     the Hawaii legislature would decide to pass a statute; and if

4     so, NSSF or any other interested person could bring a lawsuit.

5     But as things currently stand, if a firearm is not unlawful

6     under Hawaii law, then the Attorney General would not bring an

7     enforcement action to argue that that firearm is abnormally

8     dangerous because --

9               MS. LEFKOWITZ:  Under the assaultive purposes.

10              THE COURT:  Under the assaultive purposes provision,

11    yes.

12              MS. LEFKOWITZ:  (Simultaneous speaking.)  That's

13    correct.

14              THE COURT:  And so the other provision that deals

15    with youth-model firearms, that's just a different way that a

16    firearm --

17              MS. LEFKOWITZ:  (Simultaneous speaking.)

18              Absolutely -- (Off the record.)

19              THE COURT:  I apologize.

20              That's just a different way in which a firearm could

21    be banned.

22              MS. LEFKOWITZ:  Abs -- yes.

23              THE COURT:  Okay.

24              MS. LEFKOWITZ:  And just to finish up.  And that

25    third prong, products that promote and are designed to convert

1    legal firearms into illegal firearms, again, there's just a

2    failure to show that these are -- these are products that are

3    even arms in the terms of the Second Amendment, but also that

4    they are in common use for self-defense.

5              THE COURT:  And then the third point -- and I

6    understand it's sort of a global point that you don't need to

7    repeat, but just so that I'm not mistaking it, it's also the

8    argument that there hasn't been any evidence showing that there

9    are individuals who want to buy firearms or firearm products

10   that would allow them to readily convert them in that way?

11             MS. LEFKOWITZ:  That's exactly right.

12             THE COURT:  Okay.

13             MS. LEFKOWITZ:  And so unless the Court has any other

14   questions.

15             THE COURT:  No.  Thank you.  I appreciate the

16   argument.  Thank you very much.

17             Mr. Rowen.

18             MR. ROWEN:  Thank you, Your Honor.

19             I'll be brief, and I will do my best only to respond

20   to arguments --

21             THE COURT:  Thank you.

22             MR. ROWEN:  -- that have been made by Ms. Lefkowitz.

23             So first, Ms. Lefkowitz said many times that the

24   statute only applies to conduct that's directed at Hawaii; and

25   just textually, that's just not true.  That's what

1    paragraphs -- paragraph 2 says, and paragraph 1 says in Hawaii.

2    And I understand them to have sort of conceded that the passive

3    voice doesn't sort of carry all the way through, which we

4    appreciate.

5              THE COURT:  Right.

6              MR. ROWEN:  But directed at is very much paragraph 2

7    and not paragraph 3.

8              I think a perfect example of the sort of disconnect,

9    Ms. Lefkowitz gave the example of sales to a regional

10   distributor and something that, in her words, "would violate

11   Act 28" if they were, you know, either failure of reasonable

12   controls or were abnormally dangerous.  So that is exactly

13   AAM v. Frosh, the Fourth Circuit case I mentioned earlier.  And

14   what that court holds is just because the manufacturer knows

15   that its products are going to be distributed and then sold at

16   retail in the state does not give a state constitutional

17   authority to directly regulate the out-of-state transactions.

18             And I grant Ms. Lefkowitz that the Minnesota law in

19   the Ellison case is the most egregious example, and that this

20   is not quite that egregious.  But that is not sort of the outer

21   limit of what's unconstitutional.

22             And I think, you know, Frosh notably -- Pork

23   Producers favorably cites it in -- in discussing sort of how

24   the dormant commerce clause works.  So while that's an

25   out-of-circuit case, I think it's very persuasive in terms of

1    what the doctrine is.

2           You know, Ms. Lefkowitz talked about sort of the

3    jurisdictional hooks that are in the statute.  And I think

4    respectfully, she sort of mischaracterized exactly what the

5    statute says.

6           So the Attorney General is authorized to bring suit

7    under Section 134-C(c), not only to remedy harm caused by a

8    violation but also to enforce the statute.  The injunction

9    provision read in tandem with that I think makes very clear

10   that so long as the conduct comes within the terms of the

11   statute and the product comes within the terms of the

12   reasonably foreseeable provision, that there actually doesn't

13   need to be harm for an Attorney General action.

14          So that's one.  The other jurisdictional hook that

15   Ms. Lefkowitz mentioned was in the def -- was in the end of the

16   abnormally dangerous provision.  But that's a presumptively

17   defined term here, right?  So she referenced that it's not just

18   abnormally dangerous but it's abnormally dangerous and likely

19   to create an unreasonable risk of harm.

20          But that entire phrase is presumptively defined in

21   Section 134-B(d), if I have my subsections correct.  And

22   nothing in that provision has a nexus to the state.  I don't

23   think it would matter at the end of the day, because again what

24   this statute regulates is conduct, not products.  And I think

25   Ms. Lefkowitz was very clear that in the state's view if a

1   manufacturer sells a product to a distributor, and it knows

2   that that distributor is going to distribute in Hawaii, that

3   that out-of-state conduct is fair game under this statute.

4           So one other small point is I think the Attorney

5   General took a pretty expansive view of personal jurisdiction.

6   And, you know, I do think that that hopefully will sort of give

7   color to the threat of enforcement that is at issue here,

8   because, you know, I didn't hear the Attorney General sort of

9   disavow my produce hypothetical.  I didn't hear the Attorney

10  General say that selling to a distributor that sells downstream

11  is not going to come within personal jurisdiction.  I

12  understand that Hawaii's different from states on the mainland

13  and that it doesn't have a neighbor to its borders.  But, you

14  know, the way that I heard the Attorney General's conception of

15  personal jurisdiction is fairly broad.

16          THE COURT:  I think the -- if I understood it

17  correctly -- and you -- I'd like to hear argument if you think

18  I heard it incorrectly, is the -- the reason for the

19  significance of sort of the downstream retailer is because of

20  an argument of the way the firearm industry works; which is

21  that manufacturers are actually fairly careful about where and

22  to which extent they -- they sell any products based on all the

23  sort of various regulatory schemes that they face in different

24  states.

25          And so if you are -- I think the argument was if you

1   are as a manufacturer providing firearms to a particular

2   retailer that's selling in Hawaii, there is a possibility that

3   you sort of know that and that is actually sort of part of

4   your -- your plan of conduct and so forth.

5           Is that how you understood the argument as well?

6           MR. ROWEN:  Yes.

7           THE COURT:  Okay.

8           MR. ROWEN:  That's how I understood their position.

9           THE COURT:  Okay.

10          MR. ROWEN:  That's exactly the argument that the

11  Fourth Circuit rejected in Frosh.

12          THE COURT:  I understand that.  And it's your

13  position that there would not be personal jurisdiction

14  regardless of what the surrounding circumstances could be.

15          So, for example, it's -- it's one thing if a

16  manufacturer, as I sort of posited earlier, and I think this is

17  what Ms. Lefkowitz was responding to, just doesn't care, right?

18  And so selling firearms to people, and they could take it to

19  wherever they want, doesn't care, I could see that would be the

20  strongest argument for saying no personal jurisdiction, right?

21  No purposeful availment in a case like that.

22          But if there were evidence that it's part of your

23  sale strategy, actually, to sell it to retailers that you know

24  are selling in a particular state, I gather you still would

25  take the position that the Fourth Amendment -- the Fourth

1    Circuit decision would say that even that's not allowed.  But

2    that's -- that's a -- that's a different problem from the --

3    the potentially broader one of just if you're selling to

4    someone who then brings it somewhere else, now you're on the

5    hook for that.

6          MR. ROWEN:  Yes.  So I want to be clear.  So, I mean,

7    I want to reserve the rights of the NSSF members to argue --

8          THE COURT:  I understand.

9          MR. ROWEN:  -- that in a case where the suit is

10   premised on a sale to a distributor that there isn't personal

11   jurisdiction.

12         THE COURT:  Absolutely.  Right.

13         MR. ROWEN:  As I read Ford, I think that you have a

14   really hard argument in one of those cases.  So I don't think

15   that the problem is personal jurisdiction.  And the problem is

16   the dormant commerce clause and the extraterritoriality

17   doctrine.  And while the limits on, you know, a court's power

18   under the personal jurisdiction analysis and a legislature's

19   power under the dormant commerce clause extraterritoriality

20   analysis are similar, they're not the same.  And, you know, as

21   far as I know, no court has ever said that they're the same.

22   And in fact, if they were the same, then I think that Sam

23   Francis would be wrong, because, of course, California has

24   personal jurisdiction over the sales of California residents.

25   And the money that the California Resale Royalty Act --

 1          THE COURT:  That --

 2          MR. ROWEN:  -- could get escheated into the state.

 3          THE COURT:  That's -- that's fair.  I think there is

 4  sort of -- you're making a very good point about how there are

 5  different ways of obtaining personal jurisdiction, including

 6  sort of tag jurisdiction.  You could be a citizen of the state,

 7  for example, at home in the forum, so to speak.

 8          I -- I sort of understood the Attorney General to be

 9  saying they understand the dormant commerce clause, well, the

10  authority of the state to regulate under the dormant commerce

11  clause to be more sort of -- more aligned with the purposeful

12  availment part of personal jurisdiction.  Would you disagree

13  with even that?

14          MR. ROWEN:  So I think that that was their position.

15          THE COURT:  Right.

16          MR. ROWEN:  And we think that that is just dead

17  wrong.

18          THE COURT:  Okay.

19          MR. ROWEN:  And that, I mean, you know, cases like

20  Sam Francis, cases like Association for Accessible Medicines

21  versus Frosh, there's definitely purposeful availment when a

22  drug manufacturer sells to a distributor that it knows is going

23  to sell downstream to retailers in Maryland.  Which is the

24  facts there.  There's definitely purposeful availment.  I was

25  counsel in that case.  We never objected to personal

1    jurisdiction.

2              THE COURT:  Right.

3              Your position is, even in those situations where

4    there would be purposeful availment under those facts, there

5    would still be a dormant commerce problem; and that's why a

6    concession about personal jurisdiction doesn't adequately

7    address your client's concern --

8              MR. ROWEN:  Correct, Your Honor.

9              THE COURT:  -- if I understand that.  Great.

10             MR. ROWEN:  So the last point that I would like to

11   make quickly on the Second Amendment.  So obviously there's a

12   lot of churn in the Ninth Circuit's law right now on the Second

13   Amendment.  It's NSSF's position that the analysis set forward

14   in Bruen and Heller requires that it's the state's burden to

15   demonstrate that a ban on arms is consistent with what Bruen

16   said was the historical tradition of prohibiting the carrying

17   of dangerous and unusual arms.

18             I'd recognize that the Alaniz case situated the

19   common use inquiry in the sort of textual inquiry.  What I will

20   note is that the Alaniz case did not address as a holding

21   whether something satisfied that.  So what it said, you know, I

22   have to concede that it says what it says.  But it's clearly

23   dicta.

24             So our view is if that were a holding, it would be

25   inconsistent with Bruen and Heller.  It's not a holding.  We'd

1    ask Your Honor to apply Bruen and Heller as the law of the

2    land.

3              If there are no further questions, I'm happy to rest

4    on our papers.

5              THE COURT:  No further questions.  I very much

6    appreciate the argument from all counsel as well as the very

7    helpful briefing, and this matter will be taken under

8    submission.

9              MR. ROWEN:  Thank you, Your Honor.

10             COURTROOM MANAGER:  All rise.

11             Court stands adjourned.

12             (The proceedings concluded at 12:40 p.m., March 22,

13   2024.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9            DATED at Honolulu, Hawaii, March 29, 2024.

10

11

12
                        /s/ Ann B. Matsumoto
13                      ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25