IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION,<br><br>Plaintiff,<br><br>vs.<br><br>ANNE E. LOPEZ, Attorney General of the State of Hawai'i,<br><br>Defendant. | Civil No. 23-00287 MWJS-RT<br><br>ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

In this motion for a preliminary injunction, the National Shooting Sports Foundation (NSSF) seeks to enjoin enforcement of Hawai'i House Bill 426, a law that regulates the conduct of firearm industry members.  NSSF argues that H.B. 426 is unlawful for five reasons:  it violates the Second Amendment, is preempted by a federal statute, improperly regulates out-of-state commerce, runs afoul of the First Amendment, and is void for vagueness.

The Court cannot reach the merits of these claims.  Because NSSF has not demonstrated that any of its members face an imminent injury, NSSF has not met its burden of showing that it has standing to bring this pre-enforcement suit.  Accordingly, the Court DENIES the motion for preliminary injunction.

## BACKGROUND

### A.     House Bill 426

In early 2023, Hawaiʻi enacted a law to set standards of conduct for certain firearm manufacturers, distributors, and retailers.  Signed by the Governor in April 2023, H.B. 426 took effect (as Act 28) on July 1, 2023.

H.B. 426 adds a "Firearm Industry Responsibility" part to Chapter 134 of the Hawaiʻi Revised Statutes (HRS).  *See* HRS §§ 134-101 to -104.  It applies to all "firearm industry members" that manufacture, distribute, sell, or market "firearm-related product[s]."  *See id.* § 134-101.  And H.B. 426 defines a "firearm-related product" as any firearm or related item that satisfies one of three conditions:  it is (1) "sold, made, or distributed in [Hawaiʻi]"; (2) "intended to be sold or distributed in [Hawaiʻi]"; or (3) "possessed in [Hawaiʻi]" and that possession "was reasonably foreseeable."  *Id.*  Put differently, H.B. 426 applies only to products—and, in turn, only to firearm industry members who manufacture, distribute, sell, or market said products—with some nexus to Hawaiʻi.[1]

---

[1]     At the hearing on NSSF's motion for a preliminary injunction, the Attorney General of Hawaiʻi disavowed any enforcement action under H.B. 426 against a firearm industry member that (1) does not *itself* sell or intend to sell the firearm-related product in Hawaiʻi, and (2) does not *itself* reasonably foresee that the product would be possessed in Hawaiʻi.  Under this concession, the Attorney General will not bring an enforcement action against the initial manufacturer of a

Industry members who sell such products have three obligations under H.B. 426. They must "[t]ake reasonable precautions" not to distribute abnormally dangerous products, implement "reasonable controls" to prevent the diversion of firearms, and not "market[]" unlawful products. *Id.* § 134-102(b). H.B. 426 elaborates on each requirement.

***Reasonable Precautions.*** Under the reasonable precautions provision, firearm industry members must "[t]ake reasonable precautions" to avoid distributing a firearm that is "likely to create an unreasonable risk of harm to public health and safety in [Hawaiʻi]" and is "abnormally dangerous." *Id.* § 134-102(b)(2).

A firearm is not "abnormally dangerous" under H.B. 426 simply because of its "inherent capacity to cause injury or lethal harm." *Id.* § 134-102(c). But a firearm-related product is presumed to be "abnormally dangerous" if it is:

> (1) "most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities";
>
> (2) "designed, sold, or marketed in a manner that foreseeably promotes the conversion of legal firearm-related products into illegal firearm-related products"; or
>
> (3) "designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms."

---

firearm merely because *someone else* in the distribution chain sells or intends to sell the firearm in Hawaiʻi or can reasonably foresee that it will be possessed here.

3

*Id.* § 134-102(d).[2]

At the hearing on NSSF's motion for a preliminary injunction, Hawaii's Attorney General—the sole party named as a defendant in this lawsuit—made a key concession about the scope of this provision.  The concession concerns § 134-102(d)(1), which as quoted above, presumes that a firearm-related product is "abnormally dangerous" if it is "most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities."  At the hearing, the Attorney General committed to the position that the "most suitable for assaultive purposes" provision only reaches firearms otherwise prohibited by federal or Hawai'i law.  The Attorney General clarified that this means, for example, that an ordinary AR-15—which is not presently prohibited under Hawai'i law—does not currently qualify as a firearm that is "most suitable for assaultive purposes."  The Attorney General also disavowed any future enforcement action based on a more expansive interpretation of "most suitable for assaultive purposes."

***Reasonable Controls.***  The reasonable controls provision requires firearm industry members to "[e]stablish, implement, and enforce reasonable controls."  *Id.*

---

[2]      Two of these provisions—§§ 134-102(d)(2) and (d)(3)—address not only the design and sale of certain firearm-related products, but also their marketing.  For ease of exposition, marketing regulations are discussed as their own separate category below.

§ 134-102(b)(1).  These controls must aim to advance several goals:  preventing the sale or distribution of firearm-related products to certain individuals, preventing the loss or theft of firearm-related products, and ensuring compliance with all other laws.  *See id.* § 134-101.

Here again, the Attorney General has made a key concession.  H.B. 426 elaborates that reasonable controls must aim to avoid diversion to any individual the firearm industry member "has reasonable cause to believe is at substantial risk of" (1) "using a firearm-related product to harm themselves or another" or (2) "possessing or using a firearm-related product unlawfully."  *Id.* § 134-101.  At the hearing on NSSF's motion, the Attorney General agreed that the phrase "to harm . . . another" refers to *unlawful* harm—that is, it excludes lawful self-defense.  The Attorney General also disavowed any future enforcement action based on an interpretation of "to harm . . . another" that would extend to lawful self-defense.

***The Marketing Provisions.***  Finally, H.B. 426 regulates the marketing of firearm-related products in four ways.  Two of these provisions merely require firearm industry members to avoid marketing unlawful "firearm-related products."  *See id.* § 134-102(b)(3) (prohibiting "conduct related to the sale or marketing of firearm-related products that is in violation of this chapter");[3] *id.* § 134-101

---

[3]     To be precise, § 134-102(b)(3) prohibits *both* the sale *and* the marketing of products that are unlawful under Hawaiʻi state law.  But NSSF has not articulated

(requiring reasonable controls to avoid "promot[ing] the unlawful . . . marketing . . . of a firearm-related product").  The third marketing provision presumes that a firearm-related product is abnormally dangerous if it is "marketed in a manner that foreseeably promotes the conversion of legal firearm-related products into illegal firearm-related products."  *Id.* § 134-102(d)(2).  The fourth—and, in this dispute, most important—provision presumes that a firearm-related product is abnormally dangerous if it is "marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms."  *Id.* § 134-102(d)(3).

*      *      *

If a firearm industry member violates any one of the above three duties—the reasonable controls, reasonable precautions, or marketing obligations—they may be subject to a civil action for injunctive relief, damages, and other appropriate relief.  *Id.* § 134-103(d).  The action may be brought by an aggrieved party, a county attorney, a public prosecutor, or Hawaii's Attorney General.  *See id.* § 134-103(c).

---

any argument for enjoining the sale-of-otherwise-unlawful-products clause that is independent of its challenges to the reasonable precautions and reasonable controls provisions.

**B.      The Complaint and Motion for Preliminary Injunction**

Less than two weeks after H.B. 426 took effect, NSSF—a Connecticut-based trade association for firearm manufacturers, distributors, and retailers—filed this pre-enforcement suit.  *See* ECF No. 1 (Compl.).  On five counts, it seeks a declaration that H.B. 426 is unconstitutional (both facially and as applied) and an injunction enjoining the Attorney General from enforcing the law.  *Id.* at PageID.59-60.

NSSF moved for a preliminary injunction five days later.  *See* ECF No. 13.  Mirroring its complaint, NSSF advances five arguments.  First, NSSF argues that H.B. 426 violates the Second Amendment's right to keep and bear arms.  ECF No. 13-1, at PageID.113-16.  Second, NSSF contends that the Protection of Lawful Commerce in Arms Act—a federal statute that bars certain actions from being brought against firearm manufacturers—preempts H.B. 426.  *Id.* at PageID.116-21.  NSSF next claims that H.B. 426 directly regulates out-of-state conduct in violation of the dormant Commerce Clause.  *Id.* at PageID.121-25.  Furthermore, NSSF argues that H.B. 426's marketing provisions regulate protected speech and violate the First Amendment.  *Id.* at PageID.125-28.  Finally, NSSF urges that H.B. 426 is void for vagueness.  *Id.* at PageID.128-29.

NSSF included with its motion two declarations on behalf of firearm manufacturers, *see* ECF Nos. 13-2 & 13-3, which it later supplemented with a third

declaration, *see* ECF No. 56-1.  At a status conference on March 8, 2024, the parties confirmed that they did not intend to call any live witnesses or present additional evidence.  *See* ECF No. 54.  A non-evidentiary hearing on NSSF's motion for preliminary injunction was held on March 22, 2024.

## DISCUSSION

Before considering whether NSSF has satisfied the standard for a preliminary injunction, this Court must resolve a threshold issue:  whether NSSF has Article III standing.  At the preliminary injunction stage, plaintiffs "must make a clear showing of each element of standing, relying on the allegations in their complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden."  *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (cleaned up).

The Attorney General argues that the Court cannot consider the merits because NSSF lacks standing to press any of its claims.  For the reasons discussed below, the Court agrees.

### A.    The Legal Standards for Pre-Enforcement Standing

Under Article III of the U.S. Constitution, the judicial power is limited to "Cases" and "Controversies."  U.S. Const., art. III, § 2, cl. 1.  And a dispute does not count as a constitutional case or controversy if the plaintiff lacks a concrete stake in its outcome.  *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438

(2017).  When a plaintiff lacks that stake in any of their claims, "the courts have no business deciding it, or expounding the law in the course of doing so." *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976).

In its motion papers, NSSF does not assert that it has direct standing. Instead, it relies on a theory of associational standing, through which NSSF can sue on behalf of its members so long as "at least one of its members would have standing to sue in [their] own right." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006); *see also* ECF No. 42, at PageID.575 n.3.

Accordingly, NSSF must demonstrate that at least one of its members has suffered an (1) injury in fact (2) caused by the defendant's challenged conduct (3) and likely redressable by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).[4]  NSSF "bears the burden of establishing these elements." *Id.* at 561.  And NSSF must have standing "for each claim [it] seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734

---

[4]    The two other elements of associational standing—that "the interests the suit seeks to vindicate are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *Fleck & Assocs. Inc.*, 471 F.3d at 1005-06—are undisputedly met.

(2008) (internal quotation marks omitted); *see also* ECF No. 42, at PageID.572

(Pl.'s Reply Br.) (recognizing that "standing is not dispensed in gross") (cleaned

up).[5]

While NSSF brings a broad facial challenge to H.B. 426, the Court's

standing inquiry has a narrow focus. The Attorney General does not dispute that

NSSF's members satisfy causation, as an injury from the enforcement of H.B. 426

would certainly be caused by the Attorney General's actual or threatened

enforcement of the law. Nor does the Attorney General dispute that NSSF's

members satisfy redressability, as enjoining the Attorney General's enforcement of

H.B. 426 would provide relief. The dispute, then, centers on whether NSSF has

sufficiently alleged that its members suffer an injury in fact.

The inquiry narrows further still. Generally, an injury in fact must be

"concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 409 (2013) (internal quotation marks omitted). Because NSSF does

not argue that its members have suffered an *actual* injury by, for example,

changing their business models to comply with H.B. 426, the sole threshold

question is whether NSSF has demonstrated an *imminent* injury—that is, whether

---

[5]     Although the Court describes this analysis in terms of standing, its
conclusions apply equally to constitutional ripeness. *See Twitter, Inc. v. Paxton*,
56 F.4th 1170, 1173 (9th Cir. 2022) ("The constitutional component of ripeness is
synonymous with the injury-in-fact prong of the standing inquiry." (cleaned up)).

H.B. 426's "threatened enforcement" is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Isaacson v. Mayes*, 84 F.4th 1089, 1098 (9th Cir. 2023) (at pre-enforcement posture, plaintiff must show "that the potential harm is sufficiently imminent to qualify as an injury in fact").

To meet this burden, NSSF must make three showings.  It must first allege that its members "inten[d] to engage in a course of conduct arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 160 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Second, it must allege that intended future conduct is "arguably proscribed" by the challenged statute.  *Id.* at 162 (internal quotation marks omitted).  And finally, there must be a "credible threat of enforcement" under the statute.  *Id.* at 161.  This means that "a government defendant's credible disavowal of enforcement intent may defeat pre-enforcement standing."  *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 874 n.4 (10th Cir. 2020); *accord Driehaus*, 573 U.S. at 165 (giving weight to the fact that "respondents have not disavowed enforcement if petitioners make similar statements in the future"); *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) ("[W]e have held that plaintiffs did not demonstrate the necessary injury in fact where the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities.").

These showings are not easy to make.  While recognizing that parties need not "expose [themselves] to liability before bringing suit," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007), the Supreme Court has also held that there is no "unqualified right to pre-enforcement review of constitutional claims in federal court," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021).  For that reason, "[t]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III."  *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983).  At the pre-enforcement stage, as throughout a case, a plaintiff must have a "personal stake in the outcome of the controversy" before a federal court wades in. *Baker v. Carr*, 369 U.S. 186, 204 (1962).  The Court now considers whether, in this case, NSSF and its members have such a stake.

**B.    NSSF Lacks Pre-Enforcement Standing**

Because plaintiffs must have standing for each claim they press and each form of relief they seek, *Davis*, 554 U.S. at 734, the Court analyzes NSSF's standing to challenge each discrete provision of H.B. 426 in turn.

**1.    The Reasonable Precautions Provision**

NSSF principally challenges the reasonable precautions provision, which requires firearm industry members to "[t]ake reasonable precautions" to prevent the distribution of "firearm-related product[s]" that are "abnormally dangerous"

12

and "likely to create an unreasonable risk of harm to public health and safety in

[Hawaiʻi]."  HRS § 134-102(b)(2).

a.   Under the first prong of the pre-enforcement standing analysis, NSSF

successfully demonstrates that its members have an "intention to engage in a

course of conduct arguably affected with a constitutional interest."  *Driehaus*, 573

U.S. at 161 (internal quotation marks omitted).  At least three of NSSF's members

are actively manufacturing firearms, and they intend to continue doing so.  *See*

ECF No. 13-2, at PageID.132 (¶ 7) ("Ruger manufactures firearms . . . ."); ECF

No. 13-3, at PageID.136 (¶ 7) (similar); ECF No. 56-1, at PageID.664 (¶ 5)

(similar); ECF No. 42, at PageID.577 ("NSSF members indisputably intend to

continue making, selling, and marketing their products . . . .").  And "[u]nder

[NSSF's] theories," this conduct is arguably affected with a constitutional interest.

*Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024); *see* ECF No. 13-1,

at PageID.113 (arguing that laws "restrict[ing] the ability to purchase arms"

implicate the Second Amendment).

b.   The Court next considers whether that conduct is "arguably proscribed"

by the reasonable precautions provision.  Because H.B. 426 applies only to

products with a nexus to Hawaiʻi, and because the reasonable precautions

provision applies only to abnormally dangerous products, NSSF must make several

factual showings to establish that this provision arguably proscribes its members'

13

conduct.  It must first allege or offer evidence that its members make, sell, or distribute "firearm-related product[s]," as that term is defined by H.B. 426.  It must next allege or offer evidence that those products are "abnormally dangerous" within the meaning of HRS § 134-102(d).  And finally, it must allege or offer evidence that its members are not taking "reasonable precautions" for their abnormally dangerous products.

As an initial matter, there does not appear to be a dispute that at least some of NSSF's members manufacture, distribute, and sell firearms that would qualify as "firearm-related product[s]" within the meaning of H.B. 426.  According to a declaration submitted by the Attorney General, a forensic analyst examined the webpages of Smith & Wesson and Ruger, two firearm manufacturers that submitted declarations for NSSF.  *See* ECF No. 38-3, at PageID.391.  Because both webpages identified several dealers in Hawaiʻi that carried their firearms, the analyst concluded that firearms manufactured by both companies "continue to be sold and marketed into Hawaiʻi." *Id.* (cleaned up).  Given this undisputed factual assertion, the Court concludes that it is reasonably foreseeable that at least *some* products made by NSSF members will be possessed in Hawaiʻi and, therefore, that those products are "firearm-related product[s]" covered by H.B. 426.

The mere fact that *some* products made by NSSF members are apparently sold and possessed in Hawaiʻi does not, however, suffice to establish standing to

14

challenge the reasonable precautions provision. That provision applies not to firearm-related products generally, but only to "abnormally dangerous" firearm-related products. To meet its burden, then, NSSF would have to make the further showing that the specific firearms that are distributed in Hawaiʻi are also arguably abnormally dangerous within the meaning of H.B. 426.

NSSF has not done so. Indeed, it identifies only a handful of firearm models manufactured by its members anywhere, and NSSF never shows that those specific models are ever sold or possessed in Hawaiʻi. A declaration for Henry Repeating Arms—a company manufacturing firearms in Wisconsin and New Jersey—identifies several of the company's most popular rifle, shotgun, and revolver models. *See* ECF No. 56-1, at PageID.665-66 (¶¶ 5, 12, 14-15). But as explained above, the Attorney General disavowed any enforcement under HRS § 134-102(d)(1)—which presumes a firearm-related product to be "abnormally dangerous" if it is "most suitable for assaultive purposes"—against firearms that are not currently banned under federal or Hawaiʻi law. NSSF provides no allegations or evidence that any particular firearm model made by Henry Repeating Arms or by any other NSSF member is currently banned under federal or Hawaiʻi law. What is more, the declaration for Henry Repeating Arms admits that its firearms are largely for hunting and sport shooting. *See, e.g.*, *id.* at PageID.665 (¶ 12) ("the Henry Big Boy" is "ideal for brush hunting, home defense, and

cowboy action shooting"); *id.* ("the Henry Long Ranger" delivers "precision for big game hunts"); *id.* (the "Henry US Survival AR-7" is "ideal for all outdoorspeople").  And "lawful self-defense, hunting, or other legitimate sport" activities are expressly carved out of the "abnormally dangerous" presumption. HRS § 134-102(d)(1).

NSSF also generally asserts that its members, as "a matter of public record," make and sell firearms that Hawai'i currently bans.  *See* ECF No. 42, at PageID.573.  And according to NSSF, because the Attorney General considers firearms banned in Hawai'i to be coextensive with firearms "suitable for assaultive purposes" and thus presumptively "abnormally dangerous," the possession of these firearms in the State could subject NSSF's members to liability under H.B. 426. ECF No. 42, at PageID.573.[6]  NSSF, however, does not point the Court to the "public record[s]" to which it refers, and at the status conference, NSSF confirmed that it was not asking the Court to take judicial notice of any facts.  *See* ECF No. 54.  Without such evidence, the Court cannot conclude that NSSF's members sell firearms that are arguably abnormally dangerous under Hawai'i law.

Aside from the firearms identified in the Henry Repeating Arms declaration, NSSF's declarants mention just one more specific type of firearm made and sold

---

[6]     Examples of firearms currently prohibited by Hawai'i state law are automatic firearms and assault pistols.  HRS §§ 134-4(e), -8(a).

by its members:  youth-model firearms.  ECF No. 13-3, at PageID.138 (¶ 15); ECF

No. 56-1, at PageID.665-66 (¶¶ 13-15); *see also* ECF No. 13-2, at PageID.134

(¶ 15).  H.B. 426 presumes that a firearm is abnormally dangerous if it is

"designed" or "sold" in a "manner that is targeted at minors," HRS § 134-

102(d)(3), and while none of NSSF's declarants claim to "target" minors directly

through their design or sale strategies, the fact that the firearms are designed to be

useful for minors means that they are at least arguably proscribed by this provision.

But although NSSF has shown that some of its members manufacture and

distribute at least one product that could arguably be deemed "abnormally

dangerous," NSSF has not shown that these youth-model firearms—or, indeed, *any*

specific product—end up in Hawaiʻi and thus qualify as "firearm-related

product[s]" within the meaning of H.B. 426.  Recall that H.B. 426 defines a

firearm-related product as one that is sold in Hawaiʻi, is intended to be sold in

Hawaiʻi, or is reasonably foreseeably possessed in Hawaiʻi.  *See id.* § 134-101.

Absent one of these connections to the State, it is not even arguable that H.B. 426

regulates the product.  That poses a problem for NSSF here, because NSSF has

offered neither allegations nor evidence that would establish any of these three

connections for *any* specific firearm made or sold by its members, let alone for the

youth models.  None of NSSF's declarants claim to sell or intend to sell firearms in

Hawaiʻi.  And NSSF has not offered any allegations or evidence adequate to show that it is reasonably foreseeable these products would end up in Hawaiʻi.

NSSF rejoins that its members must be covered because the "reasonably foreseeable" requirement is so expansive that it can easily encompass unwitting out-of-state manufacturers and retailers.  A retailer in Texas, NSSF warns, could be held liable under H.B. 426 if one of its firearms is stolen by a gang member in Texas and brought to Hawaiʻi.  *See* ECF No. 57, at PageID.675.  At the hearing, the Attorney General assuaged these concerns with two disavowals.  She confirmed that she would not bring an enforcement action unless the industry member *itself* reasonably foresaw the possession of the firearm in Hawaiʻi.  *See supra* note 1.  And she stated that she would not bring an enforcement action where a court would lack personal jurisdiction over a firearm industry member.

In any event, the burden was NSSF's to bear.  And NSSF did not present any allegations or evidence showing that it can reasonably be foreseen that its members' out-of-state products that are arguably "abnormally dangerous" will end up in Hawaiʻi—either as the result of thefts or for any other reason.  Indeed, NSSF has not offered any allegations or evidence that any of these products have ever turned up in Hawaiʻi before.[7]  And if these firearms are never possessed in

---

[7]    NSSF also suggests that a retailer could sell a firearm to a purchaser in the continental United States (where, hypothetically speaking, the firearm is lawful)

Hawaiʻi, NSSF cannot show that its members' firearms are arguably proscribed by H.B. 426.

But assume for the moment that NSSF *had* shown that it was reasonably foreseeable some of its products might end up in Hawaiʻi, and assume further that some of those products destined for Hawaiʻi were arguably "abnormally dangerous" within the meaning of H.B. 426. Even then, NSSF's showing would fall short for a final reason: NSSF fails to allege that its members do not (or even arguably do not) take reasonable precautions to avoid having abnormally dangerous firearm-related products arrive in Hawaiʻi. Neither its complaint nor its declarations allege specific facts about the sale and distribution practices of NSSF's members.

Without any of these critical allegations, this case is readily distinguishable from cases in which the "specific" factual allegations about future conduct conferred pre-enforcement standing. *Lopez*, 630 F.3d at 787. For example, in a challenge to a law that classified certain workers as employees, an association of

---

who then moved to Hawaiʻi with the firearm (where, again hypothetically, the firearm would be considered abnormally dangerous). *See* ECF No. 1, at PageID.40 (¶ 100). As noted, however, with the exception of youth-model firearms, NSSF has not identified any types of firearms manufactured or sold by its members that are lawful on the continental United States yet banned in Hawaiʻi. Nor has NSSF made any allegations or offered any evidence to show that its members are at concrete risk of distributing firearms to individuals who would bring them to Hawaiʻi despite those firearms being banned here.

truckers alleged that its members "currently contract[ed] with independent owner-operators, rather than employees," and planned to "continu[e] with their current business practices." *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021). Because those practices were "presently in conflict with" the challenged law, the Ninth Circuit held that the association had pre-enforcement standing, as it had sufficiently alleged a "concrete plan to violate" the law. *See id.* (internal quotation marks omitted).

Or take *Peace Ranch, LLC v. Bonta*, in which a mobilehome park sued to enjoin enforcement of a rent-control statute. 93 F.4th 482, 485-86 (9th Cir. 2024). The plaintiff both alleged "corroborating past practice" and "specifically plead[ed] its intent" to "conform its conduct" to the law. *Id.* at 488 (internal quotation marks omitted). Because the plaintiff "plausibly alleged that it refrained from raising rents" for fear of enforcement of the law, the Ninth Circuit concluded that the plaintiff had pre-enforcement standing. *Id.* at 489; *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (holding that plaintiff has pre-enforcement standing when "[s]he alleges that she provides, and plans to continue to provide, shelter and transportation" to undocumented immigrants, which falls within the statute's prohibitions).

NSSF's allegations on the topic of reasonable precautions are more akin to those in *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir.

2000) (en banc).  There, landlords challenged a housing discrimination law on religion and free speech grounds.  *Id.* at 1137.  The landlords claimed that they had previously violated the statute by refusing to rent to protected individuals, but they did not say "when, to whom, where, or under what circumstances."  *Id.* at 1139.  And the landlords alleged they would violate the law in the future, but they again failed to "specify when, to whom, where, or under what circumstances."  *Id.*  The landlords' purported fear of enforcement, "though theoretically possible," was "wholly contingent upon the occurrence of unforeseeable events" and, therefore, too speculative to confer standing.  *Id.* at 1141.

NSSF directs the Court to a recent decision finding that NSSF had standing to challenge California's ban on abnormally dangerous firearms.  *See* ECF No. 48, at PageID.606 (discussing *NSSF v. Bonta*, No. 23-cv-0945, 2024 WL 710892 (S.D. Cal. Feb. 21, 2024)).  California's provision differs in at least one material respect from Hawaii's:  it makes it outright illegal to make or sell abnormally dangerous firearms.  *See* Cal. Civ. Code § 3273.51(c).  As discussed, Hawaii's law has another layer of required conduct—the requirement to "[t]ake reasonable precautions" to avoid having abnormally dangerous firearm-related products end up in Hawaiʻi.  HRS § 134-102(b)(2).  Under Hawaii's law, therefore, it would not be enough for NSSF to allege that its members make arguably abnormally dangerous firearms (which, apart from youth-model firearms, NSSF does not

21

sufficiently do).  Nor would it be enough to show that it is arguably reasonably foreseeable that some such firearms will turn up in Hawaiʻi (which NSSF does not show as to any of its members' specific firearm models).  NSSF must also allege that its members are not taking reasonable precautions to avoid that result.[8]  And on this requirement too, NSSF's allegations and evidence come up short.

    c.  Under the final prong of the pre-enforcement standing inquiry, NSSF does not demonstrate a credible threat of enforcement.  This analysis "consider[s] a variety of factors."  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).  Here, the Attorney General has not generally disavowed enforcement of this provision, which is "strong evidence that the state intends to enforce the law," at least as a general matter.  *Cal. Trucking Ass'n*, 996 F.3d at 653.  But alone, it is not dispositive.  *See LSO*, 205 F.3d at 1155 ("[W]e cannot go so far as to say that a plaintiff has standing whenever the Government refuses to rule out use of the

---

[8]    Matters would be different if any NSSF member alleged that it sold or intended to sell an abnormally dangerous product in Hawaiʻi (which none do).  In that event, it would not be necessary to further allege a failure (or arguable failure) to take reasonable precautions, because a firearm manufacturer that intentionally sells a product in Hawaiʻi necessarily fails to take reasonable precautions to avoid that result.  The same cannot be said for firearms that foreseeably end up in Hawaiʻi; it is possible that an abnormally dangerous product could foreseeably end up in Hawaiʻi even if a firearm manufacturer has taken every reasonable precaution to avoid that result.  For that reason, to establish standing based on reasonable foreseeability, a firearm manufacturer would need to allege why its conduct arguably does not satisfy the requirement of taking reasonable precautions to avoid the reasonably foreseeable result, and NSSF has not done so.

challenged provision . . . .").  And this case lacks the other hallmarks of imminent

enforcement:  The Attorney General has not declared a general plan to enforce

H.B. 426.  *See Cal. Trucking Ass'n*, 996 F.3d at 653 (finding credible enforcement

threat where "the state has notified the regulated community that it intends to

enforce AB-5").  She has not indicated that H.B. 426 covers the conduct of NSSF's

members.  *See Peace Ranch*, 93 F.4th at 490 (holding that enforcement threat is

credible where "Attorney General . . . admits that the law targets [plaintiff]").

And, although this fact carries less force for newly enacted laws, *see Cal. Trucking

Ass'n*, 996 F.3d at 653, she has not enforced the law in the nine months since its

enactment, *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501,

508 (9th Cir. 1991) (concluding that enforcement threat is credible where "the

government has already instituted proceedings under the challenged provisions").[9]

Instead, and as noted above, the Attorney General has disavowed the

broadest conceivable constructions of the reasonable precautions provision.  First,

the Attorney General has disavowed any enforcement action based on firearms that

are stolen in the continental United States and brought to Hawaiʻi through no

---

[9]      The Supreme Court has stated that "standing is to be determined as of the
commencement of suit."  *Lujan*, 504 U.S. at 570 n.5.  "Yet, in appraising threats,
the Ninth Circuit has repeatedly turned to such post-filing proof."  *NSSF v. Bonta*,
2024 WL 710892, at *4 (citing *Isaacson*, 84 F.4th at 1095, 1100-01; *Cal. Trucking
Ass'n*, 996 F.3d at 653).  To the extent that the lack of enforcement carries any
weight at this stage, it cuts against a credible threat of enforcement.

initiative of the mainland manufacturer or retailer.  Second, the Attorney General has committed to interpreting the phrase "most suitable for assaultive purposes" as limited to those firearms that are otherwise prohibited under federal or Hawai'i state law.

Taken together, the above factors weigh against finding a credible threat of enforcement.[10]  But NSSF offers one more argument:  setting aside the nuances of the pre-enforcement analysis, it asserts that "[i]t is bedrock law that manufacturers and sellers have standing to challenge laws that ban the products they make and sell."  ECF No. 42, at PageID.572.  This intuition is understandable, as laws that ban products generally will inflict economic harms on manufacturers and sellers. *Isaacson*, 84 F.4th at 1096 ("Article III injury in fact can arise when plaintiffs are simply prevented from conducting normal business activities.").  But a plaintiff's status as a manufacturer is alone not enough to meet their burden to establish standing; they must still show either an actual or imminent injury in fact.  They

---

[10]      At times, the Ninth Circuit has applied three factors "to evaluate whether a claimed threat of enforcement is genuine enough to confer standing":  "(1) whether the plaintiffs have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) (internal quotation marks omitted).  In this case, while the final factor carries "little, if any weight" because the "challenged statute is new," *id.*, the other factors counsel against a finding of standing.  NSSF does not allege a "concrete plan to violate the law," and the Attorney General has not "threat[ened] to initiate proceedings."

24

might allege actual injury by, for example, pointing to changed business practices or lost profits because of a law banning their products. *See, e.g.*, *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013) (finding injury in fact where plaintiff "alleges an economic injury resulting from laws explicitly prohibiting [the manufacture of unlicensed firearms] that he would otherwise engage in"). Or they might allege imminent injury by, for example, intending to sell a product that is arguably banned and possibly face sanctions. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 194 (1976) (holding that vendor "independently" established "injury in fact" because she faced "direct economic injury through the [market] constriction" or, if she defied the law, "sanctions and perhaps loss of license" (internal quotation marks omitted)).

NSSF has made no such showing here. It concedes that its members have not changed their conduct or suffered any other actual injury. And NSSF's allegations and evidence do not support its broad assertion that H.B. 426 arguably "ban[s] the products they make and sell." Absent a cognizable injury, NSSF lacks pre-enforcement standing to challenge the reasonable precautions provision.

### 2.      The Reasonable Controls Provision

The reasonable controls provision requires industry members to implement procedures to prevent the improper diversion of firearms. *See* HRS §§ 134-102(b)(1), -101. For the same reasons that NSSF lacks standing to challenge the

reasonable precautions provision, it also lacks standing to challenge this requirement:  while NSSF has sufficiently alleged that its members engage in constitutionally affected conduct, it fails to demonstrate that its members' conduct is proscribed by this provision, and it does not allege a credible threat of enforcement.

In defense of its standing to challenge the reasonable controls requirement, NSSF advances two additional arguments.  First, NSSF points to enforcement actions in other jurisdictions.  *See* ECF No. 42, at PageID.576; ECF 13-2, at PageID.135 (¶ 18); ECF 13-3, at PageID.138 (¶ 18).  A case in New York, NSSF argues, is emblematic of "exactly the kinds of suits" that they fear Hawaii's Attorney General will bring under the reasonable controls provision.  ECF No. 42, at PageID.576 (citing Complaint, *City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 23-cv-00066 (W.D.N.Y. Jan. 23, 2023)).  But the enforcement decisions of a city in upstate New York under a New York law have little predictive value for whether or how the Attorney General of Hawaiʻi will enforce H.B. 426.

NSSF next claims that the "breadth" of the reasonable controls provision means that its members "face a very real threat of being sued simply for their lawful commerce."  ECF No. 42, at PageID.576; ECF No. 13-1, at PageID.119 ("That unbounded reasonableness regime leaves NSSF's members guessing what judges and juries will deem insufficient."); ECF No. 13-2, at PageID.133 (¶ 11)

(stating that manufacturer is "unable to determine what will be deemed 'reasonable controls'"); ECF No. 13-3, at PageID.137 (¶ 11) (same).

It is true that, in some cases, a plaintiff's uncertainties about the reach of a law may be sufficient to establish standing.  For example, in *Isaacson v. Mayes*, physicians, medical associations, and advocacy groups challenged a law that criminalized abortions solely based on genetic abnormalities.  *See* 84 F.4th 1089, 1094 (9th Cir. 2023).  The physicians alleged that they previously performed abortions for "patients with likely or confirmed fetal conditions" but, since the law's passage, they "stay[ed] away from those abortions entirely, because it [was] unclear what conduct f[ell] within the law's grasp."  *Id.* at 1095 (internal quotation marks omitted).  Because the physicians "declared an intention to perform abortions up to the legal limits," and because "many abortions they would otherwise perform could be deemed violations of the statute," the Ninth Circuit held that they had standing.  *Id.* at 1099.

It is also true that NSSF identifies a clause in the reasonable controls provision that could arguably have resulted in standing for reasons similar to those in *Isaacson*.  NSSF notes that under H.B. 426, reasonable controls must aim to avoid diversion to any individual whom the firearm industry member "has reasonable cause to believe is at substantial risk of" (1) "using a firearm-related product to harm themselves or another" or (2) "possessing or using a firearm-

27

related product unlawfully."  HRS § 134-101.  And as NSSF observes, if the statutory phrase "to harm . . . another" were to cover *lawful* self-defense, then the provision arguably would apply to many (if not most) firearms that are sold.  *See* ECF No. 1, at PageID.16 (¶ 33).  And because the Attorney General does not appear to dispute that at least *some* firearms manufactured by NSSF's members are distributed in Hawaiʻi, a broad interpretation of this provision could well have supplied NSSF's members with a sufficient personal stake for bringing a pre-enforcement challenge.

In the end, however, the Attorney General made a key concession that has persuaded the Court to find that standing is lacking here.  As noted above, at the hearing on NSSF's motion, the Attorney General committed to interpreting the phrase "to harm . . . another" as excluding lawful self-defense and as referring only to unlawful harm.  The Attorney General also disavowed any future enforcement action based on a broader interpretation of "to harm . . . another" that would implicate lawful self-defense.  This disavowal was more than a "mere litigation position" of the sort that would not count in the standing inquiry.  *Lopez*, 630 F.3d at 788 (citing *Thornburgh*, 970 F.2d at 508).  That is, the Attorney General's disavowal here bears no resemblance to the one in *Thornburgh*, where charges under challenged provisions "were dropped, not because they were considered inapplicable, but for tactical reasons," 970 F.2d at 508, and where "the government

28

could easily reinstate those charges and was bringing similar charges against other[s]," *Lopez*, 630 F.3d at 788.  Here, the Attorney General has committed to this narrower view of the law as a general matter, and there is nothing to indicate—for example, other enforcement actions or conduct—that the Attorney General will not abide by her word in all cases.[11]  And given the Attorney General's disavowal, the Court cannot find that there is a credible threat that any NSSF member will face an enforcement action merely for failing to implement reasonable controls to avoid selling firearms to individuals likely to use those firearms for lawful self-defense.

Apart from its forceful argument about the phrase "to harm . . . another," NSSF has not offered any persuasive argument that any other conduct of its members would arguably be proscribed as a failure to adopt reasonable controls. NSSF offers no evidence about the steps that its members do or do not take to prevent the diversion of firearms.  Nor has it alleged what its members intend to do in the future.  *See also NSSF v. Bonta*, 2024 WL 710892, at *5 ("[I]t's uncertain whether plaintiff's members will disobey the 'reasonable controls' mandate—far too uncertain to meet Article III's high bar for pre-enforcement review.").  NSSF has only asserted that "there is no way" for manufacturers "to eliminate the

---

[11]     The same is true for the other disavowals the Attorney General has made, which are documented throughout this Order.

potential for liability under HB 426 other than shutting down operations entirely." ECF No. 13-3, at PageID.138 (¶ 14); *see also id.* (¶ 17) (contending that because H.B. 426's "standards are vague and unattainable," manufacturers "will continually be at risk of litigation"). But these sorts of conclusory assertions do not satisfy the standard for pre-enforcement standing. *See Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210-11 (9th Cir. 2022) (holding that, despite assertion of "potential[] ruin[]" under a new policy, plaintiffs' complaint "utterly lacks, let alone states with some degree of concrete detail, an allegation that plaintiffs intend to violate" the policy (internal quotation marks omitted)).

In any case, H.B. 426 does provide some guidance on what constitutes a reasonable control. Section 134-101 explains that reasonable controls should prevent straw purchases, the theft and loss of firearms, and violations of other state and federal laws. And the Attorney General offers an expert declaration that lists examples of reasonable controls, like using secure carriers and discrete shipment labels, training employees on how to detect straw purchase schemes, and implementing strict record-keeping processes to track inventory. *See* ECF No. 38-1, at PageID.324-29 (¶¶ 31-43).

By declining to engage with these examples, NSSF "says little about what it plans to do." *NSSF v. Att'y Gen. of N.J.*, 80 F.4th 215, 220 (3d Cir. 2023). Without sufficient allegations and evidence, this Court cannot assess whether the

conduct of NSSF's members might be proscribed by the reasonable controls

provision.  NSSF has therefore not met its burden of establishing standing to

challenge this rule.

### 3.        The Marketing Provisions

NSSF's final challenge is to H.B. 426's marketing provisions.  Together,

these provisions prohibit (1) marketing unlawful firearm-related products, HRS

§§ 134-101, -102(b)(3); (2) marketing that promotes the conversion of lawful

firearm products into unlawful products, *id.* § 134-102(d)(2); and (3) marketing

that is "targeted at minors or other individuals who are legally prohibited from

accessing firearms," *id.* § 134-102(d)(3).  NSSF most vigorously challenges the

marketing-to-minors provision found in the last of these three.[12]

That provision, NSSF contends, violates the First Amendment.  In particular,

NSSF argues that the marketing-to-minors provision squarely violates the Ninth

Circuit's decision in *Junior Sports Magazines Inc. v. Bonta*, which held

unconstitutional a statute barring a firearm industry member from "market[ing] . . .

any firearm-related product in a manner that . . . reasonably appears to be attractive

---

[12]      In passing, NSSF challenges the other marketing provisions on First
Amendment grounds.  *See, e.g.*, ECF No. 13-1, at PageID.127-28.  NSSF's
allegations and evidence, however, do not demonstrate that its members are at risk
of imminent enforcement of these provisions.  With the exception of youth-model
firearms, NSSF has not alleged that its members are selling, let alone marketing,
prohibited firearms that somehow end up in Hawaiʻi.  *See* HRS §§ 134-
101, -102(b)(3), -102(d)(2).

31

to minors." 80 F.4th 1109, 1114 (9th Cir. 2023) (quoting Cal. Bus. & Prof. Code § 22949.80(a)(1)).

Before evaluating the merits of this argument, the Court must again assess whether NSSF has standing to challenge the marketing-to-minors provision. As a background rule, the standard for pre-enforcement standing relaxes where the First Amendment is implicated. *See LSO*, 205 F.3d at 1155. In this context, "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (internal quotation marks omitted). For that reason, plaintiffs "need only demonstrate that a threat of potential enforcement will cause [them] to self-censor." *Id.* at 1068 (internal quotation marks omitted). Accordingly, NSSF's challenge to H.B. 426's marketing-to-minors provision faces the lowest standing hurdle.

NSSF has adequately alleged that its members engage in constitutionally affected conduct, satisfying the first prong of the pre-enforcement standing inquiry. One of NSSF's three declarations alleges that Henry Repeating Arms "manufactures, markets, and sells long guns specifically designed for use by minors." ECF No. 56-1, at PageID.665 (¶ 13).[13] This includes the Henry Mini Bolt Youth model, a firearm "market[ed] as the perfect rifle for introducing

---

[13]     As noted earlier, NSSF's two other declarations (for Smith & Wesson and Ruger) allege that they manufacture youth firearms. Those declarations do not, however, allege that they market them.

youngsters to shooting and hunting," and the Henry Lever Action .22 Youth model, "a lightweight and compact version of [the] Henry Lever Action rifle, . . . marketed as ideal for young shooters." *Id.* at PageID.666 (¶¶ 14-15) (internal quotation marks omitted).  Henry Repeating Arms expresses no intention of stopping these marketing efforts.  Because marketing is "a form of expression protected by . . . the First Amendment," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011), NSSF has sufficiently alleged that at least one of its members will engage in future conduct affected with a constitutional interest.

    NSSF has not shown, however, that Henry Repeating Arms's marketing activities are arguably proscribed by the marketing-to-minors provision.  Among other things, that provision deems a "firearm-related product" presumptively abnormally dangerous—thereby triggering the reasonable precautions requirement, *see* HRS § 134-102(b)(2)—if it is "marketed in a manner that is targeted at minors." *Id.* § 134-102(d)(3).  Henry Repeating Arms claims that it does not "market any of its firearms to minors."  ECF No. 56-1, at PageID.667 (¶ 17).  Instead, the declaration alleges, Henry Repeating Arms "market[s] to adults," who in turn can "pass on the American shooting sports tradition to the youth." *Id.*  So by its own admission, Henry Repeating Arms seems to imply that the marketing-to-minors provision should not apply.

33

That alone does not defeat standing; to have an injury in fact, a plaintiff need not concede that they are violating a challenged law, but rather need only show that their conduct is *arguably* proscribed. *See Peace Ranch*, 93 F.4th at 489. Here, it is arguable that a firearm marketed as "the perfect rifle for introducing youngsters to shooting and hunting," ECF 56-1, at PageID.666 (¶ 14), is also "marketed in a manner that is targeted at minors," HRS § 134-102(d)(3).[14]

But H.B. 426 does not reach all marketing to minors. Like the other provisions of H.B. 426, the marketing-to-minors provision applies only to marketing done in connection with "firearm-related product[s]." *Id.* § 134-102(d)(3). And again, a firearm is only a "firearm-related product" for purposes of H.B. 426 if it has a nexus to Hawaiʻi. *Id.* § 134-101. NSSF does not allege or offer evidence to suggest that Henry Repeating Arms sells youth-model firearms in Hawaiʻi, that it intends to sell youth-model firearms in Hawaiʻi, or that it is reasonably foreseeable that its youth-model firearms will be possessed in Hawaiʻi.

---

[14] Technically, the fact that a firearm is "marketed in a manner that is targeted at minors" simply means that that firearm is presumptively "abnormally dangerous." HRS § 134-102(d). For liability to attach, H.B. 426 requires the industry member to have failed to "[t]ake reasonable precautions" to not sell those "abnormally dangerous" firearms. *Id.* § 134-102(b)(2). But if Henry Repeating Arms is actively and intentionally marketing a firearm that is considered abnormally dangerous—say, the Henry Mini Bolt Youth model—it is at least arguable, for purposes of standing, that Henry Repeating Arms is not "[t]ak[ing] reasonable precautions" to not sell that firearm.

Absent these allegations, NSSF cannot establish that the marketing-to-minors provision arguably proscribes Henry Repeating Arms's marketing activities.

Even under the relaxed standing analysis for First Amendment pre-enforcement challenges, NSSF has not met its burden. Henry Repeating Arms does not claim that this provision has "chilled [its] speech," caused it to "self-censor," or otherwise required a change to its conduct. *Tingley*, 47 F.4th at 1069.

In any event, NSSF cannot demonstrate a substantial threat of enforcement. As stated in her opposition brief and confirmed at the hearing, the Attorney General has disavowed "enforcement action premised solely on marketing lawful firearms to minors" under HRS § 134-102(d)(3), given the Ninth Circuit's decision in *Junior Sports*. *See* ECF No. 38, at PageID.294 n.17. The Attorney General also confirmed at the hearing that even if the Supreme Court were to grant certiorari to review *Junior Sports*, she would not consider bringing an enforcement action unless and until the Supreme Court issued a decision reversing the Ninth Circuit. In light of these concessions, none of NSSF's members face any imminent risk of enforcement by the Hawaiʻi Attorney General under the marketing-to-minors provision. NSSF therefore lacks standing.

## **<u>CONCLUSION</u>**

At this preliminary stage, the allegations and evidence presented do not show that NSSF or its members have a sufficient "personal stake" in the outcome of this lawsuit to justify a court's intervention. *Baker*, 369 U.S. at 204.

That is not to say that H.B. 426 is forever shielded from pre-enforcement challenge. *See Peach Ranch*, 93 F.4th at 489 ("[N]o law is practically unchallengeable."). One can imagine allegations that nudge closer to a showing of standing—for example, allegations that identify specific models of firearms that are arguably proscribed by H.B. 426, that provide a basis for concluding that those arguably proscribed models reasonably foreseeably end up in Hawaiʻi, and that identify precautions that were not taken to avoid that result. Or allegations of specific controls that a manufacturer or retailer does not employ but which arguably are required as "reasonable controls" under H.B. 426.

But NSSF's allegations and evidence at this preliminary injunction stage do not make showings of that sort. Under the allegations and evidence before the Court at this juncture, NSSF has not met its burden of establishing standing. For that reason, the motion for preliminary injunction is DENIED.

Finally, because the Court cannot reach the merits of any of NSSF's claims, the motion for leave to file an *amici curiae* brief—which addresses the merits of one of those claims—is DENIED as moot.

36

IT IS SO ORDERED.

DATED:  April 19, 2024, at Honolulu, Hawai'i.



Micah W.J. Smith
United States District Judge

Civil No. 23-00287 MWJS-RT; *National Shooting Sports Foundation v. Anne E. Lopez*; ORDER
DENYING MOTION FOR PRELIMINARY INJUNCTION

37